Received

FEB 27 2019

Campiche Arnold, PLLC

Case No. 2: 18-CV-00055-TSZ

Le v. King County

Date of Incident: June 13, 2017

---

CASE REVIEW & ANALYSIS

EXPERT OPINION

---

Prepared by: James W. Borden

February 26, 2019

---

**PLTF EXHIBIT B**

Kathy Van Olst, Dan Kinerk
King County Prosecutor's Office
900 King County Administration Building
500 Fourth Avenue
Seattle, WA 98104


Dear Kathy and Dan:

Thank you for the kind invitation and opportunity to review this case and provide an objective opinion.

This review of incident Case No. 2: 18-CV-00055-TSZ, a use of force incident, entails an analysis of the incident with a focus on human factors through statements from the involved Deputies, Witnesses, department policy and SOP's, including a review of the tactics, mind-set, thought processes, conditions and the environment that the Deputies were faced with during this event.

All information found in this report is gleaned from statements, either written or transcribed for the purposes of this report, or gleaned from video or audio footage that exists, and/or information supplied to me by your office. All documents, videos or any other relative information that has been used for the purpose of this report is listed on the attachment "Items received."

After you have reviewed this report, please do not hesitate to contact me with any questions or concerns you may have.

**PLTF EXHIBIT B**

PERSONAL REPRESENTATIVE OF THE ESTATE OF

TOMMY LE

v.

MARTIN LUTHER KING JR. COUNTY as sub-division of the STATE of
WASHINGTON, and KING COUNTY DEPUTY SHERIFF CESAR MOLINA.

**Expert Jamie Borden**

**Our File No.:   2: 18-CV-00055-TSZ**

**Date of Incident:   June 14, 2016**

**Trial Date: June 10, 2019**

Expert Report of James Borden

Name of Expert: JAMES W. BORDEN

Area of Expertise: Law Enforcement Procedure and Law Enforcement Training &
associated Human Performance and Factors, Police Use-of-force, Video Analysis
related to use of force and police related contact

Case Type: CIVIL

Jurisdiction: US District Court, Western District of Washington at Seattle

Expert Witness testifying on behalf of Defendant

PLTF EXHIBIT B

| Page | Subject | Section |
|------|---------|---------|
| 5 | Qualifications | 01-14 |
| 9 | Executive Summary of Opinions | 15-25 |
| 13 | Important Terms | 26-30 |
| 15 | Methodology | 31-32 |
| 16 | Summary of Facts | 33-60 |
| 28 | Human Performance/Police Training/Police Practice | 59-85 |
|  | • Perceptual Issues | 60-63 |
|  | • Visual Issues | 64-71 |
|  | • Relevant news stories | 71-73 |
|  | • Movement Dynamics | 72 |
|  | • Related Inconsistencies | 73 |
|  | • Focus of Attention | 74-76 |
|  | • Shell Casing Study | 77-79 |
|  | • Movement and Time Compression | 80-83 |
| 40 | Analysis Related to Opinions | 84-88 |
|  | • Movement Time Study | 89-104 |
| 50 | Opinions | 102-113 |
| 57 | Summary of Opinions | 114-115 |
| 57 | Basis for Opinions | 116-117 |
| 58 | Conclusion | 118-120 |
| 61 | Works Cited | --------- |
|  | • Attachments | --------- |
| 63 | o Documents received and reviewed | --------- |
| 79 | o Visual Focus Example | --------- |

PLTF EXHIBIT B

**Qualifications**

1.      My name is James (Jamie) Borden. I have been a peace Officer since 1997, and I am actively involved in the review and training of police practices and law enforcement policies. As of July 20, 2018, I have retired from the Henderson Police Department (HPD) where I was a Sergeant over the Use-of-Force Training and Analysis Unit, as well as a Sergeant over the HPD Training Section. I was instrumental in the development and operation of the Use-of-Force Training and Analysis Unit, and have established the Use-of-Force Training and Analysis Unit as a single point of contact for HPD in use-of-force and critical incidents involving HPD Deputies, for the purpose of investigation, review and analysis.

2.      I was also one of two full-time Use-of-Force Instructors for HPD, and, as such, I was responsible for all in-service Use-of-Force training, and associated training, for police Deputies, corrections Deputies, and HPD's Citizens' Academy. In addition, I was the primary Use-of-Force Instructor for the Southern Desert Regional Police Academy (S.D.R.P.A.), a multi-jurisdictional academy in Clark County, which is a Nevada Police Deputies Standards of Training (P.O.S.T.) certified entity.

3.      I was involved in all management and oversight of Use-of-Force for HPD, including, but not limited to, identification of trends in use-of-force in HPD, statistical analysis of use-of-force through HPD's reporting and accountability software, and reporting to the Commission on Accreditation for Law Enforcement Agencies (C.A.L.E.A.) with respect to HPD use-of-force incidents.

**PLTF EXHIBIT B**

4.      My training, experience, lesson plan development, instruction and lecturing on the subject of use-of-force and seizure of persons is derived from case law from the Nevada Revised Statutes (NRS), the Ninth Circuit Court of Appeals and the United States Supreme Court regarding use-of-force, with perpetual study and review of all related case law decisions.

5.      In 2012, I received the Force Science Analyst Certification from the Force Science Institute, which is the leading law enforcement research institute on studying the science of human dynamics behind use-of-force encounters. In 2013, I was chosen to pilot the Advanced Force Science Analyst course with the Force Science Institute and Dr. William Lewinski. In August of 2013, after a 400-hour focused study in human factors and human behavioral science, I received the first Advanced Force Science Analyst Certification internationally.

6.      In 2013, I joined the staff at the Force Science Institute as an instructor. I give lectures and instruction in the field of human performance, and the associated human factors, as they relate to police training and police procedure. Since 2013, I have been instructing and lecturing on scientific studies conducted by the Force Science Institute and other on human factors and human behaviors as those elements apply to Deputies involved in critical use-of-force incidents. I am currently a Force Science staff instructor for the five-day Force Science Analyst Certification, the two-day focused course of instruction, the four-hour modified Introduction to Force Science classes. I have also co-developed the "Realities of De-escalation" class as well as developed the 5 day Advanced Specialist Investigators course of instruction with the Force Science Institute. I have co-developed the "Body Cam" class with Dr. William Lewinski, and I have also been

PLTF EXHIBIT B

directly involved in studies conducted by the Force Science Institute as a test subject and as a consultant, including gathering empirical data for use in peer reviewed journal articles. I am also currently an assistant instructor in forensic video investigations in the U.S. and Canada

7.     From 2012 up to my retirement in 2018, I was responsible for the review, analysis and consultation of use-of-force reporting for members of HPD, including police Deputies and corrections Deputies, as the former Sergeant over the Use-of-Force Training and Analysis Unit.

8.     I have extensive experience with HPD in police patrol and as a training Officer and instructor. I am also a certified Taser Instructor, Defensive Tactics instructor, Baton instructor, and a Firearms Instructor and Range Master in the capacity of Sergeant over the training facility for the Henderson Police Department.

9.     I have been in the following specialized assignments for HPD: Field Training Officer, The Training Bureau, Narcotics Division, and, as Sergeant, and developer of  the Use-of-Force Training and Analysis Unit. I have an in-depth background in analysis of human factors, human behavior, and human performance related to law enforcement including, but not limited to, investigating, reviewing and analyzing officer involved shootings and critical incidents through video analysis, as well as on scene investigation. My training and background have given me first-hand knowledge, application experience, and the objective basis to review peace officers actions and the time compressed decisions involved in the use of non-deadly and deadly force.

**PLTF EXHIBIT B**

10.     I was responsible for periodic reviews and updates of HPD's Use-of-Force Policy, as well as related policies connected to use-of-force and associated police procedures.

11.     Since 2013, I have instructed and/or lectured on Use-of-Force and human factors nationwide, including the FBI Academy Associates, Law Enforcement Executive Development seminars (LEEDS) and multiple jurisdictions nationwide including state police, municipalities, sheriff's departments and attorneys.

12.     I am currently a member of the HFES (Human Factors and Ergonomics Society) as a professional working in the capacity of Senior Instructor for the Force Science Institute, lecturing on the application of the scientific study of human performance and decision making related to law enforcement.  I have been accepted in court Federally and at the State level as an expert in the application of scientific research regarding human behavior, as it relates to law enforcement training, Use-of-Force, general police practices and forensic video investigation and examination related to police use of force.

13.     I have works published in the Las Vegas Police Protective Association's Magazine, "Vegas Beat," and have published an article titled "Policy Matters" in May 2016 with the Daigle Law Group (DLG) (see http://digital.911media.com/i/678564-may-june-2016). There is a complete list of my publications, lectures and instruction on my Curriculum Vitae, as well as previous and current cases I am involved in as an expert or consultant.

**PLTF EXHIBIT B**

14.    Note: Any fact summary is provided for convenience and does not necessarily itemize every single fact relied upon by this expert in the formation of my opinions-conclusions in this matter: it is based upon my review of the aforementioned records-materials. I do not contend to have direct personal knowledge of the incident facts.

**Executive Summary of Opinions**

15.    Based upon the totality of circumstances described herein, Deputy Molina's decision to use his firearm, in efforts to stop the deadly threat posed by Tommy Le ("Le") toward Deputies in this case was appropriate and within the parameters of training. Deputy Molina's use of his firearm was in accordance with generally recognized police training standards and department training, as well as within the General Order Manual parameters, based upon the distinctive circumstances experienced by Deputies in this incident.

16.    Based upon empirical data in human movement studies related to the time required to move (act), and the interactive time to respond (react), and considering the distances enmeshed, it is my opinion that Deputy Molina acted appropriately under the totality of circumstances. Deputy Molina acted quickly under the compression of time in order to defend himself and others in a highly critical incident with Le, who was an unpredictable, violent and non-compliant subject.

17.    Deputy Molina and Deputy Owens initially attempted to use a lesser level of force by first giving lawful verbal commands, and subsequently deploying

**PLTF EXHIBIT B**

ECW's (Tasers) in an effort to stop Le's forward attack toward Deputies.  It is my opinion that Deputy Molina would not have had adequate time to consider other tactics, or create enough distance to safely use another less than lethal force option, in consideration of all of the facts surrounding this incident. Additionally, in light of the information known to the officers at the time, I am of the opinion that attempts to use lesser levels of force shows an extreme and dangerous commitment to preserve another life above their own, on the mere possibility that the subject was mentally ill, or under the influence of illicit narcotics (LSD).

18.     With respect to human performance issues, based upon the facts of this case, including Deputy Molina's statements, the statements of others and available evidence, Deputy Molina would have had no time to reassess the rapidly evolving circumstances that the Deputies were faced with. This time compression prevented Deputy Molina from safely making an alternative decision, developing an alternative plan, or employing alternative tactics during the fractions of a second that the deadly threat was perceived.  Based upon statements and the factors that Deputy Molina faced in this situation, it is my opinion that Deputy Molina made an appropriate decision based upon training, policy and General Orders Manual ("GOM") section 6.00.00, Use of Force, in using deadly force in order to stop the perceived deadly threat posed by Le.

19.     Notably, an edged weapon is considered a deadly threat, and, upon initial contact, Le advanced towards Deputies with an implement the Deputies believed to be a knife or a sharp object, which was later described as "a pointy

**PLTF EXHIBIT B**

object" by Deputies.  This perceived deadly threat posed by Le toward Deputies forced Deputy Molina to respond with deadly force.

20.     Those involved and those witnessing the incident stated that Le was displaying agitated, non-compliant and violent behavior towards the Deputies. It is my opinion that these factors created a scenario where the use of any potential alternate tactics by Deputy Molina would have been incumbent upon Le's actions and compliance from Le, which did not happen.

21.     It is my opinion that the number of rounds fired by Deputy Molina at Le during the perceived deadly attack by Le is consistent with human performance issues related to the time required to; 1) perceive, react and respond to a deadly threat; 2) the time to start shooting as a response subsequent to perception and reaction; and 3) the time to stop shooting when Deputy Molina perceived a change in the actions of Le.

22.     Finally, the theory of "consequentialism" requires consideration in this event, i.e., noting that the involved Deputies had no way of knowing the future or the outcome of this event based upon the unknown elements unfolding during the incident.  It is forbidden to use 20/20 vision of hindsight in cases of this nature, as set forth in the SCOTUS decision in (Graham v. Connor, 490 U.S. 386 (1989)). This particular case law is reflected in the GOM and quoted in department training and not being referred to as an application of law. However, I do refer to governing case law in the analysis of the information gleaned from the full investigation.

**PLTF EXHIBIT B**

23.    The mention of the subject (Le) potentially being mentally ill, in mental crisis, or otherwise mentally incapacitated, has no bearing on the opinions in this report.  In these rapidly evolving scenarios, diagnosis of any particular ailment is not relevant to the split-second judgement that Deputies were faced with in this particular case.  Had initial attempts at using lesser levels of force, i.e., verbal commands, and use of the Taser been successful, other tactics and protocols could have been implemented in consideration of any mental incapacities and/or any other potential medical emergencies.

24.    Deputy Molina took a position at the rear of the patrol vehicles, in the intersection as the other Deputies on scene were gathering information from civilian witnesses and victims. Deputy Molina was "standing off" for officer safety purposes, because Deputies did not know where Le was at that time, and, were not actively seeking Le at the time of the encounter.  This is important because; the Deputies were gathering information about the incident and had no plans to approach Le at that moment. When Le appeared, Deputies were making decisions solely in reaction to Le's actions.  Le's mental status was also unknown at the time of first contact. A mere possibility that an individual may be mentally unstable does not change the Deputies immediate need to stop Le's violent behavior toward Deputies and the community.  In other words, time and circumstances did not allow any other tactic in this incident.  This is mentioned in the GOM under De-escalation.   Further, the facts in this case establish that Le approached Deputies at the intersection.

25.    Section Conclusion. Considering the totality of facts and circumstances from the perspective of the Deputies involved, and with careful balancing of all

PLTF EXHIBIT B

identifiable principles, it is my opinion that; 1) Deputy Molina was making decisions with only the information available to him at the time the incident; 2), The incident quickly developed, in real time, with deputies having no knowledge of the intentions of Le or the future outcome or results in this incident. Deputy Molina's decisions were appropriate, in defense of himself, other deputies and nearby citizens, under the extreme compression of time.

**Important terms**

26.   **Time Compression**. Refers to any phenomenon that alters the qualities of and relationship between space and time, i.e., the threatening actions of a person towards another person that diminishes the meaning of distance in relationship to the ability to respond in a timely fashion in order to defend against the threatening action (also referred to as "action v. reaction").

27.   **Consequentialism**.  In knowing how this incident ended, scrutiny of the Deputy's actions is potentially judged on this "end" knowledge, which is gained only in hindsight after reading reports, reviewing documents and analyzing any available video or audio recordings. Here, Deputy Molina did not have prescient knowledge of how this incident was going to end and, as a result, the decisions that were being made by Deputy Molina were made based upon information that was available to him at the moment of the use-of-force. It was impossible for Deputy Molina to know what the outcome of Le's actions would have been, or what Le's actual intentions were, as this event was initiated by Le and was unfolding prior to Deputy Molina being able to act. In some cases, scrutiny is based upon knowledge only known after the fact, i.e.,

PLTF EXHIBIT B

hindsight.  Here, the decisions being made by Deputy Molina were being driven by the actions of Le at the time of the incident. Hindsight knowledge and information known today was not available to Deputy Molina when he was faced with Le's actions during the incident. Therefore, any scrutiny of Deputy Molina's decisions, actions and tactics must be done without the benefit of 20/20 vision of hindsight (Graham v. Connor, 490 U.S. 386 (1989)).

28.     Regardless of what other tactics may or may not have existed, and based on the dynamics of human interaction as established in this incident, i.e., decision-making, and action versus reaction time frames, there was no time for Deputy Molina to safely analyze and compare potential options when faced with what was perceived as a deadly threat by Le that was occurring rapidly.  Deputy Molina's perception that Le's actions were a deadly threat were incidental only to Le's actions.

29.     **Focus of Attention**. Attention is the behavioral and cognitive process of selectively concentrating on a discrete aspect of information, which can be either subjective or objective, while unable to attend to other perceivable information. It is the taking possession by the mind, in clear and vivid form, of one object out of what seems to be several simultaneous objects or trains of thought. Focalization and concentration of consciousness are at the core of what constitutes "attention."  Attention has also been referred to as the allocation of limited processing resources. (Anderson, 2005).

30.     **Threat Cues**. The identification of threat cues is imperative in order for a Deputy to respond quickly and appropriately in rapidly evolving, highly critical

PLTF EXHIBIT B

scenarios such as this one. However, a Deputy cannot predict a non-compliant resistive, aggressive, combative and/or violent subject's action with 100% accuracy based on the theory of consequentialism. Considering this, a Deputy is not expected to allow himself to be subjected to violent behavior prior to responding with some level of force, based on the suspect's apparent violent behavior in the moment force is used. In this incident, Le was disobeying commands and behaving in a perpetual state of non-compliance and violent manner toward Deputy Molina, who was acting in the course of his duties as a Deputy.  Subsequently, all decisions being made by Deputy Molina are driven by the context in which Deputy Molina is operating, i.e., a Deputy in the legal course of his duties.

31.    **Methodology**. - The facts stated in this expert report are significant to police procedures, police objectives, human performance factors, and the dynamics of action versus reaction in a time of crisis while facing an unpredictable threat. Also considered is decision-making in a highly critical setting, including the Deputies' mind set and perception of the involved subject's actions in a time compressed setting, where the decisions being made implicate the safety and survivability of the Deputies and others. These decisions include the recognition of the threat confronting the Deputies in real time as the Deputies attempted to de-escalate, stabilize, control and make safe an otherwise potentially violent and unsafe circumstance. The focus of this report is on police procedures and practices and the related human performance issues during the initial contact with the involved.

32. My opinions in a deadly use-of-force case are carefully and objectively considered on a case-by-case basis. The consideration of many principles must be weighed against the level of intrusion into a person's rights when use-of-force

**PLTF EXHIBIT B**

by the government is applied in a well-intentioned manner.  However, well
intentioned does not necessarily equate to necessary or reasonable force,
acceptable or un-acceptable force, by the standards set forth in training, policy,
and/or governing case law. I have identified the following principles for
consideration in this particular case.

- Training of the Deputies.
- Relative experience and tenure.
- Pre-existing information regarding the incident.
- Information learned on the scene as the Deputies and other peace officers
  arrived.
- Information and actions unfolding in real time.
- Overarching context in which the incident occurred.
- Efforts of the Deputies to use alternative methods of force prior to their use
  of deadly force.
- The time available for Deputies to assess and evaluate information during the
  incident.
- Human performance and human limitations the Deputies were faced with
  during the incident i.e., time, distance, speed and motion.
- Physical and forensic evidence available to support or refute statements,
  decisions and claims.
- Consistencies and inconsistencies in the statements and evidence.

**PLTF EXHIBIT B**

**Summary of Facts**

33.     This is a summary of facts upon which my opinions in this case are based. This summary is based upon statements, which are written, recorded and/or transcribed. All documents referred to in the "items received" section have been reviewed for relevancy to the issues addressed in this report. The facts stated in this summary are significant to decision-making in an action versus reaction setting, including mind-set and the Deputys' perception of the involved subject's actions, in a highly critical, time compressed setting, where the decisions being made could implicate serious injury, or life and death of the subject/suspect, Deputies and others. These decisions include the recognition of the threats confronting the Deputies or others in real time as perceived by the Deputy(s) in an attempt to stop the threat in this violent circumstance. The focus of this report is on issues of general police procedure related to timing issues in the use of deadly force, as well as associated action/reaction factors, i.e., human performance and decision making in a time compressed and critical incident. Also considered in this analysis are the detection of, and reaction threats perceived through visual, audible and other stimulus.

34.     Note: Any fact summary herein is provided for convenience and does not necessarily itemize all the facts relied upon by this expert in the formation of my opinions-conclusions in this matter, which is based upon my review of the aforementioned records-materials. I do not contend to have direct personal knowledge of the incident facts other than those learned from documents and materials, and the existing evidence.

**PLTF EXHIBIT B**

35.   **Initial facts and information**. Based upon review of the listed documentation, the following general information was determined about the incident that occurred on June 13, 2017.

**Relevant General Information.**

36.   The following sections outline Deputy Molina's observations as he arrived on the scene and was subsequently faced with a subject (Le) that had an object in his hand and was non-compliant and violently aggressive toward Deputies.

37.   Outlining this information can help in understanding how Deputy Molina was making decisions, what information was driving Deputy Molina's decision-making process under the compression of time, as well as the action/reaction component, during the perceived deadly attack posed by Le.

38.   **Pre-existing information.** This was not an anonymous call.  The quantity and quality of the information, as well as the nature of the original call to call takers, was considered real and actually happening (in progress).  The call caused no concern amongst experienced call takers, dispatchers or officers that this was a false report of unknown trouble and a violent crime in progress. Further, this type of call, albeit infrequent, is not abnormal and such incidents pose very real threats to officers and the community.   In the call details, prior to

PLTF EXHIBIT B

the officer involved shooting ("OIS"), information was relayed to the officers on scene that the suspect (Le) had physically assaulted members of the community, attacking and attempting to stab at least one subject, and then chased another citizen.  Le was reported as hitting or "stabbing" the door of one citizen, who fired his legally concealed firearm once as a warning shot in an effort to stop Le, which was ineffective.  Le reportedly fled this scene with a knife in his possession as described by the victim.  Although one of the callers stated that it may not have been a knife, the caller stated that Le may have been carrying a large tool, screwdriver, or something "pointy."  Additionally, one caller described Le as possibly mentally ill (220).  This summarizes the information learned pre-event by the Deputies responding to the area, including Deputy Molina.  This information is considered an integral part of the totality of the circumstances that was known or should have been known to the responding Deputies.

39.    **Initial Response** - Deputy Molina stated that he responded to the 13600 block of 3rd Ave. S., in Burien, King County, WA, reference a 911 call.  Upon arrival, Deputy Molina was faced with a dynamic and confusing scene, with multiple individuals, wherein there was a subject, later identified as Le, reportedly had a knife, another subject reportedly had a firearm, and a shot had already been fired.  Although there was conflicting information that Le may not have had a knife, the witness who reported this stated that the subject had a "Knife," while another witness stated it may have been something other than a knife, described as a "pointy" object and was wielding it as a weapon.  This is important because officers were getting conflicting information from witnesses.  However, it does not

**PLTF EXHIBIT B**

have to be a conventional and easily recognizable weapon to cause death or substantial bodily harm.

40.     **Arrival** – Based upon information provided by the Sheriff's Department, three Deputies arrived on scene at nearly the same time: Deputy Paul and Deputy Owens were the first two Deputies to arrive. Based upon Deputy Molina's statement, Deputy Molina was the third Deputy on the scene.  Once Deputies arrived on scene, there were several people in a yard and in the street, all of them considered an unknown threat in a highly critical call for service, due to the fact that a shot had been fired.  Deputies Paul and Owens controlled the three individuals that were at the scene, considering the information received of a shot being fired.  Deputy Owens and Deputy Paul began to receive information from the witnesses and victims regarding the attacks and the shot fired by the citizen. During the time that Deputies were arriving on scene, additional information was being dispatched regarding the incident.  At this point, Le had not yet been identified or located.  However, Deputies confirmed all of the dispatched information by speaking to the victims and witnesses on scene who had been in close proximity to Le, or actually assaulted by Le.

41.     *RADIO DISPATCH OPERATOR: (Inaudible) South 136th Street, Third Avenue South, we have a male on a cell phone, said a subject just came after him with a knife and is currently northbound on Third Avenue. The subject is Asian male5'10", black shirt, black shorts, and is barefoot, South 136th Street, Third Avenue South. The original caller that said he was chased with a knife is now saying that he doesn't know if it was a knife but it was an object that was pointed.*

PLTF EXHIBIT B

*might be 220 for all the other callers, as he's trying to tell us that he is the creator.*
(KC_DISC_0000042)

42.      *On 6-13-2017 at 11:59 p.m. the Comm. Center received a 911 call from*
*Rick Benjamin. Benjamin lives at 13611 3rd Ave. S in Burien. Benjamin told the*
*call receiver he'd heard a gunshot and that he could see four people standing*
*across the street from his residence. He said one of the persons, a male, was*
*carrying a handgun. He said he couldn't tell if anyone had been injured. Sheriff's*
*deputies were dispatched to investigate the incident at 12:01 a.m. on 6-14-2017. At*
*12:01 a.m. the Comm. Center received a 911 call from James Cradle, a resident at*
*13416 3rd Ave. S. Cradle said for the past 20 minutes he'd heard a male*
*screaming at the top of his lungs. He said the male was currently walking on 2nd*
*Ave. S, heading towards a nearby 7-11 store. At 12:02 a.m. the Comm. Center*
*received a 911 call from Kevin Hernandez, who lives at 13602 3rd Ave. S.*
*Hernandez said he was the person that fired the gunshot, stating that somebody*
*tried to attack him with a knife. Other 911 calls continued to come in with similar*
*information. Deputies began arriving in the area at 12:02 a.m. At 12:04 a.m.,*
*Deputy M. Paul, one of the deputies that had just arrived on scene, said over his*
*police radio that shots had been fired. He then said that "one down" and "need*
*aid." Further, he stated that the person who had been shot was an Asian male in*
*his 30's, that he'd been struck by gunfire three times, and that he was conscious*
*and semi-alert. Medics arrived and transported the male to Harborview Medical*
*Center (HMC). (KC_DISC_0000045)*

43.      **Suspect contact.**  Based upon statements by Deputy Molina, Deputy
Molina positioned himself behind police vehicles in an attempt to locate Le.  Le

**PLTF EXHIBIT B**

then appeared infront of Deputy Molina and Deputy Molina attempted to stop Le with verbal commands as Le was approaching Deputies and other citizens. At this moment, Deputies, including Deputy Molina, had knowledge that Le was the subject identified as being in possession of a knife and that he had already aggressively chased two citizens in the area.

44. **Distance from suspect at first contact.** Deputy Molina initially contacted Le with a Taser as the force option. This was a conscious decision made by Deputy Molina despite the pre-existing knowledge that Le posed a potentially deadly threat to Deputies and citizens. That notwithstanding, Deputy Molina's choice in force options required him to be within effective Taser range in order to have any chance of successfully controlling Le. Importantly, the fact that Deputy Molina opted for a less than lethal use of force did not minimize the potential deadly threat posed by Le.

45. Witnesses stated the following just prior to contact with Le ; 1) Zachary Schwiethale stated; *we identified him, said that's the male with the knife, and uh, and then officers moved in on him.* (KC_DISC_0000671) 2) Lawrence Rice stated; *I hear Kevin yelling at the officers, "there he is, there he is", then I hear the officers hollerin at the guy and Kevin is yelling at the officers that be careful, he has a knife, he has a knife!* (KC_DISC_0000627) L. Rice stated that he did not see the knife or any object, and that he had an obstructed view of Le. In addition, although other witnesses did not comment on Le having a knife, these witnesses stated that they observed Le "charge" or "rush" the Deputies. The civilian witnesses closest to the incident at the time were Anthony Rice, Zachry Schwiethale, and Kevin Hernandez.

**PLTF EXHIBIT B**

46.     At the time Deputy Molina identified Le as the suspect, the victim and the other witnesses were positioned behind the Deputies as Le approached Deputy Molina with an object in his hand.  At this time, Deputy Molina began issuing verbal commands to Le.  Although the witness statements are inconsistent with respect to exactly what commands Deputy Molina gave to Le, witness statements confirm that verbal commands were being given to Le as he approached.  As Le approached, Kevin Hernandez stated; *A We all turned and said, Yo, that's him. Like, that's the guy. That's the guy who was just here. And they were like, Okay. And, you know, we're, like, Be careful. You know ,like, he had a -- he had a knife when he, he encountered us. And they're like, Okay*. (Dep. Kevin Hernandez, p. 58; line 9-16.)

47.     **Suspect's Actions -**   As Le was aggressing the Deputies, Deputy Molina began yelling verbal commands at Le while he (Deputy Molina) positioned himself in a tactical position in order to have a successful Taser deployment.  A successful Taser deployment required that Deputy Molina be within 15-21 feet of Le.   One of the first and primary assessments made by Deputy Molina was the fact that Le appeared agitated, and Le was not answering or responding to the verbal commands given by Deputy Molina.  Deputy Molina stated that he was maintaining a distance from Le of approximately 20-25 feet during the verbal commands, and that, at some point, Deputy Owens was a distance off to his left. Based upon Deputy Molina's recollection and as discussed in Deputy Molina's compelled statement, the following is an approximate diagram of the scene.

PLTF EXHIBIT B



48.     Le was not following Deputy Molina's verbal commands and, consequently, Deputy Molina deployed his Taser in an attempt to stop Le.   The Taser had no effect on Le.  Instead of stopping Le, Le began to run at Deputies. All witnesses in the vicinity stated in some fashion that Le was aggressively approaching the Deputies.  Deputy Owens stated Le was at a full sprint towards him and the other citizens.   Deputy Owens saw that Deputy Molina had his Taser out and subsequently drew his Taser.  At this time, based upon Deputy Molina's statements and under the compression of time, Deputy Molina transitioned from his Taser to his department issued hand gun.  This transition occurred quickly because of Le's aggressive, fast approach.  As a result, Deputy Molina had no opportunity to remove the spent cartridge from his Taser prior to holstering the Taser, which left potentially live wires and probes exposed.

49.     Holstering a Taser without removing a live cartridge is not necessarily a trained tactic.  However, in some instances like this one, it was absolutely

PLTF EXHIBIT B

necessary for Deputy Molina to secure the Taser despite the live cartridge in order for Deputy Molina to successfully transition to another force option under the distinct compression of time. Deputies must be in control of their weapons at all times, including Tasers, in order to prevent a scenario where the use of deadly force becomes immediately necessary, due to the negligent manipulation and securing of a weapon. However, training does not, and cannot, prepare a Deputy for every encounter. Accordingly, adjustments to training and tactics are often necessary and expected in highly critical incidents like this one. These adjustments are made in relation to the decision-making process, ability to focus attention, and ability to respond or react to a suspect's actions, which are all occurring very quickly. For these reasons, when an issue of fact is being determined in a critical and dynamic incident such as this, it is inaccurate to assume peace officers "never" do something that wasn't specifically trained.

50.     Deputy Owens observed that Le had an object in his hand. The position of the object is described by Deputy Owens as held in a closed fist. According to Deputy Owens, Le was also waving the object above his head in a position recognized by Deputy Owens, within the context of this incident, as an attack position. Deputy Owens described Le as running at a full sprint towards him, and Deputy Owens stated that he thought Le was going to stab him.

51.     While Deputy Molina transitioned to his hand gun, Deputy Owens stated that Le had closed the gap between him and Deputies to 5-7 feet from Deputy Owens. At this point, Deputy Owens deployed his Taser. As with Deputy Molina, the Taser deployment by Deputy Owens was unsuccessful. It was at that moment that Deputy Owens made the decision to transition to deadly force. According to

**PLTF EXHIBIT B**

Deputy Owens, while he was transitioning to his hand gun, Le charged forward, past Deputy Molina towards Deputy Owens and the other civilians standing nearby. Simultaneously, Deputy Molina began to fire his weapon.

52.     The intentions of Le were not known to the Deputies at this moment. However, based upon Le's aggressive behavior, and in the context of the other information known pre-event (see above), as well as the information assessed by Deputies as the contact with Le evolved, Deputies assumed the deadly attack was real and, in fact, progressing from an imminent deadly attack to an immediate deadly attack.

53.     It is important to note that, if Le had complied with Deputy Molina's verbal commands and other Deputies' verbal commands, or if Le had shown any signs of compliance, other de-escalation techniques or tactics may have been considered by Deputy Molina and Deputy Owens to stabilize the situation. However, in this case, Le not only failed to respond to lawful verbal commands by Deputies, he also initiated a forward advancing attack, forcing a reaction from Deputy Molina and Deputy Owens, both of whom decided to use deadly force to stop the potential deadly threat posed by Le.

54.     **Section Conclusion** - Deputies are not expected to retreat in the face of a potential deadly attack, specifically in an environment where other individuals may be in danger.  This detail, protection of others, is always a consideration based upon the actions of Le being perceived by Deputy Molina and Deputy Owens as an attack.

**PLTF EXHIBIT B**

55.     The seizure requirement under the Fourth Amendment is the prohibition of unreasonable searches and seizures (arrests) of any person, which is the constitutional provision at issue when law enforcement Deputies seize a person. *"The appropriateness of the type and level of force necessary to achieve a seizure is more often dictated by the actions of the person being seized, than by the Deputies doing the seizing... [and] can only be justified by the necessity to protect life." (Hall, 2014)*

56.     *(Graham v. Connor* (1989) 490 U.S. 386, 396-397.)  *Reasonableness includes "allowance for the fact that police Deputies are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." (Please note the General Order Manual cites language from this case law; Use-of-Force.)*  References to case law language in this report is associated not with application of the law from my perspective, however, it is referred to in this report as it relates to the above general order manual by which deputies are trained.

57.     *In* consideration of the term "consequentialism," there was no way for Deputy Molina or Deputy Owens to effectively or definitively identify the intentions of Le other than Le's actions up to the point that Le advanced towards Deputies. As the incident continued to rapidly unfold, Deputy Molina and Deputy Owens only had limited information available to them at the moment the perceived deadly attack began, including the probability that Le was going to continue his deadly attack, placing Deputy Molina, Deputy Owens, and civilians at potential risk of death or substantial bodily harm.  In this context, any reactions

PLTF EXHIBIT B

by Deputy Molina and Deputy Owens at this point were incumbent upon the actions of Le. From the statements made by Deputy Molina, these actions appear to be under the compression of time.

58.     Under the Fourth Amendment, police are "not required to use the least intrusive degree of force possible," but may use only such force as is objectively reasonable under the circumstances. The question here is, what was the stimulus for the decision to use force? Human performance elements must be considered as referenced in this report, and the Deputy's orientation can only be derived from the statements and all corroborative evidence associated with the occurrence. (MICA R. ENDSLEY).

59.     **Human Factors and Performance related to Law Enforcement Training and Standard Police Practice**. In every critical incident, there are factors related to human performance limitations in action versus reaction scenarios. At the time of the use-of-force where mechanical processes and actions by Le, as well as perceptions, decisions and responses by Deputy Molina and Deputy Owens are occurring, all under the compression of time, human performance factors and limitations are in play. In these moments, when decisions are being made, and reactions are occurring in response to Le's actions, it is important to remember that these elements regarding decisions take time and that these increments of time must be recognized and analyzed. In this incident, time compression plays a role in the decision-making process and is largely dependent on what information was being perceived by Deputy Molina during the incident.  In this case, it is not possible to accurately assume a particular focus of attention of any individual during the incident. However, Deputy Molina stated

PLTF EXHIBIT B

that he was afraid Le was going to kill or injure him, Deputy Owens, and the civilians that were present.

60.    **Perceptual Issues** – As an investigator it is significant to identify the relationship between "fact" and "truth" in terms of witnesses and involved accounts. More specifically, perception in highly critical incidents varies from one involved person to another.  These differences are based upon an individual's training (if any), experience (if any), and position within the incident, i.e., distance, visual angle, lighting. Another important aspect is consequences.  A witness that is viewing the event from a distance, without a full understanding of the interaction, a witness who is not faced with the consequences of a perceived life and death encounter, will have a very different perspective and a potentially contrasting witness statement.

61.    In an investigation or analysis of a dynamic and critical event, it cannot be assumed that issues can or should only be viewed in one particular light, manner or form.  For instance, in this incident, the "truth" as accepted by most of the witnesses, especially those witnesses with close proxemic interactions with Le, was that Le was wielding a knife or some sort of object that could cause death or serious bodily harm.  This is the "truth" from the perspective of those witnesses. Much of this perception comes from the context and the circumstances in which the information is being received.   The "fact," however, is that the object at the time of contact with Deputy Molina was a black ink pen.  Nevertheless, this "fact" is only made known after the incident has concluded.  Below is an excerpt from Zachry Schwiethale's statement.

PLTF EXHIBIT B

62.   *I, I can't and I actually, I hope I didn't over state this. I assumed it to be a knife. He was holding it in a way that looked like he was ready to stab. It looked sharp as if it was pointed. It looked sharp as if it was pointed. It looked like it was either a knife or it could have been a screw driver or something that was sh-sharp and pointy, uh...*( KC_DISC_0000672)

63.   Schwiethale's statement is an example that the visual process, in terms of perception, is dependent on a witness's ability to identify an object or an action within the evolving dynamic of contact.  In other words, this particular incident did not involve a static representation of any particular weapon, in a daylight setting, with time for Deputies or witnesses to fully evaluate the object in Le's hand, which was perceived as a potentially deadly weapon.

64.   **Visual Issue.**  One of the preeminent issues in this incident is the fact that Le did not have what most people would consider to be a deadly weapon at the time of the shooting.  The defining attributes to a perceived deadly weapon are primarily formed within the context in which the object is being presented or used.  The fact that the perceived implement is not a proper edged weapon (a knife), a gun or some other obvious deadly weapon, does not negate the fact that a subject with malevolent intentions *can* injure or kill someone with an implement that is not a knife, a gun or other obvious weapon.  Here, even a pen, such as the one Le was holding, can be used in a manner that could substantially harm or kill Deputies or other innocent bystanders.

65.   In addition, visual angle has a dramatic effect on a person's ability to determine the nature of any particular object.  The photographs below demonstrate that, even when examined statically, in daylight, without the

PLTF EXHIBIT B

compression of time, the angle of each implement makes it difficult to determine the specific type of object that is held.  All of the implements pictured below can cause death or serious bodily injury if that is what the offender chooses to do with the object.

66.    Here are some examples of visual angle:



•  a.                  b.                  c.                  d.

   e.                  f.                  g.                  h.

67.    In these examples, it is difficult to discern what each object is without having a distinct profile view of the object.  This is due to the visual angle the

PLTF EXHIBIT B

object is being viewed from, by the person trying to make the determinations. In this case, Le was wearing a black shirt, at night and was rushing toward Deputies with an object in his hand. The primary differences between the photos above and the incident herein are: 1) these photos were taken in the bright light of day and not in the darkness of night; 2) the use of flashlights by the Deputies; 3) the photos were taken at less than three feet distance whereas Deputies were approximately 20-25 feet away from Le; 4) there are no life or death consequences attached to examining the photos whereas Deputies were under a perceived deadly attack by Le; and 5) the final and most important aspect, these photos are completely static without any movement whatsoever whereas Deputies were faced with Le, a violent and aggressive individual, who they believed was trying to kill them with what they perceived to be a deadly weapon.

68.     In the incident, at one point, Deputy Molina was 20-25 feet away, in a dark environment with only street lighting.   Deputy Molina was not using a flashlight due to his use of the Taser, and his quick transition from his Taser to his firearm. As described by Deputy Molina in his deposition transcript, there was no time for Deputy Molina to retrieve and operate his flashlight, let alone enough time for him to utilize the light on his duty weapon.

69.     With relevance to the determination of whether or not Le is brandishing a weapon in hand, verses an unknown object, viewed as benign, by those who may not have the training or experience in dealing with a subject with malevolent intentions; peace officers do not have the time to consider all the potential variations of knives or other potentially deadly weapons. Simply put, not all edged weapons are silver. Knives come in a variety of colors shapes and sizes,

**PLTF EXHIBIT B**

including black.  Further, the implement could be one of many different types of potential deadly weapon based upon its size and shape.  For instance, ice picks, screwdrivers, and even pens may have the same approximate shape and size and may all be utilized as a potentially deadly weapon.  Deputies do not have time to consider all of these many possibilities when events are rapidly evolving under the compression of time.  Moreover, some innocuous appearing items may be deadly weapons in disguise.  For instance, the item pictured in photograph (g) is a pen that has been specifically designed as a penetrating weapon and most "tactical pens" of this type are black in color, although the tactical pen pictured here is gold in color. A tactical pen such as this can be used in an offensive manner and, if used in such a manner, could certainly cause death or serious bodily injury. When viewed in a dynamic, evolving and time compressed environment such as this incident, a tactical pen could not be easily identified from a regular ballpoint pen.  And, again, even a ballpoint pen has the potential to be used in a manner that could cause death or serious bodily injury.  In fact, based on additional research there are three recent cases in the news where a subject used a pen as a weapon and was arrested for assault and battery.

70.     These examples demonstrate that, no person, regardless of their area of expertise, can make a statement or a judgment that the Deputies should have, could have, or would have been able to tell that Le was holding a ball point pen rather than a knife under the compression of time.

71.     Any statements that the object in Le's hand was a plastic pen were made after the fact, as the scene was made safe and additional facts were uncovered during the investigation.  Any additional forensic evidence identified at the scene

PLTF EXHIBIT B

of this incident, i.e., toolmarks on the door of victim's home, location of evidence at the shooting scene etc., is not evidence that can be used in hindsight to evaluate the Deputies' decisions that were made at the time of the use of force. This information learned only after the fact was simply not available to the Deputies at the time of the actual incident.

72. **Movement dynamics.** In terms of time, distance, speed and motion, in order to make exact and precise determinations, or establish exact micro timelines, with respect to Le's movements during the incident, and/or the interplay between Le and the Deputies during the incident, an investigator must have precise evidence providing exacting information to support statements made by the involved parties. This type of evidence would include video footage, photographs, matching foot prints, etc., any evidence to put a *specific* person in a *specific* location at a *specific* point on the timeline. Albeit, a crime scene is chaotic and unprotected, so this requires understanding that even physical evidence does not necessarily stay in the exact location it was at during the event. Regardless, in this particular incident, we do not have any empirical evidence of human location or movement during the incident. We only have best guess information, which is based upon the testimony and statements of the involved parties, including the Deputies, the witnesses and the victim. Any evidence available in this case is designed solely to make best guess determinations regarding the incident after the fact, and these findings are subjective. This type of forensic evidence is not exact regarding anything other than the location of evidence that existed after the event ended. For instance, the location of blood evidence, the location of other physical evidence such as shell casings, and the location and nature of any potential deadly weapons that were used, remains on

PLTF EXHIBIT B

scene and in the exact location it occurred, this data is exact.  However, the dynamic interaction and movement of individuals within that scene, in regards to time, distance, speed and motion, remain best guess information.  Notably, any difference in relationship of a few feet, or even a few inches, with respect to location and movement, can drastically impact the forensic findings in a dynamic crime scene.

73.    **Related Inconsistencies.**    There are inconsistencies in distance, movement and action details, with respect to the actual shooting and the deployment of Deputy Owens' Taser.  Deputy Molina stated that Deputy Owens deployed his Taser before Deputy Molina made the decision to draw his firearm and subsequently fire shots to stop Le.  What is significant about this statement is that Deputy Molina stated that Le was moving "fast" during this portion of the encounter.   This statement tells me Deputy Molina was focused on Le, not Deputy Owens. I believe Deputy Molina observed through peripheral vision that Deputy Owens was deploying his Taser, however this shifting focus of attention is common and happens to all human beings. This inconsistency in details during the dynamic interaction of three individuals is not an abnormal occurrence in a critical incident, such as this one, where things are happening quickly. Deputies are expected to give an accurate account of all aspects of the incident, in perfect chronological order, while being expected to give the same perfect account of issues related to survival, i.e., position of the subject, potential weapons, decision making process; which is considered visual stimulus, backdrop, verbal commands, attempting to make accurate shots, making determinations about the change in the threat, locations of other people, geographical issues related to

PLTF EXHIBIT B

movement, etc. The cause of these inconsistencies in statements and memory are not restricted only to law enforcement personnel, they affect all human beings.

74.    **Focus of Attention**. Attention is the behavioral and cognitive process of selectively concentrating on a discrete aspect of information, which can be either subjective or objective, while unable to attend to other perceivable information. It is the taking possession by the mind, in clear and vivid form, of one object out of what seems to be several simultaneous objects or trains of thought. Focalization and concentration of consciousness are at the core of what constitutes "attention." Attention has also been referred to as the allocation of limited processing resources. (Anderson, 2005).

75.    Thus, by Deffenbacher's (1994) integrative theoretical formulation, if a task elicits the arousal mode of attention control, then memory will be enhanced for the most informative aspects of the stimulus display, those aspects on which the orienting response is focused. If, on the other hand, a task elicits the activation mode of attention control, then memory will either be modestly enhanced or drastically reduced, depending on the relative amounts of cognitive anxiety and physiological activation present. (Kenneth A. Deffenbacher); (Anderson, 2005).

76.    An investigator must be able to decipher whose focus of attention yields the most accurate information. Here, the most accurate information would most likely come from the perspective of Deputy Molina, as he was the person most directly involved. At the moment of contact with Le, Deputy Molina was most likely focused intently on the potential deadly threat being posed by Le (see Deputy Molina's statements). When other aspects come into play, such as movement and positioning, that information could be inaccurate due to the human

PLTF EXHIBIT B

limitation of focus of attention.  Perceptual distortions are at work in every critical incident, however, they are not the same for every person. Understanding the limitations a human being experiences in a critical incident is paramount. This is not a blanket excuse for poor tactics, negligence or inconsistencies. However, this does not make an inconsistency a lie, it doesn't make a particular persons account any more viable over another person's account. All information must be looked at in a balanced manner.

77.   **Shell Casings Ejection Patterns.**  The following is information associated with the study of shell casing ejection patterns.  This study was conducted using 7670 rounds, fired by 48 different officers with 7 different models of firearms, in 11 different positions (grips, angles and movements of the weapon).  In this study there was no movement of the test subject being fired at in any direction. However, there was movement of the firing position, i.e. sweeping left or sweeping right, and canting or angling of the firearm.  In general, the study shows that rounds eject to the right and rear of the ejection port.  The position of the firearm has a distinct effect on where "right and rear" is, in relation to the position of the weapon.  Notwithstanding the foregoing, movements during the incident cannot be considered as absolute in conjunction with the data generated by the shell casing ejection study. In order to compare this study to this incident you would have to replicate movement in the subject firing the weapon.  In this case particularly, based upon statements by Deputy Molina, Deputy Molina fired his weapon while Le was charging toward deputies and while Deputy Molina was physically moving to keep distance from Le and avoid being struck by Le.

**PLTF EXHIBIT B**

78.     *Q You're sure that when you first fired your weapon  Le 's back was not towards you? A When I first fired my weapon, he was coming towards me. Q When you last fired your weapon, Le  was to the side of you; is that correct? A To the side, yes.  So for reference points on the drawing, I back-stepped, I guess, south and out of the way.  And I ended up, I guess, facing somewhat to the west and he was about right here.  When Le was moving towards you, you moved back? A  Yes, to create distance. Q Distance? Le then started to run to the -- the southwest? Q  Would you be able to use your pen to make an arrow in the direction he was running after you moved out of the way? THE WITNESS:  I didn't have the viewpoint at the time.  That's something that Deputy Thompson was    able to see, but I was not able to see that.  Like I said, maybe could've been an arm-length, but all I can say is probably between one foot to two, because I was    backpedaling, taking a step back. When you first fired your gun, Tommy Le was approximately how far from you?  An approximation would be between three to five feet, somewhere around that range.* (Deputy Molina deposition, page 72.)

79.     The primary finding in this study is that there is no way to predictably determine where an officer (or an offender) was standing based on the ejected shell casing alone. The exact location of shell casings has no bearing on the position of Deputy Molina with any scientific exactification. (William J. Lewinski P. W., Volume 2, Number 3, November 2010)

80.     **Movement and time compression**. In the final moments of this rapidly evolving event, Le advanced toward Deputy Molina, in a perceived deadly attack. In examination, the initial step in a sprinting or forward charge can be completed in an average of (.37) of a second and cover 3.32 feet.  In the time it takes to

PLTF EXHIBIT B

complete a second stride, (.65) of a second, Le could have effectively covered 7.08 feet and approximately 25 ft in 1.67 seconds. The exact distance between Le and the Deputies (Deputy Molina) is not known.  However, the distance was stated as being approximately 20-25 feet between Deputy Molina and Le. Deputy Molina made the decision to use a Taser first to stop Le's actions in an effort to use a lesser level of force, in defiance of the fact that Le was a perceived deadly threat. Based on statements, after first attempting to use the Taser, which was unsuccessful, Deputy Molina then made the decision to use deadly force based upon the actions of Le and the information known to the Deputies, all of which led to the perception that the forward movement by Le, towards Deputy Molina, while brandishing a perceived weapon was an immediate and deadly attack.

81.     Please *refer to the sprint grid below for step distance and associated times.*

| Forwards | 1st Stride | 2nd Stride | 3rd Stride | 4th Stride | 5th Stride | 6th Stride |
|---|---|---|---|---|---|---|
| Individual Stride Length (ft) | 3.32 (0.37) | 3.77 (0.36) | 4.07 (0.36) | 4.43 (0.46) | 4.86 (0.59) | 5.22 (0.69) |
| Cumulative Stride Length (ft) | 3.32 (0.37) | 7.08 (0.65) | 11.21 (0.99) | 15.60 (1.36) | 20.49 (1.88) | 25.72 (2.51) |
| Individual Step Time (s) | 0.34 (0.09) | 0.31 (0.04) | 0.26 (0.02) | 0.26 (0.02) | 0.25 (0.03) | 0.25 (0.03) |
| Cumulative Step Time (s) | 0.34 (0.09) | 0.65 (0.09) | 0.91 (0.10) | 1.16 (0.10) | 1.42 (0.12) | 1.67 (0.14) |
| Stride Velocity (mph) | 6.96 (1.25) | 10.07 (1.27) | 10.96 (1.41) | 12.12 (1.52) | 13.42 (2.08) | 13.22 (1.52) |

(William J. Lewinski D. A., 2016)

82.     **Fact.** Please note:  There is no definitive measurement in terms of exact positioning of any individual in this incident.  Additionally, there is no precise information regarding how quickly Le was moving forward or how quickly Deputy Molina was moving backwards.  Le 's movements were described as a fast-paced walk and as a sprint in different statements, based on these statements I would speculate the forward movement might have been less than a full sprint

PLTF EXHIBIT B

and faster than a normal walking speed or a "jog" or "trot", considering that different perspectives and focus can affect judgement on speed and motion. However, the statements of the deputies and other witnesses to the event conforms to a reasonable degree of accuracy in the distance being approximately 20-25 feet between Deputy Molina and Le during the initial contact. The information in the official human movement study (sprint study) simply identifies how quickly an adult male can cover the distances described by Deputy Molina. These increments of time also interplay with the time Deputy Molina had available to transition to his firearm from his taser and to fire six rounds in rapid succession.

83.     The recorded interviews with witnesses all reflect a shot cadence of approximately .25 seconds per round fired. All witnesses state the shots were in rapid succession. This is common in a peace officer who is shooting to save his or her own life, and is reflected in the research studies.

84.     **Analysis related to opinions.** Once Deputy Molina initially contacted Le, the incident became intense very quickly due to the actions of Le, which are stated in the case facts and reflected in this report. Due to Le's unpredictable and violent physical behavior prior to officer's arrival and then during the contact with Deputies, the incident became time-compressed for Deputy Molina and Deputy Owens which ultimately influenced the decisions Deputy Molina made about his own ability to successfully subdue and control Le as well as survive the perceived attack.

85.     In the "Police Officer Reaction Time to Start and Stop Shooting: The Influence of Decision-Making and Pattern Recognition" study, which provides

PLTF EXHIBIT B

empirical data on the time required to start and stop shooting a firearm, based upon perception, reaction and response, it is documented that in response to a simple stimulus, with no decision making involved, the time to perceive the stimulus, react, and respond by pulling the trigger to fire a round from a firearm is approximately .31 seconds, including the mechanical element of pulling the trigger. This is referred to as perception, reaction and response. In the same study, with simple go/no go, i.e. shoot/don't shoot, decision making added to the count, adds an approximate additional .25 second. Thus, the reaction time increases to an average of .56 seconds. This study was conducted with the gun out of the holster and held on target. This study differs from the incident dynamic of having to draw the weapon and fire 6 shots as in this case, with critical levels of stress and anxiety and low light levels present in this incident.

86.     Based on the above study, with simple go/no go or shoot/don't shoot stimulus, it takes a human being an average of .56 seconds to decide to pull the trigger of a weapon and follow through with the act of pulling the trigger. This is a research project conducted in the sterile and safe environment of a laboratory setting. This number can vary with complex stimulus, especially with the consequences of life or death associated with the decision. Also, this is an average, some test subjects were considerably faster and some were much slower.

87.     **Movement time study**

PLTF EXHIBIT B

**Table 2. Movement Time Results for Tactical Ready Positions**

| Handgun Position | Mean (SD) | Max | Min |
|---|---|---|---|
| (1) Weapon on Target, Indexed Finger | 0.51 (0.15) | 1.36 | 0.25 |
| (2) Weapon on Target, Finger on Trigger | 0.37 (0.09)** | 0.96 | 0.20 |
| (3) Weapon on Target, Indexed Finger, 3 Round Burst | 0.44 (0.15) | 1.43 | 0.15 |
| (4) Weapon on Target, Finger on Trigger, 3 Round Burst | 0.38 (0.13)* | 1.24 | 0.10 |
| (5) Weapon in Holster, Snapped | 1.82 (0.31) | 2.93 | 1.29 |
| (6) Weapon in Holster, Unsnapped | 1.68 (0.27)** | 2.61 | 1.17 |
| (7) Weapon in Holster into Combat Tuck | 1.44 (0.31)** | 2.77 | 0.73 |
| (8) Low-Ready, Indexed Finger, Aim | 0.97 (0.19) | 1.71 | 0.50 |
| (9) Low-Ready, Indexed Finger, Point | 0.64 (0.10)** | 1.02 | 0.42 |
| (10) High Ready, Aim | 0.83 (0.20) | 1.46 | 0.44 |
| (11) Close Ready, Aim | 1.03 (0.20) | 1.72 | 0.64 |
| (12) Close Ready, Point | 0.74 (0.11)** | 0.87 | 0.52 |
| (13) Belt Tuck, Aim | 1.02 (0.21) | 1.75 | 0.68 |
| (14) Weapon in High-Guard, Aim | 1.13 (0.23) | 2.22 | 0.62 |
| (15) Weapon in High-Guard, Point | 0.73 (0.12)** | 1.07 | 0.49 |
| (16) Weapon in Bootleg, Aim | 1.32 (0.20) | 1.88 | 0.87 |
| (17) Weapon in Bootleg, Combat Tuck | 0.93 (0.19)** | 1.54 | 0.55 |
| Shotgun Position | Mean (SD) | Max | Min |
| (18) Port | 1.28 (0.48) | 2.88 | 0.79 |
| (19) Low-Ready | 0.99 (0.20) | 1.35 | 0.63 |
| (20) High-Ready/Modified Port | 0.84 (0.17) | 1.15 | 0.65 |

$*p < 0.05$
$**p < 0.01$

88.     Bringing all of the numbers together and into context.  The average time necessary for Le to cover the distance of 20-25 feet, described by Deputy Molina is approximately 1.70 seconds (see speed grid sec. 71). Decision time is approximately (.56 seconds. section 75). The time to holster the Taser (2.0 seconds, approximate), and draw his firearm from a snapped holster (avg. 1.82 seconds section 77) fire 6 shots (approximately 1.25 seconds section 85).  *Based on these average time frames, and the approximate distances established from what I believe are reliable statements, the first shots would have been fired approximately 4 seconds into the perceived attack. These shots would also likely have been fired as Le was passing Deputy Molina. The three shots that struck Le would have been to the side and back at an angle as Le moved quickly past Deputy Molina running towards other deputies and civilians.  The shots that struck Le in the back indicate an angle from left to right at an upward angle.  This

PLTF EXHIBIT B

shows that the shots fired by Deputy Molina were not fired directly at his back. These shots appear to have been fired as Le ran past Deputy Molina, and was leaning forward or falling to the ground. Notwithstanding, this is not an anomaly considering the ongoing threat Deputy Molina was responding to. After Le went to the ground he continued to move and attempt to get up. Deputies handcuffed Le to subdue him. (*research projects are peer reviewed and accepted as approved scientific methodology and published as journal articles)

89.     When an Officer/Deputy is confronted with a deadly threat such as the perceived threat posed by Le in this incident, and the need to respond with deadly force is necessary for survival, a certain amount of time is allocated to the perception of the threat and an additional amount of time is necessary to evaluate the stimulus, i.e., the weapon in hand etc. Considering the information derived from the studies referenced herein, there are the primary components playing a role in this incident. Primarily, the perception reaction and response time to the stimulus of seeing an object in Le's hand. The fractions of a second to evaluate the context of Le's actions and to determine the forward attack is happening. Additionally, the time it takes for Deputy Molina to holster his taser and draw his firearm, the time it takes Le to cover the 55-60 feet, and the time for Deputy Molina to fire 6 shots from his duty weapon. Ancillary components related to the timing issues are, the time Le ran past Deputy Molina as the initial shots are fired (approximately 3.8-4.0 seconds), the time it took Deputy Molina to detect a change in the threat posed by Le as Le began to go down to the ground. And the .35 seconds it takes on average to stop shooting. (Christa Redmann, 2009)

90.     In relationship to a timeline in this event, it is never going to be a precise representation of the occurrence. In my expertise in human performance related

**PLTF EXHIBIT B**

to law enforcement and the years that I have been investigating and analyzing use of force incidents, without corroborating evidence to verify an uncorrected and actual timeline, the best we can do as investigators is estimate, from the science that exists, a general timeline to determine the reasonable accurateness of statements made by involved deputies, witnesses and victims.

91.     The research in movement dynamic provides us with the following data; Decision time, average (.56 seconds), drawing of a weapon from a retained position average (1.82 seconds), holstering a Taser, estimate (2.0 seconds), and fire six rounds from a Glock handgun (1.25-1.50 seconds).  It must be understood that these micro events may not have occurred in linear fashion, but may have occurred in concert with one another to certain degree, especially the drawing of the firearm and the holstering of the Taser.  This gives Deputy Molina approximately 4.0 seconds to attempt to deescalate with a lesser use of force (Taser), identify the Taser was ineffective, begin to create distance, draw his firearm, holster the Taser, and subsequently fire 6 shots in an attempt to stop Le.

92.     Le took an estimated 5.00-6.00 seconds to cover the approximate distance described by Deputy Molina. The evidence that shows where Le came to rest on the ground, approximately 55-60 feet as an estimated measurement based on scale, see diagram below.  The times listed above reflect an approximation based on averages of empirical research data totaling 5.63 seconds, for the event to begin, when Le began to move towards deputies, and end, based on the actions that we know happened with Deputy Molina and the results of those actions. These two estimates are very close, within .50 seconds.  Finally, the sequence of

PLTF EXHIBIT B

Deputy Molina's shots in relation to Deputy Owens deploying the Taser.  As a note, all accounts say that Le was not affected by the Taser deployment.

93.    Deputy Owens' decision to deploy his Taser appears to have happened approximately the same time Deputy Molina decided to shoot, based on statements and approximate locations to include trajectory reflected in the bullet path of travel, through Le's torso.  Witness Bohna stated she heard only one taser and then heard gun shots.  This is not illogical based on the fact that the deployment of the Taser, pulling the trigger takes about a tenth of a second, the shots fired by Deputy Molina took approximately 1.5 seconds.  There is a very strong probability those two actions were happening at or near the same time within 10ths of a second.

94.    The diagram in the next section is for distance estimates to associate with movement and time frame approximation.

PLTF EXHIBIT B



**PLTF EXHIBIT B**

95.    The average cadence of gun fire in a scenario where a Deputy is firing a weapon in response to a rapidly evolving threat is an average of .25 seconds per round fired. This reflects an average of approximately 5 rounds fired in 1 second. See table 2 below. (Jason, 2010)

**Table 2. Experienced Shooter #1**

A.J.
Firearm: Glock 19
Caliber: 9mm

| No. of Shots | 7 | | 7 | | 7 | | 5 | |
|---|---|---|---|---|---|---|---|---|
| 1 | 0.00 | | 0.00 | | 0.00 | | 0.00 | |
| 2 | 0.24 | 0.24 | 0.21 | 0.21 | 0.22 | 0.22 | 0.21 | 0.21 |
| 3 | 0.40 | 0.16 | 0.49 | 0.28 | 0.38 | 0.16 | 0.35 | 0.14 |
| 4 | 0.71 | 0.31 | 0.64 | 0.15 | 0.55 | 0.17 | 0.52 | 0.17 |
| 5 | 1.00 | 0.29 | 0.80 | 0.16 | 0.78 | 0.23 | 0.66 | 0.14 |
| 6 | 1.17 | 0.17 | 0.95 | 0.15 | 0.93 | 0.15 | | |
| 7 | 1.33 | 0.16 | 1.11 | 0.16 | 1.08 | 0.15 | | |
| Total Time First to Last Shot | 1.33 | | 1.11 | | 1.08 | | 1.33 | |
| Average Interval | 0.22 | | 0.19 | | 0.18 | | 0.17 | |
| **Rounds Per Second (RPS)** | 4.51 | | 5.41 | | 5.56 | | 6.06 | |

96.    Deputies who are both shooting and assessing will likely give more concentration and attention to one aspect over the other. The activity with the lower level of attention or effort is the one that will suffer or be less sensitive and reactive to changes. For instance, an officer who is shooting to stop the threat and is intently focused on accurately shooting or, on the other end of the spectrum, an officer who is emotionally recoiling at the thought of his or her own apparent and imminent death and is intently shooting to save his or her own life are both going

PLTF EXHIBIT B

to be impaired in their ability to perceive and respond immediately to changes in the subject's behavior. (Christa Redmann, 2009)

97.     When shooting, police Deputies are usually engaged in a continuous action, which Morein-Zamir, Nagelkirke, Chua, Franks, and Kingstone (2004) found to be strongly correlated with the stopping observed in the stop signal paradigm. Green (2000), however, found something very different. He investigated the research on stopping reaction time from a continuous action in more "real world" circumstances when he conducted a review of the literature on braking reaction times with drivers in automobiles or simulators—a slightly different form of stopping. He found that under expected conditions, reaction time to begin braking was between 0.70 to 0.75 seconds, while under unexpected conditions, reaction time was 1.5 seconds or longer (pp. 206, 209). This rather large disparity between 0.20 and 0.70 or even 1.5 seconds may be attributable to the differences between studies conducted in pure laboratory conditions that isolate a specific phenomenon compared to real-world research which involves a variety of phenomenon, including attentional problems and automatic motor programs that are difficult to interrupt or control for in real-world studies but are usually controlled for in a laboratory study. (Christa Redmann, 2009)

98.     What has become clear is that Deputies from the same department with the same training and guidelines will respond differently in lethal force encounters and will start and stop shooting at different times.  This is due to different perspectives and situational awareness.  Deputy Owens, also attempting to stop Le's forward attack with his Taser, made the statement that he had decided to use deadly force, but by the time he had drawn his weapon, shots had already been

PLTF EXHIBIT B

fired and Le had fallen near his feet.  It is my belief based on timing issues and the window of time when shots were fired that Deputy Owens fired his Taser at or near the same time as Deputy Molina fired his first shots.

99.     Another consideration in this case is the number of rounds fired during the attack. Deputy Molina stated Le was facing him when he began to fire his weapon. The decision to shoot was made while Le was facing Deputy Molina. Based on the time it takes to perceive, react and respond by pulling the trigger, "perceptual delay,".31-.56 seconds, Le has moved approximately 4.86 – 5.22 feet before the first shot is taken after the decision is made (JENNIFER L. DYSTERHEFT, 2013).  At this point the first shots fired would be as Le is past Deputy Molina. Considering the distance estimates and timing issues, the last three shots that struck Le were fired in approximately .75 seconds with Le traveling an additional 10 feet approximately before falling to the ground.

100.    **Section conclusion**. Due to the critical nature of this incident, based on the approximation of time, distance, speed and motion of Le; Deputy Molina and Deputy Owens, had limited time to take action, analyze the incident, and develop alternative plans with regard to an infinite number of possible contingencies in response to an infinite number of unknown actions by Le. In this type of critical situation, and dangerous contact where Le was acting in an unpredictable manner, Deputy Molina was forced to react to Le's actions with a tactic that Deputy Molina believed would have the highest level of success based upon his reasonable perceptions. In this situation, Deputy Molina was required to act quickly with limited options for an optimal outcome in protecting himself, other

**PLTF EXHIBIT B**

deputies and the community, all of whom were in close proximity to Le during the forward charge.

101.   Prior to the Opinions section, please note, the information in this report has been carefully considered with a balance between "fact" and "perception." I have noted both, consistencies and inconsistencies discovered through a complete review of the information and data available to me in this case. As mentioned, there are certain aspects of the data that are factual, discovered after the incident, that no person could know definitively, without the ensuing investigation and analysis of all materials. This includes research of the geographic location, thoughtful consideration of all statements, consideration of applicable research data, forensic and physical evidence from the scene and reports generated from other entities. Please see the "methodology" section after the "opinions" section to get a clear understanding of the application of specialized knowledge from the perspective of this expert.

**PLTF EXHIBIT B**

## Opinions

102.    **Opinion.**  It is my opinion, as a professional in the field of force investigations and analysis related to law enforcement, that these types of critical incidents will generate statements from witnesses and involved parties that show consistencies as well as inconsistencies.  These inconsistencies are common and not unreasonable because every human being who witnesses an incident like this one, will witness the incident from a different perspective, which, in turn, means each individual's account of the same incident will vary.  These inconsistencies can also be exacerbated by individual biases, including, but not limited to, their understanding of the incident, their pre-existing knowledge, their distance from the occurrence, the lighting and shadowing where they are located, and visual acuity.  However, within these statements there will also be a common thread of information related to the event.

103.    Some of the common threads in this case are as follows: 1) Witnesses heard Deputies verbally ordering Le to "stop," to "drop it," in an attempt to control the situation; 2) Witnesses saw, heard and believed that the Deputies attempted to stop Le with the use of a Taser prior to using deadly force, meaning Deputies exercised multiple levels of force (verbal force, Taser and deadly force) in an attempt to stop Le; 3) Witnesses stated in some fashion that Le aggressed Deputies, that he appeared to be agitated and that he either had an object in his hand or he "acted" like he had an object in a clenched fist based upon Le's aggressive movements, such as "flailing" his arms around; 4) Witnesses stated in some fashion that the Taser deployments and verbal commands utilized by Deputies were ineffective in de-escalating the scene, and that Le continued to

PLTF EXHIBIT B

rapidly aggress Deputies despite their efforts to stop Le. Witnesses stated the following regarding verbal commands being given by Deputy Molina; *"drop the knife"*, *"get on the ground"* (Anthony Rice statement p. 13); *"show us your hands"* (Deposition Kevin. Hernandez, p. 59; 11-12.) 5) Witnesses that remarked on Deputy Molina's shot cadence, stated that Molina's shots were fired in rapid succession, and the recorded versions of witness interviews reflect this fact consistently; 6) No witnesses stated that Deputy Molina or Deputy Owens continued to use force of any kind after Le went down as a result of being shot.

104.   **Opinion.**  It is my opinion that Deputy Molina was ultra-focused on the threat posed by Le and Le's movements, as well as assessing the threat posed by Le, not only to himself but others in the immediate area. In my opinion Deputy Molina's situational awareness was demonstrated by the restraint shown in the number of rounds Deputy Molina fired in total. Here, the time to stop shooting, from the visual detection of a change in the perceived deadly threat posed by Le, to the cessation of the firing sequence is an average of .35 seconds. For Deputy Molina, who was shooting and assessing with a sharp focus of attention on the threat, this comports to a minimum of one additional shot being fired after the decision to stop shooting has been made. However, the average time for a Deputy to cease firing after detecting a visual change by the suspect could be as long as 1.5 seconds or longer. Deputy Molina, by all accounts in this incident was highly aware of his surroundings and his situational awareness appeared to be sharp. The decision times discussed above in the analysis portion of this report are reaction times to simple stimulus in sterile laboratory settings, well-lit with no associated consequences, i.e., life and death. The associated time frames in the capacity of real-life decisions, time compression and life or death consequences,

**PLTF EXHIBIT B**

may add to the amount of time a Deputy requires to reverse the decision to shoot because a Deputy in a life and death situation has been driven by survival intuition in an incident such as this one.  It is my opinion, based upon witness statements and statements from those involved, that Deputy Molina was well within the parameters of human performance as related to his reactions to the actions of Le.  There does not appear to any anomalies based on the statements and the time Deputies had to respond.

105.   **Opinion; Perceived weapon.** It is my opinion that, in a dynamic and swiftly moving incident such as this, Deputies cannot be held to an arbitrary standard of certainty or account of every detail of an incident when the potential results are death or substantial bodily harm.  Deputies in a rapidly evolving critical incident like this one do not have the luxury of analyzing a static representation of the incident, an object, or a particular action for the benefit of optimal decision making.  My opinion is that the context in which a Deputy is perceiving volatile information guides the Deputy's decisions.  As in the examples of "object" in hand in section 61, it would take the average person more than four (4) seconds to make a determination, with confidence, which photographs contain an object that is considered a deadly weapon and which photographs contain an object that is not a deadly weapon.  This particular determination is typically done with proper lighting, with no movement and with no life and death consequences for being wrong, which is not the circumstances the officers were faced with in this incident

106.   **Opinion; actions comporting to training, GOM and existing research.** In my opinion, based upon statements made by Deputy Molina, as well as other

PLTF EXHIBIT B

forensic evidence, that Deputy Molina's actions were appropriate, were in accordance with police and training standards, and were well-reasoned in response to Le's actions given the human performance issues that are outlined herein. Based upon articulable facts, circumstances and information known to Deputy Molina at the time of the incident, Deputy Molina made the decision to intervene in a deadly attack with the use of less than lethal force followed by the use of deadly force. This decision was made to save his own life and the life of his partner. It is my opinion that Deputy Molina made this decision within the scope of Le's actions, that Le posed a deadly threat to Deputies, and civilian witnesses, which is based upon Le's erratic and unpredictable behavior, the fact that Le possessed a perceived weapon and the fact that Le charged at Deputy Molina and Deputy Owens.

107.    **Opinion; Statements and Actions, inconsistencies and focus of attention.**   Deputy Molina's ability to accurately recall the particular information pertinent to the interests of those analyzing or investigating the incident, are not necessarily what Deputy Molina's interests were at the critical moment force was used.  Positioning, distances, timing, and other significant information is not exact and is not available as precise evidence for any interested party or for any purpose. There is no *exacting* scientific data that can be applied to, or that is considered to be "absolute," in these types of critical incidents where there is a lack of visual or audible recorded data.  However, the numbers reflected in the referenced studies are reliable and testable, i.e., produced by virtue of approved and accepted scientific methodology, peer reviewed and published in the form of scientific journal articles.   Based upon the available forensic evidence and statements from Deputies and witnesses, the available empirical data and theories

PLTF EXHIBIT B

outlined in this report; the overarching issues outlined above, appear to be prudent and within reason for a Deputy, such as Deputy Molina, confronted with this type of incident.

108.   **Opinion; De-escalation and GOM.**  It is my opinion that Deputies gave every effort to de-escalate prior to the use of deadly force.  De-escalation is perilously misinterpreted and misunderstood by investigators, attorneys and peace officers alike.  In the case of law enforcement, de-escalation is a desired *result* from actions taken by a person of authority, *when feasible and time and circumstances permit*. De-escalation is not a specific tactic, but a composite of all tactics, starting with officer presence.  Peace officers are trained to start a contact at the lowest level of force possible, based upon the nature of the contact itself.  It may be preferable to use verbal tactics as the lowest force possible, but only when it is feasible under the circumstances.  However, de-escalation is predicated upon a subject's actions.  If the subject is willing to acquiesce to verbal commands and cease resisting, cease aggression and cease combativity, de-escalation has been successful with the tactic of verbal commands. However, if the subject refuses to obey verbal commands and the use of a Taser is ineffective in stopping a subject's aggressive and combative behavior, now two levels of force have been unsuccessful in de-escalating the situation, and now Deputies and civilians are at a greater risk of death or substantial bodily harm. It is my opinion that Deputy Molina and Deputy Owens showed extreme restraint by choosing to utilize verbal commands and Tasers in an effort to de-escalate the situation without the use of deadly force despite the fact that all of information available to the Deputies at the time of the contact would support the use of deadly force at the onset of the

PLTF EXHIBIT B

contact.  Notably, the use of deadly force by a peace officer is authorized in response to a deadly threat *or the threat of substantial bodily harm*.

109.    A peace officer's decision to use force also has to be objectively reasonable and for a lawful purpose (see also GOM Use-of-Force policy).  In the process of the lawful duty, and in the context of responding to a critical incident where a violent offender has attacked members of the community, Deputies intervene, bravely exercising the duty to protect others.  However, Deputies never lose the right to protect themselves from the perceived deadly threat posed by a violent offender with malevolent intentions.  In the effort to overcome a resistant, aggressive and violent person for the purpose of protecting the community, protecting other Deputies or self-protection, in order to affect an arrest, or to prevent an escape, a Deputy is not required to retreat or experiment with lower levels of force when a subject poses a perceived deadly threat.  Here, all of these elements were present in this situation, which are the defining reasons for the application of deadly force.

110.    **Opinion; Police Tactics.**  It is my opinion that the tactics used by Deputy Molina appeared to be sound and purposeful.  In the use of the Taser, Deputy Molina closed the distance between himself and Le in an attempt to position himself within the Taser's effective range.  Based upon forensic evidence, there appears to be two Taser prong wounds in Le.  However, the Taser was ineffective in stopping Le's erratic and aggressive behavior.  The tactics that followed were time compressed, and the estimated timeline appears to align generally with distance estimates, the estimated speed of movements, the time available to

PLTF EXHIBIT B

process decisions, and the time to effectively respond.  These findings are not out of the ordinary for an intense encounter such as this one.

111.   **Opinion; Perceived Deadly Threat.** It is my opinion that the perceived deadly threat posed by Le, at the time deadly force was used, was real and was legitimately perceived by Deputy Molina (see Deputy Molina's statements).  The same deadly threat was also perceived by Deputy Owens, victim Zachry Schwiethale, witness and victim Kevin Hernandez (who also used a firearm in defense of himself and his family during this incident).

112.   **Opinion; detection of a change in the threat**. The fact that Le had run past Deputy Molina prior to shots being fired is *not* the point that Le ceased to pose a potential deadly threat toward Deputies and other victims and witnesses on the scene.  The perception of a deadly threat does not simply end with the movements of the subject initiating the attack, i.e., Le running past Deputy Molina as shots were fired. Le previously demonstrated violent intentions by attacking civilians prior to the point where Deputy Molina became involved. Even after Deputy Molina and Deputy Owens became involved, Le ignored the Deputies' verbal commands to stop and drop the knife.  Ultimately, Le continued to behave erratically and aggressively up to the point that Deputy Molina and Deputy Owens both perceived a deadly attack by Le towards Deputy Molina, Deputy Owens and the civilians close by.  In fact, Le's actions towards members of the community constituted the commission of a violent felony.

113.   Under careful examination of all facts and evidence, considering the totality of facts and circumstances through a full and articulate investigation and analysis, an officer's use of deadly force is appropriate only if "the officer has

PLTF EXHIBIT B

probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *(Tennessee v. Garner* (1985) 471 U.S. 1, 3.) Furthermore, "If police Deputies are justified in firing at a suspect in order to end a severe threat to public safety, the Deputies need not stop shooting until the threat has ended." *(Plumhoff v. Rickard* (2014) 134 S.Ct. 2012, 2022.)

114. **Summary of Opinions.** Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. Rather, my opinions involve the consistency of the Deputies' actions with standard police practices regarding human performance factors, including response time and related scientific based force issues, that may educate non-police about the perspective of the Deputies under the circumstances that they faced at the time force was used.

115. To properly understand the perspective of Deputy Molina and Deputy Owens under the totality of the circumstances facing the Deputies during this incident, it is important to understand how training, perceptions, reactions, and related performance factors affected the Deputies' decisions regarding the use of force.

116. **Basis of Opinions**. My opinions in this case are based upon my training and, as a policy writer in Use-of-Force, experience as a police officer, experience as a Use-of-Force Training Officer, experience as a force investigator, as well as my background in analyzing force as it relates to officer/subject interactions, studies and teachings on the subject matter of Use-of-Force, human performance factors and human performance, and, previous use-of-force case review and analysis, including any applicable pre-seizure conduct that may have led to the use of force; as well as my review of the records identified herein above.

PLTF EXHIBIT B

117.    This report is particularly focused on the police procedure and the use-of-force applied by Deputy Molina, as it relates to human performance factors that may illustrate the Deputy Molina's perspective in the use of force decision-making process. In this case, I primarily looked at the dynamics of the decision-making process of Deputy Molina, as relevant to the associated human performance factors in relation to time compression. I comment on police procedure and common police practice in order to explain how procedure and practice influences the decision-making process and/or human performance factors in relation to Deputies' performance as human beings when involved in a highly critical incident and in a time of crisis.

118.    **Conclusion.**  It is my conclusion, based upon the materials presented, coupled with my specialized education, training, and experience as a 22-year P.O.S.T. Certified Police Officer, holding an Advanced P.O.S.T. Certificate as a Police Training Sergeant, and a Use-of-Force Investigator, as well as my continued research and review of police operations and use-of-force incidents as a court recognized subject matter expert, in conjunction with the information available to me in this case, that the actions of Deputy Molina are consistent with standard police practices, policies, the General Order Manual and department training.

119.    Supporting this conclusion is research of existing case law, review and comparison of all statements, recorded and transcribed, and existing research data. Based on this research and review, the initial contact with Le was also consistent with standard police training, reactions, human performance factors, and procedures. Based upon the totality of circumstances described herein,

**PLTF EXHIBIT B**

Deputy Molina's decision to use deadly force was in accordance with policy and training standards. With respect to human factors and performance issues, Deputy Molina would not have had time to reassess the perceived threat posed by Le in order to make an alternative force decision. Furthermore, the dynamic shift in movement would not be considered any less of a threat based upon the fact that Deputy Molina was in the midst of a deadly physical attack when a decision was made to respond with deadly force, and that others were potentially in danger.

120.    Factors considered in deeming my opinion that the use of force herein was appropriate are as follows: Deputy Molina's response based on the actions of Le during the initial contact with Le; the subsequent behavior of Le as he attacked Deputy Molina; and the fact that Deputy Molina reasonably believed that Le was attempting to kill or severely injure him. I am not tasked with identifying potential truthfulness issues in the statements reviewed and do not offer any opinion on the truthfulness of the interviews or the accuracy of the transcribed documents that I have reviewed. At the time of this report, I have no other source of information other than those supplied to me in reference to this incident. I have reviewed reports and documents supplied to me as identified herein above.

121.    **Right to Amend**: I reserve the right to amend this report. It is my understanding that additional materials may be in the process of being produced or may be requested later. I reserve the right to submit a supplemental report should any subsequent information be produced that may materially affect or alter any of these opinions.

Thank you,

**PLTF EXHIBIT B**

James W. Borden

*James W. Borden*

*February 26, 2019*

Attachments:

Items recieved

Visual focus example

**PLTF EXHIBIT B**

## Works Cited

Anderson, J. R. (2005). *Cognitive Psychology and Its Implications.* Macmillan.

Christa Redmann, B. L. (2009). New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response. *Law Enforcement Executive Forum • 2009 • 9(4),* 35-36.

Dr. Bill Lewinski, P. (2000, December). why is the suspect shot in the back. *Police Marksman,* pp. 20-28.

Fackler, E. J. (2008). OFFICER REACTION - RESPONSE TIMES IN FIRING A HANDGUN. *JOURNAL OF THE INTERNATIONAL WOUND BALLISTICS ASSOCIATION,* 6-9.

Hope, L. B. (2015). Memory and the Operational Witness: Police officer recall of firearms encounters as a function of active response role. *Law and Human Behavior.*

Jason, A. (2010). Shooting Dynamics: Elements of Time & Movement in Shooting Incidents. *ISJ (investigative sciences journal),* 6-8.

JENNIFER L. DYSTERHEFT, W. J. (2013). The Influence of Start Position, Initial Step Type, and Usage of a Focal Point on Sprinting Performance. *International Journal of Exercise Science 6(4) : 320-327, 2013.*

Kenneth A. Deffenbacher, 1. B. (n.d.). A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory.

Lorraine Hope, U. o. (2016). Witnesses in action: The effect of physical exertio n on recall and recognition . *Psychological Science, 23(4) 386–390, DOI: 10.1177/ 0956797611431463 .*

PLTF EXHIBIT B

MICA R. ENDSLEY, 1. T. (n.d.). HUMAN FACTORS, 1995, 37(1), 32-64 Toward a Theory of Situation Awareness Dynamic Systems. © *1995, Human Factors and Ergonomics Society. All rights reserved.*

Nathan C. Meehan, C. S. (n.d.). Behavioral Indicators During a Police Interdiction. (V. 2. Rapid Reaction Technology Office 5611 Columbia Pike Falls Church, Ed.) *Naval Research Laboratory.*

William J. Lewinski, D. A. (2016 йил 14-17-May). Falling Subjects and the Use of Force. *The Police Chief Magazine.*

William J. Lewinski, P. W. (Volume 2, Number 3, November 2010). FIRED CARTRIDGE CASE EJECTION PATTERNS FROM SEMI-AUTOMATIC FIREARMS . *Investigative Sciences Journal.*

**PLTF EXHIBIT B**

Attachment:  List of all case files and documentation

Cesar Molina.pdf
Deputy Benjamin Blakeman.pdf
Deputy Paul Thompson.pdf
Detective Christopher Johnson.pdf
DEFOE REPORT w CV, fee sched, & prior testimony
attach.pdf
HARMENING REPORT w CV, prior test, &
invoice.pdf
HAYES & ASSOC. REPORT w CV, fee sched, & prior
test.pdf
Amended Complaint.pdf
C17029405 Van Nguyen.MP3
C17029405 Zachary Schwiethale 2.MP3
C17029406 Benjamin.MP3
C17029406 Bohna.MP3
C17029406 Delsie Baumgardner.MP3
C17029406 Foster, Jaime.MP3
C17029406 Foster, Neil.MP3
C17029406 James Cradle.MP3
C17029406 Kamron Obrien.MP3
C17029406 Rice, Anthony.MP3
C17029406 Rice, Lawrence.MP3
C17029406 Rice, Sandra.MP3
C17029406 Rowden.MP3
C17029406 Sarah Hernandez.MP3
C17029406 Victor Francois.MP3
C17029406 W- Hernandez, Kevin (1).MP3
C17029406 W- Hernandez, Kevin (2).MP3
C17029406 W- Schwiethale, Zachary 1.MP3
C17029406 wit - Dep. Blakeman.WMA
C17029406 wit - Dep. M.Paul.WMA
C17029406 wit - Dep. P.Thompson.WMA
C17029406 wit - Dep.Cotchaleovitch.WMA
C17029406.wmv
CAD Logs for K17195022.pdf
CAD Report #K17195020.pdf
CAD Report #K17195022 _ Case No. C17029406.pdf
CAD Report #K17195501.pdf
Cpt. McSwain FU Supplemental Report (9-18-17).pdf
Dep. Blakeman Recorded Statement Transcript (10-11-
17).pdf
Dep. Cotchleovitch Recorded Statement Transcript (10-
13-17).pdf
Dep. Cotchaleovitch Recorded Statement Transcript (6-
14-17).pdf
Dep. Herrera FU Supplemental Report (9-26-17).pdf
Dep. Paul Recorded Statement Transcript (10-11-17).pdf
Dep. Somers Statement (6-30-17).pdf
Dep. Thompson Recorded Statement Transcript (10-12-
17).pdf

Det. Do FU Report (11-2-17).pdf
Det. Escobar FU Supplemental Report (9-18-17).pdf
Det. Glasgow FU Supplemental Report (9-15-17).pdf
Det. Hawkins FU Supplemental Report (9-15-17).pdf
Det. Hiemstra OWS Statement (7-5-17).pdf
Det. Johnson Case Overview.pdf
Det. Johnson FU Report (10-25-17).pdf
Det. Johnson FU Report (10-5-17).pdf
Det. Johnson FU Report (4-04-18).pdf
Det. Lamothe FU Report (6-14-17).pdf
Det. Mellis FU Supplemental Report (9-15-17).pdf
Det. Merclich FU Supplemental Report (6-14-17).pdf
Det. Olmstead FU Supplemental Report (9-18-17).pdf
Det. Pedersen OWS Statement (6-19-17).pdf
Detailed History for Event #K17195020.pdf
Detailed History for Event #K17195022.pdf
Detailed History for Event #K17195025.pdf
Detailed History for Event #K17195501.pdf
Detailed History for Fire Incident #UF170004383 for 6-
28-17.pdf
Diagram of Shooting Incident - Dep. Blakeman (6-14-
17).pdf
Diagram of Shooting Incident - Dep. Cotchleovitch.pdf
Diagram of Shooting Incident - Dep. Paul (6-14-17).pdf
Diagram of Shooting Incident - Dep. Thompson (6-14-
17).pdf
Le Release.pdf
Ofc. Atterbury OWS Statement (6-14-17).pdf
Ofc. Blakeman OWS Statement (6-14-17).pdf
Ofc. Boe OWS Statement (6-16-17).pdf
Ofc. Cotchleovitch OWS Statement (6-14-17).pdf
Ofc. Didway OWS Statement (6-15-17).pdf
Ofc. Easterbrook - Incident Report - C17029406.pdf
Ofc. Easterbrook OWS Statement (6-14-17).pdf
Ofc. Kyle OWS Statement (6-14-17).pdf
Ofc. Paul OWS Statement (6-16-17).pdf
Ofc. Rice FU Report (6-20-17).pdf
Ofc. Rice OWS Statement (6-14-17).pdf
Ofc. Spiewak OWS Statement (6-15-17).pdf
Ofc. Thompson OWS Statement (6-14-17).pdf
Ofc. Young FU Supplemental Report (6-23-17).pdf
Ofc. Zydck F_U Supplemental Report (9-18-17).pdf
Photos Deputy Molina at the precinct 6-14-
17_Redacted.pdf
Photos Deputy Molina at the scene 6-14-
17_Redacted.pdf
Photos Deputy Molina guns 6-14-17.pdf
Photos Deputy Owens & Molina 6-14-17_redacted.pdf
Photos Deputy Owens at the Precinct 6-14-17.pdf
Photos Deputy Owens at the scene 6-14-17.pdf

**PLTF EXHIBIT B**

Photos Deputy Owens hands & feet 6-14-17.pdf
Photos Det. Hiemstra - still shots of scene 12-12-17.pdf
Photos Det. Johnson - the scene 6-14-17.pdf
Photos of scene after Le was shot 6-14-17.pdf
Photos of scene and surrounding cars 6-14-17.pdf
Photos Tasers deployed at the scene 6-14-17.pdf
Pulse Log Graph for Serial #X29004TAF (6-14-17).pdf
Sgt. Abott OWS Statement (6-14-17).pdf
Sgt. McNabb FU Supplemental Report (9-26-17).pdf
Sgt. Zimnisky OWS Statement (6-16-17).pdf
Statement Victor Francois (6-21-17).pdf
Supervisor Checklist for Deputy Involved Shootings -
Sgt. Abbott (6-14-17).pdf
Taser Information for Serial #X00-165021 (6-13-17 - 6-
14-17).pdf
Taser Information for Serial #X00-244066 (6-12-17 - 6-
14-17).pdf
Taser Information for Serial #X29001VEK (5-13-17 - 6-
14-17).pdf
Taser Information for Serial #X29004TAF (6-13-17 - 6-
14-17).pdf
UseOfForceReviewBoard-FINAL MolinaART2017-
002.pdf
Victim Recorded Statement Transcript Zachry
Schwiethale (7-10-17).pdf
Wit. Anthony Rice Recorded Statement Transcript (6-
14-17).pdf
Wit. Corene Bohna Recorded Statement Transcript (6-
14-17).pdf
Wit. Delsie Baumgardner  Recorded Statement
Transcript (6-14-17).pdf
Wit. James Cradle Recorded Statement Transcript (6-19-
17).pdf
Wit. Jamie Foster Recorded Statement Transcript (06-
15-17).pdf
Wit. Jonathan Pashby Recorded Statement Transcript (6-
15-17).pdf
Wit. Kamron O'Brien Recorded Statement Transcript (6-
22-17).pdf
Wit. Kevin Hernandez Recorded Statement Transcript
(6-14-17).pdf
Wit. Lawrence Rice Recorded Statement Transcript (6-
14-17).pdf
Wit. Neil Foster Recorded Statement Transcript (6-14-
17).pdf
Wit. Rick Benjamin Recorded Statement Transcript (6-
14-17).pdf
Wit. Sandra Rice Recorded Statement Transcript (06-14-
17).pdf
Wit. Sarah Hernandez Recorded Statement Transcript
(6-28-17).pdf
Wit. Van Nguyen Recorded Statement Transcript (6-28-
17).pdf

Wit. Zachry Schwiethale Recorded Statement Transcript
(6-13-17).pdf
17-195020_17-195022_C17029406_SW RADIO AND
TAC4_#90_0000-0319_VOX.MP3
17-195020_CALL1_C101_#70_2356-0002.mp3
17-195022_C17029406_CALL1_C107_#32_2358-
0003.mp3
17-195022_C17029406_CALL10_C118_#22_1217-
1220.mp3
17-195022_C17029406_CALL11_C109_#51_1228-
1230 (PHONE CALL FOR K17195501 AS
WELL).mp3
17-195022_C17029406_CALL2_C104_#94_0000-
0004.mp3
17-195022_C17029406_CALL3_S181_#12_0001-
0003.mp3
17-195022_C17029406_CALL4_C108_#85_0020-
0021.mp3
17-195022_C17029406_CALL5_C101_#70_0112-
0112.mp3
17-195022_C17029406_CALL6_C107_#32_0116-
0117.mp3
17-195022_C17029406_CALL7_C120_#95_0138-
0140.mp3
17-195022_C17029406_CALL8_C104_#94_0634-
0637.mp3
17-195022_C17029406_CALL9_C104_#94_0949-
0950_OUT.mp3
17-195025_CALL1_C101_#70_0003-0006.mp3
17-195501_D156_#31_1358-1359.mp3
17-195501_SW RADIO_#42_1603-1723_VOX.MP3
170613_1111CADInterface_Molina.pdf
170613_1358CADInterface_Molina.pdf
170613_170614CADInterface_Molina_Redacted.pdf
C17029406 Dep. Molina 7-24-17 COMPELLED.MP3
Dep. Molina Ammo Count.pdf
Dep. Molina Backup Revolver Ammo Count.pdf
Dep. Molina Compelled FU stmts.wmv
Dep. Molina Garrity Statement (6-15-17).pdf
170613_170614CADInterface_Owens_Redacted.pdf
C17029406 Dep. Owens  7-24-17 COMPELLED.MP3 -
Shortcut.lnk
Dep Owens Compelled FU stmts.wmv
Dep. Owens Ammo Count.pdf
Dep. Owens Backup Pistol Ammo Count.pdf
Dep. Owens Garrity Statement (6-15-17).pdf
GeneralOrdersManual 71 042817-062617.pdf
GeneralOrdersManual 72 062717-072617.pdf
GeneralOrdersManual 73 072717-101217.pdf
GeneralOrdersManual 74 101317-121217.pdf
GeneralOrdersManual 75 121317-022718.pdf
GeneralOrdersManual 76 022818 - 031218.pdf
GeneralOrdersManual 77 031318-042918.pdf

**PLTF EXHIBIT B**

GeneralOrdersManual 78 043018 - 051618.pdf
GeneralOrdersManual 79 051718 - present.pdf
171220Supervisors.pdf
180308IAPRO_Molina.pdf
180308Individual Assesment
History_Molina_Redacted.pdf
180308Qualified To Carry Patrol Rifle_Redacted.pdf
180308Qualified To Carry Secondary
Handgun_Redacted.pdf
180308Qualified To Carry_Molina_Redacted.pdf
PERS_Molina171214_RE_Redacted.pdf
TRGLog_Molina180308_Redacted.pdf
TRV_Molina171211_REfinal.pdf
IAPro_Redacted.pdf
Incident reports_Redacted.pdf
IncidentReport_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Request by Tacoma PD for patrol coverage.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Email.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IRIS Report_Redacted.pdf
126070_Redacted.pdf
CAD_Redacted.pdf
IAPro_Redacted.pdf
incident report_Redacted.pdf
IncidentReport_Redacted.pdf
picture of meth.pdf
17-222470_METRO RADIO_Op69_1537-
1625_RT.MP3
17-222470_SW RADIO_Op66_1538-1607_RT.MP3
17-222470_TAC4_Op66_1545-1616_RT.MP3
anderson OWS_Redacted.pdf
Andrews OWS_Redacted.pdf
C212_Redacted.pdf
CAD_Redacted.pdf
cotchaleovitch OWS_Redacted.pdf
Davis OWS_Redacted.pdf
Glasgow Incident Report_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Miller OWS.pdf
Muller OWs_Redacted.pdf
Sandu OWS_Redacted.pdf
Vehicle Reg_Redacted.pdf
Carl Cook.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf

Karen Finch.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
17-223049_SW RADIO_Op77_0200-0300_RT.MP3
17-223049_TAC4_Op77_0211-0224_RT.MP3
59611 Claim Filing_Redacted.pdf
CAD_Redacted.pdf
Final Memo Molina-Sisimit.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
IncidentReport_Redacted.pdf
Puyallup PD report--1718800175_Redacted.pdf
Screening Sheet MOLINA_Redacted.pdf
Signed Final Memo Molina-Sisimit DRB2017-100.pdf
CAD_Redacted.pdf
IAPro_Redacted.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
Radio Audio.MP3
2016-019 A Follow Up_Redacted.pdf
2016-019 Fowler statement.pdf
2016-019 W statement_Redacted.pdf
A-150 Fowler_Redacted.pdf
Buchan OWS I_Redacted.pdf
c15293033 Follow Up Report_Redacted.pdf
CAD_Redacted.pdf
Commander's Review_Redacted.pdf
Digital Forensics Request-Cell phone.pdf
Email from Records.pdf
Email from Wheeler with medical records_Redacted.pdf
Final Memo Buchan_Redacted.pdf
Final Memo Molina-Sisimit_Redacted.pdf
Findings and Recommendations for Dep Buchan from
Major Wills.pdf
Findings and Recommendations for Dep Molina from
Major Wills.pdf
HW Documents C15293033_Redacted.pdf
IAPro_Redacted.pdf
IIU2016-019 Buchan interview_Redacted.pdf
IIU2016-019 Certification Letter.pdf
IIU2016-019 Legesse statement_Redacted.pdf
IIU2016-019 Molina interview_Redacted.pdf
Incident reports_Redacted.pdf
IncidentReport_Redacted.pdf
KCSO IIU completed investigation IIU2016-019.pdf
KCSO IIU new complaints.pdf
No Advisory Major Wills IIU2016-019.pdf
Note_Redacted.pdf
OWS Molina_Redacted.pdf
Pavlovich OR.pdf
Preliminary complaint form_Redacted.pdf
Signed Disposition Letter_Redacted.pdf
Signed Receipt Letter_Redacted.pdf

PLTF EXHIBIT B

A-150 Notice.pdf
A-150.pdf
Additional statment from Silverstein_Redacted.pdf
CAD C16015435_Redacted.pdf
Certification Letter IIU2016-150.pdf
claim_Redacted.pdf
Complaint notification .pdf
Complaint Notification.1.pdf
Complaint notification.2.pdf
Complaint notification.3.pdf
Complaint notification.4.pdf
Complaint notification.5.pdf
Complaint notification.6.pdf
Complaint notification.pdf
Cotchaleovitch OWS.pdf
Currey A-150_Redacted.pdf
Curry OWS.pdf
Deputy Cotchaleovitch A-150_Redacted.pdf
Deputy Hawley A-150_Redacted.pdf
Deputy Klinger A-150_Redacted.pdf
Deputy Lopez A-150_Redacted.pdf
Deputy Silverstein A-150_Redacted.pdf
Deputy Wynkoop A-150-1_Redacted.pdf
Final Memo Cotchaleovitch_Redacted.pdf
Final Memo Currey_Redacted.pdf
Final Memo Hawley_Redacted.pdf
Final Memo Klinger_Redacted.pdf
Final Memo Lopez_Redacted.pdf
Final Memo Molina-Sisimit_Redacted.pdf
Final Memo MPO Hutchinson_Redacted.pdf
Final Memo Muller_Redacted.pdf
Final Memo Paul_Redacted.pdf
Final Memo Silverstein_Redacted.pdf
Final Memo Wynkoop_Redacted.pdf
FOLLOW-UP
REPORT_CaseNbr{C16015435}_OfficerID{08145}_R
edacted.pdf
FW_ defense interview-_Redacted.pdf
FW_ defense interview-SE_Redacted.pdf
FW_ defense interview-SE.1_Redacted.pdf
Garrity.pdf
Glasgow IIUOR_Redacted.pdf
Hutchinson's Statement_Redacted.pdf
IAPro_Redacted.pdf
IIU Follow-up_Redacted.pdf
IIU2016-150 Certification Letter.pdf
INCIDENT
REPORT_CaseNbr{C16015435}_OfficerID{08145}_R
edacted.pdf
IncidentReport_Redacted.pdf
KCSO IIU completed investigation IIU2016-150.pdf
KCSO IIU new complaint IIU2016-150.pdf
Klinger OWS I.pdf

Lopez OWS.pdf
Molina A-150_Redacted.pdf
MPO Hutchinson A-150_Redacted.pdf
MPO Paul A-150_Redacted.pdf
MPO Paul OWS.pdf
Mullers OWS.pdf
NO Advisory Memo Major Kimerer IIU2016-150 via
email.pdf
Police Officer Bill of Rights.pdf
RE_ A-150_Redacted.pdf
RE_ Complaint notification .pdf
RE_ Complaint notification.1.pdf
RE_ Complaint notification.2.pdf
RE_ Complaint notification.3.pdf
RE_ Complaint notification.5.pdf
RE_ Complaint notification.pdf
RE_ defense interview-S_Redacted.pdf
RE_ defense interview-SE _Redacted.pdf
RE_ KCSO IIU case file ready for your review IIU2016-
150.pdf
RE_ MW_Redacted.pdf
REVISED NO Advisory Memo Major Kimerer
IIU2016-150 via email.pdf
Sgt Muller A-150_Redacted.pdf
Signed Disposition Letter_Redacted.pdf
Signed F&R IIU2016-150 Hawley_Redacted.pdf
Signed F&R IIU2016-150 Silverstein_Redacted.pdf
Signed F&R IIU2016-150 Wyncoop_Redacted.pdf
Signed F&R Memo IIU2016-150
Cotchaleovitch_Redacted.pdf
Signed F&R Memo IIU2016-150 Currey_Redacted.pdf
Signed F&R Memo IIU2016-150
Hutchinson_Redacted.pdf
Signed F&R Memo IIU2016-150 Klinger_Redacted.pdf
Signed F&R Memo IIU2016-150 Lopez_Redacted.pdf
Signed F&R Memo IIU2016-150 Molina-
Sisimit_Redacted.pdf
Signed F&R Memo IIU2016-150 Muller_Redacted.pdf
Signed F&R Memo IIU2016-150 Paul_Redacted.pdf
Signed Receipt Letter_Redacted.pdf
Silverstein's OWS_Redacted.pdf
Wynkoop OWS.pdf
Final Memo Blakeman_Redacted.pdf
Final Memo Molina-Sisimit_Redacted.pdf
Final Memo MPO Hutchinson_Redacted.pdf
Final Memo Silverstein_Redacted.pdf
IAPro_Redacted.pdf
IIU2016-183 certification letter.pdf
IncidentReport_Redacted.pdf
KCSO IIU completed investigation IIU2016-183.pdf
KCSO IIU new complaints.pdf
Signed Disposition Letter_Redacted.pdf
Signed Receipt Letter_Redacted.pdf

**PLTF EXHIBIT B**

UOF 2016-118_Redacted.pdf
UOF2016-118_Silverstein Training record-1.pdf
A-128.pdf
CAD_Redacted.pdf
Commander Review.pdf
Hold Harmless_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
SW Radio.MP3
20170331_205656.pdf
20170331_205707_Redacted.pdf
20170331_205711.pdf
20170331_205712.pdf
20170331_205715.pdf
20170331_205716.pdf
A-125_Redacted.pdf
A-128.pdf
Accepted_ parks interview pct 4.pdf
CAD_Redacted.pdf
Commander Review.pdf
Contact letter returned USPS_Redacted.pdf
contact letter_Redacted.pdf
Due Date Memo Major Fryberger IIU2017-046.pdf
Final Memo_Redacted.pdf
IAPro_Redacted.pdf
IIU2017-046 Certification Letter.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
molina_IIU2017-046_Redacted.pdf
Molina-Sisimit subject a-150_Redacted.pdf
OWS- Molina_Redacted.pdf
OWS- Parks_Redacted.pdf
OWS-Zimnisky_Redacted.pdf
P-128 Garrity Admonishment.pdf
Parks witness a-150_Redacted.pdf
POBR.pdf
Public Records Request 17-288_Redacted.pdf
RE_ Subject a-150.pdf
RE_ witness a-150.1.pdf
Re_ witness a-150.pdf
Signed Disposition Letter_Redacted.pdf
Signed F&R Memo Major Fryberger IIU2017-046_Redacted.pdf
Signed Receipt Letter_Redacted.pdf
Subject a-150.pdf
SW Radio.MP3
witness a-150.pdf
Written statement_Redacted.pdf
171220Supervisors_Redacted.pdf
A-125.1_Redacted.pdf
Additional info _Redacted.pdf
Brannon Glasgow Sisimit Sandu Follow-up_Redacted.pdf

Brannon IIU A-105 Response Statement_Redacted.pdf
Brannon Subject A-150_Redacted.pdf
C17020013 001.pdf
C17020013 002.pdf
C17020013 003.pdf
C17020013 004.pdf
Coleman contact request letter_Redacted.pdf
Contact letter returned USPS (2)_Redacted.pdf
Contact letter returned USPS_Redacted.pdf
contact letter try new address (2)_Redacted.pdf
contact letter try new address_Redacted.pdf
contact letter_Redacted.pdf
Deputy Hererra Follow-up_Redacted.pdf
Due Date Memo Major Fryberger IIU2017-061.pdf
Final Memo Brannon IIU2017-061_Redacted.pdf
Final Memo Glasgow IIU2017-061_Redacted.pdf
Final Memo Molina-Sisimit IIU2017-061_Redacted.pdf
Final Memo Sandu IIU2017-061_Redacted.pdf
Findings and Recommendations Major Fryberger IIU2017-061_Redacted.pdf
Glasgow IIUORVenters_Redacted.pdf
Glasgow Subject A-150_Redacted.pdf
google maps photos VG apts.pdf
IAPro_Redacted.pdf
IIU2017-061_Certification letter.pdf
IIU2017-061_Certification letter-1.pdf
IIU2017-061_Redacted.pdf
IIUORVenters_Redacted.pdf
Incident Report- Currey_Redacted.pdf
IncidentReport_Redacted.pdf
Molina diagram.pdf
Molina OR needed--a150 service.pdf
Need an OR --- A150 service.pdf
OWS- Brannon_Redacted.pdf
OWS- Drazich_Redacted.pdf
OWS- Elliot_Redacted.pdf
OWS- Glasgow_Redacted.pdf
OWS- Molina_Redacted.pdf
OWS- Parks_Redacted.pdf
OWS- Sandu_Redacted.pdf
OWS- Silverstein_Redacted.pdf
OWS- Thompson_Redacted.pdf
OWS- Zimnisky_Redacted.pdf
P-128 Garrity Admonishment (2).pdf
POBR (2).pdf
RE_ Additional info _Redacted.pdf
RE_ Additional info1_Redacted.pdf
RE_ Additional info2_Redacted.pdf
Re_ Additional info3_Redacted.pdf
RE_ Additional info4_Redacted.pdf
RE_ Additional info5_Redacted.pdf
RE_ Additional info6_Redacted.pdf
RE_ Additional info7_Redacted.pdf

**PLTF EXHIBIT B**

RE_ Additional info8_Redacted.pdf
RE_ Glasgow OR Needed---A150 service_Redacted.pdf
RE_ IIU2017-061_Redacted.pdf
RE_ Molina OR needed--a150 service.pdf
Sandu a150_Redacted.pdf
Sandu OR Needed-a150 service.pdf
sandu OR_Redacted.pdf
Signed Disposition Letter_Redacted.pdf
Signed Receipt Letter_Redacted.pdf
Sisimit a150_Redacted.pdf
Taser Cartridge Pic.pdf
Taser Download.pdf
VV.1_Redacted.pdf
VV_Redacted.pdf
CAD printout for event._Redacted.pdf
Commanders review_Redacted.pdf
Deputy Obregon's Fol-Up Supplemental_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IRIS Recovery Follow-up Report_Redacted.pdf
Original 10-63 IRIS Report by Deputy
Timby_Redacted.pdf
Preliminary Supervisor Review A-125_Redacted.pdf
IAPro_Redacted.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
Photograph.jpg
c174.pdf
IAPro.pdf
IncidentReport_Redacted.pdf
picture of damage.jpg
126251.jpg
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Molina officer's witness statement_Redacted.pdf
Photograph2.JPG
A-128.1_Redacted.pdf
A-128_Redacted.pdf
Blakeman OR_Redacted.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IRIS Report_Redacted.pdf
Miller follow up_Redacted.pdf
Molina OWS_Redacted.pdf
PT Cruser car reg_Redacted.pdf
RE_C16027605.pdf
Trespass letter_Redacted.pdf
Young OWS_Redacted.pdf
911 request.pdf
Blakeman OR_Redacted.pdf
CAD_Redacted.pdf

Didway OR.pdf
Final Memo Deer P2016-045.pdf
Final Memo Molina-Sisimit P2016-045.pdf
FW_ Final Memo Deer P2016-045.pdf
Hutchinson OR_Redacted.pdf
IAPro_Redacted.pdf
incident report_Redacted.pdf
IncidentReport_Redacted.pdf
Kyle OR_Redacted.pdf
Map.pdf
Molina OR_Redacted.pdf
pursuit worksheet.pdf
Radio wave file.MP3
Supervisor pursuit reviewMolina.pdf
Supervisor review-Deer.pdf
CAD_Redacted.pdf
Final Memo Blakeman P2016-050.pdf
Final Memo Hutchinson P2016-050.pdf
IAPro_Redacted.pdf
Incident report_Redacted.pdf
IncidentReport_Redacted.pdf
King County Sheriff.pdf
Officer Reports_Redacted.pdf
pictures of PD car damage.pdf
Supervisor Review.pdf
supplemental OR-Hutch.pdf
Supplemental OR-Molina_Redacted.pdf
Blue Team Followup Report C16007196_Redacted.pdf
CAD Printout C16007196_Redacted.pdf
Commander's Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report C16007196_Redacted.pdf
IncidentReport_Redacted.pdf
Preliminary Complaint Submission
Report_Redacted.pdf
107339.jpg
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Photo.jpg
Related Docements.pdf
CAD_Redacted.pdf
Commander Review.pdf
Electronically signed Preliminary Complaint Submission
Form.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
IncidentReport_Redacted.pdf
Photographs.pdf
Statement of CO Shawn McNaughton.pdf
CAD printout_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf

**PLTF EXHIBIT B**

Related reports_Redacted.pdf
Supervisor Use of Force Review_Redacted.pdf
CAD Printout_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
Supervisor Use of Force Incident Review_Redacted.pdf
CAD_Redacted.pdf
Commander's review_Redacted.pdf
Det Allen follow up charging docs_Redacted.pdf
Elliot OWS_Redacted.pdf
IAPro_Redacted.pdf
IIU2016-183.pdf
Incident Report Silverstein_Redacted.pdf
IncidentReport_Redacted.pdf
OWS Blakeman_Redacted.pdf
OWS Dery.pdf
OWS Hutchinson_Redacted.pdf
OWS Johnson_Redacted.pdf
OWS Molina_Redacted.pdf
OWS Stratton_Redacted.pdf
Photos Silverstein.pdf
Silverstein follow-up_Redacted.pdf
Taser download.pdf
UOF Supervisor review_Redacted.pdf
CAD Printout C16038835_Redacted.pdf
Commander's review_Redacted.pdf
Deputy Molina OWS 2 C16038835_Redacted.pdf
DOL Printout Spriggs_Redacted.pdf
Follow-up Report C16038835_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IRIS Report C15038835_Redacted.pdf
OWS Deputy Blakeman C16038835_Redacted.pdf
OWS Deputy Molina C16038835_Redacted.pdf
OWS Deputy Stratton C16038835_Redacted.pdf
Supervisor Use of Force Investigation and Review
C16038835_Redacted.pdf
Taser Download Record C16038835.pdf
Victim Statement C16038835_Redacted.pdf
CAD printout_Redacted.pdf
Commander's review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report Elliot_Redacted.pdf
IncidentReport_Redacted.pdf
OWS Currey_Redacted.pdf
OWS Molina_Redacted.pdf
OWS Sandu_Redacted.pdf
Taser download Molina.pdf
Taser download Sandu.pdf
UOF Supervisor review_Redacted.pdf
2nd Hutchinson officer's witness
statement_Redacted.pdf

Blue Team Follow Up.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
Garrity Warning.pdf
Hutchinson Complaint Notification A-150_Redacted.pdf
IAPro_Redacted.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
Molina Officer's Witness Statement_Redacted.pdf
Supervisor Use of Force Incident Review_Redacted.pdf
CAD_Redacted.pdf
Commander review_Redacted.pdf
Follow Up Recovery Report_Redacted.pdf
Follow Up Recovery Supplemental_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Original Auto Theft Report_Redacted.pdf
UOF Supervisor Review_Redacted.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
Deputy ORs_Redacted.pdf
IAPro_Redacted.pdf
Incident report_Redacted.pdf
IncidentReport_Redacted.pdf
Supervisor review_Redacted.pdf
A-125_Redacted.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report-Owens_Redacted.pdf
IncidentReport_Redacted.pdf
OWS-Molina_Redacted.pdf
OWS-Spiewak_Redacted.pdf
OWS-Young_Redacted.pdf
Witness Statement_Redacted.pdf
Blue Team follow up report.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
IncidentReport_Redacted.pdf
Radio audio.MP3
Related documents_Redacted.pdf
Taser download.pdf
Use of Force Supervisor Investigation and
Review_Redacted.pdf
20170331_205656.pdf
20170331_205707_Redacted.pdf
20170331_205711.pdf
20170331_205712.pdf
20170331_205715.pdf
20170331_205716.pdf
A-125_Redacted.pdf

PLTF EXHIBIT B

CAD_Redacted.pdf
Commander Review.pdf
IAPro_Redacted.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
OWS- Molina_Redacted.pdf
OWS- Parks_Redacted.pdf
OWS-Zimnisky_Redacted.pdf
SW Radio.MP3
A-125_Redacted.pdf
C17020013 001.pdf
C17020013 002.pdf
C17020013 003.pdf
C17020013 004.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report- Currey_Redacted.pdf
IncidentReport_Redacted.pdf
OWS- Brannon_Redacted.pdf
OWS- Drazich_Redacted.pdf
OWS- Elliot_Redacted.pdf
OWS- Glasgow_Redacted.pdf
OWS- Molina_Redacted.pdf
OWS- Parks_Redacted.pdf
OWS- Sandu_Redacted.pdf
OWS- Silverstein_Redacted.pdf
OWS- Thompson_Redacted.pdf
OWS- Zimnisky_Redacted.pdf
Taser Cartridge Pic.pdf
Taser Download.pdf
A-125 for Molina.pdf
A1-25 Owens.pdf
CAD.pdf
CUOFR.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
SW Radio.MP3
Add'l officer's witness statements_Redacted.pdf
CAD Printout_Redacted.pdf
CUOFR_Redacted.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
IncidentReport_Redacted.pdf
Stolen Vehicle Report_Redacted.pdf
Supervisor Use of Force Incident Review_Redacted.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
IncidentReport_Redacted.pdf
Supervisor Use of Force Incident Review_Redacted.pdf
17-222470_METRO RADIO_Op69_1537-
1625_RT.MP3

17-222470_SW RADIO_Op66_1538-1607_RT.MP3
17-222470_TAC4_Op66_1545-1616_RT.MP3
A-125_Redacted.pdf
anderson OWS_Redacted.pdf
Andrews OWS_Redacted.pdf
C-212_Redacted.pdf
CAD_Redacted.pdf
Commanders Use of Force Review_Redacted.pdf
cotchaleovitch OWS_Redacted.pdf
Davis OWS_Redacted.pdf
Glasgow IRIS Report_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Memo Style_Redacted.pdf
Miller OWS.pdf
Molina OWS_Redacted.pdf
Muller OWs_Redacted.pdf
PIC #1.pdf
PIC #2.pdf
PIC #3.pdf
PIC #4.pdf
RE_ Use of Force C17033399.1_Redacted.pdf
RE_ Use of Force C17033399_Redacted.pdf
Sandu OWS_Redacted.pdf
Vehicle Reg_Redacted.pdf
Weekley OWS.pdf
Whitacre OWS_Redacted.pdf
A-125_Redacted.pdf
Commanders review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report- Easterbrook_Redacted.pdf
IncidentReport_Redacted.pdf
Main CAD_Redacted.pdf
OWS- Fitchett_Redacted.pdf
OWS- Keller_Redacted.pdf
OWS- Laux_Redacted.pdf
OWS- Molina_Redacted.pdf
OWS- Roach_Redacted.pdf
OWS- Spiewak_Redacted.pdf
Second CAD for 911 call_Redacted.pdf
Taser Download.pdf
Commendations, Written Reprimand.pdf
Miscellaneous_Redacted.pdf
New Employee Info_Redacted.pdf
Performance Evaluations_Redacted.pdf
Personal Contact Information.pdf
Personnel Orders, Salary Step Increases.pdf
TRGLog_Owens180621_Redacted.pdf
TRV_Owens180524_RE_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Deputy Owens E-mail documenting Meeting.pdf
IAPro.pdf

PLTF EXHIBIT B

IncidentReport.pdf
IAPro.pdf
IncidentReport.pdf
email.pdf
911 request_Redacted.pdf
CAD K17121092_Redacted.pdf
IAPro_Redacted.pdf
INCIDENT REPORT C17018452_Redacted.pdf
IncidentReport_Redacted.pdf
Cad_Redacted.pdf
Email (Chief Konoske).pdf
Email (Det. A Thompson).pdf
IAPro.pdf
IncidentReport.pdf
CAD_Redacted.pdf
IAPro.pdf
IncidentReport.pdf
IAPRO_Redacted.pdf
IncidentReport_Redacted.pdf
CAD_Redacted.pdf
Incident Report_Redacted.pdf
Accident Report_Redacted.pdf
CAD Printout.pdf
DRB memo- date corrected.pdf
DRB Memo.pdf
IAPro.pdf
IncidentReport.pdf
PIC 1.pdf
PIC 2.pdf
PIC 3.pdf
PIC 4.pdf
PIC 5.pdf
PIC 6_Redacted.pdf
PIC 7.pdf
PIC 8.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
NP DRB Memo.pdf
IMG_2570.pdf
IMG_2571.pdf
IMG_2572.pdf
IMG_2573.pdf
IMG_2574.pdf
IMG_2575.pdf
IMG_2576.pdf
IMG_2577.pdf
IMG_2578.pdf
IMG_2579.pdf
IMG_2580.pdf
IMG_2581.pdf
IMG_2582.pdf
IMG_2583.pdf
IMG_2584.pdf
IMG_2585.pdf
IMG_2586.pdf
IMG_2587.pdf
IMG_2588.pdf
IMG_2589.pdf
IMG_2590.pdf
IMG_2591.pdf
IMG_2592.pdf
IMG_2593_Redacted.pdf
CAD print_Redacted.pdf
Collision Report_Redacted.pdf
Sector NOI_Redacted.pdf
Citizen (DOL)_Redacted.pdf
Citizen veh (DOL)_Redacted.pdf
KCSO veh (DOL).pdf
close up of damage to E13722.pdf
damage to E13722.pdf
Deputy Owens OWS.pdf
DRB Findings.pdf
E13722 vs Cement Column.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
MARR Packet DRB2017-128_Redacted.pdf
PHOTOS MARR
Miller OR_Redacted.pdf
Owens OR_Redacted.pdf
Photo #1.pdf
Photo #10.pdf
Photo #11.pdf
Photo #12.pdf
Photo #13.pdf
Photo #14.pdf
Photo #15.pdf
Photo #16.pdf
Photo #17.pdf
Photo #2.pdf
Photo #3.pdf
Photo #4.pdf
Photo #5.pdf
Photo #6.pdf
Photo #7.pdf
Photo #8.pdf
Photo #9.pdf
CAD Printout_Redacted.pdf
911Radio Transmission Request.pdf
Signed Written Reprimand.pdf
A-128_Redacted.pdf
CAD Entry_Redacted.pdf
Commander Review_Redacted.pdf
Findings Memo_Redacted.pdf
IAPro_Redacted.pdf

PLTF EXHIBIT B

Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
Malloy A-150_Redacted.pdf
Malloy OWS.pdf
Owens OWS_Redacted.pdf
OWES A 150_Redacted.pdf
Picture 1.pdf
Picture 10.pdf
Picture 2.pdf
Picture 3.pdf
Picture 4.pdf
Picture 5.pdf
Picture 6.pdf
Picture 7.pdf
Picture 8_Redacted.pdf
Picture 9.pdf
Supervisors Follow UP_Redacted.pdf
IIU2016-279 Certification letter.pdf
KCSO IIU opened and completed investigation
IIU2016-279.pdf
Final Memo _Redacted.pdf
Signed Disposition Letter 2nd attempt new
address_Redacted.pdf
Signed Disposition Letter returned USPS_Redacted.pdf
Signed Disposition Letter_Redacted.pdf
Blue Team Preliminary C17035402 completesd prior to
this complaint_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport.pdf
Original complaint form_Redacted.pdf
Dowdall and Owens IIU FOLLOW_Redacted.pdf
Incident Report _Redacted.pdf
Email_Redacted.pdf
IIU2017-116 certification letter email.pdf
IIU2017-116 certification Letter.pdf
Signed F&R Memo Major Fryberger IIU2017-
116_Redacted.pdf
Due Date Memo Major Fryberger IIU2017-116.pdf
Final Memo Dowdall.pdf
Final Memo Owens.pdf
RE_ Voice Mail  (1 minute and 20
seconds)_Redacted.pdf
Signed Disposition Letter.pdf
Signed Receipt Letter.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
CAD  C17035402_Redacted.pdf
INCIDENT REPORT  C17035402_Redacted.pdf
Supervisor Investigation C17035402_Redacted.pdf
A-188_Redacted.pdf
Arico A150_Redacted.pdf
Arico Garrity.pdf
Arico OWS_Redacted.pdf

Arico Police officers Bill of Rights.pdf
Cad_Redacted.pdf
Commander review_Redacted.pdf
commanders use of force_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport _Redacted.pdf
Owens A-150_Redacted.pdf
Owens Email_Redacted.pdf
Owens Garrity.pdf
Owens OWS_Redacted.pdf
Owens Police Officer's Bill of Rights.pdf
Preliminary Complaint_Redacted.pdf
Tompkins A-150_Redacted.pdf
Tompkins Email_Redacted.pdf
Tompkins Garrity.pdf
Tompkins OWS_Redacted.pdf
Tompkins Police Officer's Bill of Rights.pdf
IIU2017-226FollowUp_Redacted.pdf
CAD_FU #K17339803 (Robbery)_Redacted.pdf
FU_R - Det. A Thompson_Redacted.pdf
FU_R - Sgt. Barden.pdf
FU-R1 - Det. A Thompson_Redacted.pdf
IR - Dep. S Tompkins_Redacted.pdf
IS Rpt - Dep. Roach.pdf
OWS - Dep. Arico_Redacted.pdf
OWS - Dep. B Miller_Redacted.pdf
OWS - Dep. G Anderson_Redacted.pdf
OWS - Dep. Gervacio_K9.pdf
OWS - Dep. Hennessy_Redacted.pdf
OWS - Dep. J Thomas_Redacted.pdf
OWS - Dep. Lamothe_Redacted.pdf
OWS - Dep. Owens_Redacted.pdf
OWS - Dep. Sandu_Redacted.pdf
OWS - Det. M McDonald_Redacted.pdf
OWS - Det. Skaar_Redacted.pdf
OWS - Sgt. Barden_Redacted.pdf
DOL Coleman_Redacted.pdf
DOL Lawson_Redacted.pdf
DOL Venters_Redacted.pdf
WACIC Coleman 1_Redacted.pdf
IIU2017-226_Certification Letter - follow up
satisfied.pdf
A-188 (follow up)_Redacted.pdf
Signed Findings Memo Major Williams IIU2017-
226_Redacted.pdf
Due Date Memo Major Williams IIU2017-226.pdf
Final Memo_Redacted.pdf
Signed Disposition Letter_Redacted.pdf
Signed Receipt Letter_Redacted.pdf
Subject Contact Letter Request_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
20170815_203830_Redacted.pdf

**PLTF EXHIBIT B**

| | |
|---|---|
| 20170815_203851_Redacted.pdf | 897707.pdf |
| 20170815_203857_Redacted.pdf | 897710.pdf |
| CAD_Redacted.pdf | 897713.pdf |
| Commander Review_Redacted.pdf | 897716.pdf |
| IAPro_Redacted.pdf | 20170426_134449.pdf |
| Incident Report- Young_Redacted.pdf | 20170426_134500.pdf |
| IncidentReport_Redacted.pdf | 20170426_134504.pdf |
| OWS- Arico_Redacted.pdf | 20170426_134510.pdf |
| OWS- Owens_Redacted.pdf | 20170426_134516.pdf |
| OWS-Parsons.pdf | 20170426_134521.pdf |
| Commander's review_Redacted.pdf | 20170426_134525.pdf |
| IAPro_Redacted.pdf | 20170426_134538.pdf |
| IncidentReport_Redacted.pdf | 20170426_134549.pdf |
| Owens O.R._Redacted.pdf | 20170426_134555.pdf |
| CAD_Redacted.pdf | 20170426_134602.pdf |
| CAD2_Redacted.pdf | 20170426_134614.pdf |
| IRIS follow up report_Redacted.pdf | 20170426_134631.pdf |
| IRIS incident Report_Redacted.pdf | 20170426_134637.pdf |
| Preliminary Blue Team report_Redacted.pdf | 20170426_134656.pdf |
| A-187.pdf | 20170426_134807.pdf |
| CAD.pdf | 20170426_134817.pdf |
| IAPro.pdf | 20170426_134825.pdf |
| Incident Report- Laux_Redacted.pdf | 20170426_134833.pdf |
| IncidentReport.pdf | 20170426_134842.pdf |
| OWS- Owens.pdf | 20170426_134903.pdf |
| Pursuit Map.pdf | 20170426_134915.pdf |
| Pursuit worksheet.pdf | 20170426_134929.pdf |
| SW Radio.MP3 | 20170426_135006.pdf |
| Updated OWS Owens.pdf | 20170426_135015.pdf |
| 17-135805 CAD_Redacted.pdf | 20170426_135020.pdf |
| A-187 Supervisor 422 review_Redacted.pdf | 20170426_135028.pdf |
| CAD #C17020675 (Owens) Burien 422_Redacted.pdf | 20170426_135855.pdf |
| Final Memo Owens P2017-021.pdf | 20170426_135859.pdf |
| Final Memo Thomas P2017-021.pdf | 20170426_135926_Redacted.pdf |
| Handwrittens C17020633_Redacted.pdf | 20170426_135944.pdf |
| IAPro_Redacted.pdf | 20170426_140231.pdf |
| IncidentReport_Redacted.pdf | 20170426_140240.pdf |
| IR Dep. T. Owens_Redacted.pdf | 20170426_140306.pdf |
| Map_Pursuit Checklist_Redacted.pdf | 20170426_140341.pdf |
| OWS Dep. Arico_Redacted.pdf | 20170426_140346.pdf |
| OWS Dep. B. Miller_Redacted.pdf | 20170426_140443.pdf |
| OWS Dep. G. Anderson_Redacted.pdf | 20170426_140450.pdf |
| OWS Dep. Gervacio (K9).pdf | 20170426_140504.pdf |
| OWS Dep. J. Thomas_Redacted.pdf | 20170426_140702.pdf |
| 897680.pdf | 20170426_140817.pdf |
| 897683.pdf | 20170426_140826.pdf |
| 897686.pdf | 20170426_140844.pdf |
| 897689.pdf | 20170426_143403.pdf |
| 897692.pdf | 20170426_143418.pdf |
| 897695.pdf | 20170426_143508.pdf |
| 897698.pdf | 20170426_143535.pdf |
| 897701.pdf | 20170426_143711.pdf |
| 897704.pdf | 20170426_143746.pdf |

**PLTF EXHIBIT B**

20170426_143840.pdf
103810_Redacted.pdf
103811.pdf
103812.pdf
103813.pdf
103814.pdf
103815.pdf
103816.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
IncidentReport_Redacted.pdf
Related Documents_Redacted.pdf
Supervisor Use of Force Incident Review_Redacted.pdf
CAD C16033846_Redacted.pdf
Commander's review_Redacted.pdf
IAPro_Redacted.pdf
INcident Report C16033846_Redacted.pdf
IncidentReport_Redacted.pdf
MASTER EVID C16033846_Redacted.pdf
OWS ALEXANDER C16033846_Redacted.pdf
OWS CUEVA C16033846_Redacted.pdf
OWS KENNAMER C16033846_Redacted.pdf
PHOTO CUEVA C16033846 FRONT.pdf
PHOTO CUEVA C16033846 LEFT HAND.pdf
PHOTO CUEVA C16033846 LEFT KNEE.pdf
PHOTO CUEVA C16033846 PANT LEGS FRONT.pdf
PHOTO CUEVA C16033846 RIGHT ELBOW 2.pdf
PHOTO CUEVA C16033846 RIGHT ELBOW.pdf
SCORE BOOKING SHEET C16033846_Redacted.pdf
SCORE JAIL LOG C16033846_Redacted.pdf
SCORE PHOTOS C16033846_Redacted.pdf
SCORE STATEMENT COMFORT
C16033846_Redacted.pdf
SCORE STATEMENT DILLEHAY
C16033846_Redacted.pdf
SCORE STATEMENT MARKEN
C16033846_Redacted.pdf
SUPERVISOR USE OF FORCE INVESTIGATION
AND REVIEW MCLAUCHLAN
C16033846_Redacted.pdf
CAD Radio C16054718_Redacted.pdf
Caller Patron C16054718.mp3
Commander Review_Redacted.pdf
DOL C16054718_Redacted.pdf
Evidence C16054718_Redacted.pdf
IAPro_Redacted.pdf
INCID SUPP MCLAUCHLAN C16054718.pdf
Incident Report C160054718_Redacted.pdf
IncidentReport_Redacted.pdf
Library Call 2 C16054718.mp3
Owen Photo Face C16054718.pdf
Owen Photo Full Uniform C16054718.pdf
Owen Photo left elbow C16054718.pdf

Owen Photo Left Face C16054718.pdf
Owen Photo Right knee C16054718.pdf
Owen Photo Taser C16054718.pdf
OWS HENNESSY ci6054718_Redacted.pdf
OWS MALLOY c16054718_Redacted.pdf
OWS THOMAS ci6054718_Redacted.pdf
Superform C16054718_Redacted.pdf
Supervisory Review C16054718_Redacted.pdf
Taser Download C16054718_Redacted.pdf
Voyles Photo Back C16054718.pdf
Voyles Photo Face C16054718_Redacted.pdf
Voyles Photo Thigh C16054718.pdf
Voyles Photo Thigh close up C16054718.pdf
A-125_Redacted.pdf
CAD Entry C16061059_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Inicdent Report Laux_Redacted.pdf
OWS Hayden_Redacted.pdf
OWS Owens_Redacted.pdf
OWS Young_Redacted.pdf
Photgraph Deputy Laux Injury.pdf
Photgraph Deputy Ownes.pdf
Photograph Deputy Laux.pdf
Photograph Suspect Terry 2.pdf
Photograph Suspect Terry_Redacted.pdf
Radio Traffic.MP3
Witness Statement Teala Faulconer_Redacted.pdf
A-125_Redacted.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report-Owens_Redacted.pdf
IncidentReport_Redacted.pdf
OWS-Molina_Redacted.pdf
OWS-Spiewak_Redacted.pdf
OWS-Young_Redacted.pdf
Photos_Redacted.pdf
Witness Statement_Redacted.pdf
911 Audio.MP3
A-125_Redacted.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IRIS Report 1_Redacted.pdf
IRIS Report 2_Redacted.pdf
OWS1_Redacted.pdf
OWS2_Redacted.pdf
Photos UOF 2017-058_Redacted.pdf
V Statement.MP3
17-134642 CAD_Redacted.pdf

PLTF EXHIBIT B

17-134642_C17020491_SW RADIO AND
TAC4_#29_1535-1547_REAL.MP3
Commander Review_Redacted.pdf
FU Dep. T. Owens.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IR Dep. T. Owens_Redacted.pdf
Map_Pursuit Checklist.pdf
OWS Dep. Buetow_Redacted.pdf
OWS Dep. Cueva_Redacted.pdf
OWS Dep. Emrick_Redacted.pdf
OWS Dep. Laux_Redacted.pdf
Photos 1.pdf
Photos 2_Redacted.pdf
Photos 3_Redacted.pdf
Photos 4.pdf
Photos 5.pdf
Photos 6_Redacted.pdf
UOF supervisor review_Redacted.pdf
A-125 for Molina.pdf
A1-25 Owens.pdf
CAD.pdf
CUOFR.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
SW Radio.MP3
Cad C17033976_Redacted.pdf
Commander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report C17033976_Redacted.pdf
IncidentReport_Redacted.pdf
Med Release C17033976_Redacted.pdf
Miller OWS C17033976_Redacted.pdf
Photos_Redacted.pdf
Supervisor Invest and Review C17033976_Redacted.pdf
A-125_Redacted.pdf
Arico OWS_Redacted.pdf
CAD_Redacted.pdf
Commander's Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
Involuntary Committal Form_Redacted.pdf
Photos_Redacted.pdf
Young OWS_Redacted.pdf
Zulker OWS.pdf
17-339575_SW RADIO_Op31_1110-1224_REAL
TIME.MP3
911Radio request.pdf
911Radio request_Redacted.pdf
A-188 (follow-up)_Redacted.pdf
CAD_FU #K17339803 (Robbery)_Redacted.pdf
Cad_Redacted.pdf

CEW report (download).pdf
Commander Review_Redacted.pdf
FU_R - Det. A Thompson_Redacted.pdf
FU_R - Sgt. Barden.pdf
FU-R1 - Det. A Thompson_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IR - Dep. S Tompkins_Redacted.pdf
IS Rpt - Dep. Roach.pdf
OWS - Dep. Arico_Redacted.pdf
OWS - Dep. B Miller_Redacted.pdf
OWS - Dep. G Anderson_Redacted.pdf
OWS - Dep. Gervacio_K9.pdf
OWS - Dep. Hennessy_Redacted.pdf
OWS - Dep. J Thomas_Redacted.pdf
OWS - Dep. Lamothe_Redacted.pdf
OWS - Dep. Owens_Redacted.pdf
OWS - Dep. Sandu_Redacted.pdf
OWS - Det. M McDonald_Redacted.pdf
OWS - Det. Skaar_Redacted.pdf
OWS - Sgt. Barden_Redacted.pdf
Photos 1.pdf
Photos 2_Redacted.pdf
Photos 3.pdf
Photos 4.pdf
Photos 5_Redacted.pdf
UOF Supervisor investigation_Redacted.pdf
A-125 Owens_Redacted.pdf
A-125 Young_Redacted.pdf
CAD_Redacted.pdf
commanders use of force review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
OWS- Owens_Redacted.pdf
OWS-Young_Redacted.pdf
OWS-Zulker.pdf
Photos_Redacted.pdf
911 Tape request form_Redacted.pdf
CAD_18-121885_C18016753_Redacted.pdf
CAD_Redacted.pdf
commanders use of force review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report_Redacted.pdf
IncidentReport_Redacted.pdf
Officer Witness Statements_Redacted.pdf
Photos_Redacted.pdf
Supervisor Investigation and Review
Form_Redacted.pdf
E:\Witnesses\Experts\James Borden\Recs to
Review\Owens Personnel\Witness\
Cad C16056050_Redacted.pdf
Fuller Commendation C16056050_Redacted.pdf

PLTF EXHIBIT B

IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Iris Report C16056050_Redacted.pdf
CAD Printout.pdf
IAPro.pdf
Incident Report.pdf
IncidentReport.pdf
Radio Broadcast.MP3
CAD_Redacted.pdf
Dispatch tape.MP3
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Petersons OR_Redacted.pdf
Preliminary Complaint_Redacted.pdf
Stracks OR_Redacted.pdf
A-102 Master Evidence C18020111.pdf
CAD K18146416_Redacted.pdf
Complaint Report (002).pdf
Complaint Report (002)_Redacted.pdf
Complaint Report.pdf
IAPro_Redacted.pdf
INCIDENT REPORT C18020111 Miller_Redacted.pdf
OWS C18020111 Cueva_Redacted.pdf
CAD Printout C16048092_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IRIS Report C16048092_Redacted.pdf
OWS Deputy Arico C16048092_Redacted.pdf
OWS Deputy Owens C16048092_Redacted.pdf
OWS Deputy Reed C16048092_Redacted.pdf
OWS Deputy Young C16048092_Redacted.pdf
Photos.pdf
A-125_Redacted.pdf
CAD_Redacted.pdf
Commander Review_Redacted.pdf
Dep. Cueva OWS_Redacted.pdf
Dep. Owens OWS_Redacted.pdf
Dep. Price OWS_Redacted.pdf
Glasgow OWS_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
IRIS Report_Redacted.pdf
Photos_Redacted.pdf
Sgt Garza OWS_Redacted.pdf
Taser download.pdf
A-125_Redacted.pdf
CAD_Redacted.pdf
Comander Review_Redacted.pdf
IAPro_Redacted.pdf
Incident Report-Spiewak_Redacted.pdf
IncidentReport_Redacted.pdf
OWS-Laux_Redacted.pdf
OWS-Owens_Redacted.pdf

OWS-Reed_Redacted.pdf
OWS-Young_Redacted.pdf
Photos_Redacted.pdf
Add'l officer's witness statements_Redacted.pdf
CAD Printout_Redacted.pdf
CUOFR_Redacted.pdf
IAPro_Redacted.pdf
Incident Reports_Redacted.pdf
IncidentReport_Redacted.pdf
Photographs.pdf
Stolen Vehicle Report_Redacted.pdf
Supervisor Use of Force Incident Review_Redacted.pdf
A-125_Redacted.pdf
Blue Team follow-up form.pdf
Click Incident Supplemental_Redacted.pdf
Commander Review_Redacted.pdf
Garrity provided to MPO.pdf
Hayden OWS_Redacted.pdf
IAPro_Redacted.pdf
IncidentReport_Redacted.pdf
Karanikolas OWS_Redacted.pdf
LESO BILL OF RIGHTS provided to MPO
Mansanarez.pdf
Mansanarez Incident Report_Redacted.pdf
MPO Mansanarez A-150_Redacted.pdf
MPO Mansanarez Compelled OR_Redacted.pdf
Owens OWS_Redacted.pdf
Photos_UOF 2017-192_Redacted.pdf
Refused Medical Release_Redacted.pdf
Supervisor FU C17057377.pdf
Taser Download.pdf
Audio Request (911 & Radio)_Redacted.pdf
CAD print_Redacted.pdf
CAD xreference_Redacted.pdf
Commanders review_Redacted.pdf
File 1_Redacted.pdf
File 2.pdf
File 3.pdf
File 4.pdf
File 5_Redacted.pdf
FOLLOW-UP SUPPLEMENTAL REPORT (Det.
Cotchaleovitch)_Redacted.pdf
IAPro_Redacted.pdf
INCIDENT REPORT (Dep. Johnson)_Redacted.pdf
INCIDENT SUPPLEMENTAL REPORT (Dep.
Thomas)_Redacted.pdf
IncidentReport_Redacted.pdf
OFFICERS WITNESS STATEMENT (Dep.
Anderson)_Redacted.pdf
OFFICERS WITNESS STATEMENT (Dep.
Arico)_Redacted.pdf
OFFICERS WITNESS STATEMENT (Dep.
Young}_Redacted.pdf

**PLTF EXHIBIT B**

OFFICERS WITNESS STATEMENT (Det. Wheeler)_Redacted.pdf

OFFICERS WITNESS STATEMENT (Maj. Howard)_Redacted.pdf

OFFICERS WITNESS STATEMENT_CaseNbr{c18006995}_OfficerID{00706}_EventID{1522989770}.pdf

OFFICERS WITNESS STATEMENT_CaseNbr{C18006995}_OfficerID{94906}_EventID{-929099520}_Redacted.pdf

OFFICERS WITNESS STATEMENT_CaseNbr{c18006995}_OfficerID{96807}_EventID{1522949347}_Redacted.pdf

Statements_Victim_Witness_Redacted.pdf

Stmt (witness).pdf

UOF review (supervisor)_Redacted.pdf

Deputy_Cesar_Molina_020719_1.mpg

Deputy_Cesar_Molina_020719_2.mpg

Deputy_Cesar_Molina_020719_3.mpg

Deputy_Cesar_Molina_020719_4.mpg

Deputy_Cesar_Molina_020719_5.mpg

IMG_0227.JPG

IMG_0228.JPG

012919 Blakeman Exhibit 1.PDF

012919 Blakeman Exhibit 14.PDF

012919 Blakeman Exhibit 150.PDF

012919 Blakeman Exhibit 151.PDF

012919 Blakeman Exhibit 152.PDF

012919 Blakeman Exhibit 153.PDF

012919 Blakeman Exhibit 154.PDF

012919 Blakeman Exhibit 155.PDF

012919 Blakeman Exhibit 174.PDF

012919 Blakeman Exhibit 175.PDF

012919 Blakeman Exhibit 177.PDF

012919 Blakeman Exhibit 178.PDF

012919 Blakeman Exhibit 181.PDF

012919 Blakeman Exhibit 1A.PDF

012919 Blakeman Exhibit 2.PDF

012919 Blakeman Exhibit 24.PDF

012919 Blakeman Exhibit 2B.PDF

012919 Blakeman Exhibit 52.PDF

012919 Blakeman Exhibit 54.PDF

012919 Blakeman Exhibit 55.PDF

012919 Blakeman Exhibit 56.PDF

012919 Blakeman Exhibit 58.PDF

012919 Blakeman Exhibit 65.PDF

012919 Blakeman Exhibit 71.PDF

012919 Blakeman Exhibit 72.PDF

012919 Blakeman Exhibit 93.PDF

012919 Blakeman Exhibit 97.PDF

012919 Johnson Exhibit 1.PDF

012919 Johnson Exhibit 130.PDF

012919 Johnson Exhibit 15.PDF

012919 Johnson Exhibit 158.PDF

012919 Johnson Exhibit 36 [CONFIDENTIAL].PDF

012919 Johnson Exhibit 52.PDF

012919 Johnson Exhibit 54.PDF

012919 Johnson Exhibit 55.PDF

012919 Johnson Exhibit 56.PDF

012919 Johnson Exhibit 58.PDF

012919 Johnson Exhibit 59.PDF

012919 Johnson Exhibit 6.PDF

012919 Johnson Exhibit 60.PDF

012919 Johnson Exhibit 61.PDF

012919 Johnson Exhibit 62.PDF

012919 Johnson Exhibit 7.PDF

012919 Johnson Exhibit 71.PDF

012919 Johnson Exhibit 74.PDF

012919 Johnson Exhibit 77.PDF

012919 Johnson Exhibit 79.PDF

012919 Johnson Exhibit 8.PDF

012919 Johnson Exhibit 81.PDF

012919 Johnson Exhibit 82.PDF

012919 Johnson Exhibit 83.PDF

012919 Johnson Exhibit 84.PDF

012919 Johnson Exhibit 85.PDF

012919 Johnson Exhibit 90.PDF

012919 Johnson Exhibit 91.PDF

012919 Johnson Exhibit 92.PDF

012919 Johnson Exhibit 93 [WRITTEN NOTE].PDF

012919 Johnson Exhibit 93.PDF

012919 Johnson Exhibit 94.PDF

012919 Johnson Exhibit 96.PDF

012919 Johnson Exhibit 97.PDF

012919 Johnson Exhibit 99.PDF

012919 Johnson Exhibit H.PDF

020719 Molina Exhibit 101.PDF

020719 Molina Exhibit 165.PDF

020719 Molina Exhibit 167.PDF

020719 Molina Exhibit 2 CONFIDENTIAL.PDF

020719 Molina Exhibit 23.PDF

020719 Molina Exhibit 52.PDF

020719 Molina Exhibit 54.PDF

020719 Molina Exhibit 55.PDF

020719 Molina Exhibit 59.PDF

020719 Molina Exhibit 6.PDF

020719 Molina Exhibit 66.PDF

020719 Molina Exhibit 67.PDF

020719 Molina Exhibit 68.PDF

020719 Molina Exhibit 7.PDF

020719 Molina Exhibit 71.PDF

020719 Molina Exhibit 77.PDF

020719 Molina Exhibit 78.PDF

020719 Molina Exhibit 79.PDF

020719 Molina Exhibit 8.PDF

020719 Molina Exhibit 81.PDF

**PLTF EXHIBIT B**

020719 Molina Exhibit 82.PDF
020719 Molina Exhibit 83.PDF
020719 Molina Exhibit 84.PDF
020719 Molina Exhibit 85.PDF
020719 Molina Exhibit 9.PDF

020719 Molina Exhibit 90.PDF
020719 Molina Exhibit 91.PDF
020719 Molina Exhibit 98.PDF
020719 Molina Exhibit I.PDF
020719 Molina Exhibit J.PDF

**PLTF EXHIBIT B**



ge 80 of 80

**PLTF EXHIBIT B**