1

2

3

4

5

6

7

The Honorable Thomas S. Zilly

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

17

18

19

20

BAO XUYEN LE, INDIVIDUALLY, and as the Court appointed PERSONAL REPRESENTATIVE OF THE ESTATE OF TOMMY LE, HOAI "SUNNY" LE, Tommy Le's Father, DIEU HO, Tommy Le's Mother, UYEN LE and BAO XUYEN LE, Tommy Le's Aunts, KIM TUYET LE, Tommy Le's Grandmother, and QUOC NGUYEN, TAM NGUYEN, DUNG NGUYEN, JULIA NGUYEN AND JEFFERSON HO, Tommy Le's Siblings,

Plaintiffs,

vs.

MARTIN LUTHER KING JR. COUNTY as sub-division of the STATE of WASHINGTON, and KING COUNTY DEPUTY SHERIFF CESAR MOLINA,

Defendants.

NO. 2:18-cv-00055-TSZ

DEPUTY SHERIFF CESAR MOLINA'S MOTION FOR SUMMARY JUDGMENT

**NOTE ON MOTION CALENDAR:
April 12, 2019.**

21

22

23

24

25

26

## RELIEF REQUESTED

The Defendant Deputy Sheriff Cesar Molina asks that Plaintiffs' federal and state claims against him be dismissed in their entirety, with prejudice.

## JOINDER IN DEFENDANT KING COUNTY'S
## MOTION FOR SUMMARY JUDGMENT

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1   Molina joins in Defendant King County's Motion for Summary Judgment. To the extent

2   the statement of facts, evidence, grounds for relief and argument apply with equal force to

3   Deputy Molina, Molina incorporates them herein without repeating them.

**EVIDENCE RELIED UPON**

5   1. The arguments, evidence and authorities relied upon and set forth in King County's

6   Motion for Summary Judgment filed separately;

7   2. The Declaration of Cesar Molina and attachments thereto.

8   3. The Declaration of Timothy R. Gosselin.

**STATEMENT OF THE CASE**

10   Molina joins in the statement of the case and supporting documents/evidence submitted

11   by Defendant King County in support of its Motion for Summary Judgment. Molina will

12   supplement that statement as necessary with regard to the particular arguments set forth below.

**ARGUMENT**

**1. Standard of Review**

15   Molina joins in the statement of the summary judgment standard of review set for in

16   Defendant King County's Motion for Summary Judgment.

**2. Deputy Molina is entitled to qualified immunity.**

18   Police officers are entitled to qualified immunity under § 1983 unless (1) they violated a

19   federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly

20   established at the time. *District of Columbia v. Wesby*, __ U.S. __, 138 S.Ct. 577, 589 (2018);

21   *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc). "The purpose of qualified

22   immunity is to strike a balance between the competing 'need to hold public officials accountable

23   when they exercise power irresponsibly and the need to shield officials from harassment,

24   distraction, and liability when they perform their duties reasonably.'" *Mattos v. Agarano*, 661

25   F.3d at 440 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity "is

26

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009)(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

"Under qualified immunity, an officer will be protected from suit when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).  The doctrine "gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1866 (2017)(quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 1867.

"In resolving questions of qualified immunity, courts are required to resolve a 'threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.'" *Scott v. Harris*, 550 U.S. 372, 377 (2007)(quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Id.*

**A.  Molina did not violate Le's constitutional rights.**

Plaintiffs contend that Molina violated two of Le's constitutional rights.  They claim he violated Le's Fourth Amendment right to be free of unreasonable searches and seizures by using unreasonable (deadly) force to subdue him.  Dkt. 27 at ¶¶77- 85, 90-91, 128.  They claim he violated Le's Fourteenth Amendment right to equal protection of the law by using deadly force because he was of Asian descent.

**1.  Plaintiffs cannot show that Molina violated Le's Fourteenth Amendment right to equal protection of the law by using deadly force because he was of Asian descent.**

Molina joins in the argument and authority presented by Defendant King County on this

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 3

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

issue.  As King County accurately points out, there is no evidence that Molina, who is of Hispanic descent, ever expressed racial animus towards persons of Asian descent or any other minority for that matter.  There is no evidence of any prior acts demonstrating racial animus. There is no evidence that racial animus was displayed during the course of the events leading to Mr. Le's death.  Indeed, when asked about the basis for this claim, the lead plaintiff, Bao Xuyen Le, testified it was simply that Deputy Molina was not the same color as Le so his actions had to be racially motivated.

> One of your claims is that my client shot Tommy with racial bias towards the Asian community. Do you understand that?
>
> A Yes.
>
> Q Why do you believe that my client acted on a racial basis?
>
> A Because he's a different color than from Tommy. If he were in a neighborhood of his color, or let's say, you know, in Bellevue, would he have acted differently?
>
> Q Okay. So is it -- in your mind it's the fact that he is a different color from Tommy that is -- causes that belief, that he acted with racial bias; is that correct?
>
> A Yes. He wouldn't have shot one of his color, own people.

Dec. Gosselin at 4.  The contention is scurrilous and inadequate on its face.

In addition, Plaintiffs are precluded as a matter of law from asserting a Fourteenth Amendment claim against Molina. Substantive due process analysis is inappropriate where Plaintiffs' claim is covered by the Fourth Amendment.  *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); accord *Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Graham v. Connor*, 490 U.S. 386, 395 (1989).

**2.  Plaintiffs cannot establish that Molina violated Le's Fourth Amendment right to be free of unreasonable searches and seizures by using unreasonable (deadly) force to subdue him.**

To determine whether the force used by the officers was excessive under the Fourth Amendment, the court must assess whether it was objectively reasonable "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 4

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1   motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Determining whether the force used

2   to effect a particular seizure is reasonable under the Fourth Amendment requires a careful

3   balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

4   interests against the countervailing governmental interests at stake." *Id.* at 396 (citations and

5   internal quotation marks omitted). "The use of deadly force implicates the highest level of

6   Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life'

7   and because such force 'frustrates the interest of the individual, and of society, in judicial

8   determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d

9   1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9).  When deadly force is used, the issue

10  is determining whether the governmental interests at stake were sufficient to justify it.  *Vos v.*

11  *City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018).

12      To determine the strength of the government's interest, courts must evaluate "the facts

13  and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)]

14  whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)]

15  whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations

16  omitted). The *Graham* factors are not exhaustive. *George v. Morris*, 736 F.3d 829, 837-38 (9th

17  Cir. 2013). There are no per se rules in the Fourth Amendment excessive force context.  *Torres*

18  *v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). The inquiry is highly fact-intensive.  *Id.*

19  Courts must "examine the totality of the circumstances and consider 'whatever specific factors

20  may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v.*

21  *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted).

22      "The 'reasonableness' of a particular use of force must be judged from the perspective of

23  a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490

24  U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

25      We recognize that "police officers are often forced to make split-second
        judgments — in circumstances that are tense, uncertain, and rapidly evolving —

26

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1    about the amount of force that is necessary in a particular situation," *Graham*, 490
     U.S. at 397, 109 S.Ct. 1865, and that these judgments are sometimes informed by
2    errors in perception of the actual surrounding facts.

3    *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).

4          The recent decision in *Vos v. City of Newport Beach*, supra, provides clear guidance for

5    applying these principles to this case.  The facts are closely analogous but materially different.

6    In *Vos*, police responded to a call about a man behaving erratically and brandishing a pair of

7    scissors at a 7-Eleven.  In the course of the event, eight officers arrived on scene.  The officers

8    surrounded the store, barricaded it with their vehicles, and were able to get the occupants out of

9    the store leaving only the suspect inside.  Officers learned that one of the store clerks had his

10   hand cut trying to disarm the suspect.  A standoff followed that lasted around 20 minutes.

11   During that time, the commanding officer called for a 40-mm less-lethal projectile gun, which

12   was in place before the man finally emerged from the store.  There was also a canine unit on

13   scene.  When the man emerged the court described the events this way:

14        At about 8:43 p.m., Vos opened the door of the 7-Eleven's back room. As he did
          so, some officers shouted "doors opening." Vos then ran around the front
15        check-out counter and towards the open doors. As he ran, he held an object over
          his head in his hand. The distance between Vos and the officers at the point he
16        started running was approximately 30 feet. One officer shouted that Vos had
          scissors. Over the public address system, Officer Preasmyer twice told Vos to
17        "Drop the weapon." Vos did not drop the object and instead kept charging
          towards the officers. Officer Preasmyer then shouted "shoot him." Officer
18        Preasmyer later testified that this order was directed solely to Officer Shen.
          Officer Shen fired his less-lethal weaponry and, within seconds, Officers Henry
19        and Farris fired their AR-15 rifles. No other officers fired. Vos continued to run
          as he was struck by the bullets, collapsing on the sidewalk in front of the officers.
20        Vos was shot four times and died from his wounds. About eight seconds elapsed
          from the time Vos came out of the back room to when he was killed.
21
22   892 F.3d at 1030.  On these facts, the court decided "a reasonable jury could find that the force

23   employed was greater than is reasonable under the circumstances." *Id*. at 1034.  The court

24   reasoned first, that officers were not responding to a report of a crime.  Officers were there only

25   because of the suspect's erratic behavior.  Second, once the officers were there, the suspect had

26   little chance to flee.  He was surrounded by police.  Moreover, the officers had given him no

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 6

verbal commands, and thus did not know his level of compliance.  Third and, as the court noted, most importantly, the suspect did not present an immediate threat to the officers.

> The officers had surrounded the front door to the 7-Eleven, had established positions behind cover of their police vehicles, and outnumbered Vos eight to one. The officers saw that Vos had something in his hand as he charged them, but they did not believe he had a gun, and the officers had less-lethal methods available to stop Vos from charging.

892 F.3d at 1032. The court added:

> Here, by the time Vos advanced, eight officers had arrived on the scene, Officer Shen was armed with the 40-millimeter less lethal firearm, there was a canine unit present, and other officers had tasers. The officers also had the door surrounded and had established defensive cover using police vehicles.

*Id.* at 1033.  Even on these facts, the decision was not unanimous.  See *Id.* at 1038 (Bea, J., Dissenting)

The facts here, while eerily similar in some respects, stand in stark contrast in all material, respects.  Here the facts favor Molina's actions.  For example, here, Molina <u>was</u> responding not only to a crime, but to a serious crime.  Civilians had reported that Le had chased and threatened them with a weapon. That constituted at least assault in the second degree. RCW 9A.36.021(1)(c);  *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009); *State v. Farrell*, No. 48309-2-II (Wn. App., Jan. 31, 2017)(unpublished).  Once Molina was there, Le's advancement towards the officers after being instructed to get on the ground at least constituted intimidating a public servant.  RCW 9A.76.180(1); *State v. Burke*, 132 Wn.App. 415, 417-18, 132 P.3d 1095 (2006)(suspect's physical behavior met the statutory definition of "threat" when he took a fighting stance with raised fists).  In Washington, assault in the second degree and intimidating a public servant are class B felonies.  RCW 9A.36.021(2)(a); 9A.76.180(4).

Moreover, Le <u>had</u> the ability to flee as well as – importantly – the ability to attack.  Le left the scene before officers arrived.  His location was unknown until he suddenly reappeared.  As a result, officers did not have him contained and he had virtually unfettered movement.  At the time of the shooting, he was moving towards the officers.  This factor weighs in favor of

Molina.

In addition, Molina had given Le verbal commands.  He instructed Le to drop his weapon and get on the ground.  As a result, Molina knew Le was non-compliant.  This factor weighs in favor of Molina. See *Miller v. Clark County*, 340 F.3d 959, 965 (9th Cir. 2003)("from the viewpoint of an officer confronting a dangerous suspect, 'a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death.'") quoting *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994).

Additionally, officers not only had, but used, less-than-lethal force before resorting to lethal force.  Deputy Molina twice and Deputy Owens once each attempted to administer taser blasts.  They had no effect.  And, unlike the twenty minutes officers in *Vos* had to plan and prepare for the suspect's exit, here officers had only moments to respond. Molina had been on the seen for only seconds before Le confronted him. This factor also weighs in favor of Molina.

Most importantly, Le did present an immediate threat to the officers and to bystanders. Molina had reason to believe Le was armed.  Instead of either fleeing the scene or respecting the police presence and complying with the officer's instructions as the armed civilian witnesses had, Le advanced into the scene, aggressively coming towards the officers and the civilians.  All the officers saw that Le was holding a pointed object in his hand.  None identified it as a pen.  Le ignored the instructions.  By the time Molina deployed his taser, Le had cut the distance between him and Molina to no more than 25 feet and was closing.   Even Le's own police practices expert agrees that Molina could reasonably fear death or serious physical injury from Le and justified in using his taser. See Dec. Gosselin at 2.  Under the circumstances, he was justified in fearing for the safety of the other officers and the civilians as well, all of whom were in Le's path.  This factor heavily favors Molina.

Other factors also favor Molina.  The events unfolded incredibly quickly:  Molina got to the scene at 12:03.11AM, and his shots were reported to dispatch at 12:04.56, 105 seconds later.

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 8

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

It was night and dark.  These facts demonstrate that Molina was forced into the kind of split-second decision-making that both underlie the doctrine of qualified immunity and courts are unwilling to second-guess.  *Graham v. Connor*, 490 U.S. at 397 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.")

Plaintiffs' primary argument will be based on optics and emotion.  They will reduce the event to a characterization that Molina shot a smaller, unarmed man, in the back, who presented no risk to Molina because he had already gone past him.  In *District of Columbia v. Wesby*, __ U.S. __, 138 S.Ct. 577 (2018), however, the court explicitly rejected the application of such a narrow focus.  *Wesby* reiterated that each fact must be viewed only in the totality of the circumstances, not in isolation.  138 S.Ct. at 588.  "The totality of the circumstances requires courts to consider the whole picture.  Our precedents recognize that the whole is often greater than the sum of its parts — especially when the parts are viewed in isolation."  *Id.* (internal quotations and citations omitted).  In addition, the court reiterated that the circumstances must be viewed from perspective of a reasonable officer.  "As we have explained, the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."  *Id.*

Here, in the totality of the circumstances, Molina knew nothing of Le's physical abilities except that the had resisted three taser blasts.  Molina could reasonably believe Le was armed.  And, even if Le had passed Molina, Molina could reasonably believe that, at a minimum, Le's advancement towards others continued to present a risk of serious physical injury or death to them.

Plaintiffs will argue the factors should be applied differently here.  They claim that Molina fired his last shot as Le was on or falling towards the ground, and thus was no longer a

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 9

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1  risk to anyone.  Dec. Gosselin at 3-4.  While this contention is highly disputed, even if true, it

2  does not alter the outcome.  Plaintiffs do not dispute that Molina fired his shots in rapid

3  succession, that his first four shots missed (three shots) or only struck Le in the hand (one shot),

4  and that Le continued to advance while all the shots were being fired.  *Id.*  Thus, Le presented

5  the same threat when Molina's last two shots were fired that he presented when the first four

6  were fired.

7      Plaintiffs will also contend that these factors should be applied differently because Le

8  was carrying a pen, not a weapon.  The argument is based on, and has the benefit of, hindsight.

9  None of the officers, including Deputy Molina, perceived the object as a pen.  The object they

10  saw was consistent with the weapon described by the civilians.  Moreover, in *Gregory v. County*

11  *of Maui*, 523 F.3d 1103 (9th Cir. 2008), the Ninth Circuit rejected the argument that a pen was

12  not a weapon that justified the use of force.  There, officers subdued an individual carrying a pen

13  who died immediately thereafter.  Applying the same factors discussed above, the court held that

14  the officer's use of force was reasonable under the circumstances.

15      Here, the officers had substantial grounds for believing that some degree
    of force was necessary in confronting Gregory. Upon arriving at the scene, the
16      officers were informed that Gregory had assaulted Finazzo and that he possibly
    was under the influence of drugs; it is undisputed that Gregory acted in a bizarre
17      manner throughout the confrontation. When the officers entered the studio, they
    saw Gregory holding a pen with its point facing toward them. While the pen is not
18      always mightier than the sword, a properly wielded writing instrument may inflict
    lethal force. See *United States v. Bankston*, 121 F.3d 1411, 1412 n.1 (11th Cir.
19      1997) (noting that a pen held by a bank robber was a "dangerous weapon" where
    the robber threatened to use it to kill a teller).

20      The officers did not immediately engage in a physical confrontation with
21      Gregory. Rather, they first asked him to drop the pen. Only after Gregory
    repeatedly and expressly refused to comply did they attempt to disarm him, and
22      they only sought to restrain Gregory once he resisted. There is no showing that
    the officers ever struck Gregory, or that they drew or used a weapon. See *Arpin*,
23      261 F.3d at 922 (holding that officers did not use excessive force in "using
    physical force to handcuff" an unarmed suspect who resisted by stiffening her
24      arm).

25      Accordingly, although the confrontation came to a tragic end, we must
    conclude that the officers did not use excessive force. The severity of Gregory's

26

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 10

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

trespass and of the threat he posed were not overwhelming, but we are satisfied that the force used by the officers was proportionate to both. The Fourth Amendment does not require more. See Forrester v. City of San Diego, 25 F.3d 804, 807-08 (9th Cir. 1994) ("Police officers . . . are not required to use the least intrusive degree of force possible . . . [T]he inquiry is whether the force that was used to effect a particular seizure was reasonable.").

523 F.3d at 1106-07.  *Gregory* establishes that the inquiry remains the same regardless of the fact that Le was carrying a pen.

Plaintiffs also may argue that issues of fact exist whether Molina identified himself as an officer or gave warnings he was about to shoot.  However, officers are only required to give a warning "where feasible." *Tennessee v. Garner*, 471 U.S. at 12 (1985). "Verbal warnings are not feasible when lives are in immediate danger and every second matters." *Estate of Martinez v. City of Federal Way*, 105 F. App'x 897, 899 (9th Cir. 2004).  Molina had only seconds to act as Le came towards him.

Perhaps in reliance on *Gregory*, Plaintiff may argue that Le's comparative size afforded Molina the option to wrestle Le to the ground.  During the autopsy, the medical examiner determined that Le was 5'4" and weighed 123 pounds.  Molina is 5'6" and weighs 175 pounds. (Dep. Molina at 8, lns. 20-23.)  Plaintiffs may claim that, like the officers in *Gregory*, Molina, alone or together with other officers, should have wrestled Le to the ground.

As in *Vos*, the circumstances confronting the officers in *Gregory* were materially different than those confronting Molina.  In *Gregory*, the suspect was not reported to have assaulted civilians with a weapon.  Here, Molina was told Le had chased civilians with a knife. In *Gregory*, the confrontation occurred indoors, in a well-lit environment that was fully contained, and the officers knew the object the subject held was a pen.  Here, the encounter occurred in the middle of the night, outdoors, with minimal lighting, and Molina did not know the object was a pen.  Not only did he not know the object was a pen, he had been told Le had been carrying a knife or pointed object sufficient to cause fear in the civilians and one to fire a gun.  In *Gregory*, civilians were not at risk.  The civilians were outdoors and out of harm's way.

1   Here, the civilians were at the scene and in the path of Le's advancement.  In *Gregory*, the

2   subject did not advance on the officers.  Here, Le came directly at the officers and the civilians.

3   The only similarity is that in both circumstances the officers initially employed less-than-lethal

4   force.  Critically, in *Gregory*, the effort was successful so that other levels of force were not

5   necessary; here it was not.

6          In *Gregory*, the court was able to say "the severity of Gregory's trespass and of the threat

7   he posed were not overwhelming" but "the force used by the officers was proportionate to both."

8   523 F.2d at 1107.  Here, Le had attacked civilians with a weapon, fled then returned and

9   aggressed into the scene, towards officers, and towards the civilians he previously attacked.  He

10  was carrying an object that appeared, and indeed was, capable of inflicting serious injury or

11  death.  He refused repeated lawful commands, and resisted three taser blasts.   The threat here

12  was severe.  The force was proportional to it.  *Gregory* does not support Plaintiff's Fourth

13  Amendment claim.

14         Plaintiffs' argument also fails because it begs the question before the court and ignores

15  the applicable legal standard.

16         In *Scott v. Henrich* [39 F.3d 912 (9th Cir. 1994)], we held that even though the
     officers might have had "less intrusive alternatives available to them," and
17   perhaps under departmental guidelines should have "developed a tactical plan"
     instead of attempting an immediate seizure, police officers "need not avail
18   themselves of the least intrusive means of responding" and need only act "within
     that range of conduct we identify as reasonable." We reinforced this point in
19   *Reynolds v. County of San Diego*, [84 F.3d 1162 (9th Cir. 1996)] which
     distinguished *Alexander* because "the court must allow for the fact that officers
20   are forced to make split second decisions." We affirmed summary judgment for
     the defendant police officers despite experts' reports stating--like the expert
21   report in the case at bar--that the officers should have called and waited for
     backup, rather than taking immediate action that led to deadly combat. We held
22   that, even for summary judgment purposes, "the fact that an expert disagrees with
     the officer's actions does not render the officer's actions unreasonable." Together,
23   *Scott* and *Reynolds* prevent a plaintiff from avoiding summary judgment by
     simply producing an expert's report that an officer's conduct leading up to a
24   deadly confrontation was imprudent, inappropriate, or even reckless. Rather, the
     court must decide as a matter of law "whether a reasonable officer could have
25   believed that his conduct was justified."

26

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

*Lal v. State of California*, 746 F.3d 1112, 1118 (9th Cir. 2014), quoting *Billington v. Smith*, 292

F.3d 1177, 188-89 (9th Cir. 2002).

The decision in *Lal* illustrates these principles.  The facts were summarized in *Vos*:

> In Lal, officers responded to a domestic violence call followed by a 45-minute
> high-speed car chase. 746 F.3d at 1113-14. During the pursuit, officers learned
> that Lal wanted them to shoot him and he wanted to kill himself. Id. at 1114.
> After Lal's vehicle was disabled, he got out and officers told him to put his hands
> in the air. Id. Lal briefly complied before putting his hands in his pockets and
> saying "just shoot me, just shoot me." *Id*. Lal then reached down, grabbed rock,
> and smashed it repeatedly into his own forehead. *Id*. He also attempted to pull a
> metal stake out of the ground to impale himself. *Id*. Lal then approached the
> officers while carrying a rock in his hand and pretended his cell phone was a gun,
> and he threw several soft-ball sized rocks at the officers, and one struck a
> spotlight on a patrol car. *Id*. The officers asked for "less than lethal assistance"
> and were told a canine unit was on the way. *Id*. Lal picked up a large,
> football-sized rock and continued to advance on officers despite their commands.
> *Id*. The officers fired on Lal when he was a few feet away, killing him. *Id*. at
> 1115. We held that the officers reasonably believed that Lal would heave the rock
> at them, emphasizing that Lal "forced the issue by advancing on the officers," and
> "[t]he fact that Lal was intent on 'suicide by cop' did not mean that the officers
> had to endanger their own lives by allowing Lal to continue in his dangerous
> course of conduct." *Id*. at 1117-18 (finding "no suggestion that the officers
> intentionally provoked Lal. Rather, the totality of the circumstances shows that
> they were patient. ... Instead, it was Lal who forced the confrontation").

892 F.3d 1032-33.  Yet, despite the arguable opportunity to use other levels of force, and despite

the fact that the suspect was carrying a rock and not a more traditional weapon, the court held

that the officers use of deadly force was reasonable.

The same result should follow here.  Molina had been told Le was armed and dangerous,

potentially carrying both a knife and/or a pointed object.  It is undisputed that Molina had been

informed that Le was acting erratically, he had attacked civilians, and that shots had been fired.

Molina received no description of the knife or pointed object, but knew the object could be

sufficiently dangerous to cause fear from at least two civilians and one to fire a gun.  The

description he had allowed the possibility that Le could have any range of dangerous weapons

that comported with the pointed object he saw Le carrying: a penknife, screwdriver, ice pick, or

even a more traditional knife as viewed from its edge.  Even Plaintiffs' experts agree that Le also

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 13

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1    could have hidden a weapon under his clothes.

2        Moreover, once Molina arrived at the scene, events unfolded incredibly quickly:  Molina

3    got to the scene at 12:03.11AM, and his shots were reported to dispatch at 12:04.56, 105 seconds

4    later.  It is undisputed that in that time Le returned to the scene after leaving it.  By the time he

5    returned, there were three police cars at the intersection, with three uniformed police officers and

6    three civilians standing in close proximity.  Instead of either retreating from the scene or

7    respecting the police presence as the civilian witnesses had, Le advanced on the scene,

8    aggressively coming towards the officers and the civilians.  All of the officers saw that Le was

9    holding a pointed object in his hand.  None identified it as a pen.  Le was given multiple verbal

10   commands that included commands to drop the object and get on the ground.  Le ignored the

11   instructions and continued to advance into the scene, towards the officers and towards the

12   civilians.  Molina deployed his taser twice.  By that time, Le had closed the distance between

13   him and Molina to no more than 25 feet.   Neither deployment stopped Le, who continued to

14   advance towards the officers and the scene.  It is undisputed that Molina heard deputy Owens

15   deploy his taser, which also did not stop Le's advance. At that moment, Molina could reasonably

16   believe that Le presented a risk of death or serious injury to himself, the other officers, and the

17   civilians.  See *Miller v. Clark County*, 340 F.3d 959, 965 (9th Cir. 2003)("from the viewpoint of

18   an officer confronting a dangerous suspect, 'a potential arrestee who is neither physically

19   subdued nor compliantly yielding remains capable of generating surprise, aggression, and

20   death.'") quoting *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994).  Only then did

21   Molina fire his service weapon.   While Plaintiffs attempt to make much of the fact that the last

22   two of Molina's shots struck Le in the back, it is undisputed that Molina was backing out of Le's

23   path of advancement when he fired, and that the two shots struck at a left to right, side to side,

24   angle consistent with that movement.

25        In short, Molina knew that Le had committed a serious crime, he had actively resisted

26

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 14

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1   arrest, he threatened Molina and other officers with a weapon, and was moving towards officers

2   and civilians in a manner that allowed him to carry out that threat.  It is respectfully submitted

3   that under these circumstances, an objectively reasonable officer in Molina's position had

4   substantial grounds for believing that the use of deadly force was necessary to protect himself,

5   other officers and civilians.  Molina did not use excessive force, and did not violate Le's rights

6   under the Fourth Amendment to the United States Constitution.

7               **B.  Even if Molina violated Le's constitutional rights, the rights were neither
             clearly established, nor rights of which a reasonable officer would have
8            known.**

9        Individual officers are protected "from liability for civil damages insofar as their conduct

10  does not violate clearly established statutory or constitutional rights of which a reasonable

11  person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Clearly established

12  means that "at the time of the officer's conduct, the law was sufficiently clear that every

13  reasonable official would understand that what he is doing is unlawful." *District of Columbia v.*

14  *Wesby*, __ U.S. __, 138 S.Ct. 577, 589 (2018).  To be clearly established, "existing law must

15  have placed the constitutionality of the officer's conduct 'beyond debate.'"  *Id.*, quoting *Ashcroft*

16  *v. al-Kidd*, 563 U.S. 731, 741 (2011).

17          To be clearly established, a legal principle must have a sufficiently clear
         foundation in then-existing precedent. The rule must be settled law, which means
18       it is dictated by controlling authority or a robust consensus of cases of persuasive
         authority. It is not enough that the rule is suggested by then-existing precedent.
19       The precedent must be clear enough that every reasonable official would interpret
         it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is
20       not one that every reasonable official would know.

21          The "clearly established" standard also requires that the legal principle clearly
         prohibit the officer's conduct in the particular circumstances before him. The
22       rule's contours must be so well defined that it is clear to a reasonable officer that
         his conduct was unlawful in the situation he confronted. This requires a high
23       degree of specificity. We have repeatedly stressed that courts must not define
         clearly established law at a high level of generality, since doing so avoids the
24       crucial question whether the official acted reasonably in the particular
         circumstances that he or she faced. A rule is too general if the unlawfulness of the
25       officer's conduct does not follow immediately from the conclusion that the rule
         was firmly established.

26

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 15

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1   Id. at 589-90 (internal quotations and citations omitted).[1]  The focus is on how a reasonable

2   official "could have interpreted" the authority.  Id. at 591 n.8, quoting *Reichle v. Howards*, 566

3   U.S. 658, 665-666 (2012) . This is a "demanding standard" that "protects all but the plainly

4   incompetent or those who knowingly violate the law." *Id.* at 589.

5          The question of whether a right is clearly established for purposes of qualified immunity

6   analysis is a matter of law to be decided by a judge.  *Reese v. County of Sacramento*, 888 F.3d

7   1030, 1037 (9th Cir. 2018).  Plaintiffs bear the burden of showing that the rights allegedly

8   violated were clearly established. *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th

9   Cir. 2017) (internal quotation marks and citation omitted).

10         Molina contends that existing precedent show that the rights allegedly violated were not

11  "clearly established," and whether he acted unlawfully was not "beyond debate." In cases like

12  *Lal v. State of California*, where officers used deadly force on an individual who aggressed on

13  them with a rock, and *Gregory*, where the court recognized that a pen may be a deadly weapon,

14  the court approved the uses of force as not violative of the individual's constitutional rights.

15  Accord *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (holding that officer's shooting of

16  plaintiff did not violate a constitutional right where plaintiff had ignored officer commands and

17  was accelerating towards officer on foot).

18         In many other cases, some of which were decided either after the events involving Le or

19  contemporaneous with them, the courts have held that even though more egregious uses of force

20  may have violated the person's constitutional rights, the right was not clearly defined so

21  qualified immunity applied.  In *Kisela v. Hughes*, __ U.S. __, 138 S.Ct. 1148 (2018), decided

22  nine months after the shooting in this case, the Court held that the law was not clearly

23  established where officers shot a mentally ill woman holding a kitchen knife by her side standing

24  in close proximity to her roommate).

25
26         [1] The *Wesby* Court suggested but did not decide that only its precedent may qualify as controlling authorities for purposes of qualified immunity.  District of Columbia v. Wesby, __ U.S. __, 138 S.Ct. at 591 n.8. (2018).

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

[O]fficers had arrived on the scene after hearing a police radio report that a woman was engaging in erratic behavior with a knife. They had been there but a few minutes, perhaps just a minute. When Kisela fired, Hughes was holding a large kitchen knife, had taken steps toward another woman standing nearby, and had refused to drop the knife after at least two commands to do so.

. . . . .

Kisela says he shot Hughes because, although the officers themselves were in no apparent danger, he believed she was a threat to Chadwick. Kisela had mere seconds to assess the potential danger to Chadwick. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down Kisela and Garcia. Kisela was separated from Hughes and Chadwick by a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she failed to acknowledge at least two commands to drop the knife. Those commands were loud enough that Chadwick, who was standing next to Hughes, heard them. This is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment.

138 S.Ct. at 1150, 1153.

In *Reese v. County of Sacramento*, *supra*, also decided nine months after this incident, the court held the right was not clearly established where, after the suspect answered his door with a knife, he retreated into his home, dropped the knife, then returned to the door where the officer shot him.  The officer shot the suspect from three to five feet away but could not see the suspect's hands at the time.  888 F.3d at 1038.

In *Vos, supra*, decided one year after the incident involving Le, the court held that the law was not clearly established that deadly force should not be used on a reportedly erratic individual that took refuge in a 7-Eleven, cut someone with scissors, asked officers to shoot him, simulated having a firearm, and ultimately charged at officers with something in his upraised hand.

In *S. B. v. County of San Diego*, 864 F.3d 1010, (9th Cir. 2017), decided thirty days before the incident in this case, the court concluded the law was not clearly settled where officers shot a mentally ill and intoxicated individual who was on his knees, at the moment his hand touched a knife, and without using an available taser.  Accord *Woodward v. City of Tucson*, 870 F.3d 1154 (9th Cir. 2017) (holding the law not clearly established in May 2014 where officers used deadly

force on a suspect who attacked them in his apartment while growling and brandishing a broken hockey stick).

In light of these precedents, it cannot be said that the law was so well defined that Molina would have known that using deadly force violated Le's constitutional rights.  Molina is, therefore, entitled to qualified immunity on Plaintiffs' constitutional claims.

That conclusion is proper even if the court finds an issue of fact as to whether Le was armed.  Plaintiffs may argue that *Tennessee v. Garner*, 471 U.S. 1 (1985), provides clearly established law here because Le was unarmed and did not pose a threat of serious harm. *Garner* concerned the actions of a police officer who shot and killed a fleeing burglary suspect. 471 U.S. at 3-4. The officer testified that he was "reasonably sure" that the suspect was unarmed. *Id*. The officer relied on a Tennessee law that allowed officers to use any means necessary to effect an arrest regardless of the circumstances. *Id*. at 4. The Supreme Court concluded that the statute was unconstitutional in so far as it permitted the use of deadly force to "seize an unarmed, non-dangerous suspect." *Id*. at 11. In contrast, such use of force would be reasonable if the officer had "probable cause to believe that the [escaping] suspect pose[d] a threat of serious physical harm." *Id*.

*Garner* does not provide clearly established law in "the specific context of [this] case," *Hernandez v. City of San Jose*, 897 F.3d 1125, 1137 (9th Cir. 2018)(brackets in original), because, even if Le was unarmed, the court must assess reasonableness based on the facts known to Molina at the time. See *Graham*, 490 U.S. at 396. It would not have been clear to a reasonable officer in Molina's position that Le was unarmed and non-dangerous.  Molina arrived at the scene based on reports that Le was armed with a knife or pointed object.  He observed Le with an object in his hand, Le ignored Molina's commands to drop the object, and advanced on Molina coming within a few feet of him. A reasonable officer in Deputy Molina's position could have concluded, particularly in the context of the "tense, uncertain, and rapidly evolving"

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 18

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1   situation, *Graham*, 490 U.S. at 397, that Le was armed and posed a threat of immediate harm.

2   Therefore, "in the specific context of this case," *Hernandez, supra*, it would not have been clear

3   to a reasonable officer in Deputy Molina's position that *Garner* prohibited using lethal force to

4   stop Le's advancement.

5   **3.  The court should dismiss Plaintiffs' state law claims.**

6   In addition to their claims under 42 U.S.C. §1983, Plaintiffs assert a claim under

7   Washington's wrongful death statute for "negligently causing the death of Tommy Le" and for

8   the tort of outrage.  (Dkt. 27 at 20, lns. 9-16.)  Molina joins in the arguments and authorities set

9   forth by defendant King County in its motion seeking dismissal of these claims.  He offers the

10  following additional reasons.

11  First, Plaintiffs' claims are completely barred under RCW 4.24.420.  That statute

12  provides for a "complete defense to any action for personal injury or wrongful death" when the

13  person killed was "engaged in the commission of a felony at the time of the occurrence causing

14  the injury or death and the felony was a proximate cause of the injury or death."  Under this

15  statute, summary judgment is warranted on a claim for damages for wrongful death if the

16  decedent was engaged in the commission of a felony at the time of the occurrence causing the

17  death, and the felony was a proximate cause of the death. In *Estate of Lee ex rel. Lee v. City of*

18  *Spokane*, 101 Wn. App. 158, 177, 2 P.3d 979 (2000), defendant officers had probable cause to

19  arrest decedent for domestic violence.  Officers came to the door with decedent's wife and

20  decedent threatened that "two people are going to die tonight." 101 Wn. App. at 164.  Decedent

21  opened the front door to defendant officers, holding a rifle. *Id*. When the officers commanded

22  that decedent drop the gun, he refused, instead raising it and pointing it directly at one of the

23  officers. *Id*.  The officers drew their weapons and fired once at the decedent.  *Id*.  Decedent was

24  found with the gun in hand, and other guns and ammunition throughout the home.  *Id*.  On

25  appeal, the trial court's denial of the defendant officer's motion for summary judgment on

26

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 19

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

certain state law claims was reversed.  *Id*. The appellate court held that defendant officers were statutorily immune from liability under RCW 4.24.420, because the decedent was committing a felony, first degree assault (RCW 9A.36.0l l) by pointing a gun at an officer and his wife after threatening to shoot them.  *Id*. at 177.  Accord *Estate of Villarreal ex rel. Villarreal v. Cooper*, 929 F.Supp.2d 1063, 1078 (E.D. Wn. 2013); *Haugen v. Brosseau*, 339 F.3d 857 (9th Cir. 2003) (rev. on other grounds, 543 U.S. 194 (2004)).

No serious argument can be made that Le's attack on either the civilians or Deputy Molina were not felonies.  As noted previously, civilians had reported that Le had chased and threatened them with a knife.  Those acts constituted assault in the second degree.  RCW 9A.36.021(1)(c); *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009); *State v. Farrell*, No. 48309-2-II (Wn. App., Jan. 31, 2017)(unpublished).  Once Molina was there, Le's advancement towards the officers after being instructed to get on the ground constituted intimidating a public servant.  RCW 9A.76.180(1); *State v. Burke*, 132 Wn.App. 415, 417-18, 132 P.3d 1095 (2006)(suspect's physical behavior met the statutory definition of "threat" when he took a fighting stance with raised fists).  In Washington, assault in the second degree and intimidating a public servant are class B felonies.  RCW 9A.36.021(2)(a); 9A.76.180(4).  Because the shooting occurred in the course of those felonies, Molina has a complete defense to liability under state law.

Second, Molina's actions were privileged as a matter of law. An officer making a lawful arrest is privileged to use such force as is reasonably necessary to secure and detain the offender, overcome his resistance, prevent his escape and secure him if he escapes.  *Smith v. Drew*, 175 Wn. 11, 18 (1933); *Reese v. City of Seattle*, 81 Wn.2d 374, 380 (1972).  Under Washington law police officers have a duty to arrest people who commit crimes. RCW 36.28.010(1) (sheriff or deputies "[s]hall arrest and commit to prison all persons who break the peace, or attempt to break it, and all persons guilty of public offenses"). RCW 9A.16.020 provides that force is lawful

DEPUTY SHERIFF CESAR MOLINA'S
MOTION FOR SUMMARY JUDGMENT
[No. 2:18-cv-00055-TSZ]
Page - 20

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

1    "[w]henever necessarily used by a public officer in the performance of a legal duty, or a person

2    assisting the officer and acting under the officer's direction." RCW 9A.16.020(1).

3           Again, there can be no serious dispute that Molina was acting to secure and/or detain Le

4    at the time of the shooting.  As discussed above, Molina's actions, including his use of deadly

5    force, were reasonable under the circumstances.  Therefore his actions are privileged.

6                                        **CONCLUSION**

7           For the foregoing reasons, and those stated in Defendant King County's Motion for

8    Summary Judgment, Defendant Molina asks that Plaintiffs' claims against him be dismissed in

9    their entirety with prejudice.

10          Dated this 21st day of March, 2019,


                              By : ___ *s/ Timothy R.Gosselin* _____
                              Timothy R. Gosselin, WSBA #13730
                              GOSSELIN LAW OFFICE, PLLC
                              1901 Jefferson Ave., Suite 304
                              Tacoma, WA 98402
                              253-627-0684
                              tim@gosselinlawoffice.com
                              Attorney for Defendant Molina

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028

CERTIFICATE OF MAILING AND SERVICE

I hereby certify that on the 21st day of March, 2019, I electronically filed the foregoing document(s) with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Jeffrey M Campiche                          Dan Kinerk
Philip G. Arnold                             Kathy Van Olst
Jacqueline Hackler                           Senior Deputy Prosecuting Attorney
Attorneys for Plaintiff                      King County Prosecuting Attorney's Office, Civil
CAMPICHE ARNOLD PLLC                          Division
2025 First Avenue, Suite 830                 500 Fourth Avenue, Suite 900
Seattle, WA 98121                            Seattle, Washington 98104
(206) 281-9000                               206-296-8820
jcampiche@campichearnold.com                 dan.kinerk@kingcounty.gov
parnold@campichearnold.com                   kathy.vanolst@kingcounty.gov
jhackler@campichearnold.com

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

DATED this 21st day of March, 2019 at Seattle, Washington.

*s/ Timothy R. Gosselin*
TIMOTHY R. GOSSELIN

GOSSELIN LAW OFFICE, PLLC
1901 JEFFERSON AVENUE, SUITE 304
TACOMA, WASHINGTON 98402
OFFICE: 253.627.0684 FACSIMILE: 253.627.2028