1

2
The Honorable Thomas S. Zilly
Trial Date: June 10, 2019
3
Noted on Motion Calendar: April 12, 2019

4

5

6

7

IN THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8   BAO XUYEN LE, INDIVIDUALLY, and
as the Court appointed PERSONAL
9   REPRESENTATIVE OF THE ESTATE          NO.   2:18-CV-00055-TSZ
OF TOMMY LE, HOAI "SUNNY" LE,
10  Tommy Le's Father, DIEU HO, Tommy
Le's Mother, UYEN LE and BAO XUYEN     **PLAINTIFFS' OPPOSITION TO**
11  LE, Tommy Le's Aunts, KIM TUYET LE,    **DEFENDANTS' MOTIONS FOR**
Tommy Le's Grandmother, and QUOC       **SUMMARY JUDGMENT**
12  NGUYEN, TAM NGUYEN, DUNG
NGUYEN, AND JEFFERSON HO,               Noted for: April 12, 2019
13  Tommy Le's Siblings,
                                        **ORAL ARGUMENT REQUESTED**
14                      Plaintiffs,

15  v.

16  MARTIN LUTHER KING JR. COUNTY
as sub-division of the STATE of
17  WASHINGTON, and KING COUNTY
DEPUTY SHERIFF CESAR MOLINA.
18
                       Defendants.
19

20

21

22

23

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY**              **CAMPICHE ARNOLD, PLLC**
**JUDGMENT                    - 1**                    1201 Third Avenue, Suite 3810
                                                       Seattle, WA 98101
NO. 2:cv-18-00055                                      TEL: (206) 281-9000
                                                       FAX: (206) 281-9111

**TABLE OF CONTENTS**

I.  RELIEF REQUESTED

II.  INTRODUCTION AND FACTS

    A.  Molina's Knowledge Before Arriving on the Scene

    B.  Neighbors Report Tommy Had No Weapon—His Hands Were Empty

    C.  On Scene Actions and Confrontation

    D.  Defendant Molina Admits Exhibit I States the Law Enforcement Principles Governing His Actions.

III.  UNREASONABLE AND UNNECESSARY LETHAL FORCE

    1.  Defendants would not disclose that tommy was shot in the back When face down on the pavement

    2.  Tommy was unarmed

    3.  Tommy was very small and was outnumbered

    4.  Sheriff Urquhart admits that Tommy should have been physically taken to the ground—an alternative to deadly force

    5.  Other alternatives to lethal force

    6.  Only Molina pulled a gun on Tommy Le

    7.  It was immediately apparent tommy was suffering from a severe mental disturbance

    8.  Molina exacerbated the situation

    9.  There were no bystanders or officers in jeopardy

    10.  Tommy was not a dangerous criminal

    11.  Tommy could not have gotten far

    12.  Situation Accelerated

    E.  Discrepancies and Contradictions

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                    - 2

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

F.     Evidence of Defendant King County Ratification and Approval of Deputy Molina's Use of Excessive Force

G.     Evidence of Tort of Outrage

IV.  AUTHORITY AND ARGUMENT

A.  Summary Judgment Standard

B.  42 U.S.C. § 1983 is a remedial statute

C.  Violation of Tommy's Fourth Amendment rights

1.   Tommy did not pose an immediate threat.

2.  Severity of the crime at issue

3.  Tommy did not resist arrest nor attempt to flee

4.  Less intrusive alternatives to gunfire were available to Molina

5.  No warnings were given to Tommy that Molina would shoot

6.  Molina had notice and it was apparent that Tommy was emotionally disturbed

7.  Molina's action exacerbated the situation

8. Disputed issues of fact

D. Violation of 14th Amendment Due Process clause

1. Shocks the conscience

2. 14th Amendment permit parents to recover for loss of companionship

E.     Qualified Immunity

F.     RCW 4.020.020

1.  Tommy was not engaged in a felony when Deputy Molina shot him

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                    - 3

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

a.  Tommy was not engaged in committing the felony of intimidating a public official when Deputy Molina shot and killed him.

b.  Tommy was not engaged in committing the felony of Second-Degree Assault when Deputy Molina shot and killed him.

2.  There are genuine issues of material fact regarding whether Tommy proximately caused his own injuries

3.  There are genuine issues of material fact whether Deputy Molina's conduct was a superseding cause of Tommy's injuries

G.   *Monell* Claim

H.   Tort of Outrage

IV.   CONCLUSION

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                    - 4**

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1

**Table of Authorities**

2

**Cases**

3   *A.D. v. Cal. Highway Patrol*,
        712 F.3d 446 (9th Cir. 2013)

4

    *Berrocal v. Fernandez*,
5       155 Wn.2d. 585,
        121 P.3d 82 (2005)

6

    *Bryan v. MacPherson*,
7       630 F.3d 805 (9th Cir. 2010)

8   *Campbell v. ITE Imperial Corp.*,
        107 Wn.2d 807,
9       733 P.2d 969 (1987)

10  *Chew v. Gates*,
        27 F.3d 1432 (9th Cir. 1994)

11

    *Chien Van Bui v. City of San Francisco*,
12      61 F. Supp. 3d 877 (N.D. Cal. 2014)

13  *Chien Van Bui v. City & Cty. of San Francisco*,
        699 F. App'x 614 (9th Cir. June 28, 2017) (memorandum decision)

14

    *Cty. of Sacramento v. Lewis*,
15      523 U.S. 833,
        118 S. Ct. 1708,
16      140 L. Ed. 2d 1043 (1998)

17  *City of St. Louis v. Praprotnik*,
        485 U.S. 112,
18      108 S. Ct. 915,
        99 L. Ed. 2d 107 (1988)

19

    *Cruz v. City of Anaheim*,
20      765 F.3d 1076 (9th Cir. 2014)

21  *Curnow v. Ridgecrest Police*,
        952 F.2d 321 (9th Cir. 1991)

22

23

1  *Deorle v. Rutherford*,
2       272 F.3d 1272 (9th Cir. 2001),
         *cert. denied*, 536 U.S. 958,
         122 S. Ct. 2660,
3       153 L. Ed. 2d 835 (2002) (memorandum decision)

4  *Doe v. Corp. of the President of the Church of Jesus Christ of the Latter-Day Saints*,
5       141 Wn. App. 407,
         167 P.3d 1193 (2007)

6  *Estate of Casillas v. City of Fresno*,
        342 F. Supp. 990 (E.D. Cal. 2018)
7
   *Estate of Elkins v. Pelayo*,
8       737 F. App'x 830 (9th Cir. 2018)

9  *Garlick v. Cty. of Kern*,
        167 F. Supp. 3d 1117 (E.D. Cal. 2016)
10 *George v. Morris*,
        736 F.3d 829 (9th Cir. 2013)
11
   *German v. Roberts*,
12      No. C15-5237 BHS-DWC,
        2017 WL 6547472 (W.D. Wash. Dec. 22, 2017)
13
   *Glenn v. Washington*,
14      673 F.3d 864 (9th Cir. 2011)

15 *Gomez v. Toledo*,

16      446 U.S. 635,
        100 S. Ct. 1920,
17      64 L. Ed. 2d 572 (1980)

18 *Gonzalez v. City of Anaheim*,

19      747 F.3d 789 (9th Cir. 2014)

   *Graham v. Conner*,
20
        490 U.S. 386,
21      109 S. Ct. 1865,
        104 L. Ed. 2d 443 (1989)
22
   *Gregory v. Cty. of Maui*,
23      523 F.3d 1103 (9th Cir. 2008)

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT          - 6**

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

*Grimsby v. Samson*,
  85 Wn.2d 52,
  530 P.2d 291 (1975)

*Harris v. Roderick*,
  126 F.3d 1189 (9th Cir. 1997)

*Headwaters Forest Def. v. Cty. of Humboldt*,
  240 F.3d 1185 (9th Cir. 2000)

*Hopkins v. Andaya*,
  958 F.2d 881 (9th Cir. 1992)

*Jackson v. People's Fed. Credit Union*,
  25 Wn. App. 81,
  604 P.2d 1025 (1979)

*Jaramillo v. City of San Mateo*,
  76 F. Supp. 3d 905 (N.D. Cal. 2014)

*Kaady v. City of Sandy*,
  No. CV. 06-1269-PK,
  2008 WL 5111101 (D. Ore. Nov. 26, 2008)

*Kanae v. Hodson*,
  294 F. Supp. 2d 1179 (D. Haw. 2003)

*Kaur v. City of Lodi*,
  263 F. Supp. 3d 947 (E.D. Cal. 2017)

*Kelson v. City of Springfield*,
  767 F.2d 651 (9th Cir. 1985)

*Kingsley v. Hendrickson*,
  135 S. Ct. 2466,
  192 L. Ed. 2d 416 (2015)

*Kisela v. Hughes*,
  138 S. Ct. 1148,
  200 L. Ed. 2d 449 (2018)

*Kloepfel v. Boker*,
  149 Wn.2d 192,
  66 P.3d 630 (2003)

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**   **- 7**

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

*Kungys v. United States*,
   485 U.S. 759,
   108 S. Ct. 1537,
   99 L. Ed. 2d 839 (1988)

*Menotti v. City of Seattle*,
   403 F.3d 1113 (9th Cir. 2005)

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658,
   98 S. Ct. 2018,
   56 L. Ed. 2d 211 (1978)

*New York Life Ins. Co. v. Jones*,
   86 Wn.2d 44,
   541 P.2d 989 (1975)

*N.L. v. Bethel Sch. Dist.*,
   186 Wn.2d 422,
   378 P.3d 162 (2016)

*Orn v. City of Tacoma*,
   No. C13-5974-RBL, 2018 WL 1709497 (W.D. Wash. 2018),
   *appeal docketed*, No. 18-35379 (9th Cir. May 4, 2018)

*Ostling v. City of Bainbridge Island*,
   872 F. Supp. 2d 1117 (W.D. Wash. 2012)

*Pembaur v. City of Cincinnati*,
   475 U.S. 469,
   106 S. Ct. 1292,
   89 L. Ed. 2d 452 (1986)

*Phillips v. Hardwick*,
   29 Wn. App. 382,
   628 P.2d 506 (1981)

*Porter v. Osborn*,
   546 F.3d 1131 (9th Cir. 2008)

*Price v. Roseberg Police Dep't*,
   No. 6:15-cv-01114-JR,
   2017 WL 4287216 (D. Ore. Jun. 21, 2017)

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT   - 8**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

*Reed v. Lieurance*,
        863 F.3d 1196 (9th Cir. 2017)

*Reid v. Pierce Cty.*,
        136 Wn.2d 195,
        961 P.2d 333 (1998)

*Rodriquez v. City of Newark*,
        No. C-16-04811-SBA,
        2018 WL 6710043 (N.D. Cal. Sept. 30, 2018)

*Scott v. Henrich*,
        39 F.3d 912 (9th Cir. 1994)

*Scott v. United States*,
        436 U.S. 128,
        98 S. Ct. 1717,
        56 L. Ed. 2d 168 (1978)

*Seaman v. Karr*,
        114 Wn. App. 665,
        59 P.3d 701 (2002)

*Smith v. City of Hemet*,
        394 F.3d 689 (9th Cir. 2009)

*State v. Argueta*,
        107 Wn. App. 532,
        27 P.3d 242 (2001)

*State v. Burke*,
        132 Wn. App. 415,
        132 P.3d 1095 (2006)

*State v. Stephenson*,
        89 Wn. App. 794, 950 P.2d 38,
        *review denied*, 136 Wn.2d 1018, 966 P.2d 1277 (1998)

*Strandberg v. City of Helena*,
        791 F.2d 744 (9th Cir. 1986)

*Strong v. Terrell*,
        147 Wn. App. 376,
        195 P.3d 977 (2008)

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**          **- 9**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

*Sutton v. Tahoma School Dist. No. 10*,
        180 Wn. App. 859,
        324 P.3d 763 (2014)

*Tam Lam v. City of Los Banos*,
        No. 2:15-cv-00531-MCE-KJN,
        2017 WL 1179136 (E.D. Cal. Mar. 30, 2017)

*Tennessee v. Garner*,
        471 U.S. 1,
        105 S. Ct. 1694,
        85 L. Ed. 2d 1 (1985)

*Terry v. Ohio*,
        392 U.S. 1,
        88 S. Ct. 1868,
        20 L. Ed. 2d 889 (1968)

*Thomas v. Cannon*,
        Consolidated Case Nos. 3:15-05346-BJR; 3:16-cv-05392,
        2017 WL 2289081 (W.D. Wash. May 25, 2017)

*Ting v. United States*,
        927 F.2d 1504 (9th Cir. 1991)

*Tolan v. Cotton*,
        572 U.S. 650,
        134 S. Ct. 1861,
        188 L. Ed. 2d 895 (2014)

*Trevino v. Gates*,
        99 F.3d 911 (9th Cir. 1996)

*United States v. Robinson*,
        414 U.S. 218,
        94 S. Ct. 467,
        38 L. Ed. 2d 427 (1973).

*Washburn v. City of Federal Way*,
        178 Wn.2d 732,
        310 P.3d 1275 (2013)

*White v. Pauly*,
        137 S. Ct. 548
        196 L. Ed. 2d 463 (2017)

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT - 10**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

*Wilkins v. City of Oakland,*
      350 F.2d 949 (9th Cir. 2003)

*Wilkinson v. Torres*,
      610 F.3d 546 (9th Cir. 2010)

*Wilson v. Garcia*,
      471 U.S. 261,
      105 S. Ct. 1938,
      85 L. Ed. 2d 254 (1985)

*Wuthrich v. King Cty.*,
      185 Wn.2d 19,
      366 P.2d 926 (2016)

*Zion v. Cty. of Orange*,
      874 F.3d 1072 (9th Cir. 2017)

**Other Authorities**

6 Wash. Prac., WPI 14.03, Tort of Outrage (6th ed. 2017)

6 Wash. Prac., WPI 15.01, Proximate Cause—Definition (6th ed. 2017)

6 Wash. Prac., WPI 16.01, Felony—Defense (6th ed. 2017)

28 U.S.C. § 1658(a)

42 U.S.C. § 1983

BLACK'S LAW DICTIONARY (10th ed. 2014)

CR 8(c)

Fed. R. Civ. P. 30(b)(6)

Fed. R. Civ. P. 56(a)

Fed. R. Evid. 801(d)(2)(A)–(D)

RCW 4.20.010

RCW 4.20.020

RCW 4.20.046(2)

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** - 11

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1    RCW 4.20.060

2    RCW 4.24.010
     RCW 4.24.420
3

     RCW 9A.04.110
4

     RCW 9A.46.020
5

     RCW 9A.76.180(1), (3)
6

     RESTATEMENT (SECOND) OF TORTS § 46 (1965)
7

     1997 Bill Text WA H.B. 2777 (Jan. 21, 1998)
8

     1999 Bill Text WA H.B. 1205 (Jan. 22, 1999)
9

     2001 Bill Text WA H.B. 1541 (Feb. 27, 2001)
10

     U.S. Const. amend. IV
11

     U.S. Const. amend. XIV

12

13

14

15

16

17

18

19

20

21

22

23

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**    **- 12**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

# I.  RELIEF REQUESTED

In Defendants' Motions for Summary Judgment, taking the evidence and making appropriate inferences in the light most favorable to Plaintiffs, well-established federal and state case law leave little question that a reasonable jury could find for the Plaintiffs on the claims below:

Plaintiff's Estate on its:

A.  Personal Representative Bao Xuyen Le's 4th Amendment claim;

B.  RCW 4.20.046 (general survival action) for non-economic damages including Tommy's lost net accumulation, funeral expenses, and medical and hospital expenses;

Tommy's parents (Hoai "Sunny" Le, father, and Dieu Ho, mother) on their:

C.  14th Amendment claim for loss of companionship with their son Tommy; (Regarding their wrongful death claim, present law does not permit a recovery for loss of companionship with an adult child absent dependency which does not exist here); and,

All the Plaintiffs on their:

D.  State common law tort of intentional or recklessly inflicted Outrage.

Plaintiffs respectively request the Court to deny Defendants' Motions for Summary Judgment as to the above viable claims.

# II.  INTRODUCTION AND FACTS

An unarmed[1] Tommy Le, shortly after midnight on June 14, 2017, while face down on the

---

[1] *See* O'Brien Declaration (Decl.) at ¶¶6-7, Cradle Decl. at 4-6, and Bohna Decl. at 7 (witnesses seeing nothing in Tommy's hands.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**                        **- 13**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1    street pavement was shot without warning[2] in the back by Defendant Cesar Molina, a deputy with

2    the King County Sheriff's Office (KCSO), Burien, Washington. Tommy had been undergoing a

3    mental crisis brought on by unknown factors or reasons.[3] 9-1-1 had been called.[4] The autopsy

4    reports a "[p]entreating handgun wound of the left lateral back" and another "[p]enetrating

5    handgun wound of the medial left back."[5]  Tommy Le's expert, Wilson C. Hayes, PhD, a former

6    Professor of Biomechanics at Harvard Medical School and injury reconstruction expert, has

7    recreated the position of Tommy when shot based on the physical evidence:[6]



16   Dr. Hayes reports that one of the gunshots to Tommy's back occurred when he was near

17   or on the ground. The other gunshot struck Tommy's back when he was face down on the ground.[7]

18   Deputy Molina, the shooter, denies shooting Tommy in the back: "Q. You didn't see that Mr. Le's

---

[2] Arnold Declaration in support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment
(hereafter Arnold Decl.) Exhibit (Ex.) A at 59:4-7, Deputy Molina's dep.; and, Ex. C, Deputy Owens'
dep.
[3] Arnold Decl. Ex. A at 62:18-23: "[H]e was in some form of distress, which made him act aggressively
towards us." "I thought he was confused or distressed," O'Brien Decl. at ¶ 5 at 3.
[4] Arnold Decl. Ex. 65 at 2-3, Computer Aided Dispatch Report.
[5] Arnold Decl. Ex. 23B at 5, KCME Autopsy Report.
[6] Declaration of Wilson C. "Toby" Hayes, PhD (Hayes Decl.) at 14 Figure 3.
[7] Hayes Decl. at 11:22-12:2, at 12:19-13:4, and figures 2-4.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                          - 14

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

back was turned to you? A. His back was never turned to me."[8] Deputy Thompson testifies that the first gunshot occurred with deputies Molina and Owens behind Tommy.[9] Dr. Hayes reports all shots occurred when Tommy was passed and moving away from Deputy Molina.[10] This is one of many factual contradictions in this case.

Deputy Owens stated that before Tommy was shot, Deputy Owens was not afraid for his life, nor was Tommy a threat of harm to him,[11] contradicting Deputy Molina. This is because Tommy was moving away from Deputies Molina and Owens[12] in a southwesterly direction.[13] Deputy Molina claims that his fear for Owens' life was one of his justifications for shooting Tommy.[14]

The neighborhood residents who had called 9-1-1 about Tommy were with Deputy Paul to the south of the intersection, quite a distance away, according to Paul's diagram of the scene attached with his statement:[15]

---

[8] Arnold Decl. Ex. A. at 38:13-14.
[9] Arnold Decl. Ex. B. at 11:23-12:24, Thompson dep.; and Ex. 57 at 5-6, Thompson's June 14, 2017 statement. Thompson testified that this statement was true and correct, Ex. B at 5:5-19.
[10] Hayes Decl. at 9:16-21.
[11] Arnold Decl. Ex. C at 17:5-17. Nor did Owens know whether Tommy was a threat to Molina just before the shooting, *Id.* at 17:18-24.
[12] Deputies Molina and Owens were behind Le by only a couple of feet with Le moving away from them, Arnold Decl. Ex.  B at 11:23-12,24; Ex. A at 72:15-73:3; and Ex. C at 15:10-13.
[13] Arnold Decl. Ex. C at 13:22-14:21.
[14] Arnold Decl. Ex. A at 25:2-17.
[15] Arnold Decl. Ex. 55 at 19-22, Paul's June 14, 2017 statement. Attached to Paul's statement is his "map" or picture he drew of the scene as part of his statement.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                                          - 15

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1

2

3

4

5

6

7

8

9

10

11

12

13



14    The red circles have been added to help identify the participants' positions. The star "*" in

15    the diagram locates where Tommy was shot.[16] The "M" is Deputy Molina's location at the time of

16    his gunshots to Tommy.[17] The "T" is Deputy Tanner Owens' position at the time of Molina's gun

17    fire.[18]  The boxes with "Paul" and "Molina" are the positions of their patrol cars.[19] The diagram's

18    "ME" is Deputy Paul's position at the time of the gunshots.[20]   The victim's location was placed

19

20

21    ───────────────────
      [16]  Arnold Decl. Ex. 55 at 23.
22    [17] *Id.* at 21.
      [18] *Id.*
      [19] *Id*.
23    [20] *Id.* at 19.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                        - 16**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  by Deputy Paul on this map. Tommy's movement in a southwesterly direction[21] is away from

2  Deputy Paul and the victims located south of the intersection by Paul's handwritten map.

3       Former King County Sheriff John Urquhart[22] admitted to Tommy's family that "I don't

4  know why the deputies shot him—I would not have shot him, maybe I'd wrestled him to the

5  ground, but not shot him. The officers will have to explain their actions in court."[23] Tommy was

6  20-years old, just five 5'4" tall, and weighed 123 pounds.[24]  All the deputies were substantially

7  bigger than Tommy.[25] For example, Deputy Paul was on the scene and stands 6'3" and weighs 270

8  pounds.[26]  Taking Tommy physically down was a reasonable alternative to the use of deadly force.

9  Deputy Thompson testifies that Deputies Molina and Owens were behind Tommy before the

10  gunshots.[27] Although Deputy Molina denies this position, he admits to being within three to five

11  feet of Tommy when firing his first shot.[28] Deputy Owens was only one to two feet from Molina's

12  left side.[29] Owens was close enough to assist Molina in a physical take down. There were three

13  other officers present to provide assistance to physically take Tommy down to the ground.[30] Sheriff

14  Urquhart was right to say that a physical take down—not lethal force—was appropriate. Plaintiffs'

---

18  [21] Arnold Decl. Ex. C at 13:22-14:21.

[22] Sheriff Urquhart after this statement lost reelection.

19  [23] Declarations (Decls.) of Tam Q. Dinh, PhD at ¶10, Uyen Le at ¶8, and Joseph Lachman at ¶6.

[24] Arnold Decl. Ex 23B at 6. Deputy Molina was 5'6" and 175 pounds, Arnold Decl. Ex. A at 8:20-23.

20  Deputy Owens was 6 feet and 175 to 180 pounds, Arnold Decl. Ex. C at 5:24-6:2. Deputy Paul at 6'3"
and 270 pounds was the biggest deputy on the scene, Arnold Decl. Ex. D at 14:25-15:3 Paul Dep.

21  [25] Arnold Decl. Ex. A at 96:25-97:25.

[26] Arnold Decl. Ex. D at 14:25-15:3.

22  [27] Arnold Decl. Ex.  B at 11:23-12:24.

[28] Arnold Decl. Ex. A at 72:15-18.

[29] Arnold Decl. Ex. A at 71:4-72:1.

23  [30] Arnold Decl. Ex. C at 30:1-19.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                - 17

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1    two expert police officers support a physical take down as the appropriate response to controlling

2    Tommy.[31]

3                          **A. Molina's Knowledge Before Arriving on the Scene**

4          Deputy Molina alone made the decision to kill Tommy.[32] The use of excessive force is an

5    objective standard. "A court must make this determination from the perspective of a reasonable

6    officer on the scene, including what the officer knew at the time, not with the 20/20 vision of

7    hindsight." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015)

8    (Constitutional standard for determining excessive use of force by a law enforcement officer).

9    Therefore, the following scenario presents only those facts known by reasonable inference by

10   Deputy Molina before he shot and killed Tommy.[33] The knowledge of other deputies or witnesses

11   is irrelevant to this inquiry. Deputy Molina heard from dispatch the following at the time

12   indicated:[34]

13       1.  23:59:48[35] "A disturbance that involved a male chasing someone with a knife
             in the area of South 136 and Third Avenue South."[36] Defendant informed
14           dispatch he was responding to the call.[37]

15       2.  00:00:45[38] "While I was en route, I received updates regarding the incident in
             which I believe four subjects reported hearing a gunshot, but they weren't sure
16           if somebody was injured."[39]

17

18   _____

     [31] Arnold Decl. Ex. F at 179:3-181:5, Scott DeFoe dep. and Decl. of William Harmening Opposing
     Defendants' Motions for Summary Judgment (hereafter Harmening Decl.) at 6 ¶¶ 14, 15.
19   [32] Arnold Decl. Ex. C at 36:15-23 (none of the deputies on the scene communicated with one another).
     [33] Arnold Decl. Ex. 23B at 5: "The cause of death of this 20-year-old man … is gunshot wounds sustained
20   in a confrontation with police. The manner of death is classified homicide."
     [34] Arnold Decl. Ex. 71 at 4:15-25, Deputy Molina's 7-24-17 statement. Molina testified this statement was
21   true and correct, Arnold Decl. Ex. A. at 14:20-15:18.
     [35] Arnold Decl. Ex. 65 at 1.
22   [36] Arnold Decl. Ex. 71 at 4:15-25.
     [37] Id.
     [38] Arnold Decl. Ex. 66 at 1, Computer Aided Dispatch report.
23   [39] Arnold Decl. Ex. 71 at 4:19-22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

3.  00:01:39[40] "The original caller that said he was chased with a knife is now saying that he doesn't know if it was a knife but it was an object that was pointed. He might be 220 for all the other callers, as he's trying to tell us that he is the creator."[41] Deputy Molina admits this information was transmitted to him but does not recall it.[42] The reference to "220" refers to Tommy as a person with mental issues.[43]

4.  00:02:57[44] "And then another update was that someone had fired a shot at an individual that was chasing him with a knife."[45]

5.  00:03:11 Deputy Molina reports arriving at the incident scene.[46]

6.  00:03:35[47] "And another lady called that someone had shot at her house two to three times."[48]

**B. Neighbors Report Tommy Had No Weapon—His Hands Were Empty**

Although the testimony of neighbor witnesses was unknown to Deputy Molina, it is a jury question whether the neighbor witnesses' following testimony that Tommy was "unarmed and empty handed" is true.  Before Tommy's alleged menacing confrontation of several neighbors leading to Kevin Hernandez' firing a warning shot (first gunshot) into the ground,[49] Tommy went North on 3rd Avenue towards his residence.[50] Tommy was refused admittance to his home.[51] His yelling brought him to the attention of  several neighbors who came outside of their homes to investigate.[52] Tommy  was seen running up and down the street by Kamron O'Brien who lived

---

[40] Arnold Decl. Ex. 65 at 1.
[41] *Id.* and Arnold Decl. Ex. 67 at 4:19-11.
[42] Arnold Decl. Ex. A at 20:16-21:7.
[43] *Id.* at 21:8-13.
[44] Arnold Decl. Ex. 65 at 1.
[45] Arnold Decl. Ex. 71 at 4:22-24.
[46] Arnold Decl. Ex. 66 at 1.
[47] *Id.*
[48] *Id*.
[49] Arnold Decl. Ex. E at 37:2-23, Hernandez dep.
[50] Declaration of Kamron O'Brien (O'Brien Decl.) at 2, ¶¶ 3, 5.
[51] *Id.* at 2, ¶ 5.
[52] *Id.* at 2, ¶2 and Declaration of James Cradle (Cradle Decl.) at 3-4.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT            - 19

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

across the street from Tommy's residence.[53] Mr. O'Brien heard a gunshot and saw Tommy return to his house and attempt to enter.[54] O'Brien declares that Tommy's hands were empty before all the gunshots (the first shot was Hernandez' warning shot followed by Deputy Molina's shots to Tommy's back):

> 6. "I observed that Tommy Le's hands were empty as he trotted South down Third Avenue towards 136th Street before the first gunshot. I am absolutely certain that Tommy Le held no knife or weapon in his hands when he sat on the elevated porch and then trotted Third Avenue toward 136th Street. I saw nothing that looked like a weapon in his clothing, which were tight and small. His hands were empty.

> 7. However, I observed that he was unarmed when he ran from the gray house towards 136th Street, which is only several hundred yards away. Only moments after I observed the unarmed young man run towards 136th Street, I heard multiple gunshots and I understand that the deputies shot and killed Tommy Lee."[55]

O'Brien saw Tommy banging on the front door to Tommy's house and yelling "I am Tommy," trying to be let in. O'Brien then saw Tommy sit down on the front steps. Tommy put his head in his hands. The only thing in his hands was his head.[56]

Before the first gunshot James Cradle, O'Brien's neighbor, also observed Tommy running up and down the street screaming.[57] Mr. Cradle heard the first gunshot and Tommy returned to his residence.[58] Mr. Cradle confirms his hands where empty—no weapon was in Tommy's hands before Deputy Molina's gunshots:

> He came back towards the house again where the Asian lady was and started knockin' on the door again. And he kept screamin' my name is Tommy, my name is Tommy. I didn't see anything. I didn't see um, a cell phone. They, they said he had a knife, I didn't see a knife on him. I didn't see it at all. I do not think he had

---

[53] O'Brien Decl. at 2, ¶¶ 3, 5.
[54] *Id.* at 2, ¶ 5.
[55] *Id.* at ¶¶ 6-7.
[56] *Id.* at ¶ 5:22 and Arnold Decl. Ex 75 at 4, O'Brien June 22, 2017 statement.
[57] Cradle Decl. at 3-4.
[58] *Id.* at 4.

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

anything in his hand…. He just went back and forth. So basically, what happened was he walked down to the corner…. He got in some kind of confrontation. So, we were outside looking down and we heard, we seen two cars pull up. I think they were the cops, and we heard … three gunshots go off.[59]

Mr. Cradle repeats the absence of weapons or anything in Tommy's hands. "[B]ut the direction he was walkin' towards the street there was light there, so I didn't see anything in his hands at all."[60]

Another neighbor, Corene Bohna, saw Tommy near and at the intersection when and where he was shot.[61] Tommy turned and moved east on 136th towards Ms. Bohna who moved to a porch to avoid Tommy. Tommy turned away and moved towards the intersection.[62] Ms. Bohna saw Tommy tased.[63] She is asked and answers the following question:

"Det:  Did he have anything in his hand?

Wit:  I couldn't see. He acted like he did but he, I couldn't see anything in his hands."[64]

A reasonable inference may be drawn from the three neighbors' testimony that Tommy was unarmed without anything in his hands at time Deputy Molina shot Tommy.

### C. On Scene Actions and Confrontation

From the dispatch information Molina knew he was responding to victims who reported Tommy questionably menacing one victim with a knife and menacing a second victim.[65] Assuming that he believed this information to be true and accurate,[66] one can only ask why Deputy Molina,

---

[59] *Id.*
[60] *Id.* at 5.
[61] Declaration of Corene Bohna (Bohna Decl.) at 5-6.
[62] *Id.*
[63] *Id.* at 7.
[64] *Id.*
[65] Arnold Decl. Ex. A at 20:16-21:7 and Ex. 71 at 4:15-25.
[66] All Deputy Molina knew was the information from dispatch regarding a weapon. He did not know the testimony of O'Brien, Cradle, and Bohna that Tommy was not armed.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** - 21

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  and his fellow deputies at the scene, Owens and Paul, failed to take any steps to establish a tactical

2  plan that would allow the deputies to safely take charge of Tommy without the use of deadly force.

3  There was no communication between the on-scene deputies.[67] There was no plan on how to

4  handle Tommy or the situation.[68]

5         Deputy Molina carried on his duty belt pepper spray,[69] a taser,[70] and flashlight.[71] His baton

6  was in his patrol car.[72] Deputy Molina is required to wear his bullet proof vest on duty.[73]

7         They did not discuss less-than-lethal force options such as a baton, pepper spray, a taser,

8  or a taser used as a stun gun.  There were four deputies on the scene,  and two more deputies were

9  arriving on the scene.[74] It is only logical that in any possibly high risk arrest situation, where a

10  weapon may be involved, there is a need for pre-planning and tactical conversations in the patrol

11  car or over the radio before dangerous contacts ever happen.[75] Instead, Deputy Molina put his gun

12  away and walked towards the intersection of 136th Street South and 3rd Avenue South which was

13  in the direction the suspect was last seen to provide security for his partners and "prevent anyone

14  from coming from behind us and ambushing us."[76]

15        Deputy Molina placed himself in the open, by himself, without cover despite Deputy

16  Molina's stated belief that Tommy was armed and posed a possibly lethal threat.[77] Had Molina

17

18  [67] Arnold Decl. Ex. C at 36:15-23.
    [68] *Id.* at 36:24-37:3.

19  [69] Arnold Decl. Ex. A at 47:4-10.
    [70] *Id.* at 48:7-16.

20  [71] *Id.* at 47:4-10.
    [72] *Id.* at 49:6-7.

21  [73] Arnold Decl. Ex. C at 33:12-18.
    [74] Arnold Decl. Ex. C at 30:11-19; Ex. K at 12:1-19, Blakeman dep.; Ex. I at 20:1-12, Cotchaleovitch

22  dep.; and Ex. B at 9:10-20.
    [75] Arnold Decl. Ex. F at 25:1-19 and 35:13-36:14.
    [76] Arnold Decl. Ex. 52 at 1, Molina's June 15, 2017 statement.

23  [77] *Id.* at 2.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**   - 22

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

taken cover, he would have been able to better de-escalate the confrontation.[78] At first contact with Tommy, Deputy Molina moved towards Le.[79]

Molina has received training on safely interacting with people such as Tommy reported to be and acting as a "220."[80] "Law enforcement officers are trained to assess the situation, secure the scene, establish rapport with the subject, determine the main problem and then utilize crisis intervention skills, guided by their knowledge, training, experience and judgment and common sense to bring the incident to a non-violent resolution."[81] Defendant Molina admits that when practical de-escalation involves "creat[ing] distance, find[ing] cover, and concealment."[82] This de-escalation technique of taking cover is precisely the technique that Plaintiffs' expert and former police officer, Scott DeFoe, states was required.

Besides the patrol vehicles, there were other cover options available. Plaintiffs' expert Scott DeFoe testifies that the presence of a brick wall, patrol cars, and other cars could provide cover.[83]

Deputy Owens, on the other hand, recognized a tactical plan was necessary. He advised over the radio that he was going to stage around the corner and wait for more units to arrive.[84] He testified that after making contact with two of the witnesses, Hernandez and Schwiethale, he "*was trying to figure out the best way to proceed with this and scene security, officers present, things*

---

[78] Arnold Decl. Ex. F at 182:11-183:9.
[79] Arnold Decl. Ex. A at 55:18-21.
[80] *Id.* at 53:9-19.
[81] Declaration of Scott DeFoe Ex. A at 24, DeFoe's FRCP26(a)(2)(B) report.
[82] Arnold Decl. Ex. A at 53:9-17.
[83] Arnold Decl. Ex. F at 80:6-17.
[84] Arnold Decl. Ex. 54 at 1 Owens' June 15, 2017 statement. Owens testified that this statement was true. and correct, Ex. C at 7:18-8:11.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                    - 23

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

like that, when I hear yelling [from Molina] behind me."[85] Deputy Matt Paul claims he heard either Deputy Molina or Owens yell "stop" or "drop it."[86] Tommy did not respond, and appeared agitated.[87] Tommy had been "lit up" by Paul, that is, Paul had a powerful flashlight pointed at Tommy.[88] Arriving Deputy Cotchaleovitch states that Tommy was "lit up" while he and other deputies were pulling in.[89] Molina then approached Tommy with Owens behind him.[90] While Molina and Owens approached Tommy, Deputy Paul lit Tommy up with his flashlight.[91] Tommy was stationary.[92] At that point, Tommy was tasered, without warning,[93] by Deputy Molina causing Tommy to start moving towards Molina and Owens.[94] At this time Deputy Molina was less than 20 feet from Tommy and given the lighting, should have been able to see an unarmed Tommy.[95] At the time Molina fired his first gunshot, Tommy was only within three to five feet of Molina and should have seen he was unarmed. "Q. When you first fired your gun, Tommy Le was approximately how far from you? A. An approximation would be between three to five feet,

---

[85] Arnold Decl. Ex. 72 at 6:14-18, Owens' July 14, 2017 video statement. Owens testified that this statement was true and correct, Ex. C at 8:25-9:4.
[86] Arnold Decl. Ex. 55 at 3-4, Deputy Paul testified this statement was accurate. Ex. D at 9:3-10:18.
[87] Arnold Decl. Ex. 52 at 2.
[88] Arnold Decl. Ex. 55 at 5.
[89] Arnold Decl. Ex. 56 at 4, 8, Cotchaleovitch June 14, 2017 statement.
[90] Arnold Decl. Ex. D at 25:6-10 and Ex. 55 at 6.
[91] Arnold Decl. Ex. D at 25:6-10.
[92] Arnold Decl. Ex. C at 38:7-8.
[93] Arnold Decl. Ex. 55 at 12 and Ex. A at 58:23-25. Deputy Owens does not recall hearing Molina warn of the tasing. Arnold Decl. Ex C at 26:8-12. Hernandez claims a warning was given in his recently filed declaration. This is the first time Mr. Hernandez made such a claim. In his June 14, 2017 statement Mr. Hernandez states: "They saw the knife, they said 'drop the knife, drop the knife.' I heard um the, the of a Taser um I heard their attempt to tase the person. And then I heard the officer un 'stop, stop, stop' and then I heard the, the shots pop, pop, pop." Arnold Decl. Ex. N Hernandez June 14, 2017 statement excerpt.
[94] Arnold Decl. Ex 54 at 2.
[95] Arnold Decl. Ex. A at 60:8-13 and Hayes Decl. at 8:12-20.

1   somewhere around that range."[96] If Tommy had a pen in his hands, he was close enough to Deputy

2   Molina for Deputy Molina to see it.[97]

3         One of Deputy Molina's stated reasons for shooting Tommy was his fear for Deputy

4   Owens' life after the tasing.[98] After Owens' attempted tasing, Tommy started running towards

5   Deputy Paul's car,[99] away from Deputies Molina and Owens. Deputy Owens contradicts Deputy

6   Molina's claim Tommy was a threat to Owens.

7              Q. Was Tommy Le a lethal threat to you when he was running towards
                Officer Paul's car away from you?

8
              A. No.[100]

9
              Q. Okay. Was Tommy Le posing a serious threat of harm to you at the point

10               in time he was moving away from you towards Officer Paul's pink car?

11            A. No.[101]

12            Q. Was Tommy Le posing a lethal threat to Office Molina when he was
                moving towards Officer Paul's car, away from Officer Molina?

13
              A. I would ask Deputy Molina that question.[102]

14
         Then Deputy Molina, without warning, shot six rounds in Tommy's direction.[103] Four

15   rounds struck an occupied house on the intersection.[104] One struck Tommy Le's left hand before

16

17

18

19   [96] Arnold Decl. Ex. A at 72:15-18.
     [97] Arnold Decl. Ex. L. at 50:3-16 and at 55:13-57:1, Hayes dep.; Arnold Decl. Ex. A at 60:8-13; and Hayes
20   Decl. at 8:18-20.
     [98] Arnold Decl. Ex. 71 at 20-23.
21   [99] Arnold Decl. Ex. C at 13:1-6 and at 13:22-14:15.
     [100] *Id.* at 17:5-10.
22   [101] *Id.* at 17:11-17.
     [102] *Id.* at 17:18-24.
     [103] Arnold Decl. Ex. A at 59:4-7 and Ex. 74 at 16, Detective Johnson's follow-up report.
23   [104] Arnold Decl. Ex. 74 at 16.

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  striking the same occupied house.[105] Before Tommy was shot in the back, he began to fall[106]

2  arguably from being Tased.[107] Deputy's Molina last two shots hit him in the back when Tommy

3  was near or on the pavement.[108] Proof that Tommy was on the ground when he was shot comes

4  from a partial exit wound on his abdomen called a "shored" wound,[109] the bullet shows damage

5  consistent with impacting a textured surface such as a roadway.[110] The following photograph is

6  from Dr. Hayes' expert report and the autopsy.[111]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

---

[105] Tommy had three bullet wounds with two bullets remaining in his body, Arnold Decl. Ex. 23B at 5. The bullet going through the left hand was one of the four bullets striking the house, Arnold Decl. Ex. 74 at 16.

[106] Arnold Decl. Ex. L at 77:16-78:22.

[107] Hayes Decl. at 16:11-16.

[108] Arnold Decl. Ex. L at 78:23-81:5; Ex. L deposition Ex. 3, at 14 and figure 7 and at 31 ¶ 40 and at 30 figure 26, Dr. Hayes' expert report; Hayes Decl. at 11:22-12:2. *See* Arnold Decl. Ex. 23B at 7: "A deformed copper jacketed bullet is recovered from the skin …." Arnold Decl. Ex. L. By stipulation the following testimony is ascribed to Dr. Hayes: Ex. 3 is a true and accurate copy of his expert report (193:14-18), the statements within Ex. 3 are true (193:19-194:5), Dr. Hayes made a site trip to the shooting scene (194:6-10), and the materials identified in his report, paragraph 9, are reasonably relied upon by experts in reconstruction of injuries and Dr. Hayes so relied upon them (194:11-21).

[109] Arnold Decl. Ex. L deposition Ex. 3 at 14, figure 7 and at 31 ¶ 40 and Hayes Decl. at 12:19-13:1 and figure 4.

[110] Arnold Decl. Ex. L deposition Ex. 3 at 31 ¶ 40, figure 26 at 35 and Hayes Decl. at 12:21-13:1.

[111] Arnold Decl. Ex. L deposition Ex. 3 *see* figure 7 at 14.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT          - 26

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

Figure 7.  Autopsy photograph of Mr. Le taken on June 15, 2017, under the direction of the Associate Medical Examiner for King County, WA, Brian Mazrim, MD (Le_I 0096), after Mr. Le's body had been washed, showing the shored exit wound in Mr. Le's abdomen.  The photograph lightened and sharpened by Jeremy J. Bauer, Ph.D., of Bauer Forensics, LLC, in Adobe Photoshop CC (v.19.1.6, Adobe Inc., San Jose, CA 95110) using the settings superimposed over the photograph.

Dr. Hayes quotes the literature defining a shored exit wound:

> Shored exit wounds … arise in situations where the skin around the exit site is abraded at the moment the bullet stretches and breeches the skin. A subject lying on the ground or against a wall when shot, and the bullet's exit site supported by the surface, will sustain a shored exit wound … Substantial shoring combined with a bullet that barely has the remaining energy to perforate the skin may result in the bullet being retained at the exit site.[112]

The other bullet did not exit the body or penetrate the skin.[113] "The path of the non-exiting bullet was parallel to the path of the bullet that partially exited Mr. Le's body, which demonstrates this bullet was fired in close proximity to and from the same relative position as the bullet that hit Mr. Le as Mr. Le was lying on the ground."[114]

---

[112] Arnold Decl. Ex. L deposition Ex. 3 at 31 and Hayes Decl. Ex. 1, Dr. Hayes' expert report at 31 ¶ 40.
[113] Arnold Decl. Ex. 23B at 8: "A deformed copper jacket and adjacent lead core are recovered from the subcutaneous soft tissue …."
[114] Arnold Decl. Ex. L at 42:11-43:12; Ex. L deposition Ex. 3 at 31 ¶ 40; and Hayes Decl. at 13:1-4.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                - 27

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

### D.  Defendant Molina Admits Exhibit I States the Law Enforcement Principles Governing His Actions

Each of the following principles of Exhibit I was endorsed ("yes") by Defendant Molina who admitted these principles applied to the confrontation with Tommy.[115]

| Do you agree with the following principles? | | |
|---|---|---|
| | **YES** | **NO** |
| 1.  Look carefully for a weapon before you shoot a suspect. | ✓ | |
| | | |
| **SHERIFF KING COUNTY** **GENERAL ORDERS MANUAL** | | |
| 2.  "If possible, members should warn the suspect that deadly force may be used." 1:338 #5 | ✓ | |
| 3.  "Members shall exhaust every reasonable means of apprehension before resorting to the use of deadly force." 1:337#1 | ✓ | |
| 4.  Only when there is no reasonable effective alternative should you use deadly force. 1:336 | ✓ | |
| 5.  When practical you should consider de-escalation when non-compliance with an order is from a mental impairment. 1:337 | ✓ | |
| 6.  "It is the policy of the Sheriff's Office to promptly and to thoroughly investigate any use of force incident." 1:342 | ✓ | |

### III. UNREASONABLE AND UNNECESSARY LETHAL FORCE

The evidence demonstrates that the shooting was an unreasonable and unnecessary use of lethal force; that Molina and all of the other officers recognize that shooting an unarmed person in the back, who was lying face down on the pavement, violated that person's Fourth Amendment rights; and that Molina used deadly force with a purpose to harm Tommy unrelated to a legitimate law enforcement objective based on the following facts and analysis.

---

[115] Arnold Decl. Ex. A at 94:8-15, 95:6-18, and 85:15-93:22 (each principle is admitted as a "yes").

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**      **- 28 -**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1

2

### 1. Defendants would not disclose that Tommy was shot in back when face down on the pavement.

Deputy Molina's refusal to state that he shot Tommy in the back[116] and while Tommy was on the ground is an implied admission that it was wrong to shoot an unarmed man in the back while on the ground.[117] Fed. R. Evid. 801(d)(2)(A)-(D).  Defendant King County in numerous releases of official reports and press releases never informed the public that Tommy was shot in the back.[118] Detective Johnson's Deposition Exhibit H[119] shows these failures to inform the public of the shooting in the back, endorsed by Detective Johnson, the lead investigator of Tommy's death for the King County Sheriff's Office.[120] These failures are additional implied admissions from conduct inferring the Le shooting was unlawful.

### 2. Tommy was unarmed

Three neighbor witnesses state that Tommy had nothing in his hands before he was shot: two witnesses observing Tommy near his home and a third near the intersection scene and shooting.  Deputy Owens states that after Tommy was shot and was lying on the ground a black plastic pen was found in Tommy's right hand.[121]  At Tommy's autopsy it was found that Tommy's left hand had a bullet hole through the palm.[122]  Tommy was left-handed.[123]  If Tommy was threatening the deputies with a pen, he was using his non-dominant hand.[124]  Secondly, photos

---

[116] Arnold Decl. Ex. A at 38:13-21 (Molina claims Tommy back never turned towards him).

[117] Arnold Decl. Ex. L at 42:11-43:21 and 78:23-81:5 and deposition Ex. 3, at 14 and figure 7 and at 31 ¶ 40 and at 30 figure 26. Arnold Decl. Ex. 23B at 7: "A deformed jacketed bullet is recovered from the skin…."

[118] Arnold Decl. Ex. G at 48:1-54:15 Johnson dep.

[119] Arnold Decl. Ex. G at 54:11-15. The individual marking of "no" for each publication appears at Ex. G at 48:7-54:2.

[120] *Id.* at 14:1-7 and at 16:1-23.

[121] Arnold Decl. Ex. C at 10:13-11:1.

[122] Arnold Decl. Ex. 23B at 8.

[123] Hoai "Sunny" Le (father) Decl. at ¶ 2 and Uyen Le (aunt) 2nd Decl. at ¶ 2.

[124] *Id.*

---

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** - 29

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

from Tommy's room, taken the morning after he died, show that Tommy did own Paper Mate pens, the kind sold in packs, but they were blue in color. The photos show a total of four blue pens.[125]

Plaintiffs' expert Dr. Hayes discounts the presence of a plastic black pen based upon the implausibility of circumstances surrounding the finding of broken pen at the scene.[126] Deputy Owens states he kicked a black plastic pen from Tommy's hands.[127] The only pen found at the scene has a fractured tip.[128] Dr. Hayes testifies that to fracture the pen required fixing one end of the pen and bringing a shearing force downward to break it.[129] Moreover, it is next to impossible to kick the pen the distance it was found away from Tommy out of Tommy's hand with the fractured tip landing a couple of feet away from the body of the pen.[130]  In response to Plaintiffs' Interrogatory No. 13,[131] King County admits that it does not know how the pen was broken or who broke the pen.  There is no explanation as to why the broken tip is located approximately a foot away from the rest of the pen.[132]  There is no explanation of how ink came to be found by the medical examiner on the 4th and 5th digits of Tommy's right hand[133] when it is known that the pen was intact when seen in Tommy's hand by Deputy Thompson[134] and Deputy Owens.[135]

---

[125] Arnold Decl. Ex. O, photographs of Tommy's room following the shooting.
[126] Arnold Decl. Ex. L at 53:13-54:1 and at 55:13-57:2.
[127] Arnold Decl. Ex. C at 11:15-17.
[128] Arnold Decl. Ex. 94 at 6:14-18, Plaintiffs' 2nd Interrogatories No. 13 & 6th Request for Production No. 26.
[129] Arnold Decl. Ex. L at 158:18-159:8 and at 160:14-21.
[130] Arnold Decl. Ex. L at 53:13-55:1.
[131] Arnold Decl. Ex. 94 at 9:1-2.
[132] Arnold Decl. Ex. 95, photo of pen at scene.
[133] Arnold Decl. Ex. 145, ESi, Dale Mann Report.
[134] Arnold Decl. Ex. B at 16:6-22.
[135] Arnold Decl. Ex. C at 11:12-14.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                - 30

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

Deputy Molina never reported seeing a knife.[136] Deputy Molina states that before he shot Tommy he saw "a dark pointy object" in Tommy's hand.[137] Molina was in close enough proximity, and the lighting was sufficient, for him to determine that any allegedly held dark pointy object was a pen.[138] Molina testifies that when he shot Tommy, Tommy was three to five feet from Molina.[139] Arriving deputies state that Tommy was "lit up" while they were pulling in.[140] Deputy Cotchaleovitch states in his declaration: "When I first saw him, that's how they lit him up because I didn't have my spot light on or anything and I was just coming down the road and that's how I could see them in the distance because they had the light on him."[141] And "I, like I say I could see him lit up because somebody's got a light on him."[142] And "So I see them crossin' the road. I see 'em lightin' this guy up. All of a sudden he's comin' after 'em."[143] Tommy had also been "lit up" by Deputy Paul, that is, Paul had a powerful flashlight pointed at Tommy when Molina challenged him.[144]

Plaintiffs' expert Dr. Hayes will testify that "based on the lighting conditions described at the scene, the distances between the deputies and Tommy, Deputy Molina should have recognized that Tommy was not armed with a weapon and was not a danger to officers or other bystanders at the scene."[145] Deputy Molina's failure to recognize that Tommy was unarmed violates Exhibit I's principle 1: "Look carefully for a weapon before you shoot a suspect."

---

[136] Arnold Decl.: Ex. A at 44:2-9, at 45:4-22, at 45:24-46:10; and Ex. G at 76:24-77:2.
[137] Arnold Decl. Ex. A at 44:14-23.
[138] Arnold Decl. Ex. L at 52:1-9; Ex. L deposition Ex. 3 at 35 ¶ 41; and Hayes Decl. at 8:18-20.
[139] Arnold Decl. Ex. A at 72:15-18.
[140] Arnold Decl. Ex. 56 at 4, 8, and 10.
[141] *Id*. at 10.
[142] *Id.* at 18.
[143] Arnold Decl. Ex. 56 at 24.
[144] Arnold Decl. Ex. D at 25:6-10.
[145] Arnold Decl. Ex. L deposition Ex. 3 at 35 ¶41 and Hayes Decl. at 8:12-20.

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1    Regardless of whether Tommy's hand was empty or held a plastic pen, both of Plaintiffs'

2    retired law enforcement officers opine that Tommy should have been taken down physically and

3    not shot in the back.[146] They point out other options: re-tasing, using pepper spray, or using the

4    taser as a stun gun.[147]

5                        **3.  Tommy was very small and was outnumbered**

6    Tommy was very small, short in stature, and thin.  He weighed only about 123 pounds and was

7    only 5'4" tall.[148]  He was dressed only in a tee shirt and shorts and was barefoot.[149]  Of the three

8    officers present, Deputy Paul is six feet three inches tall and weighs 270 Pounds,[150] Deputy Owens

9    is 6'0" tall and weighs 175, 180,[151] and Deputy Molina  at 5'6" tall weighed 175 pounds.[152]

10   Deputies Thompson and Cotchaleovitch arrived at the scene before the gunfire.[153]

11   **4.  Sheriff urquhart admits that tommy should have been physically taken to the ground—**
     **an alternative to deadly force**

12

13   Former Sheriff Urquhart and his Chief of Staff Deputy Christopher Barringer came to the

     Le family home.   When asked by Plaintiff Bao Xuyen Le "*if Tommy was not armed with a knife,*
14
     *why did the deputies shoot him?*" Sheriff Urquhart replied: "*I don't know why the deputies shot*
15
     *him – I would not have shot him, maybe I'd have wrestled him to the ground, but not shot him. The*
16
     *officers will have to explain their actions in court.*"[154] The expert retired law enforcement officers
17
     and expert witnesses also opine that the deputies taking Tommy to the ground physically was
18

19   ---

     [146] Harmening Decl. at 5-6 ¶¶ 14-15 and Arnold Decl. Ex. F at 178:18-181:5.
20   [147] Arnold Decl. Ex. F at 49:25-50:13, at 113:10-24, at 179:3-181:5, and Ex. M at 94:17-95:10 and at
     101:2-10, Harmening dep.
21   [148] Arnold Decl. Ex 23B at 6.
     [149] Arnold Decl. Ex. A at 73:90-15 (wearing shorts, T-shirt, and bare feet).
     [150] Arnold Decl. Ex. D at 14:25-15:3.
22   [151] Arnold Decl. Ex. C at 5:24-6:2.
     [152] Arnold Decl. Ex. A at 8:20-23.
23   [153] Arnold Decl. Ex. B at 8:11-23.
     [154] Decls of Tam Q. Dinh, PhD, at ¶10, 1st Uyen Le at ¶8, and Joseph Lachman at ¶6.

1   practical and should have been employed.[155] A physical take down is mandated by Exhibit I's

2   principles 3 and 4 and admitted by Molina, that direct the use of reasonable alternatives to deadly

3   force.[156] Deputy Owens admits that there were an adequate number (four) deputies present to assist

4   in a physical take down should the decision have been made to do so.[157] Two additional deputies

5   arrived at the scene in patrol cars just before the gunshots.[158]

### 5. Other alternatives to lethal force

7        Molina failed to take control of Tommy by using less than lethal force. If the first tasing

8   was not effective, Molina could have reloaded and fired his taser into Tommy's back, a preferable

9   target.[159] Molina could have used his taser in "contact stun mode."[160] He could have used pepper

10  spray.[161] Owens failed to take control of Tommy by using less than lethal force. Owens had

11  available to him, on his person, a taser that could have been re-fired could be used in "contact stun

12  mode," and pepper spray.[162] Both could have availed themselves of "physical force" defined by

13  the King County Sheriff General Orders Manual as "the intentional application of force through

14  the use of physical contact" and includes "hitting with or without an object, kicking… and any

15  other use of force that results in in injury…"[163] Defendant King County's Fed. R. Civ. P. 30 (b)(6)

16  witness Sergeant Lockhart admits that Molina was trained to consider alternatives to lethal force;

17  including the use of batons, pepper spray, taser, and physical force.[164]

---

[155] Arnold Decl. Ex. F at 179:3-181:5; Arnold Decl. Ex. M at 94:25-95:10, at 102:6-103:1, and at 121:23-122:3; and Harmening Decl. at 5-6 ¶¶14-15.
[156] Arnold Decl. Ex. A at 94:8-15 and at 92:4-25.
[157] Arnold Decl. Ex. C at 30:9-19 and Ex. A at 51:25-52:6 and at 55:1-17.
[158] Arnold Decl. Ex. K at 12:20-13:2 and Ex. B at 8:11-23.
[159] Arnold Decl. Ex. F at 98:21-99:2, Ex. M at 94:17-24, Ex. H at 20:17-25, Lockhart dep.
[160] Arnold Decl. Ex. 1 at 1:353 section 6.04.015 1.b. King County Sheriff General Orders Manual.
[161] Arnold Decl. Ex. M at 97:8-13 and 99:1-7 and Ex. F at 49:25-50:13, at 113:10-24, and 179:3-181:5.
[162] Arnold Decl. Ex. C at 31:7-25; Ex. F at 98:21-99:2; and Ex. M at 94:17-24.
[163] Arnold Decl. Ex. 1:336 section 6.00.010.
[164] Arnold Decl. Ex. H at 10:12-11:20 and Ex. H deposition Ex. B.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**          **- 33 -**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

### 6. Only Molina pulled a gun on Tommy Le

When deputies arrived at the scene, they knew Molina was the shooter as he was the only one who had a gun in his hand.[165] Owens claims after he had fired his taser, he had pulled his own gun out[166] but this statement is contradicted by three fellow officers' statements.[167] One example is when Deputy Blakeman arrived, he knew shots had been fired because he had seen the flash but at first could only see tasers.  He then realized Molina had both his taser and his gun out, and it was obvious to Blakeman that Molina was the shooter. Because he was the only one with a gun out.[168]

Owens' claim is also contradicted by Deputy Paul, who states he turned toward Tommy when he heard the second taser and saw Owens with a taser in his hand.[169] After Molina fired his gun, Paul saw the gun in Molina's hand.[170]  No deputies and no witnesses saw a gun in Owens' hand.  Only Molina pulled his weapon and that is because neither Owens or Paul thought deadly force was necessary. Owens testified that when Tommy pivoted, and started moving away from Owens, Tommy was not even a serious threat to Owens.[171]

### 7.     It was immediately apparent Tommy was suffering from a severe mental disturbance

"220" is code in the King County Sheriff's Department used to describe a person who appears to be suffering from mental illness or drug induced psychosis.[172]  Dispatch had informed Molina and other the deputies that Tommy was a possible "220" and that he had been claiming to

---

[165] Arnold Decl. Ex. 58 at 10, Blakeman's June 14, 2017 statement; Ex. 55 at 9; and Ex. B at 14:18-25.
[166] Arnold Decl. Ex. C at 28:15-29:1.
[167] Arnold Decl. Ex. 58 at 10; Ex. 55 at 9; and Ex. B at 14:18-25.
[168] Arnold Decl. Ex. 58 at 10.
[169] Arnold Decl. Ex. 55 at 9.
[170] *Id*.
[171] Arnold Decl. Ex. C at 17:5-17.
[172] Arnold Decl. Ex. A at 21:8-13.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT          - 34

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  be "The Creator."[173]  When first seen by the deputies, it was obvious that Tommy was agitated.[174]

2  It was seen that he could or would not follow police orders, and that he was showing a lack of

3  compliance.[175]

4      KCSO General Orders Manual, 6.00.020, De-Escalation: 01/17 states that "When safe

5  under the totality of the circumstances and time and circumstances permit, deputies shall use de-

6  escalation tactics in order to reduce the need for force."[176]  This principle is similar to Exhibit I

7  principle 5 admitted by Defendant Molina.[177]  Deputies are to consider whether lack of compliance

8  is a deliberate attempt to resist or an inability to comply based on factors including, but not limited

9  to medical conditions, mental impairment or behavioral crisis. The KCSO GOM states:

10      When time and circumstances reasonably permit, deputies shall attempt to de-
        escalate use of force situations by:
11          a. Moving from a position that exposes deputies to potential threats to
               a safer position.
12          b. Decreasing the exposure to potential threat by using:
                 ▪ Distance.
13               ▪ Cover.
                 ▪ Concealment.
14          c. Communicating from a safe position with the intention to gain the
               subject's compliance, using:
15               ▪ Verbal techniques such as Listen and Explain with
                   Equity and Dignity (LEED) Training, to calm an agitated
16                 subject and promote rational decision making.
                 ▪ Advisements.
17               ▪ Warnings.[178]

18

19

20

---

21  [173] *Id.* at 20:16-21:7.
    [174] *Id.* at 62:14-23 and Ex. C at 39:10-21.
22  [175] Arnold Decl. Ex. 52 at 2.
    [176] Arnold Decl. Ex. 1:337.
    [177] Arnold Decl. Ex. A at 93:1-5.
23  [178] Arnold Decl. Ex. 1:337, De-escalation section 6.00.020 (3).

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                           - 35 -**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1   Finally, the Order provides that when time and circumstances reasonably permit, deputies shall

2   call extra deputies or specialty units to assist.[179]

3   ### 8. Molina exacerbated the situation

4   Instead of making any kind of effort to de-escalate, Molina started yelling at Tommy to

5   "drop it," or "get down on the ground."[180]  Molina exacerbated the situation by yelling.  As Deputy

6   Thompson testified, when making first contact with a 220, yelling commands is "not the approach

7   we typically use right off the bat," "because it can make things more difficult."[181]  When Tommy

8   did not comply with the yelled commands, Molina started moving towards Tommy.[182]

9   Owens testifies that when Molina tased Tommy, Tommy was standing.[183]  Deputy Paul

10  testifies that "Tommy didn't initially walk towards [Molina and Owens].  He stopped on the far

11  side of 136th, that's where I initially saw him. And then when I saw Deputy Owens and Deputy

12  Molina start moving towards him, I focused back on the individuals in the front yard."[184] Deputy

13  Cotchaleovitch testified that "Mr. Le is here up on the sidewalk. I see the two officers

14  approaching…"[185]  Molina did not warn Tommy that he was about to be tased.[186]  This too

15

16

17  ---

18  [179] Id. at 6.00.020(3)(d).
    [180] Arnold Decl. Ex. A at 25:2-5.
    [181] Arnold Decl. Ex. B at 18:14-20.

19  [182] Arnold Decl. Ex. D at 27:13-21.
    [183] Arnold Decl. Ex. C at 38:7-8.

20  [184] Arnold Decl. Ex. D at 16:5-9.
    [185] Arnold Decl. Ex. I at 21:25-22:1 and Arnold Decl. Ex. 56 at 8.

21  [186] Arnold Decl. Ex. 55:12 and Ex. A at 58:23-25. Deputy Owens does not recall hearing Molina warn of
    the tasing. Arnold Decl. Ex C at 26:8-12. Hernandez claims a warning was given in his recently filed

22  declaration. This is the first time Mr. Hernandez made such a claim. In his June 14, 2017 statement, Mr.
    Hernandez states: "They saw the knife, they said 'drop the knife, drop the knife.' I heard um the, the of a
    Taser um I heard their attempt to tase the person. And then I heard the officer un 'stop, stop, stop' and

23  then I heard the, the shots pop, pop, pop." Arnold Decl. Ex. N.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT            - 36 -

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1   exacerbated the situation. The taser barbs were embedded in Tommy's body and were likely

2   causing pain. Only after the tasing, did Tommy to start move towards Molina, and then Owens.[187]

3        Plaintiffs' police procedure and excessive force expert Mr. William Harmening[188] testified

4   that "Deputy Molina's use of the Taser escalated the confrontation and accelerated the use of

5   deadly force."[189] Mr. Harmening, a former police officer and police academy instructor,[190] states

6   that "when Molina deployed his Taser, and then seconds later his firearm, he did so without

7   justification, and at a time when other less lethal  methods for gaining Le's compliance were

8   readily available."[191] Mr. Harmening found that "[t]he use of deadly force when a physical take

9   down or the use of pepper spray were available and effective violates Deputy Molina's law

10   enforcement training."[192]

### 9.  There were no bystanders or officers in jeopardy

12        After Owens tased Tommy, Tommy moved away from Molina and Owens West as he

13   traveled Southwest across the intersection.[193] Based on the distances between Tommy and the

14   officers and the lighting at the time, both Molina and Owens would have known that Tommy was

15   unarmed,[194] and both officers would have known that Tommy did not pose a risk to the three

16   deputies who were substantially bigger than Tommy.[195]  Deputy Owens testifies that he did not

17   perceive Tommy as posing a risk of harm to him after Tommy passed him.[196]  Deputy Paul was

---

[187]Arnold Decl. Ex. C at 38:7-8 and Ex. 54 at 2.
[188] Harmening Decl. at ¶¶ 3-7.
[189] Harmening Decl. at ¶ 11.
[190] Harmening Decl. at ¶¶ 3-4.
[191] Harmening Decl. at ¶ 11.
[192] Harmening Decl. at ¶ 12.
[193] Arnold Decl. Ex. C at 14:4-21 & 15:10-13.
[194] Arnold Decl. Ex. A at 72:15-18; Ex. L at 52:1-9; Ex. L deposition Ex. 3 at 35 ¶ 41; and Hayes Decl. at 8:12-20.
[195] Arnold Decl. Ex. C at 30:11-19.
[196] Arnold Decl. Ex. C at 17:11-17.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**          **- 37**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  guarding the bystanders[197] some distance away and at 6'3" and 270 pounds was almost a foot taller

2  than Tommy and 147 pounds heavier.[198] Paul was somewhere South of Owens,[199] and his

3  Southwest movement would take him West – away from the bystanders.

### 10.  Tommy was not a dangerous criminal

5  Tommy had no criminal record.[200] Tommy had not physically touched, let alone injured,

6  anyone. He had harassed several people and obviously induced panic in Hernandez and

7  Schwiethale. There is no independent evidence to support Hernandez' or Schwiethale's claim that

8  Tommy ever had any weapon. No knife was ever located at the scene.[201] There is no evidence that

9  Kevin's front door was "stabbed" by a knife. Tommy was not a serious criminal and would not

10  have faced felony charges or jail time if he had not been shot to death.

### 11.  Tommy could not have gotten far

12  Four deputies were on the scene and two other deputies were pulling up and parked at the

13  scene.[202]

### 12.  Situation accelerated

15  Deputy Molina, by tasing Tommy, who was standing still, exacerbated and <u>accelerated</u> this

16  shooting.[203]

### E.    Discrepancies and Contradictions

18  As documented above, there are many factual contradictions and discrepancies in the

---

[197]Arnold Decl. Ex. 55 at 3 and Arnold Decl. Ex D at 9:3-21 (statement is accurate).
[198] Arnold Decl. Ex. 23B at 6 and Ex. D at 14:25-16:2.
[199] Arnold Decl. Ex C at 19:16-21.
[200] Arnold Decl. Ex. 74 at 11 (no hits on the Automated Finger Print Identification System or FBI inquiry).
[201] Arnold Decl. Ex. G at 47:1-6.
[202] Arnold Decl. Ex. B at 8:11-23 and Ex. 56 at 4, 8.
[203] Arnold Decl. Ex. C at 38:7-8 and Ex. 54 at 2.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT               - 38 -
NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

evidence regarding many issues, including whether Tommy was armed with a weapon, where Tommy was shot, on the ground or not, whether he was shot in the back, whether Tommy was standing or moving when he was tasered, whether Molina exacerbated the situation, whether Tommy presented a lethal threat to anyone, whether Deputy Owens pulled his gun, and whether the Sheriff's Department attempted to mislead the public about the events surrounding Tommy's death. There are factual contradictions and discrepancies between the deputies, between the deputies and the witnesses, between the deputies and the physical evidence, and between Plaintiffs' experts and the deputies' accounts.  The resolution of these contradictions and discrepancies by a jury is necessary to determine the liability issues in this case.

### F.  Evidence of Defendant King County's Ratification and Approval of Deputy Molina's Use of Excessive Force

The former King County Sherriff Urquhart stated that he would have not used deadly force against Tommy, and instead physically taken him to the ground.[204] Nevertheless, the Defendant King County never considered the then acting Sheriff's proposed alternative to lethal force. Defendant ratified and approved the use of excessive force by promoting Deputy Molina to detective with more pay one month following Tommy's shooting,[205] and by the report of the USE OF FORCE REVIEW BOARD—DEPUTY MOLINA ART 2017U-002 dated August 22, 2018 (hereafter Force Review Board) a sham investigation approving Molina's shooting Tommy.[206] The Force Review Board never considered former Sheriff Urquhart opinion flawing the outcome.

---

[204] Decls. of Tam Q. Dinh, PhD, at ¶10, 1st Uyen Le at ¶8, and Joseph Lachman at ¶6.
[205] Arnold Decl. Ex. A at 83:21-84:12.
[206] Arnold Decl. Ex. 81 at 1 and 7, August 22, 2018 Use of Force Review Board Report.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**     **- 39**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

The lead detective, Detective Johnson, who conducted the criminal investigation and presented his findings to the Force Review Board,[207] also flawed the Force Review Board's findings by failing to adequately investigate this shooting.  Detective Johnson testified that:

> 1. He failed to ascertain the distance between Tommy and Deputy Molina at any time[208] although this information was admittedly important to his investigation;[209]
>
> 2. He failed to find out what information Deputy Molina had from dispatch and the radio regarding Tommy's mental condition;[210]
>
> 3. It was not important to his investigation whether Molina committed a crime shooting Tommy in the back;[211] and,
>
> 4. The alternatives to the use of lethal force "was not part of my investigation."[212]

These failures flawed the Force Review Board's conclusions particularly when Detective Johnson presented the "RELEVANT FACTS OF THE INCIDENT" to the Force Review Board.[213] The information Detective Johnson failed to obtain has great bearing on the alternative use of force—a physical take down. Molina was practically within arm's reach of Tommy's back. The Force Review Board only had before it's presentations by—Detective Johnson who conducted the criminal investigation, Sergeant Escobar who provided the Administrative Review Team information (ART),[214] and Deputies Molina and Owens in-person appearance to describe events

---

[207] *Id.* at 2.

[208] Arnold Decl. Ex. G at 70:3-21. Molina in a discovery deposition stated that he was within 3-5 feet of Le when he discharged his gun the first time, Arnold Decl. Ex. A at 72:15-18.  Deputy Thompson states that Molina was behind Le when gunshots were fired, Arnold Decl. Ex. B at 11:23-12:24

[209] Arnold Decl. Ex. G at 70:22-25.

[210] *Id.* at 74:25-75:10.

[211] *Id.* at 36:19-22.

[212] *Id.* at 19:18-20.

[213] Arnold Decl. Ex. 81 at 2.

[214] Arnold Decl. Ex. J at 13:18-14:9, Mulligan dep.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                    - 40

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1    and answer questions.[215] The ART presentation did not add much more information of the Johnson

2    presentation.[216]

3          Tommy's expert and instructor on police practices and use of force, William Harmening,

4    cataloged the deficiencies of Detective Johnson who presided over the investigation of Tommy's

5    death. Mr. Harmening reports as follows:[217]

6                29.    I also reviewed Detective Christopher Johnson's investigation of
                the case.  Based on my review, it is my opinion that the Sheriff's Office
7                investigation is flawed because it never addressed the fact that Tommy Le
                was shot in the back;[218] it did not address whether Tommy Le was actually
8                holding an ink pen despite Kamron O'Brien[219] and James Cradle's[220]
                statements that there was nothing in Tommy Le's hands before he was shot;
9                and the Sheriff's Office improperly displayed a knife taken from Tommy
                Le's home to witnesses, despite knowing that Tommy Le never gained
10               access to his home again and could not have grabbed a knife from inside.[221]

11         The Force Review Board did not have the witness statements and Detective Johnson

12   provided a misleading and omitted verbal summary/account of the missing statements.[222] The

13   Force Review Board never heard:

14         1.    That neighbor eyewitnesses saw Tommy's hands were empty before he was

15   shot;[223]

16         2.    Deputy Owens statement that Tommy was standing still before Molina tased

17   him;[224]

18   _____

19   [215] *Id.* at 13:25-14:9.
     [216] *Id.* at 10:7-23.
     [217] Harmening Decl. at 13-14 ¶29.
20   [218] Arnold Decl. Ex. G deposition Ex. H.
     [219] O'Brien Decl. at 3 §6.
21   [220] Cradle Decl. at 4-6.
     [221] Arnold Decl. Ex. G at 75:11-16.
22   [222] Arnold Decl. Ex. J at 13:4-22.
     [223] *Id.* at 39:2-40:6 and at 14:10-13; O'Brien Decl. at 3 ¶ 6; Arnold Decl. Ex. 75 at 4 (his hands were
     empty); and Cradle Decl. at 4-5 (did not see anything in his hands).
23   [224] Arnold Decl. Ex. J at 24:9-24; Arnold Decl. Ex. 54 at 2; and Arnold Decl. Ex. C at 37:8-38:8.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY**
**JUDGMENT          - 41**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

3.      Deputy Molina was within three to five feet of Le;[225]

4.      Deputy Thomson's statement that Deputies Molina and Owens were behind Tommy when the gun fire commenced;[226]

5.      Which direction Deputy Molina fired his gunshots;[227] and,

6.      Where Tommy was positioned with respect to Deputy Molina when the gunshots were fired.[228]

One of King County's 30(b)(6) witnesses, Chief Lisa Mulligan (Chief Mulligan), admitted that if Tommy was standing still when tased, indicates that de-escalation could be successful[229] and probably would have changed the tactics Molina used.[230] The close proximity between Deputies Molina and Owens with Tommy bear on a successful physical take down. The shooting of Tommy in the back is inconsistent with Deputy Molina's claim that "[h]is back was never turned to me."[231]

Chief Mulligan was a voting member of the Force Review Board and King County's FRCP 30(b)(6) witness.[232] The 30(b)(6) topics included the Force Review Board's: basis for its conclusions; basis for finding Deputy Molina acted within policy and training; factors underlying

---

[225] Arnold Decl. Ex. J at 15:11-16:6. Molina in his deposition stated that he was within 3-5 feet of Le when he discharged his gun the first time, Arnold Decl. Ex. A at 72:15-18.  Deputy Thompson states that Molina was behind Le when gunshots were fired, Arnold Decl. Ex. B at 11:23-12:24.
[226] Arnold Decl. Ex. J at 45:7-46:16; Arnold Decl. Ex. 57 at 5-6; and Arnold Decl. Ex. B at 11:23-12:24.
[227] Arnold Decl. Ex. J. at 28:1-14.
[228] *Id*. at 29:6-11.
[229] *Id.*  at 24:25-25:7.
[230] *Id.* at 23: 5-20.
[231] *Id.* at 38:13-21.
[232] *Id.* 6:13-7:5.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT      - 42**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1   the reasonableness of force used; and, the facts and information presented to it.[233] Chief Mulligan

2   admits that nothing on the face of the report indicates that Tommy was shot in the back.[234]

3       The Force Review Board Report was sent by the Undersheriff Scott A. Somers, Chair of

4   the Force Review Board[235] and to elected Sheriff Mitzi Johanknecht.[236] The Force Review Board

5   is mandated by the King County Sheriff's Office General Orders Manual (hereafter GOM) "to

6   review a Deputy-involved shooting …"[237] One of the purposes for the Force Review Board is "a

7   need to review and provide management oversight of serious incidents."[238] This is a top

8   management tool "to evaluate whether policies and procedures were followed and also whether

9   any further action needs to be taken with respect to training, equipment, performance and/or

10   behavior."[239] The Force Review Board concluded that the use of force was justified;[240] the use of

11   force did not violate GOM policies;[241] and there were no reasonable alternatives to the use of

12   force.[242] Defendant ratified Deputy Molina's use of excessive force in a sham report and by

13   promoting Molina within a month of the shooting.

### G.  Evidence of Tort of Outrage

15       John Urquhart, former King County Sheriff, repeatedly admitted that the circumstances did

16   not justify Deputy Molina's use of deadly force against Tommy; rather, the Sheriff repeatedly

17   stated that "Deputy Molina should have wrestled Tommy to the ground and taken the pen from his

---

[233] Arnold Decl. Ex. H deposition Exhibit Z at 5:12-19.
[234] Arnold Decl. Ex. J at 25:25-26:14.
[235] Arnold Decl. Ex. 81 at 2.
[236] *Id.* at 1.
[237] *Id.*
[238] *Id.*
[239] *Id.*
[240] *Id.* at 7-8.
[241] *Id.* at 9.
[242] *Id.* at 8.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT                                    - 43

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

hand."[243] Both King County and Sheriff Urquhart acknowledged the Sheriff's admission that deadly force was not necessary.[244] The Sheriff's admissions notwithstanding, KCSO stated to the Le family, press, and prosecuting attorney that the shooting of Tommy was necessary as he was "shot because he was attacking the deputies with a knife," despite KCSO's knowledge that Tommy was unarmed and was shot in the back.[245] There was no knife: no knife in Tommy's hand, no knife at the scene, no knife marks in Mr. Hernandez's door, and no knife produced from the extensive search of the path that Tommy walked.[246] Tommy was not attacking when Deputy Molina shot him—he was fleeing in fear.

The King County Sheriff's Office's cover-up is composed of a litany of misstatements of the truth and concealed facts that began hours after the shooting and continued through KCSO's August 22, 2018 Use of Force Review Board Findings Press Release. In its release, KCSO's included its Use of Force Review Board Findings[247] repeated the factual misstatement that Tommy was armed with a knife or deadly weapon when he charged at Deputy Molina. Additionally, KCSO intentionally omitted the critical fact that Deputy Molina shot Tommy in the back—not the torso, as KCSO claimed.[248] Another part of the cover-up is KCSO's repeated claims that civilian witnesses identified the knife taken from Tommy's room by the deputies was the knife he allegedly brandished at the witnesses earlier in the evening, despite the fact that witnesses testified that

---

[243] Decl. of Bao Xuyen Le at ¶4; 1st Decl. of Uyen Le at ¶¶8 & 11; Decl. of Tam Dinh at ¶10, PhD; Decl. of Joseph Lachman at ¶ 6.

[244] Dkt. #85, Sheriff John Urquhart's Decl. at 2:20-3:16, ¶¶7-10; Dkt #78, Def. KCSO MSJ at 33:7-13 ("his initial contact with the Le family occurred at their home and consisted of sharing some of the facts leading up to the shooting and the next steps to be taken. . . His later remarks in a public forum as to how he personally would have apprehended Le [not shot him]…"); Decl. of Tam Dinh at ¶9; Decl. of Bao Xuyen Le at ¶6.

[245] Arnold Decl. Ex. I at 25:25 and 26:2 and Ex. G at 32:3-10, 35:18-21, and 36:1-2.

[246] Arnold Decl. Ex. C at 11:15-17, Ex. 74 at 4-6, and Ex. G at 47:1-6; and Dkts. 52-9 at 4-6 and 96-9.

[247] Arnold Decl. Ex. 81.

[248] Arnold Decl. Ex. 23B at 3, 5-6, 15, Ex. G at 31:14-20, and Ex. H; Dkt. 92-3 at 2; and Decl. of Bao Xuyen Le at ¶¶13, 14, 18, 26-30, 35-36, 38.

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  Tommy's hands were empty and he did not access his room between the initial incident and when

2  Deputy Molina shot him. Thus, Tommy could not have left the knife seized by the deputies after

3  he was shot and killed. KCSO knew Tommy did not place the knife in his room yet continued to

4  generate and perpetuate statements indicating that the knife seized after the shooting was

5  brandished by Tommy.

6  ### III.  AUTHORITY AND ARGUMENT

7  ### A.  Summary Judgment Standard

8  Summary Judgment is appropriate when the moving party demonstrates no genuine issue

9  as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

10  R. Civ. P. 56 (a). The facts are viewed in the light most favorable to the non-moving party. *Tolan*

11  *v. Cotton*, 572 U.S. 650, 651, 657, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). All reasonable

12  inferences are drawn in favor the non-moving party. *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th

13  Cir. 2017). "In cases where the best (and usually only) witness who could offer direct testimony

14  for the plaintiff about what happened before a shooting has died, our precedent permits the

15  decedent's version of events to be constructed circumstantially from competent <u>expert and</u>

16  <u>physical evidence</u>, as well as from <u>inconsistencies</u> in the testimony of law enforcement." *George*

17  *v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (emphasis added).

18  ### B.  42 U.S.C. § 1983 is a Remedial Statute.

19  A 42 U.S.C. § 1983 action is: "[A] uniquely federal remedy against incursions under the

20  claimed authority of state law upon rights secured by the Constitution and laws of the Nation. The

21  high purposes of this unique remedy make it appropriate to accord the statute 'a sweep as broad as

22  its language." *Wilson v. Garcia*, 471 U.S. 261, 271–72, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)

23  (citations omitted), *superseded by statute on other grounds*, 28 U.S.C. § 1658(a). This remedial

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** **- 45**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

law (§ 1983) should be "construed generously to further its primary purpose." *Gomez v. Toledo*, 446 U.S. 635, 639, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980).

### C. Violation of Tommy's Fourth Amendment Rights.

The use of deadly force against Tommy was unjustified and excessive. "[N]otwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Tennessee v. Garner*, 471 U.S. 1, 9, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). A judicial test of reasonableness applies to excessive force cases.

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," (citation omitted) however, its proper application requires careful attention to the **facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight**. *See Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S. Ct. 1694, 1699–1700, 85 L. Ed. 2d 1 (1985) (the question is "whether the totality of the circumstances justif[ies] a particular sort of ... seizure")

*Graham v. Conner*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (emphasis added).

The governmental interests at stake are measured by a consideration of the *Graham* factors as well as any other "exigent circumstances [that] existed at the time of the arrest. *Chew v. Gates*, 27 F.3d 1432, 1440–41 n.5 (9th Cir. 1994). *See Jaramillo v. City of San Mateo*, 76 F. Supp. 3d 905, 917 (N.D. Cal. 2014). These factors, however, are simply a means by which to determine objectively "the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** **- 46**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

396–97." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001), *cert. denied*, 536 U.S. 958 (2002).  These exigent circumstances surrounding the death of Tommy that demonstrate that his shooting was a use of excessive and unreasonable force include the following.

### 1.  **Tommy did not pose an immediate threat**

By far the most important of the circumstances is whether the suspect poses an immediate threat to the officers or others.  Deadly force may not be used in an attempt to detain someone unless the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Scott v. Henrich,* 39 F.3d 912, 914 (9th Cir. 1994), quoting *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).

> A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. There must be other significant circumstances that warrant the use of such a degree of force at the time it is used … However, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.

*Deorle v. Rutherford*, 272 F.3d at 1281 (9th Cir. 2001) (Rutherford testified in his deposition that he shot Deorle to prevent the latter from passing him and thereby posing a menace to Rutherford, the public, and other officers); *see also Price v. Roseberg Police Dep't*, No. 6:15-cv-01114-JR, 2017 WL 4287216, at *1 (D. Ore. Jun. 21, 2017) ("Moreover, Walton's speculation that Price was headed in the general direction of two witnesses is insufficient to demonstrate the existence of a public threat … Critically, Price was unarmed and would have needed to "veer off" course in order to actually cross paths with the bystanders; because he "hadn't made it that far."); *see also Glenn v. Washington*, 673 F.3d 864 (9th Cir. 2011) (where a distraught and intoxicated teenager was shot dead by police officers; in reversing a summary judgement granting the police qualified immunity, the court found relevant the fact that the police could intervene before the teenager could get close enough to any bystanders).

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

Tommy was not armed and was empty handed when shot. Deputies Molina and Owens were behind Tommy but within 3–5 feet of Tommy's back and were in a position to physically take Tommy to the ground as recommended by Sheriff Urquhart. The take down protects any possibility that Tommy could harm others.  Nevertheless, the evidence shows Tommy was moving away from the officers and bystanders.

Both of the wounds that caused Tommy's death were to Tommy's back, one while he was falling to the ground and one when face down on the ground. Thus, even if force was necessary for Molina's self-protection, or for the protections of others, the force used by Molina was excessive.

> "But terminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting…. This is particularly true when the suspect wields a knife rather than a firearm."

*Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017).

Of importance is the size and number of officers present relative to the size of Tommy. The Trial Court in *Chien Van Bui v. City of San Francisco*, 61 F. Supp. 3d 877, 883 (N.D. Cal. 2014), *affirming in part and reversing on other grounds*, 699 Fed. App'x 614 (9th Cir. 2017) (Memorandum Decision), denied defendant's motion for summary judgment on an excessive force claim on the important fact that one officer was 6'0" tall, 198 pounds, the other 5'9" tall, at 180 pounds compared to a 46 year old mentally ill man who was 5'6" tall and weighed 135 pounds. *See also Kaady v. City of Sandy*, No. CV. 06-1269-PK, 2008 WL 5111101, at *8, *16 (D. Ore. Nov. 26, 2008) (where the risk posed to the officers or the public was lessened by the fact that the decedent was outnumbered by law enforcement officers); *Price v. Roseberg Police Dep't*, No. 6:15-cv-01114-JR, 2017 WL 4287216, at *1 (D. Ore. Jun. 21, 2017) (the fact that the deceased was outnumbered by the officers was pertinent to whether excessive force was used).

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** - 48

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

Tommy, an unarmed, half-naked man, weighing 123 pounds, only 5'4" tall, posed no significant threat to any of the people present when Tommy was shot. This was recognized by Deputy Owens, 6'0" tall, 175 pounds, and Deputy Paul, 6'3" tall, 270 pounds, who did not pull a gun, let alone use one.

The claim that Tommy could pose a significant threat with a plastic Paper Mate pen is on its face unbelievable. Defendant Molina relies on *Gregory v. Cty. of Maui*, 523 F.3d 1103 (9th Cir. 2008), for the proposition that a pen is a weapon that justifies the use of force. The Ninth Circuit found that reasonable force was used by three officers who **grabbed and pinned to the ground** a man who was behaving irrationally and aggressively and **pointing a pen** at the officers. *Id.* 523 F.3d at 1106-07. The use of force that was justified was minor. The Ninth Circuit did not approve the use of deadly force to control a suspect wielding a pen.

> Relying on the undisputed facts 'that Gregory was trespassing and acting aggressively," that Gregory refused to drop the pen in his hand, and **that the officers never drew their weapons or used pepper spray** on Gregory, the district court concluded that "[t]he use of force in response to it was proportionate and reasonable.'

*Id.* 523 F.3d at 1106 (emphasis added).

## 2. Severity of the crime at issue

If Tommy survived, what crime would he be charged with? No knife or any other weapon has ever been located. Tommy never physically assaulted or even touched any of the people who had called 911 that night. Tommy's actions might constitute the crime of a harassment,[249] either a gross misdemeanor, or at most a class C felony. Thus, the governmental interests at stake that might justify the use of deadly force were not significant. *See Deorle v. Rutherford*, 272 F.3d at

---

[249] RCW 9A.46.020.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**    **- 49**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1281 (9th Cir. 2001) (emotionally disturbed, suicidal man who had lost control of himself who was eventually charged "with nothing more than obstructing the police"). "The character of the offense is often an important consideration in determining whether the use of force was justified. *Id.* at 1280); *Kaady v. City of Sandy*, No. CV. 06-1269-PK, 2008 WL 5111101, at *16 (D. Ore. Nov. 26, 2008) (possible hit-and-run accident and assault are not minor offenses). Thus, before [the officers] encountered Kaady sitting naked in the street, they had information to suggest that Kaady posed a risk to themselves or the public. The significance of that potential threat, however, was lessened by the fact that Kaady was badly injured, outnumbered by law enforcement officers, and sitting, naked, in the open, in plain sight."); *Price v. Roseberg Police Dep't*, No. 6:15-cv-01114-JR, 2017 WL 4287216, at *6 (D. Ore. Jun. 21, 2017) (Regarding the governmental interests at stake, the *Graham* factors weigh in plaintiff's favor; any potential charge against him was not severe, would not likely rise to felony status or jail time); *Chien Van Bui,* 61 F. Supp. 3d at 886. Bui had stuck a teenage girl in the back with a one-inch X-Acto knife. "Although the officers knew that Bui previously had inflicted a small cut on a teenager with the X-Acto knife, the officers also knew her wound was not serious." *Id.*

### 3.  Tommy did not resist arrest nor attempt to flee

It was quickly apparent that Tommy was in a deranged state, not following the shouted commands, not speaking, and only making unintelligible noises.[250] Corene Bohna states in her declaration that when first confronted by the deputies, Tommy turned to the East, and came up 136th Street at a trot.  He went East for a short distance, then turned back towards the deputies. She states that Tommy "acted like he didn't even hear em."[251]  According to the deputies, he was

---

[250] Arnold Decl. Ex. 72 at 8:10.
[251] Bohna Decl. at 5-6.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** - 50

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

stationary at the corner until he was tased, without warning, then started trotting first towards Owens, then towards the Southwest, probably to avoid being tased again.  Tommy never turned around to run towards his residence.  As to whether he was resisting arrest, or attempting to flee, "the crux of the resistance was the refusal to follow commands." *Glenn*, 673 F.3d at 875.

Indeed, it is well-established that "[n]oncompliance does not constitute active resistance." *Kaady*, No. CV. 06-1269-PK, 2008 WL 5111101, at *18 (D. Ore. Nov. 26, 2008). "It is not clear on the current record whether it is accurate to characterize Bui's failure to comply with the officers' commands to drop the X-Acto knife as an act of resistance, rather than as an expression of confusion or fear." *Chien Van Bui v. City and Cty. of San Francisco*, Memorandum Decision, 699 F. App'x 614, 615 (9th Cir. 2017).

Tommy's actions were more consistent with "an expression of confusion or fear" than with an attempt to resist arrest or escape.

### 5.  Less intrusive alternatives to gunfire were available to Molina

KCSO GOM l 6.00.030 provides that "Members shall exhaust every reasonable means of apprehension before resorting to the use of deadly force." Molina was carrying a Taser CEW on the night he shot Tommy which was equipped with two cartridges.  Deputies are instructed that if a taser is not effective, they should reload a new cartridge and re-engage.[252] He was also carrying pepper spray on his person and had available a baton in his patrol car.[253]

Officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Henrich*, 39 F.3d, 912, 915 (9th Cir. 1994). However, "police are 'required to consider [w]hat other tactics if any were available,'" and if there were "clear, reasonable and less intrusive alternatives" to the force employed, that "militate[s] against finding [the] use of force reasonable." *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (quoting

---

[252] Arnold Decl. Ex. F at 180:9-19 and at 130:24-131:6.
[253] Arnold Decl. Ex. A at 46:25-47:10 and at 49:6-7.

1    *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000)); *see*
2    *also Smith*, 394 F.3d at 703 (considering "alternative techniques available for subduing
     him that presented a lesser threat of death or serious injury").

3    *Glenn v. Washington*, 673 F.3d 864, 876 (9th Cir. 2011); *see also Deorle v. Rutherford*, 272 F.3d

4    1272, 1282 (9th Cir. 2001) ("Nothing in the record before us suggests that [the officer] considered

5    other, less dangerous, methods of stopping Deorle"); *Smith v. City of Hemet*, 394 F.3d 689, 703

6    (9th Cir. 2009) ("[Plaintiff] argues that the officers' conduct violated applicable police standards

7    and that there were alternative techniques available for subduing him that presented a lesser threat

8    of death or serious injury… A rational jury could rely upon such evidence in assessing whether

9    the officers' use of force was unreasonable"); *Estate of Casillas v. City of Fresno*, 342 F. Supp. 3d

10   990, 999 (E.D. Cal. 2018) ("availability of other means of subdual").

11                    6.    **No warnings were given to Tommy that Molina would shoot**

12           At no time did Molina warn Tommy that he would be tased or that he would be shot.  The

13   law is established that "warnings should be given, when feasible, if the use of force may result in

14   serious injury, and that the giving of a warning or the failure to do so is a factor to be considered

15   in applying the *Graham* balancing test." *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir.

16   2001); *see also Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (While the failure to

17   warn, alone, is insufficient to establish liability, it does militate a finding that such force was not

18   objectively reasonable.); *and see Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014)

19   (In general, we have recognized that an officer must give a warning before using deadly force

20   "whenever practicable."). Deputy Paul on the scene testified that it was practical for Molina to

21   warn Tommy he was going to shot him with his gun.

22           Q. There was no warning that he was going to be shot?

23           A. Correct.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT          - 52**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

Q. And there certainly was plenty of time for that warning, if they could yell, Drop it, stop, they could have told him, stop or we'll shoot, couldn't they?

[objection omitted]

A.  If they had time to react, it's possible, yes.

Q. Because they shouted stop more than once, right?

A.  Correct.[254]

King County Deputies are trained to provide a warning when feasible as here.[255]

### 6.  Molina had notice and it was apparent that Tommy was emotionally disturbed

Dispatch had informed the responding deputies that Tommy had been "screaming on the top of his lungs," was claiming to be the "creator" and was a possible "220."[256]  Molina testified that he understood a "220" to be "someone who is having some sort of a mental issue."[257]  When Molina saw that Tommy was not complying,[258] and was making incoherent noises, Molina recognized that Tommy "was having some type of distress."[259]  The fact that someone is having "some kind of distress" is a factor to consider in determining whether the use of deadly force is reasonable under the circumstances.

The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of

---

[254] Arnold Decl. Ex. D at 29:1-17.
[255] Arnold Decl. Ex. 8 at 8, Taser Annual Cew User Update (2015). Molina was trained with Ex. 8, Arnold Decl. Ex. H at 8:2-5.
[256] Arnold Decl. Ex. 65 at 1 and Ex. 66 at 1.
[257] Arnold Decl. Ex. A at 21:8-10.
[258] *Id.* at 25:2-5.
[259] *Id.* at 62:11-23.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT        - 53

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. *See Alexander*, 29 F.3d at 1366 (holding that the police used excessive force, considering all the circumstances, in "storm[ing] the house of a man whom they knew to be a mentally ... recluse who had threatened to shoot anybody who entered"). Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

*Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001); s*ee also Glenn v. Washington*, 673 F.3d 864, 877 (9th Cir. 2011) ("We also recognized in *Deorle* that when dealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal, officers typically use less forceful tactics."); *Kaady v. City of Sandy*, No. CV. 06-1269-PK, 2008 WL 5111101, at *15 (D. Ore. Nov. 26, 2008) ("In addition to the [*Graham*] factors mentioned above, courts may consider the reasonableness of officers' use of force in light of whether officers knew that an individual was mentally unstable."); and *Kaur v. City of Lodi*, 263 F. Supp. 947, 969 (E.D. Cal. 2017) ("In that circumstance, [apparent mental illness] Ninth Circuit precedent is clear that the government interest in the use of force is diminished. *See Glenn*, 673 F.3d at 876; *Bryan*, 630 F.3d at 829. The government interest in that context is in providing treatment and ensuring the potentially mentally ill person does not present a danger to himself or others rather than punishing him.")

### 7.  Molina's actions exacerbated the situation

It was recognized in *Deorle* that in dealing with a mentally ill or disturbed person, "increasing the use of force may, in some circumstances at least, exacerbate the situation …" *Deorle*, 272 F.3d at 1283. Molina had been trained in de-escalation techniques.  KCSO General

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1   Orders Manual, 6.00.020, De-Escalation requires that de-escalation be used if possible.[260]  Rather

2   than follow the protocol, Molina, by himself, went to look for Tommy who was near-by.  When

3   he saw Tommy, he began to yell at him to get on the ground.[261]  When Tommy did not immediately

4   comply, Molina started towards Tommy, pulled his taser, and without any warning, fired.[262]

5   Owens states that he heard Molina yelling, turned towards Molina, and saw Tommy standing at

6   the corner with the red dot of the taser on Tommy's chest.[263]  Deputy Paul states "so Tommy didn't

7   walk towards them.  He stopped at the far side of 136th, that's where I initially saw him…I saw

8   Deputy Owens and Deputy Molina start moving towards him…"[264]  In Owens' first Garrity

9   statement he states that Molina fired his taser and Tommy began to move toward Molina, then

10   Tommy veered towards Owens, and Owens fired his taser.[265]  The timing is important. Tommy

11   started moving after he was tased, probably not understanding the commands being given, without

12   warning that he was about to be tased, and now suffering the pain of the two taser probes embedded

13   in his chest. Molina's actions exacerbated the situation. There was no effort to de-escalate.

14

        Regarding his decision to shoot Tommy with a taser, Molina testified as follows

15

16   Q.  At this point, you're not in fear for your life, are
17   you?

18   A.  I just want to put a stop to the thing. I'm trying to
19   prevent to use deadly force by using a Taser first
20   because I felt that I have enough distance between he
21   and I for me to properly deploy my Taser in order to
22   prevent the use of deadly force. Because usually you
23   don't have to use a Taser when someone has an edge

---

[260] Arnold Decl. Ex. 1:337.
[261] Arnold Decl. Ex. A at 58:14-17.
[262] *Id.* at 25:2-17.
[263] Arnold Decl. Ex. 72 at 7.
[264] Arnold Decl. Ex. D at 16:3-9.
[265] Arnold Decl. Ex. C at 38:7-8: Tommy was standing when tased by Molina.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT          - 55**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

24   weapon, you can automatically go to deadly force. But I
25   felt that I have enough distance between he and I for me
1    to use my Taser as another form of trying to de-escalate
2    the situation without the need of having to use deadly
3    force.[266]

Expert testimony regarding whether an officer's conduct comports with departmental policy and has been admitted to assist the jury in determining whether an officer's use of force was reasonable. *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005). An expert opinion by a former Bellevue, Washington Chief of Police that law officers "escalated a static situation into an unnecessary and avoidable shooting" was admissible to defeat a motion for summary judgment brought by the officers. *Glenn*, *supra*, at 877. In finding that unnecessary escalation was evidence that unnecessary force was used the court noted the officers did not follow proper procedure and "Instead, '[w]ith no attempt at establishing any dialogue whatsoever,' '[t]he shooters began loudly and continuously yelling at the decedent.'" *Glenn*, *supra*, at 877. Plaintiffs' expert Harmening testifies that Deputy Molina accelerated and exacerbated the confrontation with Tommy.[267]

### 8. Disputed issues of fact

Because an excessive force claim 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom,' the Ninth Circuit has also instructed that summary judgment in excessive force cases should be granted sparingly. *Glenn v. Washington*, 673 F.3d 864 (9th Cir. 2011).

Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts.

---

[266] Arnold Decl. Ex. A at 59:16-60:3.
[267] Harmening Decl. at 5:3-19.

1

*Hopkins*, 958 F.2d at 885–88; *Ting v. United States*, 927 F.2d 1504, 1510–11 (9th
Cir. 1991). In other words, the court may not simply accept what may be a self-
serving account by the police officer. It must also look at the circumstantial
evidence that, if believed, would tend to discredit the police officer's story, and
consider whether this evidence could convince a rational factfinder that the officer
acted reasonably.

2

3

4  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

5        Summary Judgment on a deadly force claim was denied where witness accounts differed

6 from the officers and where there was physical evidence regarding bullet trajectories that

7 conflicted with the officers' testimony.  *Kaady v. City of Sandy*, No. CV. 06-1269-PK, 2008 WL

8 5111101, at *8 (D. Ore. Nov. 26, 2008).

9

In cases where the best (and usually only) witness who could offer direct testimony
for the plaintiff about what happened before a shooting has died, our precedent
permits the decedent's version of events to be constructed circumstantially from
competent expert and physical evidence, as well as from inconsistencies in the
testimony of law enforcement.

10

11

12 *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).  Here, an expert could provide an opinion

13 that medical evidence called into question whether the deceased was physically capable of

14 wielding a gun as the defendant officers described. *See Estate of Casillas v. City of Fresno*, 342 F.

15 Supp. 990 (E.D. Cal. 2018). There, expert Harmening offered "interpretive evidence of the

16 officers' accounts of the event, concluding that the circumstantial evidence and inconsistencies in

17 Officer Shipman's testimony support a finding that Officer Shipman had no reason to use deadly

18 force. Under these 'light-most-favorable' facts, Harmening stated Officer Shipman had alternative

19 means of subduing Casillas, given his slow movement and non-assaultive stance." *Id*. at 999.

20        Where an officer's entitlement to qualified immunity depends on the resolution of disputed

21 issues of fact in his favor, and against the non-moving plaintiff, summary judgment is not

22 appropriate.  *Wilkins v. City of Oakland*, 350 F.2d 949, 956 (9th Cir. 2003).  The disputed issues

23 include:

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT**       **- 57**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1       a.  Witnesses in the neighborhood state that Tommy had nothing in his hands when

2  he approached the intersection where he was shot.[268]

3       b.  Molina insists Tommy was shot in the torso and cannot admit that Tommy was

4  shot in the back.[269]

5       c.  Tommy shot when face down on pavement.[270]

6       d. Owens claims that he "popped his taser" and that "doesn't affect him."[271]  There

7  is no evidence that Tommy was tased by Owens, only evidence that Owens pulled the

8  trigger.[272]  There were only two puncture wounds on Tommy's body, most likely from

9  Molina's taser.[273]  Owens' taser probes were never found.[274]

10       e. Owens testified that he pulled his gun before Tommy was shot by Molina and

11  this testimony is contradicted by two other deputies.[275]

12       f.  Molina's poor memory.[276]  *See Rodriquez v. City of Newark*, No. C16-04811-

13  SBA, 2018 WL 6710043, at *10 (N.D. Cal. Sept. 30, 2018) (officer's ability to perceive

14  events in question accurately called into question where the officer testified that the events

15  in question are fuzzy).

16       g.  Differing descriptions of the pen.[277]

17

18  [268] *See* page 21:11-13 of this Opposition Brief (section II B).
   [269] *See* page 18:9-10 of this Opposition Brief (section II).

19  [270] *See* page 30:1-10 (section II C).
   [271] Arnold Decl. Ex. C at 13:1-6.

20  [272] Arnold Decl. Ex. 179 at 3, Deputy Herrera Follow-Up Supplemental Report.
   [273] Arnold Decl. Ex. 23B at 9 and Ex. M at 152:7-17.

21  [274] Arnold Decl. Ex. 179 at 3.
   [275] See page 35:2-14 of this Opposition Brief (II, E, 6).

22  [276] Arnold Decl. Ex. 71 at 10,12-13: Molina could not recall whether he had a flashlight, what the lighting conditions were, whether his taser struck tommy, and cannot recall hearing Owens taser deploying. "So, most of my recollection was still all scattered around," Arnold Decl. Ex. A at 21:22-22:5.

23  [277] *See* pages 30:11-31:15 of this Opposition Brief.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT    **- 58 -**

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1      h.  Tommy was left-handed. [278]

2      ### D. Violation of Fourteenth Amendment Due Process Clause

3      ### 1.      Shocks the conscience

4      The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest

5      under the Fourteenth Amendment in the companionship and society of his or her child. *See*

6      *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986); *Kelson v. City of Springfield*, 767

7      F.2d 651, 653–55 (9th Cir. 1985); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 834, 118 S. Ct. 1708,

8      140 L. Ed. 2d 1043 (1998). The 14th Amendment provides that no state shall "deprive any person

9      of life, liberty, or property, without due process of law."

10     The Supreme Court in *Cty. of Sacramento v. Lewis*, 523 U.S. at 846 made it clear that only

11     official conduct that "**shocks the conscience**" is cognizable as a due process violation. Culpable

12     conduct that "shocks the conscience" and gives rise to a due process violation needs to be shown

13     to be the result of conduct that amounts to "deliberate indifference" or to be the result of an "intent

14     to do harm." Plaintiffs Le concede that Molina did not have the opportunity for actual deliberation

15     and that the "intent to do harm" is the appropriate standard to be met.

16     The question is whether under the totality of the circumstances a jury could infer that

17     Molina, when he shot Tommy in the back, face down on the street, "was acting for purposes other

18     than legitimate law enforcement." *Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008). In

19     *Porter*, the officer precipitously sprayed the [decedent] with pepper spray, "an action that could

20     be viewed as punishing or harassing when it is unclear whether [the decedent] knew he was dealing

21     with law enforcement, that his fleeing "might have been a normal effort to escape further

22

23     [278] Hoai "Sunny" Le decl. at ¶ 2 and Uyen Le 2nd decl. at ¶ 2. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (2014) (That all the officers witnessed the same thing, that the deceased was left handed but allegedly reached for his gun with his right).

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT   - 59**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

spraying…and most important is [the officer's] severe and sudden escalation of the situation: where [the decedent's] only violation was non-compliance, [the officer's] extraordinary response was to fire five shots." *Id*. at 1142.

> When an officer creates the very emergency, he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation. His motives must then be assessed in light of the law enforcement objectives that can reasonably be found to have justified his actions.

*Porter*, 546 F.3d at 1141.

Deputy Molina failed to attempt to de-escalate the confrontation and tased a stationary Tommy exacerbating and creating the "very emergency" for which "he then resorts to deadly force to resolve …"[279]

Other facts that may bear on whether an officer is acting for purposes other than legitimate law enforcement is whether an officer is in compliance with regulations, such as the King County Sheriff's General Orders, governing the use of force. *Porter*, *supra*, at 1142. *See also Zion v. Cty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (declining to grant summary judgment on a Fourteenth Amendment claim as "a reasonable jury could also conclude that [the officer] was acting out of anger or emotion rather than any legitimate law enforcement purpose").

In *A.D. v. Cal. Highway Patrol*, 712 F.3d 446 (9th Cir. 2013), the defendant police officer appealed after an adverse jury verdict that the police officer had violated Plaintiffs' due process rights. Plaintiffs' unarmed decedent had been shot to death after a high-speed car chase. The jury had been instructed that the jury should find that defendant violated Plaintiffs' rights if he "acted in a manner which shocks the conscience," defined by the court as acting with a purpose to cause the decedent's death unrelated to legitimate law enforcement purposes of taking her into custody,

---

[279] *Porter*, 546 F3d at 1141 and heading "8. Molina exacerbated the situation" on page 37 of this brief.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**      **- 60**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

self-defense, or the defense of others. *Id*. at 461. The trial judge refused to grant defendant Judgment as a Matter of Law as the jury could have reasonably concluded that the police officer acted with a purpose to harm based on evidence that: 1) the driver's car was contained in a dead-end street; 2) the driver refused to exit the car and said "fuck you" to the officer; 3) the other officers were not in the path of the driver's car; 4) other officers testified that they did not feel threatened or perceive an immediate threat; 5) five other officers had their guns drawn but did not fire; 6) the driver's car was stopped or going forward at the time of the shooting; 7) the location of the car was inconsistent with the officer's testimony; and, 8) the officer shot the driver 12 times. *Id*. at 452.

*Kaur v. City of Lodi*, 263 F. Supp. 3d 947 (E.D. Cal. 2017) arose from the fatal police shooting of a mentally ill man who, according to the officers involved, charged at them with a knife. The officers' version was contradicted by witnesses who saw nothing in his hands.  The Court held that a reasonable jury could find that the "purpose to do harm" standard could be satisfied.  *Id*. at 972-3. The Court declined to grant qualified immunity for the 14th Amendment due process claim as these facts would present an "obvious case." *See also, Estate of Elkins v. Pelayo*, 737 Fed. App'x 830, 833 (9th Cir. 2018) ("Regarding Plaintiffs' Fourteenth Amendment claim, a reasonable jury could find under the facts presented, that shooting a suspect simply to stop him from running away was not a legitimate law enforcement objective."); *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1167 (a reasonable jury could find that the officer's use of severe force provoked a situation the officer resorted to lethal force to resolve and that such conduct could "shock the conscious"); *Tam Lam v. City of Los Banos*, 2:15-cv-00531-MCE-KJN, 2017 WL 1179136, *6 (E.D. Cal. Mar. 30, 2017) (declining to grant summary judgment on the Fourteenth Amendment claims where resolution of facts, justifying the use of lethal force, whether the

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT          - 61**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  deceased was armed with knife, whether he had stabbed the officer, and whether he posed a threat

2  to the officer, could support a jury finding that the officer acted with a "purpose to do harm").

3      Plaintiffs Le should be allowed to present to the jury evidence that Molina was not acting

4  for legitimate law enforcement purposes but was acting with a "purpose to do harm" based on

5  evidence that: Tommy was not armed with a weapon; no other deputies had drawn their guns;

6  Molina violated his training and police practice by exacerbating the situation by yelling, then tasing

7  Tommy without warning; there was an adequate number of deputies to take control of Tommy

8  using less than lethal methods; Deputy Owens did not consider Tommy to pose a serious threat of

9  harm to Owens at the time Tommy was moving away from him; Tommy did not pose an immediate

10  risk of serious harm to anyone; and, Tommy was shot in the back while face down on the pavement.

11  Molina declares that he was in fear for his life and the lives of others when he decided to use deadly

12  force. But a jury could reasonably find that Molina's fear was not reasonable, and that Molina's

13  motivation, be it based on unreasonable fear or some other emotion to use deadly force, was not a

14  legitimate police objective. Molina stated in his deposition:

15      Q If you knew Mr. Le was holding a plastic pen, like
        6 Officer Thompson is holding, you would not have shot
16      7 him, would you?

17      [objections omitted]

18      12 THE WITNESS: Based on the information I
        13 had, and his actions and behaviors that night, and the
19      14 fact that he was approaching me, even if he would have
        15 been holding that pen, that pen can still cause great
20      16 bodily injury if I get stabbed in the eye or the face
        17 area. So I would have used deadly force to put a stop
21      18 to it.[280]

22

23

---

[280] Arnold Decl. Ex. A at 75:5-18.

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

## 2.    14th Amendment permit parents to recover for loss of companionship

"The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child [citations omitted] … Thus, *Graham v. Connor* does not bar the parents' and children's due process claims." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).  *Curnow* was recently reaffirmed by the Ninth Circuit in *Zion v. Cty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017). In an extensive analysis, *Ostling v. City of Bainbridge Island*, 872 F. Supp. 2d 1117, 1125–27 (W.D. Wash. 2012) concludes that the "restriction of non-economic damages in Washington's survival statutes [RCW 4.20.046 and RCW 4.20.060] undermines the purpose of § 1983 and must therefore be disregarded." *Id*. at 1126 (bracketed material added).  The state restrictions limit recoveries essentially to the loss net accumulation to the estate,[281] and burial expenses. *Id*. at 1124–25.

### E.  Qualified Immunity

Plaintiffs do not dispute Defendant Molina's recitation of the applicable law regarding qualified immunity and that once a violation of a constitutional right is established, that the focus becomes whether the law was sufficiently clear so that a reasonable officer would understand that the force used was unlawful.  "Although 'this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' *White v. Pauly*, 580 U.S., at ——, 137 S. Ct. 548, 551 (internal quotation marks omitted)." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018).

---

[281] Tommy was a dish washer at a Casino and student at the time of his death. He was low income ,and his loss net accumulation would be on the low side supporting non-economic damages consistent with the remedial purpose of § 1983.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT        - 63**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1    Existing caselaw establishes, beyond debate, that an officer may not use deadly force to

2    apprehend a suspect where the suspect poses no immediate threat to the officer or others.

3    *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010), citing *Tennessee v. Garner*, 471 U.S. 1,

4    11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985). At the time of this shooting, caselaw had clearly

5    established that "[law] enforcement officers may not shoot to kill unless, at a minimum, the suspect

6    presents an immediate threat to the officers or others, or is fleeing and his escape will result in a

7    serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997). "A

8    police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee*

9    *v. Garner*, 471 U.S. at 6 (1985)

10    Every deputy present at the scene of Tommy's death knew that shooting an unarmed person

11    who posed no immediate threat to anyone was in violation of established caselaw.

12    The threat analysis must be based on objective factors and not merely "a simple statement

13    by an officer that he fears for his safety or the safety of others." *Deorle*, 272 F.3d at 1281.

14    > As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in
15    > an excessive force case is an objective one: the question is whether the officers'
16    > actions are "objectively reasonable" in light of the facts and circumstances
     > confronting them, without regard to their underlying intent or motivation. See *Scott*
16    > *v. United States*, 436 U.S. 128, 137–139, 98 S. Ct. 1717, 1723–1724, 56 L. Ed. 2d
     > 168 (1978); see also *Terry v. Ohio*, *supra*, 392 U.S., at 21, 88 S. Ct., at 1879 (in
17    > analyzing the reasonableness of a particular search or seizure, "it is imperative that
     > the facts be judged against an **objective standard**"). An officer's evil intentions
18    > will not make a Fourth Amendment violation out of an objectively reasonable use
     > of force; nor will an officer's good intentions make an objectively unreasonable use
19    > of force constitutional. *See Scott v. United States, supra,* 436 U.S., at 138, 98 S. Ct.,
     > at 1723, citing *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d
20    > 427 (1973).

21    *Graham*, 490 U.S. at 397 (1989) (emphasis added).

22

23

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY
JUDGMENT        - 64**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

Plaintiffs have submitted credible evidence that Tommy was not armed with a weapon when he was shot in the back. Witnesses state that Tommy had nothing in his hand.[282] There are numerous unexplained circumstances surrounding the pen found at the scene.[283] There was adequate lighting and Molina was close enough to Tommy to see that Tommy had nothing in his hand.[284] On the bases alone, Molina's decision to shoot to kill was not objectively reasonable.

Defendant Molina claims that Tommy's constitutional right to be free of excessive and deadly force was neither clearly established nor known to a reasonable officer. The cases cited to this Court in support of this claim involve a weapon that was being used to threaten imminent serious bodily injury or death to the officers or to the people in close proximity. Molina asks this court to ignore plaintiffs' evidence that Tommy had nothing in his hand, rely on assertions that a black Paper Mate pen was in his hand, and that such a pen could reasonably be considered a weapon justifying lethal force. As shown above, *Gregory* does not provide justification for this claim.

Moreover, the factual contradictions should carry this case to a jury. Judge Leighton observed in a case with many factual inconsistencies that:

> The testimony of the officers involved in the pursuit of Orn does not present a comprehensive, consistent story of what happened and why. Thus, it cannot be said as a matter of law that the officers are entitled to qualified immunity. Defendants' motion for summary judgment on qualified immunity is **DENIED**.

*Orn v. City of Tacoma*, No. C13-5974 RBL, 2018 WL 1709497, at *6 (W.D. Wash. 2018), *appeal docketed*, No. 18-35379 (9th Cir. May 4, 2018).

---

[282] O'Brien Decl. at ¶¶ 6-7; Cradle Decl. at 5; and Bohna Decl. at 7.
[283] *See* section "2. Tommy was unarmed" on page 29 of this brief.
[284] *Id.*

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT        - 65

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1

**F.  RCW 4.020.020**

2

**1.  Tommy was not engaged in a felony when Deputy Molina shot him.**

3

Under RCW 4.24.420:

4

It is a complete defense to any action for damages for personal injury or wrongful
death that the person injured or killed was engaged in the commission of a felony
<u>at the time of</u> the occurrence causing the injury or <u>death</u> and the felony was a
proximate cause of the injury or death. However, nothing in this section shall affect
a right of action under 42 U.S.C. § 1983.

5

6

7

(emphasis added).

8

a.  <u>Tommy was not engaged in committing the felony of intimidating a
public official when Deputy Molina shot and killed him.</u>

9

10

There is a genuine issue of material fact as to whether Tommy was engaged in intimidating

11

a public servant under RCW 9A.76.180 as claimed by defendants. While Tommy's actions may

12

have constituted a threat, there is insufficient evidence to prove that he attempted to influence the

13

deputies' behavior, a requirement of the crime. RCW 9A.76.180(1) provides that "(1) [a] person

14

is guilty of intimidating a public servant if, by use of a threat, he attempts to influence a public

15

servant's vote, opinion, decision, or other official action as a public servant." "(3) 'Threat' as used

16

in this section means: (a) to communicate, directly or indirectly, the intent immediately to use force

17

against any person who is present at the time; or, (b) threats as defined in RCW 9A.04.110." RCW

18

9A.76.180(3)(a) & (b). However, threats are not enough; the person must attempt to influence the

19

public servant's behavior with the threats. *State v. Burke*, 132 Wn. App. 415, 420–21, 132 P.3d

20

1095 (2006); *State v. Stephenson*, 89 Wn. App. 794, 807, 950 P.2d 38, *review denied*, 136 Wn.2d
1018, 966 P.2d 1277 (1998).

21

22

23

The defense incorrectly asserts that "no serious argument can be made that Le's attack on either the civilians or Deputy Molina were not felonies."[285] There is ample caselaw that indicates Tommy's actions did not constitute intimidating a public servant. Defendant Molina cited to *Burke*, where the Court of Appeals held that a suspect's physical behavior met the statutory definition of "threat" when he took a fighting stance w/raised fists toward a police officer. *Burke*, 132 Wn. App. at 416–17. But, in *Burke*, the Court held that there was insufficient evidence to prove that the suspect tried to influence the officer's behavior. The court stated:

> [T]he State fails to explain how simple anger implies intent to influence. The evidence shows only that [the suspect] was drunk & angry. Evidence of anger alone is insufficient to establish intent to influence [the officer's] behavior. The State must show that [the suspect's] anger had some specific purpose to make [the officer] do or not do something.

*Burke*, 132 Wn. App. at 422.

Similarly, Deputy Molina cannot show that Tommy intended to influence his or the other deputies' behavior. A threat, without more, is insufficient evidence to prove beyond a reasonable doubt that Tommy attempted to influence Deputy Molina's behavior. Deputy Molina fails to produce evidence on every element of the defense, and therefore entitled to judgment as a matter of law.

### b. Tommy was not engaged in committing the felony of Second-Degree Assault when Deputy Molina shot and killed him.

Even if Tommy's actions against the civilian witnesses constituted Second-Degree Assault, Tommy was not "engaged in the commission of the [assault]" at the time Deputy Molina shot and killed him, as required by RCW 4.24.420. Defendant Molina incorrectly concludes that "because

---

[285] Dkt. 78 Defendant King County's Motion for Summary Judgment

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** - 67

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1  the shooting occurred in the course of those felonies, [he] has a complete defense to liability under

2  state law."[286]

3      The statutory language is clear that the complete defense to a wrongful death action for

4  damages is available only where the person killed was engaged in the commission of a felony

5  when shot. The statute does not encompass felonies the person killed may have committed prior

6  to the killing. Under the rules of statutory construction against surplusage every word and every

7  provision is to be given an effect that does not duplicate another provision or to have no

8  consequence. *Kungys v. United States*, 485 U.S. 759, 778, 108, S. Ct. 1537, 99 L. Ed. 2d 839

9  (1988) (plurality opinion of Scalia, J.) (citing the "cardinal rule of statutory interpretation that no

10  provision should be construed to be entirely redundant"). *See Berrocal v. Fernandez*, 155 Wn.2d

11  585, 599–600, ¶ 22, 121 P.3d 82 (2005).

12      The legislature has repeatedly declined to adopt proposed amendments that would expand

13  the statute.[287] The rules of statutory construction require that undefined words are given their

14  common dictionary meaning. *State v. Argueta*, 107 Wn. App. 532, 536, 27 P.3d 242 (2001).

15  Black's Law Dictionary defines "commission" as "the act of doing or perpetrating (as a crime)."

16  BLACK'S LAW DICTIONARY (10th ed. 2014). Tommy did not perpetrate any crimes when Deputy

17  Molina and other deputies arrived at the scene. The language is not ambiguous, and the statute

18  reflects a clear and obvious legislative intent to preclude state claims for injuries specifically where

19  the person killed was engaged in committing a felony <u>at the time</u> he was killed.

20

21

22

23

---

[286] Dkt. 87, Defendant Molina's Motion for Summary Judgment.
[287] 1997 Bill Text WA H.B. 2777 (Jan. 21, 1998); 1999 Bill Text WA H.B. 1205 (Jan. 22, 1999); 2001 Bill Text WA H.B. 1541 (Feb. 27, 2001).

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**     **- 68**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1

2

### 2.   There are genuine issues of material fact regarding whether Tommy proximately caused his own injuries

3

RCW 4.24.420 allows the defendant a complete defense if the plaintiff engaged in a felony

4

that qualifies as a proximate cause of the injury. This statutory requirement of proximate cause

5

corresponds with the common law rule of proximate cause being an element of negligence.

6

*Wuthrich v. King Cty.*, 185 Wn.2d 19, 25, 366 P.2d 926 (2016); *New York Life Ins. Co. v. Jones*,

7

86 Wn.2d 44, 47, 541 P.2d 989 (1975) (where the legislature uses statutory language that has a

8

well-defined common law meaning, it is presumed that the statute should be interpreted in

9

accordance with the common law meaning). The common law meaning of proximate cause is "a

10

cause which in a direct sequence [unbroken by any superseding cause,] produces the [injury]

11

[event] complained of and without which such [injury] [event] would not have happened." 6 Wash.

12

Prac., *supra*, WPI 15.01 (brackets & formatting in original). Proximate cause is absent if an

13

intervening act has broken the chain of causation. *Campbell v. ITE Imperial Corp.*, 107 Wn.2d

14

807, 812–13, 733 P.2d 969 (1987). Deputy Molina's shooting an unarmed Tommy may be a

15

superseding cause of any felony Le earlier committed. Under this definition, the question of

16

proximate cause is ordinarily for the jury, unless the facts and reasonable inferences from the facts

17

are undisputed. *See* Wash. Prac., *supra*, WPI 15.01 & cmt.; *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d

18

422, 436, 378 P.3d 162 (2016). Accordingly, whether RCW 4.24.420 provides a complete defense

to Plaintiffs' claims is properly reserved for trial. *See* Wash. Prac., *supra*, WPI 16.01 & cmt.

19

### 3.   There are genuine issues of material fact whether Deputy Molina's conduct was a superseding cause of Tommy's injuries.

20

21

A superseding cause is a new independent cause that breaks the chain of proximate

22

causation between a party's negligence and an injury or event. *See id.*, WPI 15.05 & cmt.;

23

*Washburn v. City of Federal Way*, 178 Wn.2d 732, 761, 310 P.3d 1275 (2013) (noting that

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT        - 69**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1   "[u]nforeseeable intervening acts break the chain of causation"). Even if a reasonable jury could

2   find that Tommy was engaged in committing a felony at the time Deputy Molina shot him, there

3   are genuine issues of material fact as to whether Deputy Molina's conduct may have been a

4   superseding cause of Tommy's injuries.

5         Numerous factual discrepancies exist, and a jury should be entitled to find that Deputy

6   Molina's conduct in exacerbating the situation was a superseding cause of Tommy's injuries.

7   There are genuine issues of material fact regarding whether Tommy was engaged in the

8   commission of a felony when Deputy Molina shot him in the back, whether any felony was a

9   proximate cause of Tommy's injuries, and whether Deputy Molina's conduct was a superseding

10   cause of Tommy's death.

11                        **G.**    *Monell* **Claim**

12         A reasonable jury could find that King County ratified Deputy Molina's unconstitutional

13   use of excessive force when the King County Sheriff not only agreed with Deputy Molina's illegal

14   conduct by not imposing discipline, but also promoted him shortly thereafter.[288]

15         A plaintiff seeking recourse against a municipality must prove: 1) that his or her

16   constitutional rights were violated; and, 2) that the constitutional violation was directly caused by

17   a municipal policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 211

18   (1978). As a prerequisite to establishing § 1983 municipal liability, "the plaintiff may prove that

19   an official with final policy-making authority ratified a subordinate's unconstitutional decision or

20   action and the basis for it. *Menotti v. City of Seattle*, 403 F.3d 1113, 1147 (9th Cir. 2005). *See, e.g.*,

21   *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  In *City of St. Louis v. Praprotnik*, 485 U.S.

22

23

---

[288] Arnold Decl. Ex. A at 83:21-84:12.

112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988), the Supreme Court recognized the relevance of ratification to what may be chargeable to a municipality in the § 1983 context:

> When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. **If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final**.

(emphasis added).

In its motion, Defendant King County selectively ignores the well-established jurisprudence of *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988), and its progeny under which a municipality may be liable based on ratification. It also seems to conflate the ratification theory with the "custom or usage" theory by arguing that Plaintiffs are required to show prior instances establishing a custom or usage to prove liability by subsequent ratification. However, under *Pembaur* (*infra*), the Supreme Court definitively held that it is immaterial whether a policy is so persistent and widespread as to practically have the force of law. Rather, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). There, the Supreme Court stated that:

> It is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.

*Pembaur*, 475 U.S. at 480. Accordingly, Plaintiffs are not required to prove prior incidents of conduct to prevail on their claim.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                - 71

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

Plaintiffs present a viable § 1983 claim based on ratification for a jury to decide. Deputy Molina acted under the color of state law because: he shot and killed Tommy while performing his authorized and official duties under KCSO's policies; and, his decision to unnecessarily use excessive deadly force violated Le's Fourth Amendment rights against unreasonable seizure. The King County Sheriff's Office knew about Deputy Molina's wrongful conduct (as proved by former King County Sheriff John Urquhart's admissions), yet the Review Board[289] chose to unanimously approve it in its August 22, 2018 review. Several weeks after Deputy Molina shot Tommy, Sheriff John Urquhart publicly admitted that there were alternatives to deadly force available to detain Tommy and that it was not necessary to employ deadly force. He made the admission twice: First, to the Le family in their home; and Second, to a crowded meeting of the Asian Pacific Directors Coalition.[290] Specifically, the Sheriff admitted that it was not necessary for Deputy Molina to shoot Tommy, and that he should have "wrestled Tommy to the ground and taken the plastic pen from his hand."[291] Despite Sheriff Urquhart's admissions that Deputy Molina used excessive force, KCSO promoted Deputy Molina to the rank of Detective.[292]

The King County Sheriff was the final policymaker. The Sheriff is the official policymaker under GOM 6.06.030 which provisions were violated, and which states that all findings and recommendations of the Review Board shall have the Sheriff's final approval.[293] The Sheriff shall review the findings and recommendations of the Review Board within <u>ten working days</u>.[294] If the

---

[289] Arnold Decl. Ex. 81.
[290] Jefferey Vu Decl.
[291] 1st Uyen Decl. at 4:21-5:1 and Decls. of Bao Xuyen Le and Tam Dinh, PhD describing the Sheriff's admission at the Le family home and Declaration of James Lachman referencing the Sheriff's admission at a meeting of the Asian Pacific Directors Coalition.
[292] Arnold Decl. Ex. A at 83:21-84:12.
[293] Arnold Decl. Ex.1:53 GOM 1.03.020(1) (Sheriff is Dep't Chief Executive and upon her rests the final responsibility for determining dep't direction).
[294] *Id.* at 1:352 GOM 6.03.035.

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                    - 72

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1   Sheriff concurs with the Board, she shall forward the findings to IIU for records retention. *Id*. If

2   she does not concur with the Board, she may ask the appropriate person(s) to investigate specific

3   issues or concerns or note specific concerns in writing. *Id*. Additionally, she shall notify the

4   involved member(s), in writing, of the findings and recommendations within ten working days

5   following final review. *Id*.

6        "Municipalities are required to review police shootings and carefully determine whether

7   the shooting complied with local policy, and then determine whether or not discipline is

8   appropriate." *Thomas v. Cannon*, Nos. 3:15-05346-BJR; 3:16-cv-05392, 2017 WL 2289081, at

9   *13 (W.D. Wash. May 25, 2017). In *Thomas*, the Western District of Washington denied the

10  defendant city's motion for summary judgment on the plaintiffs' *Monell* "ratification theory,"

11  holding that a rational jury could find that the officer's decision to shoot was not constitutionally

12  justified and that the city ratified that unconstitutional decision by determining it was lawful and

13  within policy. *Thomas v. Cannon*, 2017 WL 2289081, at *13. There, the plaintiffs argued that

14  defendant Lakewood was liable under *Monell* based on a ratification theory for the Review Board's

15  finding that the officer's actions were lawful and within policy. *Id*. The court addressed the

16  requirement that municipalities review police shootings and carefully determine whether the

17  shooting complied with local policy, and then determine whether discipline is appropriate. *Id*.

18       In this case, the Review Board conducted its review of the June 14, 2017 shooting of

19  Tommy on August 20, 2018, which was over seven months ago.[295] Pursuant to KCSO's rules, the

20  Sheriff was required to review the Review Board's findings within ten working days of the review

21  and either forward the findings to IIU for records retention[296] or ask the appropriate person(s) to

22

23  [295] Arnold Decl. Ex. 81.
    [296] Arnold Decl. Ex. 1:352 GOM 6.03.035(1).

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT** - 73

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1    investigate specific issues or concerns or note those concerns in writing and set a reasonable

2    deadline for additional review(s).[297] To date, KCSO has produced no documentation (pursuant to

3    Pl.'s 1st RFPs, No. 12[298] requesting all documents pertaining to the shooting of Le) that the Sheriff

4    requested any further investigation or noted any concerns regarding the Review Board's findings.

5    The Sheriff has therefore given final approval as required by GOM 6.03.030(1) by default. To hold

6    otherwise absolves municipal government from the duty of reviewing the appropriateness of police

7    shootings and rewards this failure of governmental action by preventing *Monell* ratification claims.

8         KCSO released its August 22, 2018 Use of Force Review Report, in which the five-member

9    Board unanimously voted that Deputy Molina's use of force did <u>not</u> violate KCSO policies, that

10   Deputy Molina's choices leading up to the event were sound, and that there were "no reasonable

11   alternatives" available.[299] The Undersheriff served as Chairperson of the Board,[300] and, according

12   to GOM 1.03.020(2), the Undersheriff "commands the activities of the Sheriff's Office according

13   to policies prescribed by the Sheriff. It is his duty to oversee the internal operations of the

14   department, and he may prescribe rules of conduct the Sheriff's Office members under his

15   command that do not conflict with other Sheriff's Office policy. *Id*. Additionally, "the

16   Undersheriff is subordinate to the Sheriff." *Id*.

17        As stated in *Thomas*, KCSO had a duty to investigate the shooting and appropriately

18   discipline Deputy Molina. It failed to do so. Instead, the Board based its decision on an entirely

19   flawed investigation which never addressed the fact that Tommy was shot in the back or whether

20   he actually held an ink pen (despite Kamron O'Brien's and James Cradle's statements that he held

21

22   _____
     [297] *Id.* at GOM 6.03.035(2).

23   [298] Arnold Decl. Ex. 300, Plaintiffs' First Request for Production No. 12 and Responses Thereto.
     [299] Arnold Decl. Ex. 81 at 7-11.
     [300] *Id.* at 2: "Undersheriff Scott Somers, Chair." *See* GOM 6.03.020 (Chairperson's Responsibilities).

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY**          **CAMPICHE ARNOLD, PLLC**
**JUDGMENT            - 74**                        1201 Third Avenue, Suite 3810
                                                       Seattle, WA 98101
NO. 2:cv-18-00055                                   TEL: (206) 281-9000
                                                    FAX: (206) 281-9111

1  nothing). Additionally, KCSO showed witnesses a knife taken from Tommy's home as part of its

2  investigation even though KCSO knew that Tommy did not have access to his home and could not

3  have obtained a knife from inside. A sham investigation supports a *Monell* claim. *German v.*

4  *Roberts*, No. C15-5237-BHS-DWC, 2017 WL 6547472, at *2 (W.D. Wash. Dec. 22, 2017)

5  recognizes that a sham investigation into excessive force cases creates *Monell* liability. "On the

6  other hand, other courts have concluded that such an investigation and conclusion will not

7  constitute ratification for the purposes of *Monell* absent evidence of "something more," such as a

8  "sham investigation" or "conduct [by the officer] so outrageous that a reasonable administrator

9  should have known that he or she should do something about it. *See Kanae v. Hodson*, 294 F.

10  Supp. 2d 1179, 1191–92 (D. Haw. 2003)." *Id.*

11        The Review Board must "thoroughly investigate"[301] an officer's use of force to determine

12  whether it was unconstitutional. While the Review Board "may call any witnesses deemed

13  necessary,"[302] it should not be permitted to insulate itself from liability by only calling witnesses

14  whose testimony supports KCSO's members (Deputy Molina).

15                    **H.      Tort of Outrage**

16  **Defendant King County's Cover-up and Private and Public Misrepresentations Regarding**
    **the Shooting of Tommy Le Caused Foreseeable Harm & Present a Jury Question on the Tort**
17  **of Outrage**

18        A reasonable jury could find that King County committed the tort of outrage when (1) King

19  County's actions were clearly outrageous; (2) there is evidence of Plaintiffs' severe emotional

20  distress; and, (3) the evidence, when viewed in the light most favorable to the non-moving party,

21

22

23  ───────────────
    [301] Arnold Decl. Ex. 1:342 KCSO GOM 6.01.005.
    [302] *Id.* at KCSO GOM 6.03.010(5).

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY**          **CAMPICHE ARNOLD, PLLC**
**JUDGMENT                    - 75**              1201 Third Avenue, Suite 3810
                                                      Seattle, WA 98101
NO. 2:cv-18-00055                                   TEL: (206) 281-9000
                                                    FAX: (206) 281-9111

1   proves that plaintiffs suffered actual harm greater than mere annoyance, inconvenience, or normal

2   embarrassment.

3        Plaintiffs Le family believe the facts support the conclusion that the goal of the KCSO

4   investigation and conduct following the shooting of unarmed Tommy was to cover-up the truth

5   and protect the deputy and Sheriff's Office from the consequences of shooting an unarmed high

6   school student in the back. Plaintiffs further believe the KCSO's conduct is in contradiction of the

7   laws and values of our democracy and that a jury might well find this to be an outrage.

8   Accordingly, the Le family asks the Court to deny King County's Motion to dismiss their claim of

9   outrage and allow the jury to determine the truth behind the shooting of Tommy and the conduct

10  of the Sheriff's Office. To understand plaintiffs' opposition to King County's Motion for Summary

11  Judgment on outrage it is necessary to read the factually specific declarations of several witnesses

12  including; Laura Brown PhD, Tam Q. Dinh PhD, Joseph Lachman, Jefferey Vu, Xuyen Le, and

13  Uyen Le.[303]

14       The Le family reminds the Court that John Urquhart, the former King County Sheriff,

15  repeatedly admitted that the circumstances did not justify Deputy Molina's use of deadly force

16  against Tommy; rather, the Sheriff repeatedly stated that "*Deputy Molina should have wrestled*

17  *Tommy to the ground and taken the pen from his hand.*"[304] Both King County and Sheriff Urquhart

18  acknowledge the Sheriff's admission that deadly force was not necessary.[305] The Sheriff's

---

[303] Decls. of Laura Brown, Tam Q. Dinh, PhD, Joseph Lachman, Jefferey Vu, Bao Xuyen Le, and 1st Uyen Le.

[304] Decl. of Bao Xuyen Le at ¶4; 1st Decl. of Uyen Le at ¶¶8 and 11; Decl. of Tam Q. Dinh, PhD at ¶10; Decl. of Joseph Lachman at ¶ 6.

[305] Dkt. 85, at 2:20-3:16 Sheriff John Urquhart's Decl., ¶¶7-10; Dkt. 78, Def. KCSO MSJ at 33:7-13 ("his initial contact with the Le family occurred at their home and consisted of sharing some of the facts leading up to the shooting and the next steps to be taken. . . His later remarks in a public forum as to how he personally would have apprehended Le [not shot him]…"); Decl. of Tam Q. Dinh, PhD at ¶9; and Decl. of Bao Xuyen Le at ¶6.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT**          **- 76**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

admissions notwithstanding, KCSO stated to the Le family, press, and prosecuting attorney that the shooting of Tommy was necessary as he was "*shot because he was attacking the deputies with a knife*,"[306] despite KCSO's knowledge that Tommy was unarmed and shot in the back.[307] There was no knife: no knife in Tommy's hand, no knife at the scene, no knife marks in Mr. Hernandez' door, and no knife produced from the extensive search of the path that Tommy walked.[308] Tommy was not attacking when Deputy Molina shot him—he was fleeing in fear.[309]

The Washington Supreme Court adopted the elements of the tort of outrage from the RESTATEMENT (SECOND) OF TORTS § 46 (1965) in *Grimsby v. Samson*, 85 Wn.2d 52, 59–60, 530 P.2d 291 (1975). *See also* Wash. Prac., WPI 14.03 (6th ed. 2017). The prima facie case for outrage requires the proof of three elements: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to plaintiff of severe emotional distress. *Kloepfel v. Boker*, 149 Wn.2d 192, 195–96, 66 P.3d 630 (2003); *Reid*, 136 Wn.2d at 202. "Any claim of outrage must be predicated on behavior so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Strong v. Terrell*, 147 Wn. App. 376, 385–86, 195 P.3d 977 (2008).

For purposes of a summary judgment motion, KCSO's (a public law enforcement agency) actions in covering up the truth about homicide committed by its member—first privately to the deceased family and second, publicly to the press—and its factual misrepresentations concerning

---

[306] Decl. of Bao Xuyen Le at ¶4; 1st Uyen Le Decl. at ¶10; Decl. of Tam Q. Dinh, PhD at ¶4; and Decl. of Jefferey Vu at ¶3.

[307] Arnold Decl. Ex. 23B at 3,5-6: ("Penetrating handgun wound of the left lateral back" and "of the medial left back"); Arnold Decl. Ex. C at 11:15-17; Arnold Decl. Ex. 74; Ex. G deposition Ex. H; Dkts. 52-7, 52-9, 92-2-B, 96-9, and 99-7; and Decl. of Tam Q. Dinh, PhD at ¶9.

[308] Arnold Decl. Ex. C at 11:15-17; Arnold Decl. Ex. 74; Arnold Decl. Ex. G at 44:23-45:6, and at 47:1-6; and Dkts. 52-7, 52-9, 92-2-B, 96-9, and 99-7.

[309] Arnold Decl. Ex. C at 15:10-13 and at 17:22-23; and Arnold Decl. Ex. B at 11:23-12:24.

1    the shooting of an unarmed 20-year-old high school student is "*so offensive as to lead an average*

2    *member of the community to exclaim, 'Outrageous!'*" *Kloepfel*, 149 Wn.2d at 195–96; *Reid v.*

3    *Pierce Cty.*, 136 Wn.2d 195, 201–02, 961 P.2d 333 (1998).   "Any claim of outrage must be

4    predicated on behavior so outrageous in character, and so extreme in degree, as to go beyond all

5    possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

6    community." *Strong v. Terrell*, 147 Wn. App. 376, 385–86, 195 P.3d 977 (2008). The extreme and

7    outrageous character of conduct may arise from an abuse by the actor of a position, or relation

8    with the other, which gives him actual or apparent authority over the other, or power to affect his

9    interests. RESTATEMENT (SECOND) OF TORTS § 46, cmt. e. In particular, police officers have been

10   held liable for extreme abuse of their position. *Id*. Moreover, the extreme and outrageous character

11   of the conduct may arise from the actor's knowledge that the other is susceptible to emotional

12   distress by reason of some physical or mental condition of peculiarity, and the conduct may

13   become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge

14   where it would not be so if he did not know. § 46, cmt. f.

15          KCSO cannot argue that it lacked knowledge that releasing a false story that Tommy

16   charged at a deputy with a knife would cause the grieving Le family severe emotional distress.[310]

17   Plaintiffs are Tommy's family members who were present at the time of such conduct. *Grimsby*,

18   530 P.2d at 295, cmt. *l*. Presence is not an issue.  Both Detective Johnson and Sheriff Urquhart

19   spoke to the Le family in their home on June 14, 2017 and told Tommy's aunt Xuyen Le, his father

20   Hoai "Sunny" Le, grandmother Kim Tuyet Le, that Tommy "*attacked the deputies with a knife*,"

21   along with many other misrepresentations.[311] Additionally, the press coverage (TV, newspaper,

22

23   [310] *Supra* Fn. 302-10.
     [311] Decl. of Bao Xuyen Le at ¶¶31, 31-46.

**PLS' OPP TO DEFS' MOTIONS FOR SUMMARY**
**JUDGMENT          - 78**

NO. 2:cv-18-00055

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

and radio) containing KCSO's misrepresentation of fact was observed, read, and heard in the Le home.[312] While the cases involving physical trauma speak of limiting liability to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred, § 46's Caveat and Comment *c* leave open the possibility of situations in which presence at the time may not be required. *See* RESTATEMENT (SECOND) OF TORTS § 46 cmt. c. This is just such a case, the outrage is the repeated misrepresentations and community has expressed outrage in response to KCSO's cover-up of the truth.[313] After KCSO's Use of Force Review Board released its August 22, 2018 report and press release (which omitted crucial facts), several community representatives spontaneously made a statement of outrage in a letter to the Sheriff Johanknecht.[314]

In the context of a motion for summary dismissal it is important to consider that "the elements of outrage generally are factual questions for the jury." *Strong*, 147 Wn. App. at 385. In this context the Trial Court's role is "to make an initial determination as to whether the conduct may reasonably be regarded as so '*extreme and outrageous*' *as to warrant a factual determination by the jury.*'" *Doe v. Corp. of the President of the Church of Jesus Christ of the Latter-Day Saints*, 141 Wn. App. 407, 429, 167 P.3d 1193 (2007) (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. h) (emphasis added); *Sutton v. Tahoma School Dist. No. 10*, 180 Wn. App. 859, 869, 324 P.3d 763 (2014). "It is only where the evidence is such that reasonable minds cannot differ that the trial court is justified in granting defendant's motion to dismiss." *Jackson v. People's Fed. Credit Union*, 25 Wn. App. 81, 82–83, 604 P.2d 1025 (1979). In determining whether a case should go to the jury, a Trial Court considers:

> a) the position the defendants occupied; b) whether the plaintiff was peculiarly susceptible to emotional distress, and if the defendants knew this fact; c) whether

---

[312] Decl. of Bao Xuyen Le at ¶¶13-30.
[313] Decl. of Jefferey Vu, Ex. A, October 4, 2018 Community Letter
[314] *Id.*

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1
2
3

the defendants' conduct may have been privileged under the circumstances; d) whether the degree of emotional distress the defendants caused was severe as opposed to merely annoying, inconvenient, or embarrassing to a degree normally occurring in a confrontation between these parties; and e) whether the defendants were aware that there was a high probability that their conduct would cause severe emotional distress, and they consciously disregarded it.

4
5

*Seaman v. Karr*, 114 Wn. App. 665, 685, 59 P.3d 701 (2002) (citing *Phillips v. Hardwick*, 29 Wn. App. 382, 388, 628 P.2d 506 (1981)).

6
7
8
9
10
11
12
13

Plaintiffs present factual questions on each element of the tort of outrage. The declarations and exhibits establish that KCSO's outrageous conduct taken together in the context of the death of their child, could and in fact, did cause the honorable and lawful Le family members painful shame and severe emotional distress. The KCSO misstatements to the Le family in their home and the facts of a cover-up entitle plaintiffs to a jury determination of whether King County conducted a cover-up to protect their deputy and department from the consequences of the shooting of an unarmed high school student in the back and whether this conduct is so extreme and outrageous as to warrant a jury finding that a tort was committed.

## IV.  CONCLUSION

14
15
16
17

The Le Plaintiffs respectfully request this court to permit their claims to go forward to a jury in recognition that the power of police officers to execute suspects is bounded by constitutional limitations protecting all of society.

18

RESPECTFULLY SUBMITTED: April 8, 2019.

19
20
21
22
23

By:   *s/ Philip G. Arnold*
By:   *s/ Jeffery M. Campiche*
Philip G. Arnold, WSBA No. 2675
Jeffery M. Campiche, WSBA No. 7592
CAMPICHE ARNOLD PLLC
Attorneys for Plaintiffs Le family
1201 Third Avenue, Suite 3810
Seattle, WA  98101
Tele: 206.281.9000 Facsimile: 206.281.9111
Email addresses:

PLS' OPP TO DEFS' MOTIONS FOR SUMMARY JUDGMENT                - 80

NO. 2:cv-18-00055

CAMPICHE ARNOLD, PLLC
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

jcampiche@campichearnold.com
parnold@campichearnold.com
ltran@campichearnold.com
jhackler@campichearnold.com
slandholm@campichearnold.com
lharris@campichearnold.com
lrichard@campichearnold.com
imedina@campichearnold.com

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111

1

**CERTIFICATE OF SERVICE**

2        I certify under penalty of perjury under the laws of Washington state that I caused this

3 pleading to be served on the persons listed below in the manner shown.

4        Filed ECF;

5        E-served via ECF;

6        Electronic exhibits Filed to the Clerk via Legal Messenger; and,

7        Electronic exhibits served via Legal Messenger to:

8        Judge Zilly's Chambers
         United States Courthouse
         700 Stewart Street, Suite 15229
9        Seattle, WA 98101

10       Daniel Kinerk
         Kathy Van Olst
         Senior Deputy Prosecuting Attorneys
11       King County Prosecuting Attorney's Office
         500 Fourth Avenue, Suite 900
12       Seattle, WA 98104
         Emails: dan.kinerk@kingcounty.gov
13               Kathy.vanolst@kingcounty.gov
                 Nadia.rizk@kingcounty.gov
                 alindsey@kingcounty.gov
14
         Timothy Gosselin
15       Gosselin Law Office, PLLC
         1901 Jefferson Avenue, Suite 304
16       Tacoma, WA 98402
         Email: tim@gosselinlawoffice.com

17

18       Dated: April 8, 2019.

19

20                                      By      _s/ Sierra Landholm, Paralegal_

21

22

23

**CAMPICHE ARNOLD, PLLC**
1201 Third Avenue, Suite 3810
Seattle, WA 98101
TEL: (206) 281-9000
FAX: (206) 281-9111