The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BAO XUYEN LE, INDIVIDUALLY, and as the Court appointed PERSONAL REPRESENTATIVE OF THE ESTATE OF TOMMY LE, HOAI "SUNNY" LE, Tommy Le's Father, DIEU HO, Tommy Le's Mother, UYEN LE and BAO XUYEN LE, Tommy Le's Aunts, KIM TUYET LE, Tommy Le's Grandmother, and QUOC NGUYEN, TAM NGUYEN, DUNG NGUYEN, AND JEFFERSON HO, Tommy Le's Siblings,

                                    Plaintiffs,

        vs.

MARTIN LUTHER KING JR. COUNTY as a sub-division of the STATE of WASHINGTON, and KING COUNTY DEPUTY SHERIFF CESAR MOLINA,

                                    Defendants.

No. 2:18-CV-00055-TSZ

DEFENDANT KING COUNTY'S TRIAL BRIEF

TRIAL DATE: JUNE 10, 2019

I.    **INTRODUCTION**

        Defendant King County respectfully submits this trial brief to the Court. The claims

for trial against Defendant King County are *Monell* claims by the personal representative

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 1

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

of the Le Estate and Le's parents under 42 U.S.C. § 1983 for violations of the 4th and 14th Amendments. The parties anticipate that this trial will take three (3) weeks to conclude.

## II.   STATEMENT OF FACTS

### A.   King County Sheriff Deputies Respond to 911 Calls from Two Victims of Felony Assaults

On June 13, 2017, at 11:57 p.m., King County 911 dispatch received a five-minute call from a civilian, Zachry Schwiethale, who was in a residential neighborhood of Burien, Washington to visit a friend, Kevin Hernandez. Dkt. 79-2 at p. 3-4. Schwiethale reported an unknown stranger, later identified as 20-year-old Tommy Le, had just approached him, threatening him with a knife. Dkt. 79-1 at p.3; Dkt. 79-2 at p. 5. Schwiethale described that Le, dressed in a black shirt and black shorts with no shoes, was jogging in the street yelling, "I am the Creator," "I am the Creator of the World." Dkt. 79-2 at p. 5. Upon seeing Schwiethale approaching the home of his friend Mr. Hernandez, Le veered toward Schwiethale with one of his arms raised holding something that appeared to be a knife or sharp object saying, "I am the Killer. I am the Killer." *Id.*. Schwiethale yelled for help, pounded on Mr. Hernandez's door and took off running to escape. Dkt. 79-2 at p. 27.

As Schwiethale was running, he called 911 to provide information to police. For over five minutes, Schwiethale described Le's erratic and threatening behavior. Schwiethale stated to the operator, "I don't know if it's a knife. It just looked like a pointy – it could have been a screwdriver, it could have been a knife, it was something he clearly was intending on harming something with – somebody with." Dkt. 79-1 at p. 4. During the call, Le returned to the area of Hernandez' home and Hernandez now was outside. Dkt. 79-2 at p. 9. Schwiethale called warnings to Hernandez then watched in fear from across the street as Mr. Hernandez was threatened at knifepoint by Le. Mr. Hernandez tried to deter Le by talking to him, warning Le that he had a gun, and finally firing a warning shot at Le's feet. Dkt. 79-6 at p. 3. But the gunshot did not deter Le who

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 2

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

continued to advance at Hernandez with a knife. *Id.* After backing into his house, Hernandez saw Le strike the molding of his door with a knife. *Id.* at p. 6. Hernandez described that Le then walked away from Hernandez's front door, north on 3rd Street South into the neighborhood. *Id.* at p.8. Hernandez's next-door neighbor, Anthony Rice, who had heard Hernandez' yells for help and then the gunshot, came outside with his gun. Dkt. 79-7 at p. 3. Mr. Rice also saw Le at Hernandez' door before Le left the area walking north. *Id.*

At 12:00 a.m., Mr. Hernandez, called 911 to report that he had fired his personal firearm at Le who tried to attack him with a knife. Dkt. 79-5 at p. 2. At 12:02 a.m., just 5 minutes after the first calls about the knife attack to 911, King County Sheriff deputies began arriving nearby the intersection of 3rd Avenue South and South 136th St. in Burien. Dkt. 79-4. King County Deputy Tanner Owens arrived first in his marked police car and awaited for backup due to the reports involving a knife and gun shots. Dkt. 83 at ¶9. Deputies Matt Paul and Cesar Molina arrived just after Owens in their marked patrol cars. *Id.* at ¶10. Together the deputies approached the scene. *Id.* at ¶11. Deputy Molina arrived on the scene at 12:03:11 a.m. Dkt. 79-4 at p. 3.

### B. Less than 2 minutes Elapsed Between King County Sheriff Deputies Arriving on Scene And Deputy Molina Discharging his Firearm to Stop Le's Threatening Advance toward Deputies and the Civilian Victims

Deputies Owens and Paul immediately pulled up to confront a group of men, Schwiethale, Rice and Hernandez, standing in the yard of Hernandez's home. Dkt. 83 at ¶14; Dkt. 84 at ¶7-9. Hernandez was still on the phone with 911 and was still holding his firearm when police arrived. Dkt. 79-6 at p. 9. Deputy Owens got out of his patrol car, firearm drawn against his chest and pointed downward. Dkt. 83 at ¶12. Owens' police vehicle lights and spotlight were directed at the three men. *Id.* at ¶11. Owens ordered Hernandez to drop his weapon, to end his call and to approach Owen's vehicle to speak with him. *Id.* at ¶13. Victim Hernandez told Deputy Owens that an Asian male, who was

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 3

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

in a black shirt and possibly high, had attacked him with a knife just minutes earlier. *Id.* at ¶14. While Owens and Paul spoke with the three men, Deputy Molina exited his car and approached the scene. Once Molina was satisfied that Deputies Owens and Paul had the group of men under control, he asked which direction Le had gone. Dkt. 88 at ¶9. Hearing from the victims and deputies that Le went north on 3rd Avenue S., Deputy Molina walked a few feet to the middle of the intersection of South 136th Street and 3rd Avenue to keep watch in case Le returned. *Id.* Deputies Paul and Owens continued to talk to the civilian victims and secure their two firearms. *Id.*

>    **i.    Victims of the Attack Recognize the Suspect Returning to the Scene And Advancing Toward Deputies**

While the victims were explaining to the deputies what had just transpired, the victims yelled that Le, who earlier had a knife, was re-approaching the intersection from the north. Dkt. 79-6 at p. 11-12 Hernandez yelled, "Yo, that's him. Like, that's the guy. That's the guy who was just here." *Id.* at p. 12. Hernandez also said to the deputies, "…be careful. You know, like, he had a – he had a knife when he, he encountered us." *Id.* Anthony Rice's father, Lawrence Rice, who also ran outside to defend Hernandez, heard Hernandez yelling at the officers to be careful, "he has a knife, he has a knife." Dkt. 79-8 at p. 3. The deputies responded, "Okay." Dkt. 79-6 at p. 12.

About the same time, Deputy Owens heard Deputy Molina yelling commands such as "drop it!" Dkt. 83 at ¶15. Deputy Owens turned around and saw Deputy Molina near the middle of South 136th Street and a male standing on the north side of the road, wearing a black t-shirt, black boxer shorts and no shoes. *Id.* The male appeared angry and agitated with clenched fists at his side near his waistline. *Id.* The street lights illuminated the man fairly well but Owens could not see if he was holding anything. *Id.*

Deputy Molina moved to get a better view of Le and confirmed that the man moving fast toward him from the north matched the description of Le from dispatch. Dkt. 88 at ¶10. Deputy Molina also saw that Le looked very agitated, with his hands closed in

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 4

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

a fist, holding a dark object in his hand. *Id.* at ¶10-11. Deputy Owens then holstered his firearm and drew his Taser as he began running to assist Deputy Molina, leaving Deputy Paul to monitor and guard the civilian victims. Dkt. 83 at ¶16. Deputy Paul turned in the direction of Deputies Molina and Paul, momentarily shining his flashlight to the north and located Le about 30 feet away. Dkt. 84 at ¶10. Deputy Paul then turned his attention back to the three males in the yard whom he had directed to move into the street. *Id.* at ¶11; ¶13.

### ii.    Deputy Molina's Unsuccessful Attempts To Communicate With Le to Stop and Drop His Weapon

Deputy Molina continued to attempt to communicate with Le to stop his advance after he reappeared at the scene. Both Deputy Molina and Deputy Owens were dressed in marked police uniforms with their lighted patrol cars parked in close proximity so that there was no question regarding the police presence. Dkt. 83 at ¶7; Dkt. 88 at ¶14. Deputy Molina had extensive training in dealing with mentally impaired individuals and had completed the King County Sheriff's Office (KCSO) crisis intervention training only a week earlier. Dkt. 88 at ¶3. Hernandez recalls the deputies trying to engage Le verbally saying, "Hey, can we talk to you? We want to talk to you." Dkt. 79-6 at p. 12-13. He also heard deputies instructing Le to "show us your hands, show us your hands." *Id.* at p. 13. Schwiethale noted, "They instruct him to put his arms up, to drop his weapon, to stop." Dkt. 79-2 at p. 11. Schwiethale noted, "I saw him walking towards them aggressively, like he had been walking aggressively toward us ... even though I was hearing them say, Stop." *Id.*. Another neighbor that lives three houses from the intersection, Corene Bohna, described that Le, "continued to run in, um more of a trot ... at the policemen an, an they started yelling at him telling him to stop and he acted like he didn't even hear 'em but he just kept goin' for 'em ... ." Dkt. 79-9 at p. 3. Deputy Owens recalled that Le made noises that were audible but he did not speak to them. Dkt. 83 at ¶18. The attempts by Molina and Owens to verbally engage Le did not affect him.

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 5

Daniel T. Satterberg, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

While Le was advancing toward the deputies his fists were clenched. Dkt. 79-6 at p. 13. Corene Bohna, could not see if Le had anything in his hand, but she remarked that he, "acted like he did …The way that he was flailing his arms is like . . . he had something in his hand." Dkt. 79-9 at p. 3. When Le did not stop or drop anything from his fists, Hernandez heard the deputies yell, "We're going to tase you." Dkt. 79-6 at p. 13. Deputy Molina could still see Le's fists clenched with a "pointy object" in his right hand. Dkt. 88 at ¶11. King County Deputy Marty Cotchaleovitch, who was just arriving on the scene, saw Le charging toward Deputies Molina and Owens, with his arm slashing. Dkt. 79-10 at p. 3. Again, the deputies' commands to Le did not cause him to stop or hesitate. Dkt. 79-2 at p. 12.

### iii.    Deputies Molina and Owens Attempt to Stop Le's Advance by Deploying Their Tasers

As Le moved toward Deputy Molina, the Deputy fired his Taser at Le's chest. Dkt. 88 at ¶11. The Taser did nothing to stop Le's advance toward the Deputies. Dkt. 83 at ¶17. Victim Hernandez saw Le get hit by the Taser but Le kept going. Dkt. 79-6 at p. 13. Hernandez observed, "So, like, when he was--so he got Tased, and then he wasn't going down; he was, like – he was yelling. And then they're, like, Show us your hand. Show us your hand. Then he was, like, coming towards the officers." *Id.* at p. 14. Schwiethale also saw that the Taser had no effect on Le. Dkt. 79-2 at p. 12. He observed, "They deploy a Taser, which does not dissuade him. He still continues with his arm raised moving towards them [Officers]." Dkt. 79-22 at p. 3. Bohna described Le when they shot the Taser, "He just didn't even act like it touched him but it did. I mean it was hooked to him. And and he just kept, kept towards 'em . . . ."  Dkt. 79-9 at p. 4.

After shooting his Taser, Deputy Molina retreated south, stepping backward and off to Le's left side to avoid his direct line towards him. Dkt. 88 at ¶12. Le continued toward officers with his right hand raised above his head, moving directly toward Deputy Owens. Dkt. 83 at ¶17. With Le now five to seven feet from Deputy Owens,

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 6

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

Owens could see something in his right hand. Fearing that Le was holding a knife, Owens fired his Taser at Le. *Id.* at ¶18-19. While Le pivoted, he did not stop his advance now towards Deputy Paul and the civilians. *Id.* at ¶20.

Deputy Owens recognized after firing his Taser, that Le was not stopping his advance toward Deputies and the civilian victims, so he began to pull his firearm, to shoot. *Id.* at ¶21. In those moments, Deputy Owens heard gunshots. *Id.* Officer Molina, believing that Le posed an immediate threat of death or serious injury to Officer Owens, other officers at the scene and the nearby civilians, fired his service weapon to stop Le. Dkt. 88 at ¶13. Le stumbled and fell at Owens' feet. *Id.* at ¶22. Three of the bullets struck Le and three bullets struck a nearby house and fence. Dkt. 82 at ¶5. Deputy Paul radioed dispatch that shots were fired at 12:04:56 a.m. Dkt. 84 at ¶14.

Over this rapidly evolving event lasting just 105 seconds from deputies responding to the victims' calls for help and Le re-appeared on the scene, his life ended tragically.

C.   **King County Sheriff Deputies Secure Le, Render First Aid, and Begin an Investigation into the Knife Attacks and Officer-Involved Shooting**

After Le fell to the ground, King County Sheriff Deputies Blakeman, Owens, Cotchaleovitch and Paul surrounded him to secure his hands, which were still in fists. Dkt. 79 at ¶23. Deputy Cotchaleovitch noticed that Le still held something in his hand after his fall. Dkt. 79-10 at p. 4-5. Deputy Cotchaleovitch was focused on the tip of the object cupped in Le's hand, "trying to determine whether it was a nail or an X-Acto knife or something like that." *Id.* at p. 6. Deputy Cotchaleovitch instructed Deputy Owens to kick it out of Le's hand before attempting to handcuff Le. *Id.* at p. 5. Deputy Owens did so and recalls seeing an object that looked like a pen in Le's right hand. Dkt. 83 at ¶24. The deputies then put Le in handcuffs to secure him while providing medical aid to him. *Id.*. Medics arrived and transported Le to Harborview Medical Center where he was later pronounced dead. Dkt. 82 at ¶6. The King County Medical Examiner (Medical Examiner)

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 7

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

took custody of Le's body on June 14, 2017, after his death at Harborview Medical Center to conduct an autopsy.

King County Major Crimes responded to the scene, and Detective Chris Johnson was assigned as the lead detective to conduct the investigations. Dkt. 82 at ¶4. Because Le had no identification at the time of his death, Detective Johnson worked with the Medical Examiner and took statements of neighbors to identify him. *Id.* ¶7. After identifying Le and notifying his family of his death, Detective Johnson continued his investigation of both incidents with the help of other King County Major Crimes detectives.

On August 31, 2017, the Medical Examiner released its report on Le's autopsy. Dkt. 82 at ¶18. The report indicated that the cause of Le's death was multiple gunshot wounds to the left lateral back, the medial left back and the left wrist sustained in a confrontation with police. *Id.* A supplemental toxicology report, dated October 24, 2017, which was requested by the Medical Examiner to test for the presence of LSD and Psilocin (associated with mushrooms) confirmed the presence of LSD in Le's blood at the time of his death. *Id.* at ¶20.

Upon completion of his investigation, Detective Chris Johnson forwarded his criminal investigation to the King County Prosecuting Attorney's Office Criminal Division for review for charges and for an inquest proceeding. In October 2017, the King County Executive Dow Constantine suspended all inquests pending a review of the inquest process. To date, no final charging decision has been made by Criminal Division of the King County Prosecuting Attorney's Office.

### D.    King County Sheriff's Office Use of Force Review Board Conducts an Internal Review of the Force Used by Deputy Molina

The King County Sheriff General Orders Manual states that an internal department Use of Force Review Board ("Review Board") is required to conduct an administrative review when "a member uses force that rises to the level of a serious force

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 8

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

incident," which includes an intentional firearm discharge. Dkt. 109-17 at p.2.  The

Review Board is to meet within 45 days after the completion of the criminal investigation

or completion of any inquest if held, whichever is later. *Id.,* p.2. The Review Board is

charged with answering the following questions:

> (1) If a firearm was used, was it intentional, unintentional;
> (2) Was the use of force justified or unjustified, regardless of the tactics or choices leading up to the use of force;
> (3) Were the member's choices leading up to the event sound;
> (4) Were there reasonable alternatives to the use of force;
> (5) Was either inadequate or improper training a contributing factor to the event;
> (6) Were policies and procedures followed after the event;
> (7) Did the use of force involve a policy violation.

*Id.* at p.8. It is the Review Board's responsibility to evaluate information on the events

leading up to a serious force incident to determine whether the level of force was

appropriate, necessary and within policy. *Id.* at 2.

In this case, the inquest process was suspended and no formal decision regarding

the criminal investigation has been made by the King County Prosecuting Attorney. In

November 2017, a new Sheriff was elected for King County, Mitzi Johanknecht. Sheriff

Johanknecht took office on January 2018. In order to be diligent in completing its internal

review of this incident, the King County Sheriff's Office convened a Use of Force Review

Board on June 20, 2018 regarding this officer-involved shooting death. Dkt. 109-17 at p.2.

For the hearing, the Review Board was comprised of five voting members from

patrol, legal, training, and the police union. Dkt. 109-17, at p.3. The Board members

were provided with "significant information to review prior to convening for its

review" which "included the statement of others on-scene, such as 911 witnesses, other

residents, and another deputy present at the time of the shooting (MPO Paul)." *Id.* at

p.4. A number of additional specialists in the areas of defensive tactics, crisis training

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

and tasers attended the hearing and participated. Dkt. 109-17 at p. 3. The Review Board first heard an overview of the criminal investigation from Detective Chris Johnson. *Id.* at p. 2-5. Sergeant Jason Escobar provided the Administrative Review Team (ART) perspective and recommendations. *Id.* at p. 3. Deputies Cesar Molina and Tanner Owens each gave their recollections of the events on the night of the shooting. *Id.* at p. 3; 5-6. All of these witnesses were questioned by the voting and non-voting members of the Board. *Id.* For this hearing, the Review Board received participation from non-voting experts in all of the following King County Sheriff Office subject matters: firing range, crisis intervention training, taser operations, defensive tactics instruction and internal investigations. *Id.* at p. 3. Also in attendance and participating in the questioning of witnesses was Mr. Rick Fuentes, a representative from the Office of Law Enforcement Oversight ("OLEO). *Id.* at 3. OLEO is an independent review office established "to hold the King County Sheriff's Office accountable for providing fair and just police services." https://www.kingcounty.gov/independent/law-enforcement-oversight.aspx.

After hearing from the presenters and participants, the Review Board voted on their answers to the seven required questions. *Id.* at p. 7. The Review Board voted that the use of a firearm by Deputy Molina was intentional; the use of force was justified under state law and federal constitutional law; Deputy Molina's choices leading up to the event were sound; that there were no reasonable alternatives to the use of force; inadequate or improper training was not a contributing factor to the event; policies and procedures were appropriately followed after the event; and there were no policy violations related to the use of force. *Id.* at p. 8-10. In addition, the Undersheriff conducting the Review Board asked the Board to review and deliberate on the following additional issues which were of interest to the Sheriff's Office. *Id.* at p. 10-11. On these additional issues, the Review Board determined that first aid was rendered and provided to Le appropriately but improvements in the first aid kits were being made; the supervision and command of

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 10

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

the scene was within policy; no issues involving communications were identified apart from usual radio communication issues in the Burien area which did not play a role or impact the incident; and regarding equipment issues, some of the Taser evidence left the scene with medics and was unrecovered from the hospital and that Deputy Molina noted that his Taser was an older model and "clunkier" to operate. *Id.* at p. 10-11. With regard to the older model Tasers, the Review Board noted that the King County Sheriff's Office had already entered an agreement to upgrade all Tasers and that less-lethal shotguns have also been introduced into the patrol force. *Id.* at p. 11.  Finally, the Review Board considered if there were any other issues identified with policies and procedures or if there were any other policy violations not associated with the use of force and the Review Board determined that there were not. *Id.* at p. 11.

## PROCEDURAL HISTORY

On January 16, 2018, the personal representative of Tommy Le's estate, his grandmother, parents, two aunts and five siblings and step-siblings, filed a Complaint for Damages for Violation of Civil Rights and under Washington State Law against John Urquhart, Dow Constantine, King County, King County Sheriff's Office and King County Deputy Cesar Molina. Dkt. 1.[1]

Between April 3, 2018 and May 2018, Plaintiffs amended their Complaints to remove defendants John Urquhart, Dow Constantine and the King County Sheriff's Office as defendants and to correcting the spelling of King County Deputy Cesar Molina's name. Dkt. 25; 26. On May 30, 2018, Plaintiffs filed their Second Amended Complaint for Damages. Dkt. 27.

On October 15, 2018, the Court entered a Minute Order dismissing, with prejudice, Plaintiffs 'Fourth Cause of Action for Reckless or Negligent Infliction of Emotional Distress and extending expert witness disclosures until mid-December. Dkt. 38.

---

[1] The City of Burien contracts with King County to provide police services to Burien using King County Sheriff's Office deputies who work out of the Burien Police Department. Dkt. 84 at ¶2.

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 11

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

The Court entered an additional Minute Order on February 7, 2019 extending the discovery cutoff in this case to March 14, 2019. Dkt. 58. Then on February 8, 2019, the Court ordered that the jury trial in this case be continued to June 10, 2019 and extended certain other case scheduling dates. Dkt. 63.

On February 22, 2019, the parties signed a Stipulation and Order dismissing, with prejudice, Plaintiff's Fifth Cause of Action for Negligent Selection, Training, and Supervision. Dkt. 64. The Court signed this Stipulation and Order on February 27, 2019. Dkt. 65.

On March 12, 2019, the parties signed and filed a Stipulation and Order dismissing Julia Nguyen from the case. Dkt. 71.

On March 21, 2019, King County moved for summary judgment as to Plaintiffs remaining causes of action against King County which included alleged violations of the Fourth and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983; State law claims of negligence; wrongful death and survival action under RCW 4.20.020 and 4.20.046; the tort of outrage; and lastly, respondeat superior. Dkt. 78. Defendant Cesar Molina also moved for summary judgment on the plaintiffs' claims and qualified immunity. Dkt. 87.

On April 26, 2019, the court issued a Minute Order regarding the Defendants' motions for summary judgment. Dkt. 148. The court granted Defendants King County and Deputy Cesar Molina's motions for summary judgment regarding Plaintiffs' claims for wrongful death and Deputy Molina's claim for summary judgment regarding plaintiffs' claim for Outrage. *Id.* The court denied the Defendants motions for summary judgment regarding whether Defendant Molina used excessive force in tasering and/or shooting Le and whether excessive force deprived Le's parents of a liberty interest in the companionship and society of their son under the 14th Amendment. The court reserved ruling on the issue of qualified immunity for Deputy Molina and on dismissal of King

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 12

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

County on the basis of *Monell* and dismissal of Plaintiffs' claim for the tort of Outrage. On May 17, 2019, the court granted King County's Motion for Summary Judgment regarding the tort of Outrage but denied summary judgment based on *Monell* liability under Plaintiffs' ratification theory for violations of the 4th and 14 Amendments. Dkt. 178.

Significant motions are pending before the Court, including Defendant Cesar Molina's motion for summary judgment based on qualified immunity and motions in limine by both parties. Ruling on these motions will likely alter the course of the trial, and this trial brief may not fully address the issues in light of further court orders.

### III.  APPLICABLE LEGAL AUTHORITY

### A.  Municipal Liability Under Section 1983 is limited by *Monell*

#### 1.  Plaintiffs cannot establish liability against Defendant King County based on a Respondeat Superior theory

The doctrine of respondeat superior "imposes liability on an employer for the torts of an employee who is acting on the employer's behalf." *Niece v. Elmview Group Home*, 131 Wn.2d 39, 929 P.2d at 420 (1997). Respondeat superior, however, "is not an independent cause of action." *Zellmer v. Constantine*, No. C10-1288MJP, 2015 WL 1611939, at *3 (W.D. Wash. Apr. 9, 2015); *Fulbright v. Dayton Sch. Dist. No. 2*, No. C13-0030TOR, 2013 WL 1497388, at *6 (E.D. Wash. Apr. 10, 2013) ("Respondeat superior ... is a theory of liability rather than a separate cause of action.")(citing *Hollinger v. Titan Capital Corp,* 914 F.2d 1564, 1576-77 n.28 (9th Cir. 1990)). Liability of a local governing body can only exist when "action pursuant to official municipal policy of some nature caused a constitutional tort," and not on the basis of respondeat superior. Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 691 (1978). Local governments *cannot* be held vicariously liable for their employees' constitutional violations. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013). As such, Plaintiffs have no basis to assert a vicarious liability theory against King County for their federal civil rights claims.

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 13

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

### 2. Municipal Liability Against King County Can Only Be Established under *Monell*

A municipality may be liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury**."** *Monell v. Dep't. of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* liability will only attach if the plaintiff suffered an underlying constitutional violation. See *County of Sacramento v. Lewis,* 523 U.S. 833, 837-8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (no liability where there is no underlying constitutional right violated); *Cooper v. Dupnik,* 924 F.2d 1520, 1528 (9th Cir. 1991) ("If the conduct of the individual officers is not a constitutional violation, then the fact that the two law enforcement departments condoned such conduct cannot turn it into one."). Here, Plaintiffs' must first prove violations of the 4th and/or 14th Amendments to establish municipality liability under *Monell.* Further, liability under *Monell* cannot be imposed by proof of a single incident of unconstitutional activity unless proof of the incident includes proof that it was caused by an existing unconstitutional policy, which policy can be attributed to a municipal policymaker. *Sanders v. City of Bakersfield,* 2005 WL 6267361.

Municipal liability may arise under § 1983 under three separate ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local government entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington 98104
(206) 296-0430 Fax (206) 296-8819

*Gillette v. Delmore,* 979 F.2d 1342, 1346-47 (9th Cir. 1992).

Plaintiffs here allege municipal liability only under a ratification theory. Municipal liability under this theory of section 1983 attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84 (1986) (plurality opinion); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988). The plaintiff must show that an individual with final policymaking authority ratified a subordinate's unconstitutional action, knowing it to be unconstitutional. *Jenssen v. County of Fresno,* 2019 WL 132271 (2019) (citing *Gillette v. Delmore,* 979 F.2d 1342 (1992)). The policymaker must also approve of the improper or unconstitutional basis for the action in his/her decision. *Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013) (citing *Clothier v. Cty. of Contra Costa,* 591 F.3d 1232, 1253 (9th Cir. 2010)("As we stated in *Gillette,* '[t]o hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law [creating an] end run around *Monell.'")).*

In the recent decision of *German v. Roberts,* 2017 WL 6547472 (W.D. Wash. Dec. 22, 2017), the court considered the issue of *Monell* ratification in the context of an officer involved shooting. Specifically, the court examined whether the decisions of a police department Shooting Review Board and the Police Chief, that a shooting was within the Police Department's use of force policy, amounted to ratification under *Monell*. The court in *German*, like the court in *Kanae v. Hodson,* 294 F.Supp.2d 1179, 1191-92 (D. Haw. 2003), found that *Monell* liability under the ratification theory requires "something more" than "an investigative group accept[ing] an officer's version over a victim's differing version" of the circumstances surrounding a shooting. 2017 WL 6547472 at 4 (citing *Kanae,* 294 F.Supp.2d at 1191). The court noted, "[r]atification … generally

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

requires more than acquiescence." 2017 WL 6547472 at 2 (citing *Sheehan v. City & Cty. of San Francisco,* 743 F.2d 1211, 1231 (9th Cir. 2014), *rev'd on part on other grounds, City & Cty. of San Francisco v. Sheehan,* 135 S. Ct. 1765 (2015)). In finding that *Monell* liability was not established, the *German* court stated that in reviewing the decision of the Review Board and the Chief of Police it could not conclude that either made "a conscious affirmative decision to ratify the unconstitutional conduct in question," or that either "conducted the internal investigation, or previous investigation, in a way that signaled to officers that they could 'get away with anything.'" 2017 WL 6547472 at 4 (citing *Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir. 1991).

With regard to determining whether the internal investigation into the shooting was "flawed," the *German* court noted that the shooting review board considered numerous reports, some of which supported the officer's account and some of which created factual questions. *Id.* However, the court stated that "[i]n reaching its decision to believe [the officer's] description of the shooting, the review board neither unreasonably relied on any particular unbelievable evidence nor disregarded any compelling evidence." *Id.* (citing *Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir. 1991)). The court also noted that the City had "no history of ignoring unfavorable evidence over credible allegations." *Id.* Because the court found that the review board and the Chief of Police had relied upon the factual account of the officer to determine the shooting was within the City's use of force policy and because plaintiff failed to present material evidence showing the internal investigation was genuinely flawed, the court in *German* granted the City's motion for summary judgment. *Id.* at 4-5.

To prevail on their ratification theory here, Plaintiffs will need to present evidence that the King County Sheriff and Review Board either made a conscious affirmative decision to ratify the alleged unconstitutional conduct and the basis for it or that either the Use of Force Review Board investigation, or earlier investigation, was so

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 16

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

flawed as to signaled to officers that they could "get away with anything." *Id.* Plaintiffs' claims will prove to be both factually lacking and legally insufficient.

While plaintiffs assert that ratification is demonstrated because Deputy Molina was not disciplined following the shooting and instead received a paid promotion, the undisputed evidence is Deputy Molina was not promoted to detective after the incident, but that he received a slight pay raise because he was assigned to work on an undercover operation requiring a Spanish–speaking deputy. Dkt. 140 at ¶3-5. The Ninth Circuit is clear that a single failure to discipline does not rise to the level of ratification. *Haugen v. Brosseau,* 339 F.3d 857, 875 (2003) *rev'd on other grounds,* 543 U.S. 194 2004 (2004). *See Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) ("we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability").

Further, while Plaintiffs assert that the KCSO Use of Force Review Board hearing was a "sham" investigation sufficient to establish ratification due to its lack of thoroughness in reviewing statements from neighbors <u>not</u> at the scene or from the former sheriff or by failing to clearly note the location of Le's gunshot wounds, these assertions are inaccurate and fail to rise to the level of showing that the internal investigation or previous investigations were conducted in a way that signaled to officers that they could get away with anything. Plaintiffs have no evidence that the KCSO Review Board unreasonably relied on any particular unbelievable evidence nor did it disregard any compelling evidence during its investigative review so as to impose liability under *Monell*. *See* 2017 WL 6547472 at 4 (citing *Larez,* 946 F.2d  at 647 (*Monell* liability established when an internal investigation expressly relied on a factual account from an officer <u>who was not present</u> and the "investigation <u>contained holes and inconsistencies</u> that should have been visible to any reasonable police administrator.")(emphasis added). Plaintiffs also cannot establish a history of ignoring

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

unfavorable evidence over credible allegations such that a history of flawed investigations makes it "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen." *See id.*

The KCSO Use of Force Review Board investigation and hearing in this case was similar to the type of review undertaken and approved by the courts in *German* and *Kanae*. The Use of Force Board was chaired by KCSO Undersheriff Scott Sommers and consisted of 5 additional voting members from patrol, legal, training, and the police union. Dkt. 109-17 at p. 2-3. None of the voting members on the Board were involved in the shooting.[2] Dkt. 139 at ¶4. In addition to the 6 voting members, 15 non-voting members were present to hear and question witnesses including a representative from the Office of Law Enforcement Oversight. Dkt. 109-17 at p. 3; Dkt. 139 at ¶5. All of these members were present for all of the presentations. Dkt. 109-17 at p. 3; Dkt. 139 at ¶6 (i)-(ii). Deputy Molina, who testified regarding his recollection of events, also did not work in either Detective Johnson's or Sergeant Escobar's units at the time of the review nor were they supervised by either at the time of the review. Dkt. 140 at ¶6.

Following the presentations and the discussion at the Use of Force Review hearing, the Board considered all seven questions it was required to answer as set out in the KCSO General Orders Manual. Dkt. 109-17 at p. 8-10; Dkt. 139 at ¶8. For purposes of the seven questions, the Board was allowed to consider only the information that Deputy Molina knew prior to and at the time of the shooting in order to determine the reasonableness of the Deputy's actions at the time of the shooting. Dkt. 109-17 at p. 7-10; Dkt. 139 at ¶8. One of the issues discussed by the Review Board was whether there were reasonable alternatives to the use of force such as "O.C. Spray, control holds and

---

[2] The composition of the Use of Force Review Board here stands in contrast to the Review Board in *Thomas v. Cannon,* 2017 WL 2289082, at *12-13 (W.D. Wash. May 25, 2017). In *Thomas,* an individually named defendant, who was a SWAT commander at the scene of the shooting was also the leader of the Use of Force Review Board that approved of the shooting. This same SWAT commander was also designated as the final policymaking decision-maker for the Police Department for the incident.

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 18

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

other defensive take-downs." Dkt. 109-17 at p. 8-9; Dkt. 139 at ¶8. Only after the Review Board had read and heard all the information presented to it, did they determine based on the information presented that the use of force was justified. Dkt. 109-17 at p. 8-10; Dkt. 139 at ¶8. In sum, the Use of Force Review Board considered information regarding the shooting from many different sources, from differing perspectives, and all Review Board members, both voting and non-voting members, were encouraged to ask questions. In fact, the representative from the independent law enforcement oversight office was an active participant in the hearing. Dkt. 139 at ¶7; Dkt. 169-16 at p. 3-6.

While Plaintiffs' will provide the testimony of one expert to question the thoroughness of the Use of Force Review Board, even if one accepts all of his criticisms directed at the KCSO Use of Force Review Board investigation, plaintiffs cannot establish that the investigation was sufficiently flawed to "signal to officers that they could get away with anything" so as to establish *Monell* liability.  Simply put, plaintiffs' theory of ratification is not the law:

> The law does not say that every failure to discipline an officer who has shot someone is evidence of a "whitewash" policy or some other policy of "sham" investigations. The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held under § 1983. If that were the law, counties might as well never conduct internal investigations and might as well always admit liability. But that is not the law. The law clearly requires "something more." As Kanae presents nothing more than the failure to discipline Hodson, the County is entitled to summary judgment on Kanae's § 1983 ratification claim.

*Kanae* at 1191. The same rationale holds true in this case, at trial Plaintiff will be unable to establish *Monell* liablity.

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 19

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

**B.  Plaintiffs' Fourth and Fourteenth Amendment Claims**

Plaintiff Bao Xuyen Le, as Personal Representative of the Estate of Tommy Le, and Le's parents allege that all the defendants are liable for the deprivation of Le's civil rights under the Fourth and Fourteenth Amendments. Dkt. 27 at p. 19, lines 17-20.

The Ninth Circuit has recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children, however, the standard that a plaintiff must satisfy to establish a due process violation under the Fourteenth Amendment is higher than the standard for excessive force claim under the Fourth Amendment. Whereas an alleged Fourth Amendment violation is evaluated under a reasonableness standard, *Ohio v. Robinette*, 519 U.S. 33, 34 (1996), "the Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense. *County Of Sacramento v. Lewis*, 523 U.S. 833, 846, (1998).

The standard of culpability for a due process right to a familial association claim is whether the officer's conduct "shocks the conscience." *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir 2008). To show that an officer's conduct "shocks the conscience, "a plaintiff must demonstrate that the officer "acted with deliberate indifference," or with a "purpose to harm … that was unrelated to legitimate law enforcement objectives," which is a more demanding showing." *Id.* at 1137. The deliberate indifference standard, "a[s] the very term 'deliberate indifference' implies," applies "only when actual deliberation is practical." *Lewis* at 523 U.S. 833, 851 (1998).

In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Porter,* 546 F.3d at 1137 (quoting *Moreland v. Las Vegas Metro Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. *Id.* "On the other hand,

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 20

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

1

2

where a law enforcement officer makes a snap judgment, because of an escalating

situation, his conduct may only be found to shock the conscience if he acts with a

3

purpose to harm unrelated to legitimate law enforcement objectives." *Wilkson v. Torres,*

4

610 F.3d 546, 554 (9th Cir. 2010).[3]

5

In *Porter,* the court found that actual deliberation was not practical where a five-

6

minute altercation between the officers and the victim evolved quickly and forced the

7

officers to make "repeated split-second decisions." *Porter,* 546 F.3d at 1139. The court

8

noted "deliberation" should not be interpreted in the narrow, technical sense, reasoning

9

that the Supreme Court had rejected the deliberate indifference standard even in cases

where an officer giving chase could have deliberated while pursuing the suspect. *Id.* at

10

1139-1140. Instead the heightened purpose-to-harm standard applies where a suspect's

11

evasive actions force the officers to react quickly. *Id.* at 1140.

12

The uncontroverted facts in this case demand application of the purpose-to-harm

13

standard. The rapidly-evolving incident between Le and Deputy Molina lasted

14

approximately 105 seconds—less than 2 minutes. Dkt. 88 at ¶8. Within seconds after

Deputy Molina's arrival at the scene, Le re-appeared at the crime scene. *Id.* at ¶10. The

15

situation rapidly escalated from Deputy Molina's use of various levels of non-deadly

16

force, such as verbal commands and his Taser, to the need to deploy his service weapon

17

all in less than a minute. *Id.* at ¶11. Deputy Molina said there was little time between

18

when he first directed Le to the ground and when shots were fired due to Le continuing

19

advance at Deputies and civilians. *Id.* at ¶19.

20

The deputies' conduct can only be found to shock the conscience if they acted

21

with a purpose to harm unrelated to legitimate law enforcement objectives. There is no

22

evidence of conduct by the deputies that shocks the conscience. The deputies were

informed that Le was armed, had attacked others, and was a possible "220" or

23

---

[3] An example of a purpose-to-harm might be found where an officer uses force to "teach him a lesson" to a suspect or "get even." *Porter* at 1140.

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 21

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington 98104
(206) 296-0430 Fax (206) 296-8819

1  individual in mental crisis. Deputy Molina initially used minimal force to attempt to

2  restrain Le which was unsuccessful, then non-deadly force with a Taser, which was also

3  unsuccessful, before he finally resorted to deadly force as Le closed in on the Deputies

4  and victims he had originally attacked. Le's parents and personal representative cannot

5  establish a substantive due process claim under the purpose-to-harm standard.

6      **C.**      <u>**Cumulative Evidence of Plaintiff's Damages**</u>

7         FRE 403 provides that the court may exclude otherwise relevant evidence if its

8  probative value is substantially outweighed by a danger of an undue delay, a waste of

9  time, or a needless presentation of cumulative evidence. FRE 403. It is well settled that a

10  court's decision to admit or exclude evidence under FRE 403 is entitled to "considerable

11  deference." *McEuin v. Crown Equipment Corp.*, 328 F.3d 1028, 1035 (9th Cir. 2003) (citations

12  omitted).

13         The Plaintiffs have listed an expert witness as well as many family members and

14  four of Le's high school teachers as witnesses to testify about the extent of plaintiffs'

15  damages. While it is anticipated that the Court will permit an appropriate number of

16  family and teachers on the issue of damages, it seems likely that all of these witnesses will

17  be unnecessarily cumulative and of little additional probative value, particularly in light of

18  the testimony of Plaintiffs' damage expert. Defendants accordingly request that Plaintiffs'

19  presentation on the issue of damages be limited accordingly, or, in the alternative, that

20  Plaintiffs' provide an offer of proof to the Court as to the importance and uniqueness of

21  each witness' testimony.

22

23

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 22

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

1    DATED this 22nd day of May, 2019 at Seattle, Washington.

2

3                              DANIEL T. SATTERBERG
                              King County Prosecuting Attorney
4

5                              /s/Kathy Van Olst
                              DANIEL KINERK, WSBA #13537
6                              KATHY VAN OLST, WSBA #21186
                              Senior Deputy Prosecuting Attorney
7                              Attorney for King County Defendants
                              King County Prosecuting Attorney
8                              500 Fourth Avenue, Suite 900
                              Seattle, WA. 98104
9                              (206) 296-8820   Fax (206) 296-8819
                              dan.kinerk@kingcounty.gov
10                             kathy.vanolst@kingcounty.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 23

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on May 22nd, 2019, I electronically filed the foregoing

3

document(s) with the Clerk of the Court using the CM/ECF System which will send

4

notification of such filing to the following participants:

5

6

**Jeffrey M Campiche**
**Philip G. Arnold**

7

**Attorneys for Plaintiff**
**CAMPICHE ARNOLD PLLC**

8

**1201 Third Ave, Suite 3810**
**Seattle, WA 98101**

9

**(206) 281-9000**

10

**jcampiche@campichearnold.com**
**parnold@campichearnold.com**

11

**Timothy R. Gosselin**

12

**GOSSELIN LAW OFFICE, PLLC**
**1901 Jefferson Ave., Suite 304**

13

**Tacoma, WA 98402**
**253-627-0684**

14

tim@gosselinlawoffice.com

15

I declare under penalty of perjury under the laws of the United States and the

16

State of Washington that the foregoing is true and correct.

17

18

DATED this 22nd day of May, 2019 at Seattle, Washington.

19

20

*s/Angela Lindsey*

21

ANGELA LINDSEY
Legal Secretary

22

King County Prosecuting Attorney's Office

23

DEFENDANT KING COUNTY'S TRIAL BRIEF
[18-cv-00055-TSZ] - 24

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430 Fax (206) 296-8819