The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BAO XUYEN LE, as Personal Representative of the Estate of TOMMY LE; HOAI "SUNNY" LE; and DIEU HO,<br><br>                                        Plaintiffs,<br><br>            vs.<br><br>REVEREND DR. MARTIN LUTHER KING JR. COUNTY; and KING COUNTY DEPUTY SHERIFF CESAR MOLINA,<br><br>                                        Defendants. | No. 2:18-CV-00055-TSZ<br><br>DECLARATION OF DANIEL L. KINERK IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL MOTIONS IN LIMINE |

I, Daniel L. Kinerk, declare under penalty of perjury under the laws of the United States and the State of Washington that, to the best of my knowledge, the following is true and correct:

1.  I am over the age of 18 years and am competent to testify as to the matters stated herein.

2.  I am one of the attorneys assigned to represent defendant King County in this lawsuit.

DECLARATION OF DANIEL L. KINERK IN SUPPORT
OF DEFENDANTS' SUPPLEMENTAL MOTIONS IN LIMINE - 1

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430  Fax (206) 296-8819

3.  I was one of the attorneys who conducted the deposition of Mr. Scott Defoe on March 13, 2019. In his deposition, he listed all the documents he had relied on in formulating his opinions in this case. None of his opinions in his written report address the Use of Force Review Board hearing. A true and correct copy of excerpts of Mr. Defoe's deposition transcript are attached hereto as Exhibit 1.

4.  I was one of the attorneys who conducted the deposition of Mr. William Harmening on March 14, 2021.  In his deposition, he listed all the documents he had relied on in formulating his opinions in this case.   Mr. Harmening did not produce any opinions relating to plaintiffs' *Monell* claim in his report or at his deposition. A true and correct copy of excerpts of Mr. Harmening's deposition transcript are attached hereto as Exhibit 2.

5.  Plaintiffs identified forensic economist Robert Johnson as an expert witness in this case. They later represented to the Court and counsel they would not be calling him at trial. Defendants relied on that representation and would be extremely prejudiced if he were now allowed to testify.

6.  I was one of the attorneys who  conducted the deposition of Tam Dinh on November 9, 2020.  A true and correct copy of excerpts of Ms. Dinh's deposition transcript are attached hereto as Exhibit 3.

7.  I was one of the attorneys who  conducted the deposition of Deborah Jacobs on November 9, 2020.  A true and correct copy of excerpts of Ms. Jacobs' deposition transcript are attached hereto as Exhibit 4.

DECLARATION OF DANIEL L. KINERK IN SUPPORT
OF DEFENDANTS' SUPPLEMENTAL MOTIONS IN LIMINE - 2

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430  Fax (206) 296-8819

8. On September 2, 2020, the King County Council Law and Justice Committee heard about the OLEO report. The remarks of King County Councilmember Girmay Zahilay were recorded and videotaped.  Defendants later objected to the plaintiffs' efforts to depose Councilmember Zahilay based on legislative immunity and testimonial privilege.

9. A true and correct copy of excerpts of the report of Wilson "Toby" Hayes is attached as Exhibit 5.

10.  A true and correct copy of excerpts of the deposition of Detective Mike Mellis  is attached as Exhibit 6.

11.  A true and correct copy of excerpts of the deposition of Wilson "Toby"  Hayes is attached as Exhibit 7.

12.   A true and correct copy of excerpts of the deposition of Dijana Coric  is attached as Exhibit 8.

13.   A true and correct copy of the rebuttal report of Dr. Wilson "Toby" Hayes is attached as Exhibit 9.


DATED and SIGNED this 17th day of March 2021, at Seattle, Washington.


DANIEL L. KINERK

DECLARATION OF DANIEL L. KINERK IN SUPPORT
OF DEFENDANTS' SUPPLEMENTAL MOTIONS IN LIMINE - 3

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430  Fax (206) 296-8819

# Exhibit 1

# Deposition of Scott DeFoe

# Le, et al. v. Martin Luther King Jr. County

# March 13, 2019



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Le, et al. v. Martin Luther King Jr. County                                    Scott DeFoe

---

Page 9

1    Q   Thank you.  And just looking on page 1 of 35,
2  there's a cover letter that you sent to Mr. Campiche and
3  Mr. Arnold.
4        And the last sentence of that first page says,
5  "Please be advised that if additional documents related
6  to this matter are provided, it may be necessary to
7  write a supplemental report to refine or express
8  additional opinions."
9        Do you see that?
10   A   Yes.
11   Q   Did you write a supplemental report beyond the
12 December 11th, 2018 report that makes up Exhibit 1?
13   A   I have not been asked to write a supplemental
14 report thus far.
15   Q   Mr. DeFoe, were you asked to review any
16 additional documents or exhibits since the
17 December 11th, 2018 report that you prepared?
18   A   Yes, there was a significant amount of
19 additional discovery that came in from December 11th to
20 present, including deposition transcripts, the Use of
21 Force Review Board report, the additional discovery as
22 well that came in through Mr. Campiche and Mr. Arnold's
23 office.
24   Q   And just so the record's clear for us,
25 Mr. DeFoe, were the additional depositions that you were

---

Page 10

1  provided and reviewed, are those included in the thumb
2  drive that you -- that we've received in response to the
3  subpoena duces tecum?
4    A   Yes, I -- everything that I've received thus
5  far, according to Mr. Campiche's office, Ms. Sierra
6  Landholm advised me yesterday that she has sent my
7  entire file that I received, just duplicated it on a
8  thumb drive and sent it to you.
9    Q   Thanks very much.  I know on Exhibit Number 3
10 it lists, from pages 2 through 11, 167 entries of
11 documents that you have reviewed as of December 11th,
12 2018.
13       Would that be correct?
14   A   Yes, sir.
15   Q   And we can pull up the thumb drive in a
16 moment, but to the extent that you recall, can you tell
17 us what depositions you were provided and asked to
18 review?
19   A   Deputy Molina's, Master Police Officer Paul,
20 Deputy -- excuse me, Master Police Officer Tanner Owens,
21 deposition of Mr. Anthony Rice.  I believe that was it
22 for the depositions that I received after the submission
23 of my report.
24   Q   Thank you.  And with regards to the Use of
25 Force Review Board report, can you just confirm the date

---

Page 11

1  for us so we know it's that same document, please?
2    A   The date of the report?
3    Q   Yes, if you have that in front of you,
4  Mr. DeFoe.
5    A   I believe the date of the report was
6  August 22nd, 2018.
7    Q   Thank you.  And then with regard to additional
8  discovery that you were provided, Mr. DeFoe, to the
9  extent that you can identify that for us, that would be
10 appreciated.
11   A   There was deposition exhibits to Deputy Cesar
12 Molina, as well as deposition exhibits to Master Police
13 Officer Tanner Owens.
14       There was the expert report by Jeff -- Jeffrey
15 Noble, as well as his rebuttal report partially
16 rebutting my opinions based on submission of my Rule 26
17 report.
18       There was an expert report by Mr. -- and I
19 will get you his name.  Mr. Borden.  I read Mr. Borden's
20 expert report as well.
21       There was additional policies and procedures I
22 believe that I had not received prior to the submission
23 of my report.  I don't recall which one.  There was such
24 a large volume of procedures and policies.  I think that
25 is about it.

---

Page 12

1    Q   Well, Mr. DeFoe, with regard to the review of
2  Deputy Molina, Deputy Paul, Deputy Owens and Mr. Rice's
3  deposition transcripts along with the accompanying
4  exhibits, did you rely on them in formulating the
5  opinions that you have made in this case?
6    A   Well, obviously I didn't have them at my
7  disposal prior to the submission of my report, but since
8  reviewing them I believe they enhance my positions and
9  support my positions, especially Deputy Owens' -- excuse
10 me, Master Police Officer Owens' deposition, as well as
11 Officer Thompson's deposition, and of course Deputy
12 Molina's deposition transcript.
13   Q   And I know you had mentioned earlier the
14 depositions that you had reviewed, and you had listed
15 Molina, Paul, Owens and Mr. Rice, and then you just
16 referenced Thompson.
17       Were there other deputies' transcripts that
18 you reviewed?
19   A   No, I believe that was it.  I had forgotten
20 Mr. Thompson's when I gave you my prior list.
21   Q   And likewise with regard to the August 22nd,
22 2018 Shooting Review Board memorandum, did you rely on
23 that in formulating your opinions in this case?
24   A   I believe the report conflicts with my
25 opinions, it doesn't support.  So I did not rely on it.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Le, et al. v. Martin Luther King Jr. County                           Scott DeFoe

---

**Page 17**

1    Q   Would it be fair to say, Mr. DeFoe, that with
2  regards to the additional King County policies and
3  procedures that you received, that you relied on them in
4  formulating the opinions that you'll be sharing in this
5  case?
6    A   Yes.  I think the policies and procedures that
7  I relied on prior to the submission of my report, there
8  won't be any additional opinions that I'm providing
9  based on additional policies that I have reviewed.
10       My -- my report includes reference to policies
11 from King County, specifically as it relates to the use
12 of force 6.00.
13   Q   Just so I understand the chronology of the
14 documents that you've received and reviewed in preparing
15 your December 11th, 2018 report, am I correct in
16 concluding that you had not been provided with the King
17 County Shooting Review Board memorandum prior to you
18 authoring the December 11th, 2018 report in this case?
19   A   You know, I -- I stand corrected.  I did
20 receive that prior to the submission of my report, and
21 it's noted on number 10 of my materials reviewed.
22   Q   Again, just for purposes of clarity,
23 Mr. DeFoe, were you provided with the deposition
24 transcripts of Kevin Hernandez?
25   A   Yes.

---

**Page 18**

1    Q   Were you provided with the deposition
2  transcript of Zachry Schwiethale?
3    A   I believe so.
4    Q   And were you provided with the deposition
5  transcript of Anthony Rice?
6    A   Yes.
7    Q   Okay.  And you relied on those deposition
8  transcripts in formulating the opinions that are
9  outlined in your December 11th, 2018 report?
10   A   I believe I received all deposition
11 transcripts after the submission of my report.
12   Q   Thank you.  What were you asked to do in this
13 case, Mr. DeFoe?
14   A   Initially I was contacted by Mr. Jeff
15 Campiche, and the date was August 2nd, 2017.
16 Mr. Campiche, we had a phone conversation, and he
17 initially told me a little bit about the incident and
18 about what transpired.  I Googled the incident.  Some
19 information, I believe, came up online.
20       We spoke about a week or so after that, and he
21 started sending me material as material became
22 available.  And it came in a number of different --
23 probably over a dozen different transmissions, either by
24 way of thumb drive or by way of Dropbox.
25       My initial scope was to look at obviously the

---

**Page 19**

1  officers' response to the call, the planning of the
2  officers while en route to the call, as well as once
3  they arrived at the call.  The communication between the
4  officers.  The tactics between the officers.
5        The less than lethal force considerations
6  stemming from someone who might be under the influence
7  of a controlled substance, someone that might be
8  mentally ill or experiencing a mental crisis who may be
9  on or off psychotropic medication.
10       The use of less than lethal force options that
11 were available to the officers and deputies at the time,
12 as well as the use of lethal force by Deputy Cesar
13 Molina.
14       The standard of care following the shooting,
15 that's providing medical treatment in a reasonable
16 fashion.  Not asked to provide medical opinions.
17       And then ultimately the post-shooting
18 investigation, when that became available, to review for
19 completeness and thoroughness as it relates to what
20 transpired.
21   Q   Just for a minute, Mr. DeFoe, I'm starting
22 from the end and working backwards.
23       When you said that one of the things you were
24 asked to do was look at the post-shooting review as to
25 the -- in this particular case, did you formulate any

---

**Page 20**

1  opinions with regards to the post-shooting review in
2  this case?  And if so, can you point out to me where
3  they are in Exhibit Number 3, your December 11th, 2018
4  report.
5    A   They're not outlined in my report, but I did
6  make some notations stemming from both what the lead
7  detective submitted on his case review, as well as the
8  actual Use of Force Review Board shooting that was
9  published -- or the memorandum, on August 22nd, 2018.
10   Q   Since today is my only opportunity, Mr. DeFoe,
11 to explore with you all the opinions that you've
12 formulated in this case, are you anticipating that you
13 are going to be testifying or providing opinions with
14 regards to the post-shooting review in this case?  And
15 if so, tell me what those opinions are, please.
16   A   Well, as it relates to Detective Christopher
17 Johnson and his report, specifically on -- on page
18 number 8 of 9, there was no mention at all in his report
19 regarding the location of the wounds to Mr. Le, where in
20 fact he was struck, in this case.
21       And I think that's significant based on the
22 testimony by Deputy Molina and Officer Owens that Mr. Le
23 was actually moving away from the officers in a south or
24 southwesterly direction, at which time he was shot.
25       I think that's critical because it obviously

5 (Pages 17 to 20)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Le, et al. v. Martin Luther King Jr. County                                    Scott DeFoe

---

Page 21

1   shows that that threat no longer existed, or should have
2   existed with an individual carrying a Paper Mate
3   ballpoint pen moving away from the officers prior to the
4   use of lethal force.
5        I thought that was -- I thought that was
6   critical that that was not mentioned in the report by
7   Detective Johnson because I think it's a critical factor
8   in this matter.
9        Q   Can I interrupt you for a minute on that,
10  Mr. DeFoe, and ask you whether you were provided a copy
11  of the autopsy report regarding Mr. Le in terms of
12  documents for you to review in this case?
13       A   I was.
14       Q   Okay.  And from your review of the autopsy
15  report of Mr. Le conducted by the King County Medical
16  Examiner's office, does it indicate or reflect the
17  location of the wounds to Mr. Le?
18       A   It does.  It's on Bates Number 349, the
19  autopsy report from King County Medical Examiner.  It
20  states, "Pathological diagnosis:  Penetrating handgun
21  wound to level lateral back.  Penetrating handgun wound
22  to medial left back.  Perforating handgun wound to the
23  left wrist."  And then, obviously, "Superficial blunt
24  force injuries of the head, shoulders, trunk and lower
25  extremities."

---

Page 22

1        Q   And in fact, you include the pathological
2   diagnoses on page 15 of 35 on Exhibit 3, do you not?
3        A   I'll have to look.  I do, yes.
4        Q   Were you aware, Mr. DeFoe, that the autopsy
5   report would be a part of the overall report of
6   Detective Christopher Johnson with regards to the
7   criminal investigation of this June 14th, 2017 incident?
8        A   I don't understand your question.
9        Q   My question -- I'm sorry if it wasn't clear to
10  you -- did you learn that the autopsy report that's
11  referenced regarding Mr. Le was part of Detective
12  Johnson's criminal investigation report involving this
13  incident?
14       A   Well, it states in his report -- unless I'm
15  misunderstanding you, it states that -- in his report,
16  it states the autopsy report documented three gunshot
17  wounds to Le's body, but he doesn't -- he does not note
18  where they were.
19       But he does note, quite significantly,
20  following that regarding the toxicology report that was
21  involved in there, which took up about three or four
22  sentences following the sentence that it was just
23  multiple gunshot wounds sustained in a confrontation
24  with the police.
25       Q   My question, and I'm sorry if it wasn't clear,

---

Page 23

1   was, was it your understanding that the autopsy report
2   from the King County Medical Examiner's was part of
3   Detective Johnson's overall criminal investigation
4   report in this case?
5        It's either a yes or a no or you don't know.
6        A   It's a yes.
7        Q   Thank you.  Now, you had told us a few moments
8   ago that you were asked to review the standard of care
9   as to the medical treatment provided by -- or provided
10  to Mr. Le in this particular incident.
11       Can you point out to me in Exhibit Number 3,
12  your 35-page report, what reference you have to the
13  standard of care regarding the medical treatment he
14  received outside of what you said, medical diagnoses.
15       A   I don't know if I put that in the form of an
16  opinion.  I know there was part of the report from
17  August 22nd that there were going to be some
18  improvements in some of the trauma kits in training to
19  the deputies.
20       What I did find in my review, that the
21  ambulance that responded to the scene remained at the
22  scene for 17 minutes and 12 seconds prior to
23  transporting Tommy to the hospital after being shot.
24       Q   And what was your understanding as to why the
25  ambulance remained at the scene for 17 minutes and 30

---

Page 24

1   seconds?
2        A   It was 17 minutes and 12 seconds, and I don't
3   know.
4        Q   I'm sorry, sir.
5        A   I've been at probably well over a thousand
6   shooting scenes, or probably more, in my career, and I
7   don't recall -- barring -- typically they triage the
8   best they can, and then they transport the patient as
9   quickly as possible to the hospital.
10       I don't know, once again, and I'm not
11  providing that there was any lack of medical care by the
12  fire department or that there was any lack of -- I don't
13  know what action they did, and nor will I be providing
14  opinions.
15       It just struck me that their time on scene for
16  17 minutes to get him to a critical care facility seemed
17  a little bit unusual based on my background, education
18  and training.
19       Q   Okay.  So just so you and I understand each
20  other, Mr. DeFoe, you're not offering any opinions in
21  this case that King County violated the standard of care
22  regarding the medical treatment received by Mr. Le at
23  the scene or en route to the emergency room or at the
24  emergency room; is that a fair statement?
25       A   Yes, sir.  That's beyond my scope.

---

6 (Pages 21 to 24)

Le, et al. v. Martin Luther King Jr. County                              Scott DeFoe

---

Page 29

1          Once again, that's not conclusive at this time
2  based on any material that I've received, that that was
3  still being -- King County was still doing a forensic
4  review of that door, is my understanding, to determine
5  what caused those marks on the door and adjacent to the
6  door.
7          Q    Based on your experience as a law enforcement
8  officer, Mr. DeFoe, what were the felonies that you
9  understood to have allegedly been committed that the
10 officers were responding to on June 13th/14th of 2017?
11         A    Allegedly that there was an assault with a
12 deadly weapon, that being a knife or an edged weapon.
13 And you could possibly have two potential victims,
14 Mr. Schwiethale, and then Mr. Hernandez.
15         Q    So would it be fair to say that the King
16 County sheriff's deputies were responding to two alleged
17 felonies, being assault in the second degree with a
18 deadly weapon?
19         A    Yes.
20         Q    Thank you.  Mr. DeFoe, would you be kind
21 enough to look at Exhibit Number 3 with me, which is
22 your 35-page report dated December 11th, 2018.
23         And I'd ask you if you would please look to
24 page 21 of the report and tell us when you've got that
25 in front of you.

---

Page 30

1          A    I'm ready.
2          Q    Mr. DeFoe, would you be kind enough under
3  number 5 to read the first two sentences of that
4  paragraph for us, please.
5          A    Sure.  "It is my opinion that a reasonable
6  officer acting consistent with standard police practices
7  upon arrival at scene would have requested King County
8  Sheriff Air Support Unit to assist with establishing the
9  inner and outer perimeter."
10         Shall I continue?
11         Q    Yes, if you would read the second sentence as
12 well, please.
13         A    Yes, sir.  "Based on my review of the facts of
14 this matter, King County Sheriff Deputy Cesar Molina,
15 Deputy Sheriff Tanner Owens and Master Police Officer
16 Matt Paul failed to request air support to assist with
17 establishing the inner and outer perimeter."
18         Q    Mr. DeFoe, what information have you been
19 provided as to the specific air support that was
20 available on June 14th, 2017, at the time of this
21 incident?
22         A    I don't know if there was air support
23 available at the time of this call.
24         Q    What information were you provided as to the
25 number of pilots, if any, that were available on

---

Page 31

1  June 14th, 2017 at the time of this incident?
2          A    I don't know.  I was not provided any
3  information if there were any pilots available.
4          Q    What information, if any, were you provided,
5  Mr. DeFoe, as to where a helicopter or helicopters were
6  stored on June 14, 2017 at the time of this incident?
7          A    I don't know where they're stored.
8          Q    What information, if any, were you provided as
9  to whether the helicopter or helicopters were actually
10 in the field -- and by that, I mean in the air -- on
11 June 14, 2017 at approximately midnight time of the day?
12         A    I don't know if they were in the air at that
13 time.
14         Q    What information, if any, were you provided
15 with -- as to the steps necessary for a King County
16 Sheriff's air support pilot to take in order to get
17 authorization to leave the field -- by that, I mean the
18 airfield -- to respond to a call on June 14th, 2017,
19 approximately midnight?
20         A    What the pilot's responsibilities would have
21 been is your question?
22         Q    No, sir.  What steps would be necessary for
23 them to receive authorization from traffic control to
24 leave a field at approximately midnight on June 14th,
25 2017.

---

Page 32

1          A    Well, I know one of their primary duties
2  according to their policy is that they had patrol
3  support.
4          So typically what transpires, as it has in
5  probably well over a thousand times in my career, is
6  that you request through dispatch for an air unit, if
7  dispatch did not request prior to getting there, knowing
8  that you have a male suspect that's possibly armed with
9  an edged weapon who may be in an area, and especially at
10 night, to provide air support, and establishing an inner
11 and outer containment.
12         Typically that's how it's done throughout the
13 United States is that you will get on dispatch.
14 Dispatch will contact air support, and air support will
15 make a decision, if they can obviously respond, if
16 they're available.  Could be a weather condition, could
17 be a number of factors.  But my opinion is that they
18 should have requested an air unit to respond.  If they
19 could not respond is not my opinion.
20         My opinion is they should have requested, and
21 if they were denied, at least that request was in to
22 support the officers at a -- as you mentioned a rapidly
23 evolving call for service that potentially had an
24 individual who had committed, or allegedly committed
25 assaults with a knife on two individuals.

---

8 (Pages 29 to 32)

Le, et al. v. Martin Luther King Jr. County                                    Scott DeFoe

---

Page 33

1    MR. KINERK:  I'll move to strike as
2  nonresponsive.
3      Q    And I'm sorry if my question wasn't clear to
4  you, Mr. DeFoe.  My question for you, sir, was directed
5  to the air support pilots.
6      And I said what information have you been
7  provided to date in this case as to the steps necessary
8  for the pilots to receive authorization to leave a
9  hangar or airfield in order to get into the air?
10     A    I have not received any information regarding
11  that.
12     Q    What information, if any, were you provided as
13  to the actual steps the pilots would take -- and by
14  that, I mean the inspection and startup steps would be
15  necessary for them to take a helicopter into the air?
16     A    Specifically for this incident, I don't know.
17     Q    Mr. DeFoe, would it be fair to conclude, based
18  on the information that was provided to you in this
19  case, that you do not know what the range of time or
20  estimated time it would take for a helicopter from the
21  King County Air Support Unit to respond to the scene on
22  June 14, 2017 at midnight?
23     A    That's correct.
24     Q    Mr. DeFoe, would you agree with me that you
25  are not offering an opinion in this case that had Deputy

---

Page 34

1  Molina or Deputy Owens or Deputy Paul requested any King
2  County sheriff's air support to the scene that the
3  shooting would not have occurred?
4      A    That's correct, I am not.
5      Q    Mr. DeFoe, would you be kind enough to turn
6  the page to page 22 of 35 of Exhibit 3, your
7  December 11, 2018 report, and tell me when you have that
8  in front of you, please.
9      MR. ARNOLD:  What was the page?
10     MR. KINERK:  Page 22, the next page.
11     MR. ARNOLD:  Thank you.
12     THE WITNESS:  I have it.  I'm ready.
13 BY MR. GOSSELIN:
14     Q    Thank you.  And under Number 6, Mr. DeFoe,
15  would you be kind enough to read to us the first two
16  sentences of your report under Number 6?
17     A    Sure.  "It is my opinion that a reasonable
18  officer acting consistent with the standard police
19  practices would have immediately requested King County
20  Sheriff's Department K-9 Unit to respond and assist with
21  a systematic search of the established perimeter and
22  with the assistance of King County Sheriff's Deputies
23  and the King County Air Support Unit to search for
24  Mr. Le.  The use of a K-9 is an effective tool to locate
25  an individual and if necessary, for K-9 handler

---

Page 35

1  protection to be utilized for directed deployment as a
2  less lethal force option."
3      Q    Thank you.  And I just asked you to read the
4  first two, but thank you for reading the third one for
5  us as well.
6      And your opinion under Number 6, when you say
7  that a reasonable officer acting consistent with
8  standard police practices would have immediately
9  requested King County Sheriff's Department K-9 unit to
10  respond, can you tell me, when you say "immediately
11  requested," when was that in your opinion, sir?
12     A    Well, typically, if you've --
13     Q    By the way -- excuse me.  I didn't mean to
14  interrupt you.  Just to clarify that, do you mean en
15  route to the scene or upon arrival at the scene?  And
16  that's what I'm trying to get understood from your
17  opinion, sir.
18     A    Sure.  Having worked K-9 as a supervisor, what
19  typically happens is that a call like this, where you've
20  got an individual who has fled an area who you believe
21  is, in this case, en route to 7-Eleven on foot,
22  typically K-9 will answer up and respond.
23     Typically an air unit works in conjunction
24  with K-9.  So once the air unit's been requested,
25  officers typically will request a K-9 because -- to

---

Page 36

1  conduct a systematic search of the area.
2      That's what traditionally happens.  If
3  dispatch didn't do it en route, especially having a
4  master police officer, would have requested, "Do we have
5  a K-9 available," because once again, it's nighttime.
6  You're hopefully going to formulate a tactical plan that
7  would involve the use of a K-9 to search for Mr. Le.
8  It's a great less than lethal force option for both
9  finding people who are hiding, as well as in the use of
10  a directed deployment.
11     So I believe it should have happened on the
12  way to the call, and then upon arrival, once they
13  realized that Mr. Le was not in the general area, to
14  request an air unit as well as K-9.
15     MR. KINERK:  And I'll move to strike as
16  nonresponsive.
17     Q    But if I understood the last two sentences or
18  remarks that you made, and correct me if I'm wrong,
19  Mr. DeFoe, that -- my question was when should that
20  request have been made for a K-9, and you said it should
21  have been made en route, correct?
22     A    Yes, en route, or if it had not been done en
23  route, the officer should have requested upon arrival.
24     Q    So upon arrival at the scene, which officer or
25  officers should have made the request for a K-9 unit?

---

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Le, et al. v. Martin Luther King Jr. County                                    Scott DeFoe

Page 37

1    A   Any of the first three officers, obviously
2  that being Owens, Molina or Paul, if one of them didn't
3  do that.  But typically the first officer on scene,
4  or -- I know they all got there within the same period
5  of time, maybe a minute difference with the time Deputy
6  Molina arrived.
7        But upon arrival, once they realized the group
8  of people in fact did not involve Mr. Le -- it did
9  involve Mr. Le, but he was not one of the people that
10 were there, that they knew that he was not in the area,
11 to request K-9 at that point.
12    Q   Let me ask you this, Mr. DeFoe.  What
13 information were you provided in this case as to the
14 scope of the King County Sheriff's Office K-9 unit
15 assigned to the area of this incident on June 14th, 2017
16 at midnight?
17    A   Their scope, based on their policy, is that
18 they provide backup to deputies, locate suspects and
19 victims and find evidence at or near crime scenes.  They
20 have eight handlers and dog teams, so they've got a
21 pretty robust K-9 unit at King County Sheriff's
22 Department.
23    Q   And maybe my question wasn't clear to you,
24 Mr. DeFoe.  What information were you provided in this
25 case as to the number of K-9 units working at midnight

Page 38

1  on June 14th, 2017 that could have responded to a K-9
2  call?
3    A   I don't know.
4    Q   What information were you provided, Mr. DeFoe,
5  as to the K-9 handlers closest in distance and readily
6  available at the time of this June 14th, 2017 incident?
7    A   I don't know because they weren't requested.
8    Q   Well, my question is what information, if any,
9  were you provided as to whether there were any available
10 on June 14th, 2017 at approximately midnight, sir?
11    A   I don't know.  But once again, that comes down
12 to them being requested.  You wouldn't know if they were
13 available unless you requested.  And then upon
14 requesting, you'll find out that there's a K-9 team five
15 minutes out, ten minutes out, 20 minutes out,
16 unavailable, off duty, whatever it was.  My opinion is
17 that they should have requested is what the opinion is.
18    Q   Mr. DeFoe, what was your understanding as to
19 the length of time that lapsed between the deputies
20 arriving at the crime scene and Mr. Le's return to the
21 crime scene?
22    A   I think, according to the CAD, I believe it
23 was about under two minutes.
24    Q   In formulating your opinions in this case as
25 to the actions or inactions taken by the King County

Page 39

1  sheriff's deputies, did you rely on the CAD reports for
2  purposes of timing?
3    A   Yes.
4    Q   Did you rely on anything beyond the CAD
5  reports in formulating your opinions with regards to
6  times?  By that, I mean times that they arrived -- heard
7  the calls, arrived and responded?
8    A   Just the officers' statements, I believe,
9  based on my review.
10    Q   Would it be fair to say that you were not
11 provided with any information in this case as to whether
12 there was a K-9 unit available and able to respond to
13 the crime scene in the time frame of under two minutes?
14    A   Yes, I was not -- I was not provided with that
15 time frame, if in fact the K-9 would have responded
16 within that two-minute time frame.
17    Q   And it would be fair to say, would it not,
18 Mr. DeFoe, that you're not offering an opinion in this
19 case that had the King County Sheriff's Office K-9 unit
20 been available and responded to this call that this
21 shooting would not have occurred?
22    A   Once again, it's the same question as to the
23 use of the air unit.  It's a prudent tactic that -- when
24 you're formulating a plan, and if the shooting
25 transpires prior to the arrival of K-9 is not my

Page 40

1  opinion, it's that they should have requested that.
2        So I don't know if K-9 could have been on
3  scene at that time prior to, or as the time that the
4  deputies arrived and a K-9 officer could have used a K-9
5  as a directed deployment on Mr. Le as he walked in a
6  southerly direction.  That could have been an option if
7  K-9 was in fact on scene when the -- when the deputies
8  arrived.
9    Q   Would you agree with me, Mr. DeFoe, you
10 weren't provided with sufficient information to offer an
11 opinion that had a K-9 unit been responding to this
12 situation in under two minutes that this shooting would
13 not have been avoided?
14    A   Once again, I don't know.  If the K-9 would
15 have arrived at the same time the initial three officers
16 arrived, then there's a chance that a K-9 could have
17 been deployed, especially when you're dealing with
18 distance of 20, 25 feet to, you know, do a directed
19 deployment on Mr. Le in lieu of standing in an open air
20 environment without any cover, and utilizing a Taser or
21 electronic control device.
22        MR. KINERK:  I'll move to strike as
23 nonresponsive.
24    Q   Mr. DeFoe, let me ask you this question.
25 Based on your reliance on the CAD reports with regards

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Le, et al. v. Martin Luther King Jr. County                                    Scott DeFoe

Page 41

1  to timing in this case, how much time lapsed between
2  Deputy Molina's arrival at the scene and the report of
3  shots fired?
4       A   I don't have -- I thought I had this with me,
5  the specific printout.  It shows that -- just on the
6  timeline, that at three minutes after midnight and 11
7  seconds is when the deputies begin arriving.
8       And within that group, according to the
9  sheriff's report, is Deputy Molina.  And then we have
10  shots fired one minute and 46 seconds after the arrival
11  of -- I don't know if the last one being Molina or
12  Marty -- I don't want to butcher his last name, or
13  Officer Thompson.  It doesn't state as to in what order.
14  But around a minute and 46 seconds from the arrival of
15  the deputies until the time of the shooting.
16       Q   And again, just so my question is clear to
17  you, Mr. DeFoe, I'm specifically asking as to Deputy
18  Molina.
19       Given that you are offering opinions with
20  regards to the actions he took or didn't take, what was
21  your understanding based on your reliance on the CAD
22  reports as to the amount of time that lapsed between his
23  arrival and shots fired by him?
24       A   I'll say a minute and 46 seconds.
25       Q   Thank you.  Would it be fair to say that in

Page 42

1  that one minute and 46 seconds that Deputy Molina would
2  have been expected to have been one of the deputies that
3  would have made a call to dispatch for a K-9 unit and/or
4  air support?
5       A   He could have been.  One of the officers en
6  route could have done that, or upon arrival.
7       Once again, when you have an individual who is
8  not in the area, who has fled, who is potentially armed,
9  typically air unit is requested when the officers are en
10  route.  In conjunction with that, K-9 is typically
11  requested at that time.  If it is not while en route,
12  upon arrival, once you realize that you have someone
13  who's no longer present, especially when they were
14  speaking with Mr. Hernandez and three other individuals
15  in front of Mr. Hernandez's residence, at that point to
16  request K-9 and air unit.
17       Q   Okay.  And again, if you'd be kind enough to
18  answer the questions that I ask.
19       I'll move to strike as nonresponsive his last
20  answer.
21       Mr. DeFoe, my specific question for you was
22  that in the minute and 46 seconds that you've relied on
23  for purposes of opining that Deputy Molina arrived at
24  the scene and shots were fired, my question was simply,
25  was he one of the deputies that should have in your

Page 43

1  opinion contacted dispatch to request air support
2  assistance and K-9 assistance?  Yes or no.
3       A   Yes.
4       Q   Thank you.  How long, based on your experience
5  as a law enforcement officer, would it have taken
6  someone like Deputy Molina to contact dispatch to make
7  the request for a K-9 unit support?
8       A   Quite simply, he would have pressed the button
9  on his radio and said, "Requesting air unit and K-9 to
10  our location."  So however long it took me to say that.
11  Three seconds, maybe.
12       Q   Okay.  Thank you.  Mr. DeFoe, would you be kind
13  enough to turn to page 16 of 35 of Exhibit Number 3,
14  your December 11th, 2018 report?
15       A   I'm here.
16       Q   Thank you.  And would you be kind enough to
17  read for us the full paragraph, first paragraph under
18  Number 1?
19       A   Sure.  "It is my opinion that a reasonable
20  officer acting consistent with standard police practices
21  would have formulated a tactical plan upon arrival at
22  scene.  It is my opinion that King County Deputy Sheriff
23  Cesar Molina failed to formulate a tactical plan with
24  Master Police Officer Matt Paul and Deputy Sheriff
25  Tanner Owens upon arrival at scene.  Based upon my

Page 44

1  review of the facts in this matter, Deputy Sheriff Cesar
2  Molina had the necessary time to formulate a plan of
3  action."
4       Q   Thank you.  And just below that in your
5  report, Mr. DeFoe, you list four bullets under the
6  caption of "Plan of Action."
7       Do you see that?
8       A   Yes.
9       Q   And would you be kind enough to read those
10  into the record for us, please?
11       A   Sure.  "Officers should discuss safety factors
12  as well as possible plans for taking actions in
13  situations involving fleeing subjects."
14       "Plans may include coordination of who will
15  transmit radio traffic."
16       "Appropriate use of escalation of force."
17       And to interview witnesses.
18       Q   Now, with regards to this incident that you
19  were asked to offer opinions in this case, Mr. DeFoe,
20  would each of the bullets under the plan of action that
21  you've included in your report have been applicable?
22       A   Yes.
23       Q   Okay.  So just so you and I understand each
24  other with regards to the plan of action that you have
25  opined Deputy Molina was to formulate, that would have

11 (Pages 41 to 44)

Le, et al. v. Martin Luther King Jr. County                           Scott DeFoe

Page 45

1  included that he should discuss safety factors as well
2  as possible plans for taking actions in situations
3  involving fleeing subjects; number 2, he should make
4  plans that include coordination of who will transmit
5  radio traffic; number 3, he will -- there will be
6  discussion of appropriate use of escalation of force;
7  and lastly, there will be interview of witnesses,
8  correct?
9      A   Yes.
10     Q   All right.  So based on your experience as a
11  law enforcement officer, and based on the documents that
12  have been provided to you in this case, Mr. DeFoe, tell
13  me how much time it would have taken, your best
14  estimate, for Deputy Sheriff Cesar Molina to have
15  addressed the discussion of safety factors as well as
16  possible plans for taking actions in situations
17  involving fleeing subjects.
18     A   Well, it's formulating a plan.  And in law
19  enforcement, it's common, a common practice that when
20  officers arrive they formulate a plan.  And that plan's
21  going to involve, you know, the less than lethal force
22  options that are available, the type of individual,
23  regarding the subject, any available cover, who's going
24  to be contact and cover officers, who will utilize the
25  radio in the event you need to broadcast information if

Page 46

1  the individual is fleeing.
2          We know that based on the review in this case,
3  specifically in Officer Owens' as well as Officer
4  Molina's deposition transcripts, there was no
5  conversation at all.  Deputy Owens did not have a
6  conversation with Officer Paul or Officer Molina or
7  Deputy Molina any time prior to the shots being fired.
8  Officer Molina also testified --
9      Q   I'll -- I'm sorry.
10     A   Officer Molina also testified --
11     Q   I didn't mean to interrupt you.
12     A   -- in his deposition that at no time did he
13  have any conversation with -- with any of the officers
14  prior to taking independent action of walking into the
15  middle of the intersection leading up, but prior to the
16  use of lethal force.
17     Q   And again, I don't mean to interrupt -- I'm
18  sorry, Mr. DeFoe.  I didn't mean to interrupt you.  My
19  question -- I'll move to strike as nonresponsive.
20         My question simply was this, was you have
21  opined that Deputy Molina had necessary time to
22  formulate a plan of action.  You've identified for us
23  the bullets that make up a plan of action.
24         And my question for you that I asked a moment
25  ago, and I'm going to ask you to please answer, is how

Page 47

1  long was it to take, based on your experience, for
2  Deputy Molina to discuss safety factors as well as
3  possible plans for taking actions in situations
4  involving fleeing subjects?
5      A   Once again, it's going to depend.  I mean,
6  there's not a -- there's not a set amount of time.  It
7  depends the size of the perimeter.  It depends the
8  individual you're looking for.  It depends what they're
9  armed with.  It depends if you need to request
10  additional information, request additional equipment,
11  request additional less than lethal force options; like
12  I mentioned, K-9, a bean bag shotgun if you don't have
13  that at your disposal.
14         There's a number of factors that you're going
15  to take a look at.  So it depends on -- if you're
16  looking at an elaborate plan, no.  I'm looking at
17  something where, okay, this is what we're going to do.
18  We're going to contain the location.  We're going to
19  request additional personnel.  We know that people are
20  coming.
21         That could take -- that could take a half a
22  minute.  But having no conversation at all is below the
23  standard of care.  And based on my review of the
24  testimony, the officers did not speak with one another
25  prior to the shooting.  There was no conversation.

Page 48

1  There was no --
2      Q   I'll just --
3      A   Well, I'd like to finish my response.  I know
4  you don't want to hear my response, but --
5      Q   No, I'm happy to let you finish, Mr. DeFoe,
6  but I want you to answer the question I asked.
7          The question I asked you --
8          MR. ARNOLD:  Hold on.  Now, you've interrupted
9  him, and please let him finish his answer.  Then you may
10  certainly continue.
11         MR. KINERK:  Very good.  Thank you.
12     Q   Go ahead and finish.
13     A   It's my understanding I'm not required as an
14  expert to give a yes/no response to questions.  So if
15  I'm going to answer the question, it's to my best
16  ability based on the information I have at the time and
17  based on my background, education and training.
18         So you're asking me a very broad-based
19  question, like I can put a numerical figure on it, like
20  23 seconds, I can't.  It depends on the gravity of the
21  situation.  It depends on the magnitude of the
22  situation.  It's going to differ based on the type of
23  call for service.
24         In this case, there was no conversation, no
25  plan.  30 seconds, someone requesting something over the

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Le, et al. v. Martin Luther King Jr. County                                    Scott DeFoe

Page 69

1    in a tactical game plan with them, correct?
2        A    Yes, or once realized that they were busy
3    doing something, then he could have put together a game
4    plan and then advised them what they needed at that
5    point and then start putting together a plan.
6        Q    Now, with regard to a game plan, you
7    indicate -- and I'm now looking on page 18 of your
8    report under Number 3.  Tell me when you have that in
9    front of you.
10       A    I have it.
11       Q    Thank you.  Would you be kind enough to read
12   the first sentence under Number 3?
13       A    "It is my opinion that a reasonable officer
14   acting consistent with standard police practices would
15   have designated a cover and contact officer."
16       Q    "Upon arrival at the scene."  Isn't that what
17   your sentence says, sir?
18       A    Yes, pardon me, "upon arrival at the scene."
19       Q    All right.  So what you've opined is that upon
20   arrival at the scene, which officer was it that was
21   going to be the cover officer and which officer was
22   going to be the contact officer, based on the
23   information you've been provided in this case?
24       A    There was no conversation between the officers
25   based on my review, so it's -- I don't know who was

Page 70

1    cover and contact officers because the officers didn't
2    speak with one another, based on my review of the
3    testimony in this matter.
4        Q    But my question -- and I'll move to strike
5    that last answer.
6            Mr. DeFoe, my question is, in your opinion
7    based as a law enforcement officer, who would have been
8    the cover officer and the contact officer based on the
9    facts as you understand them in this case?
10       A    It depends.  There's different segments.  It
11   just depends on, once again, communicating and asking
12   people what they need, and maybe covering Deputy Paul
13   and Deputy Owens while they're interacting with the
14   three individuals.
15           While you're waiting for additional resources
16   to arrive, you could be functioning as a cover officer
17   while Deputy Owens and Deputy Paul were contacting three
18   potential witnesses at that point, or victims.
19           So you could be a cover officer at that point.
20   But once again, that comes by way of communicating.  We
21   don't read minds.  We communicate with one another and
22   we develop strategies or ask people what they need.
23       Q    Okay.  So in this particular case, you would
24   agree with me that Deputy Paul and Deputy Owens arriving
25   at the scene in advance of Deputy Molina contacted the

Page 71

1    victims, proceeded to interview them, pat them down and
2    secure their weapons, correct?
3        A    Yes.
4        Q    And during that period of time, Deputy Molina
5    arrived at the scene, did he not?
6        A    Yes.
7        Q    And so when Deputy Molina arrived at the scene
8    and the two other deputies are involved in the series of
9    tasks involving these victims, Deputy Molina was
10   providing cover to those deputies, was he not?
11       A    That's what he testified to, yes.
12       Q    So based apparently on the experience and
13   training that these deputies had received, Deputy Molina
14   at that point was able to provide cover for the two
15   deputies that were engaged in contact without the
16   necessity of a verbal tactical plan; is that fair?
17           MR. ARNOLD:  Assumes facts not in evidence.
18   BY MR. KINERK:
19       Q    You can answer, sir.
20       A    Well, he was providing cover, yes, but once
21   again, communication is the key to law enforcement.  And
22   not asking them what they need, not -- I mean, you had
23   Officer, obviously, Thompson that was arriving,
24   Cotchaleovitch was arriving or had arrived, Officer
25   Blakeman was arriving.

Page 72

1            There was no conversation as to what
2    additionally needed to be done, not just arbitrarily
3    cover them by standing in the middle of the
4    intersection.
5            But to answer your question, yes, he was
6    covering them, based on his testimony, while they were
7    interacting with Mr. Rice and Mr. Hernandez.
8        Q    You would agree with me, Mr. DeFoe, would you
9    not, that by Deputy Molina providing coverage to
10   Deputies Paul and Owens while they were interacting with
11   armed individuals in the dark at that particular time,
12   that's proper -- that's proper standard police practice,
13   is it not?
14       A    I agree with that.
15       Q    Mr. DeFoe, would you be kind enough to look to
16   page 20 of 35 of your December 11th, 2018 report.  And
17   tell me when you have that in front of you, please.
18       A    I have it.
19       Q    Thank you.  And under Number 4, would you be
20   kind enough to read the first two sentences of that
21   paragraph.
22       A    "It is my opinion that a reasonable officer
23   acting consistent with standard police practices would
24   have established an inner perimeter and an outer
25   perimeter immediately upon arrival.  In addition, it is

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Le, et al. v. Martin Luther King Jr. County                              Scott DeFoe

---

Page 73

1   my opinion that King County Sheriff Deputy Cesar Molina,
2   Deputy Sheriff Tanner Owens and MPO Matt Paul failed to
3   establish an inner perimeter and outer perimeter
4   immediately upon arrival."
5       Q   Now, in your report, you define inner
6   perimeter and outer perimeter, correct?
7       A   Yes.
8       Q   And would you be kind enough to read into the
9   record your definition of inner perimeter?
10      A   Inner perimeter is immediate area around the
11  incident.  Example, private residence, commercial
12  establishment, vehicle.  And then varying in size
13  depending on the purpose of the perimeter.
14      Q   And then would you be kind enough to read into
15  the record how you define outer perimeter?
16      A   The area surrounding the inner perimeter,
17  established to further contain and isolate the crime
18  scene.  May aid in apprehension if a suspect manages to
19  breach the inner perimeter.  Providing protection and
20  cover for inner perimeter officers.  Providing traffic
21  control, and assisting in public safety.
22      Q   Now, in your report, you said that these three
23  deputies, Molina, Owens and Paul, failed to establish an
24  inner and outer perimeter immediately upon arrival.
25          Isn't that what your report says?

---

Page 74

1       A   It does.
2       Q   So in terms of the formulation of this inner
3   and outer perimeter, were -- in your opinion, were
4   Deputy Owens and Deputy Paul responsible for
5   establishing an inner and outer perimeter immediately
6   upon their arrival and prior to Deputy Molina's arrival?
7       A   Well, sure.  Once you find out -- once they
8   get on scene and they find out that Mr. Le was not in
9   the general area, that he had fled, that he was not one
10  of the individuals that they confronted, at that point
11  they would need to establish both inner containment and
12  outer containment so officers that were arriving on
13  scene, like Blakeman and Thompson, they could take
14  perimeter positions.
15          Because the intent on containment is to keep
16  Mr. Le contained, and then establish a perimeter,
17  because if he did in fact commit a crime, you don't want
18  him to escape.  So establishing containment is critical
19  right away, not five minutes later.  Because if he's
20  running or walking, you want to keep him within that
21  perimeter.
22          In the event you do request an air unit and
23  there is one available, and in fact you do request K-9
24  and there is one available, then they can come and
25  assist with a systematic search of the containment, of

---

Page 75

1   both the inner and outer containment of the perimeter.
2       Q   Based on your understanding and experience
3   and information provided in this case, Mr. DeFoe, what
4   were the -- what were the parameters of the inner
5   perimeter in this case?
6       A   I think the last seen location.  I think that
7   once again, depending on, I would probably look at --
8   you know, to ensure that, you know, if Mr. Le did not go
9   far from Mr. Hernandez's home, I know that he was seen
10  walking away north but, you know, did he come back?  As
11  we know, he did.
12          So it would be -- the last seen location is
13  typically the inner perimeter, which would be the scene
14  location of a crime.  I would look at that as
15  establishing inner perimeter.
16          And then I would go ahead and establish, you
17  know, a good one-block perimeter to be able to ensure
18  that you have Mr. Le contained in that one-block
19  perimeter.  And if you need to expand that based on new
20  information, you can always do that.
21      Q   Now, in the -- how much time lapsed between --
22  from your understanding of this case, between
23  Deputy Paul and Deputy Owens' arrival at the scene,
24  their contact with these victims, before they learned
25  that the assailant, Mr. Le, was not present?

---

Page 76

1       A   You know, what Deputy Owens states is that --
2   correction, what Deputy Owens says, he says, "As he
3   walked towards me" -- he was talking about
4   Mr. Hernandez -- "I briefly spoke with him.  He told me
5   that a male attacked him with a knife," and that he was
6   an Asian male with a black shirt and he was possibly
7   high.
8           So it doesn't say exactly.  And then that's
9   the point in which he was drawn -- his attention was
10  drawn to the north, and he heard Deputy Molina yelling.
11      Q   And his attention was drawn to the north at
12  that particular moment because Mr. Le had re-emerged at
13  the crime scene, correct?
14      A   Well, he was on the north side of the road,
15  coming in a southerly direction.
16      Q   Yeah, and that's -- he was approaching the
17  crime scene, correct?
18      A   Walking towards --
19      Q   At that moment.
20      A   Well, walking towards the crime scene, yes.
21  He was walking towards their location, which was south
22  of Mr. Le's location.
23      Q   So you're not suggesting in that period of
24  time that Deputy Owens and Deputy Paul would have been
25  able to establish both an inner perimeter and outer

---

19 (Pages 73 to 76)

Le, et al. v. Martin Luther King Jr. County                    Scott DeFoe

Page 77

1  perimeter, are you?
2      A   Once you see a suspect, knowing that he may
3  run, is that you want to verbalize where he is on the
4  radio so responding units don't all converge on where
5  he's at, but they converge on areas north, south, east
6  and west.  In the event he does run from officers, you
7  have that area contained.
8      So that is critical to put that information
9  out for both responding officers to know where he's at,
10 as well as for officers to be able to contain that
11 location.  In the event he does flee, you're going to
12 want the perimeter established to contain him within
13 there so you obviously don't miss the opportunity to
14 arrest him or apprehend him.
15     Q   Did, in your -- based on the information you
16 provided in this case, Mr. DeFoe, did Mr. Le attempt to
17 escape from the crime scene at the point where Deputy
18 Owens looked in a northerly direction, having heard
19 Deputy Molina's words?
20     A   Well, I don't know what he was doing after --
21 the time after the two Taser deployments.  We know that
22 he was walking away from Deputy Owens and Deputy Molina,
23 based on their testimony, in a south or southwesterly
24 direction.
25     So I don't know at that point if he was trying

Page 78

1  to escape.  But prior to the deployment of the Taser, he
2  was walking towards them and not away from them.  So I
3  don't know.
4      Q   You would agree with me, Mr. DeFoe, that based
5  on the information you've been provided in this case, at
6  the point where Deputy Owens, who was interacting with
7  these victims, turned and looked to the north, having
8  heard Deputy Molina's voice, that that's the point when
9  Mr. Le was re-emerging and approaching the crime scene,
10 correct?
11     A   Yes, walking towards.  So walking in a
12 southerly direction towards his location at
13 Mr. Hernandez's residence.
14     Q   So at that particular point, Deputy Molina was
15 positioned between Deputy Owens, Deputy Paul and these
16 four victims, correct?
17     MR. ARNOLD:  Let me object.  It assumes facts
18 not in evidence.
19     THE WITNESS:  Yes, they were between him.  He
20 was north of their location.
21 BY MR. KINERK:
22     Q   Now, let me, if I could with you, Mr. DeFoe,
23 go back for a moment to Number 2 on page 17 of 35,
24 Exhibit 3 of your December 11th, 2018 report.
25     Tell me when you have that in front of you.

Page 79

1      A   I'm here.
2      Q   And could you again be kind enough to read to
3  us that first two sentences of that Number 2.
4      A   "It is my opinion that a reasonable officer
5  acting consistent with standard police practices would
6  have utilized cover and not positioned themselves in an
7  open air environment that did not afford them cover.
8  Based on my review of the facts in this matter, Deputy
9  Sheriff Cesar Molina walked towards the intersection of
10 South 136th Avenue and 3rd Avenue South, which was in
11 the direction of the suspect."
12     Q   Okay.  So Mr. DeFoe, I know you've told us
13 that you haven't been to the scene, but I'm assuming
14 you've looked at the Google photographs you referenced
15 us.
16     What were the cover options available to
17 Deputy Molina at that point at the intersection of 136th
18 Avenue South and South 3rd Avenue?
19     A   Well, his vehicle was parked just west -- or
20 actually on the west-most -- on the southwest curb
21 facing eastbound.  Deputy Paul's vehicle was parked on
22 3rd just south of the intersection, and Deputy Owens'
23 vehicle was just south of Deputy Paul's vehicle.
24     He could have used any one of the three of
25 those vehicles to provide cover for the officers rather

Page 80

1  than standing in an intersection that provides no cover
2  or any form of concealment at all.
3      Q   What other options, if any, besides the patrol
4  vehicles do you believe provided Deputy Molina with
5  cover options at that point?
6      A   Well, there was vehicles adjacent to
7  Mr. Hernandez's residence.  There were several vehicles
8  on the southeast corner, two vehicles, one on 3rd.
9  There was -- appears to be a wall on the residence
10 adjacent directly across from them, a brick wall on the
11 residence on the southwest corner.
12     There was plenty of options for cover in
13 relation to where Deputy Owens and Officer Paul were
14 interacting with the four individuals rather than not
15 using any cover and walking in an environment, open air
16 environment, if you reasonably believe someone is armed
17 with an edged weapon.
18     Q   Based on the information you've been provided
19 in this case, Mr. DeFoe, what was the approximate
20 distance that Deputy Molina was positioned or could have
21 been positioned behind any of the patrol cars relative
22 to Mr. Le's re-emergence to the crime scene?
23     A   Well, the distance of the -- obviously of
24 where the -- are you talking about where their vehicles
25 are positioned compared to where -- on the north corner?

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

# Exhibit 2

# Deposition of Professor William M. Harmening

# Le, et al. v. Martin Luther King Jr. County

# March 14, 2019



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Le, et al. v. Martin Luther King Jr. County                              Professor William M. Harmening

Page 13

1    shooter, correct?
2        A. That's correct.
3        Q. We'll talk in a minute about some of your
4    other job titles and positions after 1993, but just
5    so I understand your history, Mr. Harmening, is it
6    fair to say that the last time that you worked as a
7    law enforcement officer for a police agency would
8    have been in August of 1993 as the chief deputy for
9    the Menard County Sheriff's Department?
10       A. Well, it would have been the last time I
11   was in uniform as a police officer.
12       Q. So the last time you worked as a police
13   officer in uniform would have been over 26 years
14   ago --
15       A. Yes, sir.
16       Q. -- if my math is right. Is that --
17       A. Yes, sir.
18       Q. It appears from looking at Exhibit No. 2,
19   Mr. Harmening, that after you left the Menard County
20   Sheriff's Department in August of 1993, you went to
21   work as an investigator for the Illinois Securities
22   Department; is that right?
23       A. Yes.
24       Q. From the summary that you included in your
25   resume, that would lead us to believe that you were

Page 14

1    working as a fraud investigator. Is that a fair
2    assessment?
3        A. Yes.
4        Q. After August of 1993, you never worked as a
5    patrol officer for any other police department once
6    you left Menard County Sheriff's Department; is that
7    right?
8        A. That's correct.
9        Q. Mr. Harmening, were you provided any
10   documentation in this case as to the size of the
11   King County Sheriff's Office in 2017?
12       A. I don't believe so.
13       Q. When you worked in Menard County Sheriff's
14   Department, did they have a K-9 unit?
15       A. No.
16       Q. When you worked for the Menard County
17   Sheriff's Department, did they have an air support
18   unit?
19       A. No.
20       Q. What's your best estimate of the number of
21   patrol cars you had in the Menard County Sheriff's
22   Department while you were employed there in the
23   early -- into the early '90s?
24       A. Six.
25       Q. Mr. Harmening, are you familiar with the

Page 15

1    term "ART, Administrative Review Team"?
2        A. Is that an acronym?
3        Q. Yes. It's A-R-T for "Administrative Review
4    Team."
5        A. I mean, I can sort of tell from, you know,
6    the title, but more specifically, is there one
7    you're referring to?
8        Q. I was just asking you generally if you were
9    familiar with that term. It's either a "yes" or a
10   "no" or a "maybe."
11       A. Yes. Yes, maybe.
12       Q. Fair enough. Did you review or were you
13   provided in this case with any of the investigation
14   that was done by the King County Sheriff's Office
15   Administrative Review Team related to the June 14,
16   2017, incident?
17       A. Yes.
18       Q. What type of ART team, if any, did the
19   Menard County Sheriff's Department have when you
20   employed there?
21       A. We didn't. We didn't have one.
22       Q. In this case, have you been asked to offer
23   any opinions with regards to the adequacy of the ART
24   investigation that was conducted in this June 14,
25   2017, incident?

Page 16

1        A. No.
2        Q. Mr. Harmening, were you provided in this
3    case with the King County Sheriff's Office Shooting
4    Review Board hearing materials and investigation
5    related to this June 14, 2017, incident?
6        A. Well, that's what I was provided with. I
7    may be confusing the two. I was certainly provided
8    the review board's report. At this point, if
9    there's another report by the administrative review
10   committee, I'm not sure I have that, if there are
11   two separate reports.
12       Q. During the period of time you were employed
13   by the Menard County Sheriff's Department, did they
14   have a shooting review board in their unit?
15       A. No.
16       Q. During the period of time that you were
17   employed by the Menard County Sheriff's Department,
18   were you, as a patrol chief or as a -- excuse me, as
19   a deputy sheriff or as a chief deputy sheriff, were
20   you issued Tasers?
21       A. No.
22       Q. Were Tasers even in play during the period
23   of time that you were a member of Menard County
24   Sheriff's Department?
25       A. Initially, in the early '80s, they were

4 (Pages 13 to 16)

# Exhibit 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

```
BAO XUYEN LE, as Personal         )
Representative of the Estate of   )
TOMMY LE; HOAI "SUNNY" LE; and    )
DIEU HO,                          )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          ) No. 2:18-CV-00055-TSZ
                                  )
REVEREND DR. MARTIN LUTHER KING   )
JR. COUNTY; and KING COUNTY       )
DEPUTY SHERIFF CESAR MOLINA,      )
                                  )
          Defendants.             )
                                  )
```
_____

DEPOSITION UPON ORAL EXAMINATION OF

TAM DINH, PhD
_____

1:30 p.m.
Monday, November 9, 2020

BY VIDEOCONFERENCE

REBECCA E. DONLEY, CCR 3184
NORTHWEST COURT REPORTERS
20819 72nd Avenue South, Suite 625
Kent, Washington 98032
(206) 623-6136
E-mail:  nwcourtreporters@iinet.com

Tam Dinh, Ph.D. - November 9, 2020

6

1         another, okay?

2    A.    Sounds good.

3    Q.    One of the things that I'd like to do in talking with

4         you this afternoon is to provide you an opportunity to

5         give an answer and a complete answer before I proceed

6         to the next question.  But remote from one another

7         there is sometimes a slight delay.  So I will try to

8         not talk over you.  To the extent that I do so, I will

9         try and refrain from that, and if you'll provide me the

10         courtesy of just letting me ask my question before you

11         answer it, that would be greatly appreciated, okay?

12    A.    Okay.

13    Q.    One other caveat that comes into play is that if you

14         can give all of your answers verbally, that allows the

15         court reporter to take down accurately a transcript for

16         all of the parties, okay?

17    A.    Sounds good.

18    Q.    Dr. Dinh, have you ever had your deposition taken

19         before?

20    A.    No, this is my first time.

21    Q.    Dr. Dinh, have you ever qualified as an expert witness

22         in any type of state court proceeding?

23    A.    No.

24    Q.    Have you ever qualified as an expert witness in any

25         type of federal court proceeding?

Tam Dinh, Ph.D. - November 9, 2020

7

1   A.   No.

2   Q.   Dr. Dinh, have you ever been retained to do forensic

3       work?  And by that I mean to do work as involves a case

4       that's in litigation.

5   A.   No.

6   Q.   Dr. Dinh, did you know any of the Le family prior to

7       June 14th, 2017?

8   A.   I did not.

9   Q.   I've had marked as an exhibit to your deposition a

10      declaration that is dated -- I think seven pages long

11      and dated February 14th, 2019.  Prior to our

12      conversation this afternoon, have you had a chance to

13      review that declaration?

14   A.   I did.

15   Q.   Were there any other documents that you were asked to

16      review or that you did review before our conversation

17      today?

18   A.   This is the only one.

19   Q.   Can you tell us, Dr. Dinh, what contact, if any, you

20      had with any of the Le family since February 14th,

21      2019.

22   A.   I have not had any physical contact with them except

23      being -- we were at a community event together where --

24      it was an ACRS.  And let me qualify.  There was not any

25      personal contact with them except at a community event

12

1       to give my deposition for the Le family.

2   Q.  You had mentioned a moment ago to us, Dr. Dinh, that

3       you had attended a court proceeding in which the Le

4       family was present.  Did I understand you correctly?

5   A.  Yes.

6   Q.  What was the purpose for which you were there for?

7   A.  As a community member during that time, recognizing

8       that, one, it was such a more -- an important moment or

9       kind of occasion for our community.  The community

10      gathered together to provide the Les support to show

11      that the community cared.  So as part of the community.

12  Q.  Had anyone specifically asked you to attend?

13  A.  No.  But there was a kind of a support between the

14      community to say, Hey, we need to be there.  And so if

15      you notice, you will see a couple community leaders who

16      have been there from the very beginning, but then there

17      were a lot of other community who wanted to come out to

18      support.

19  Q.  When you say that there were community leaders who have

20      been there since the beginning, who are they, in your

21      opinion?

22  A.  Well, so with CAPAA there was Joe Nguyen who knew one

23      of the Le family members.  I don't know who he knew.

24      As CAPAA commissioner, I was invited from the very

25      get-go to -- you know, how do we help the family

Tam Dinh, Ph.D. - November 9, 2020

16

```
 1        have not recently pulled it up.  So I apologize.  I
 2        thought it was the most recent, and this is the most
 3        recent -- the only thing I've seen right now.
 4   Q.   And just so you and I understand each other, Dr. Dinh,
 5        you're not offering any opinions with regards to the
 6        psychological evaluation that Laura Brown prepared in
 7        this, are you?
 8   A.   Well, she is a professional with her own opinion.  I am
 9        also a therapist.  My work is in intergenerational
10        trauma and mental health, diversity and equity, so I
11        have my own opinions.  But I would not offer my opinion
12        on her report.
13   Q.   That was my question.  Have you prepared -- I should
14        say in this case, as a clinical therapist have you
15        counseled any of the Le family?  And when I say the Le
16        family, I mean both the grandmothers, the aunts, the
17        parents, the siblings, just so you understand my
18        question.
19   A.   Yes.  No, I have not counseled any of the Le family
20        members.
21   Q.   Would I be correct in concluding, Dr. Dinh, that you're
22        not offering any opinions with regards to institutional
23        betrayal?  Are you familiar with that term?
24   A.   My own personal opinion of it, but not other people's
25        opinion of it.  If you're asking me for my opinion of
```

Northwest Court Reporters * 206.623.6136 * Toll Free 866.780.6972

# Exhibit 4

# Deposition of Deborah Jacobs

# Le, et al. v. Martin Luther King Jr. County, et al.

# January 5, 2021



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Le, et al. v. Martin Luther King Jr. County, et al.                                    Deborah Jacobs

---

Page 9

1  there was a final interview before Council, and then I
2  was offered the position.
3      Q.  How does the Office of Law Enforcement Oversight
4  use consultants?
5      A.  Well, when I first arrived, there were only
6  three staff, and now I think there are only six or
7  seven.  And it's not possible to do all the work that is
8  listed in this ordinance with that few staff, and so we
9  used consultants to meet capacity needs, both in terms
10  of capacity there, but also expertise as well.
11      So, for example, often police when we, civilians
12  working in OLEO would give recommendations, they would
13  discard them or disregard them as not being credible.
14  But if they come from an outside expert, such as Mike
15  Gennaco, who has reviewed like hundreds and hundreds of
16  shootings, they, you know, seem to give it a tiny bit
17  more attention, although not much.
18      So it's sort of the three things:  Not having
19  the capacity, the additional expertise, and then
20  just how that outsider status is given a little more
21  credence sometimes than the people they already know.
22      And so when I arrived, we didn't have full-time
23  positions, but we had some money in the bank because the
24  office hadn't really been doing anything.  So I used
25  consultants to primarily conduct systemic reviews and

---

Page 10

1  also help with like organizational development.
2      Q.  You were using consultants to fulfill the duties
3  of the Office of Law Enforcement Oversight?
4      A.  Yes; that's correct.
5      Q.  And I'm trying to get up on the screen Exhibit
6  81.
7      A.  Yeah.
8          (Exhibit No. 81 marked.)
9  BY MR. ARNOLD:
10      Q.  Do you see it?
11      A.  Yes.
12      Q.  And Exhibit 81, I'll identify and read it into
13  the record.  It's the "USE OF FORCE REVIEW BOARD --
14  DEPUTY MOLINA ART2017-002," and I'm going to refer to
15  this document as the "Review Board report"; is that
16  reasonable with you?
17      A.  Yeah.
18      Q.  Can you tell me if you have seen this report
19  before as the director of OLEO?
20      A.  Yes.
21      Q.  What is the connection between the Review Board
22  report and the shooting of Tommy Le?
23      A.  So after an officer-involved shooting, the
24  Sheriff's Department has procedures to review it, in
25  addition to any kind of criminal investigation that

---

Page 11

1  might take place, which, not when Tommy Le was shot, but
2  now is, you know, done by a different law enforcement
3  department.
4      So they -- they changed their systems a lot
5  under either a different leadership or some other
6  reason, but in this case, there was an ART review,
7  that's Administrative Review Team, which is charged with
8  looking at like systems and lessons learned.
9      And then every shooting has a Shooting Review
10  Board at which they make determinations about the
11  culpability of the personnel involved, like was the
12  shooting justified, or specifically they ask regardless
13  of everything leading up to the moment that they shot,
14  was it justified?  They ask if a weapon was used, was it
15  intentional?  They ask questions about maybe if it was
16  consistent with training.  There's like six questions.
17  They're probably below in this document.
18      And to my knowledge, they have never found a
19  shooting not to be justified or a death in custody not
20  to be justified.  And even when they have found like
21  lessons learned, such as the Chance -- the case of
22  Mi'Chance Dunlap-Gittens, where they did a thorough job
23  on the review, they just ignored them.
24      So every shooting has a document like this that
25  reviews the discussion that they have in the Use of

---

Page 12

1  Force Review Board.
2      Q.  Can you tell me what are the Office of Law
3  Enforcement Oversight's responsibilities with respect to
4  this Review Board report?
5      A.  We don't have any specific responsibilities.
6  The Office of Law Enforcement Oversight is allowed to
7  send one representative to these meetings, and although
8  that person is invited to participate, it's a difficult
9  environment to do that in.  And also, as I have
10  personally experienced, they often respond hostilely, so
11  it kind of sets the Office of Law Enforcement up to be
12  looking like you're doing something because you're
13  there, but it's very difficult to have any kind of
14  impact in that room that has like twenty law enforcement
15  and one civilian representative of the public.
16      So, you know, we attend.  Depending on the
17  representative who attends, they, you know, do the best
18  they can in the circumstance, and then this report comes
19  out sometime later.  Often it takes them a really long
20  time.
21      Q.  Did you direct a review of the Use of Force
22  Review Board report regarding Tommy Le's shooting?
23      A.  Not of this report specifically.  What we asked
24  the OIR Group, led by Mike Gennaco to do, is to conduct
25  a systemic review of the Tommy Le shooting as he

---

3 (Pages 9 to 12)

Le, et al. v. Martin Luther King Jr. County, et al.                    Deborah Jacobs

---

Page 17

1   Q.  I'm going to go to page 25 of this report,
2   Exhibit 116, and take you down to Headnote 20.  And
3   Headnote 20 of the OIR report says, "Under current KCSO
4   protocols, the Use of Force Review Board is now called
5   the Critical Incident Review Board."
6       Is that your understanding, too?  There's been
7   a --
8   A.  Yeah.
9   Q.  -- name change?
10  A.  Yes.  I think I mentioned to you when we were
11  talking about their policies had changed a lot, and so
12  one of the more recent, a December 2019 edit, renamed it
13  that just to, I guess, broaden it out.
14  Q.  So is it fair to say that the Critical Incident
15  Review Board is used also, in this instance, to mean the
16  Use of Force Review Board --
17  A.  Yes.
18  Q.  -- with respect to the Tommy Le shooting?
19  A.  Yes.
20  Q.  I'm going to look at this exhibit, 116, again,
21  and go to page 15.
22      And you see on page 15, it says, "Involved
23  Deputy's Written Report"?
24  A.  Yeah.
25  Q.  Then I want to go down, and can you see Item

---

Page 18

1   No. 9 that I marked in red, quote, Deputy C wrote that
2   he fired at the suspect, who kept moving forward at a
3   fast pace, end of quote; do you see that?
4   A.  Yes, yes.
5   Q.  Is it your understanding that Deputy C is Deputy
6   Molina --
7   A.  Um...
8   Q.  -- being the shooter?
9   A.  Yeah; yes.  Yes.
10  Q.  Okay.
11  A.  Sorry.  One thing I want to mention is the
12  original draft we had all the names.  I actually, since
13  I worked with these folks, worked really hard to not
14  stay too familiar with names because I then would
15  interact differently.
16      But, yes.  Deputy Molina was the shooter, so,
17  yes, that looks right.
18  Q.  And then looking at Item No. 10, the "Witness
19  Deputy's Written Report," Deputy A.  Then going to --
20  down the page on Exhibit 116, page 16, it says,
21  "Deputy A wrote that he deployed his Taser" --
22  A.  Right.
23  Q.  -- "and tried to step out of the man's path."
24      Is it your understanding that Deputy A is Deputy
25  Owens?

---

Page 19

1   A.  Yes.
2   Q.  Then going to page 5 of Exhibit 116, do you see
3   Item No. 1?
4   A.  Yes.
5   Q.  I'll read into the record, quote, This report,
6   commissioned by the King County's Office of Law
7   Enforcement Oversight ("OLEO") and prepared by OIR
8   Group, focused on KCSO's investigative and
9   administrative review mechanisms.  The goal is to assess
10  the objectivity and thoroughness of fact collection and
11  the rigor of the subsequent internal review of KSO
12  actions.
13      Did I read that correctly?
14  A.  Yes, except you didn't say the letter C in KCSO,
15  but, yes.
16  Q.  Okay.  Is the goal expressed by this report also
17  the goal of OLEO?
18  A.  Yes.
19  Q.  Then Item No. 2, on that same page of the OIR
20  report, states, quote, In furtherance of that goal, we
21  reviewed the investigative materials to determine
22  whether KCSO's, apostrophe "s," investigative policies
23  and practices allowed for the development of a body of
24  evidence that was adequate to the task of appropriately
25  scrutinizing the involved deputy's actions and

---

Page 20

1   decision-making.  We further reviewed those materials to
2   learn whether current KCSO protocols provided for
3   effective collection of evidence, scene management, and
4   timely post-shooting provisions of medical care.  We
5   also examined KCSO incident review materials and
6   protocols in order to learn whether these systems
7   properly facilitated the ability of the Sheriff's Office
8   to learn from critical events and adjust its practices
9   to strengthen further performances -- I guess
10  performance.
11      Did you agree with that approach --
12  A.  Yes.
13  Q.  -- taken from OIR?
14  A.  Yes.
15  Q.  Looking at page 43 of Exhibit 16 (verbatim),
16  that's headed "Recommendations"?
17  A.  Mm-hm.
18  Q.  And I'm going to take you down to Recommendation
19  No. 9, which states, "Before a presentation is made to
20  the Review Board for consideration of an
21  officer-involved shooting, a detective supervisor should
22  review the interviews of involved and key witness
23  personnel, evaluate whether the interview sufficiently
24  addressed the key considerations of deputy observations
25  and decision-making and return the matter to detectives

---

5 (Pages 17 to 20)

Le, et al. v. Martin Luther King Jr. County, et al.                    Deborah Jacobs

Page 37

1    re-evaluate) the threat level presented to them in
2    determining whether and how to deploy force.  The Review
3    Board did not consider whether the deputies conducted
4    this evolving evaluation in keeping with expectations;
5    nor did it seemingly explore whether a diminished threat
6    level warranted other tactical or force options that the
7    deadly force that was used -- than the deadly force that
8    was utilized.
9           Was that the statement that you agreed with as
10   the deputy -- as the director of OLEO?
11   A.  Yes.
12          MR. KINERK:  Object to form of the question.
13   Lack of foundation.  Also calls for speculation.
14   BY MR. ARNOLD:
15   Q.  Are these also other examples of unanswered
16   questions that the Review Board did not consider?
17   A.  Yes.
18   Q.  And then I understand that you were not
19   reappointed for another a four-year term; is that
20   correct?
21   A.  That's correct.
22   Q.  Is there any temporal relationship between that
23   and the publication of Exhibit 116, the IOR report?
24   A.  OIR?
25   Q.  OIR report.

Page 38

1    A.  Did you say "temporal" relation?
2    Q.  Yes.
3    A.  What does that mean?
4    Q.  Connection.  What's the timing?  How many days,
5    weeks elapsed after the publication and dissemination of
6    Exhibit 116, the OIR report?
7    A.  Yeah.  The OIR report, I believe, was presented
8    on September 2nd, and I think it was right around the
9    time that the decision was made.
10        Actually, I'm sorry.  It's hard to remember, but
11   the -- I think that this -- presenting this report was
12   the last thing I did in my duties in that role, is what
13   I can tell you, and so it was within a week or two.
14   Q.  I understand that you filed a claim against King
15   County?
16   A.  I filed a tort, yeah.
17   Q.  When did you file your tort claim?
18   A.  I think around the first week of October once my
19   employment was fully completed.
20        MR. ARNOLD:  Thank you.
21        THE WITNESS:  Thank you.
22        Is that it?
23        MR. ARNOLD:  No.  Mr. Kinerk, I'm sure, may
24   have some questions, and then Mr. Gosselin.
25        THE WITNESS:  Oh.

Page 39

1          THE VIDEOGRAPHER:  Do you still want to
2    still be sharing the exhibits?
3          MR. ARNOLD:  I'm going to stop share right
4    now.
5
6             E X A M I N A T I O N
7    BY MR. KINERK:
8    Q.  Ms. Jacobs, you and I have met previous on
9    previous occasions with regards to this case, have we
10   not?
11   A.  Yes.
12   Q.  Okay.  Would I be correct in concluding that you
13   have never qualified as an expert witness in state
14   court?
15   A.  That's correct.
16   Q.  Would I be correct in concluding that you have
17   never qualified as an expert witness in federal court?
18   A.  That's correct.
19   Q.  And you have never qualified as an expert with
20   regards to use of force review hearing boards in state
21   or federal court, correct?
22   A.  Correct.
23   Q.  And you have never qualified as an expert
24   witness with regards to police practices in state or
25   federal court, correct?

Page 40

1    A.  Correct.
2    Q.  You have never testified as a witness in federal
3    court, have you?
4    A.  I don't think so, no.
5    Q.  And you have never testified in state court as a
6    witness, correct?
7    A.  Correct.
8    Q.  The King County Council that you appeared in
9    front of on September 2, 2020, regarding the OLEO report
10   were some of the same councilmembers who voted not to
11   renew your contract as OLEO director, correct?
12   A.  Correct.
13   Q.  The claim for damages counsel just asked you
14   about, that $2 million claim for damages against King
15   County alleging sex and gender discrimination was dated
16   August 7, 2020.
17        You would agree with me that was approximately
18   two weeks before your September 2, 2020 appearance in
19   front of the King County Council?
20   A.  So one thing is I submitted a revised one, so,
21   yeah, probably the initial one was August 7th.  And then
22   when I mentioned previously an October date, that would
23   have been the revised tort that we submitted.
24   Q.  Okay.  And just so you and I understand each
25   other, in response to that question, Ms. Jacobs, you

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 6

# Deposition of Michael Mellis

# Le, et al. v. Martin Luther King Jr. County

# February 25, 2019



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Le, et al. v. Martin Luther King Jr. County                                      Michael Mellis

---

Page 9

1    Plaintiff Exhibit 74:1.  Do you see that?
2        A.  Yes.
3        Q.  74 is the exhibit number and the one is the
4    page number.  Could you go to Johnson Exhibit 74, page
5    23.  That's 74:23.
6        A.  Yes, sir.
7        Q.  If you look at the entry of 11:25 a.m. on
8    Friday, June 23, 2017, I made some highlighting.  Can
9    you see that?
10       A.  Yes.
11       Q.  And the highlighting states in part, quote,
12   Dr. -- Detective Mellis used an ink pen on a lower
13   portion of the door.  He struck the door several times
14   with the pen trying to duplicate the damage pointed out
15   by Hernandez.  He was not able to.  The tip of the pen
16   broke and ink came out, end quote.
17           Did I read that correctly?
18       A.  Yes.
19       Q.  Then if you would go to tab 158 of the Johnson
20   exhibits, there's two photographs?
21       A.  Yes.
22       Q.  Do you recall who made those photographs?
23       A.  No.
24       Q.  Do those photographs show the ink pen damage
25   that you applied to the door?

---

Page 10

1        A.  I'm sorry?
2            MR. ARNOLD:  Could you read that back,
3    please.
4            (Question was read back.)
5        A.  I believe not.  But I don't know, are these
6    cropped photos?  Are these something of a series?  I
7    don't know where these are.
8        Q.  (BY MR. ARNOLD)  These photographs were
9    produced by King County.
10       A.  Okay.  I don't think King County produced a
11   montage of two photos on top of each other is what I'm
12   getting at.
13       Q.  No, this was created by me.
14       A.  Okay.  Maybe we should unphotoshop it.
15       Q.  They are cropped.  The point is to show you
16   the photographs showing a before and after photograph.
17   The photograph on the left of Exhibit 158 is the older
18   photograph.  The photograph on the right is more
19   recent.
20           If you can't recognize them, that tells me --
21       A.  Do we have the original photos?  I'm glad to
22   comment on the original photos.  That way I would know
23   what I'm actually looking at.
24       Q.  I don't have those with me.  But those
25   photographs I've shown you are not recognizable to you

---

Page 11

1    in this form; correct?
2        A.  I know I was at the door taking several
3    pictures in daylight hours.  They both look lit but I
4    don't know if these are daylight photos.  I don't know
5    what the times are of them.
6            I certainly took photos that would have
7    included either closeups or wide angles of all areas of
8    the edge of the door.
9        Q.  If we go back to Exhibit 74:23 --
10       A.  Yes.
11       Q.  -- of the Johnson deposition.  Mr. Le was shot
12   on June 14, 2017.  And at this time when you're out
13   with the door --
14       A.  Yes.
15       Q.  -- applying a pen to it is June 23rd; correct?
16       A.  23rd after photography was completed, yes.
17       Q.  Can you tell me what damage you were trying to
18   duplicate as pointed out by Mr. Hernandez?
19       A.  Well, the door had several nicks.  It was
20   impossible to tell when they were done, that day, a
21   year ago, at the time of the shooting.  That's just not
22   done.  He was pointing out several portions of the door
23   that he had damaged.
24           Now, I didn't hear Mr. Hernandez's statement,
25   his whole statement about this or that.  I came to this

---

Page 12

1    door site late.  So when he was there pointing out
2    items, I don't know if this particular one on 158 was
3    what he pointed out.  It certainly may have been.
4            But after the photographs that I took were
5    done, nothing that Mr. Hernandez pointed out was for
6    the lower part of the door, it was all the upper
7    portion.  And we had made a decision prior to any of
8    that that the door wasn't going to be physically
9    collected as evidence and that our duties would be to
10   document the door photographically, like a lot of items
11   of evidence.  And we had completed that.
12           THE WITNESS:  Could you repeat this
13   question?  I guess I probably went off field but...
14           (Question was read back.)
15       A.  I think the damage was just to see what type
16   of damage a general pen would do as opposed to
17   comparing it and making a detailed comparison.
18       Q.  (BY MR. ARNOLD)  Did you use a plastic pen?
19       A.  You know, I think I used -- well, whatever pen
20   I had would have had either a plastic tip or the metal
21   tips.  And I don't recall.
22       Q.  The door evidence was sent off to the crime
23   lab?
24       A.  What door evidence?
25       Q.  The Hernandez door.

---

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Exhibit 7

# Deposition of Wilson Hayes, Ph.D.

# Le, et al. v. Martin Luther King Jr. County

# March 15, 2019



**206.287.9066 | 800.846.6989**
**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**
**www.buellrealtime.com**
email: info@buellrealtime.com



Le, et al. v. Martin Luther King Jr. County                    Wilson Hayes, Ph.D.

Page 61

1    A.  No.
2    Q.  I want to make sure we have time to get to
3  your testing because I have a few questions about
4  that, but nothing else about it.  What about, you
5  also said that Lead Detective Johnson, there was
6  something there that -- in his recent deposition that
7  you noted that was important.
8    A.  I think, if I did, I'd make no dispute that
9  I didn't say, but no, in terms of the real focus of
10  my work, he wasn't a participant, he wasn't there,
11  and he's capturing events with hindsight, etc., so my
12  struggles with him are on a different level or about
13  different issues.
14    Q.  Okay.  So there's nothing at this point?
15    A.  No.
16    Q.  So let's go to the -- one of the tests and
17  one of the analyses that you did was about the
18  shooting reconstruction.  So we've talked about that
19  a bit.  I'd like to go there.  I think that begins in
20  your report on page 27; is that right?
21    A.  Oh.
22    Q.  That's what I'm looking at.  And before we
23  start, now, what is your training with regard to
24  gunshot wound analysis?
25    A.  In a sense it's gained by my -- it's -- it

Page 62

1  comes from my knowledge of anatomy and then reading
2  the literature and authoritative sources on entry --
3  on all aspects of interactions with bullets and other
4  objects with the body.  We've done this -- I've done
5  the same kind of thing with knives with -- so it's
6  really founded in the anatomy piece of it and then
7  understanding the characteristics of tissues, both
8  hard and soft, in the body and their relationships to
9  one another.
10    Q.  Have you been qualified as an expert to
11  testify with regard to a gunshot wound?
12    A.  Yes.
13    Q.  When was that?
14    A.  Oh.
15    Q.  Do you recall?
16    A.  So the two -- I mentioned three cases.
17    Q.  Same three.  Springfield?
18    A.  So Springfield was a Taser.
19    Q.  Oh.  Okay.
20    A.  So that doesn't count.
21    Q.  No.
22    A.  But the -- for some reason what I'm
23  percolating up in my mind is that the case, the other
24  shooting case through the windshield of a vehicle was
25  Snauer, S-N-A-U-E-R, but -- so that was an officer

Page 63

1  was standing in the roadway when a suspect drove his
2  vehicle at him.  Officer shot the suspect in the
3  vehicle.  Reconstructed it and used the wounds,
4  entry and exit, and a kind of -- same kind of
5  reconstruction is done here.  And I was qualified in
6  court to testify as to that.
7    And he was being -- the officer was being
8  accused by the family of -- I don't remember if it
9  was civil rights violations, or I don't remember the
10  -- and jury found on behalf of the officer.  And the
11  same, although the other side disputed my
12  qualification, I was -- qualifications, I was found
13  by the court to be qualified to do the same sort of
14  gunshot and wound analysis that I've done here, in
15  that case in Los Angeles, where it was the cold case
16  of five family members murdered and a question of
17  whether someone -- the gun was planted on one of the
18  brothers, and so --
19    Q.  Okay.  And did you do bullet trajectory
20  analysis, as well, in the -- in those cases?
21    A.  Both of them.
22    Q.  And you testified about the trajectory
23  analysis, as well.
24    A.  Absolutely.
25    Q.  Okay.  Looking on page 27, then, in

Page 64

1  paragraph 37 --
2    A.  Wait a second.  I'm a slow turner.  Okay.
3    Q.  First thing I want to ask you about is, your
4  report reads, and this is about the third sentence
5  down, "The positions the bullet casings were used to
6  determine the approximate location of Officer Molina
7  when each shot was fired."  Did I read that
8  correctly?
9    A.  You did.
10    Q.  What is the basis of your opinion that the
11  bullet casings are a reliable method for determining
12  where the shooter is?
13    A.  Well, there are four or five papers and
14  chapters in books that are widely cited that speak to
15  this issue and have conducted amazingly extensive
16  experiments with multiple types of guns in multiple
17  positions and looked at many of the factors that are
18  known to influence the variable positions of shell
19  casings after firing.
20    They're listed in your expert's report.  He
21  speaks to the paper by Lewinski, L-E-W-I-N-S-K-I.
22  And in answer to your question, my bases is, in part,
23  directly from the Lewinski paper with a Glock 17 and
24  the -- and the figure that's cited in my report from
25  this paper -- actually with a firing position, as

16 (Pages 61 to 64)

Le, et al. v. Martin Luther King Jr. County                    Wilson Hayes, Ph.D.

---

Page 77

1    towards -- as we look at it, it's -- we're looking
2    right down the hollow cylinder of the open jacket,
3    and you can see it peeking up a little bit behind.
4    And those chaotic motions will do more to change the
5    direction.
6         Q.  Does it also slow the path of the bullet
7    within the body?
8         A.  It must.  I don't have -- I haven't looked
9    at the bases for that, but if I have something that's
10   tumbling -- if I have something that's smooth and
11   arrow shaped, it goes right through and stays
12   straight.  If it's a shape that's blunt, or
13   especially if it's sharp and it's tumbling, you can
14   imagine it's much more chaotic.  That's the way these
15   bullets are designed.
16        Q.  What is the information that you're relying
17   on to say that Mr. Le was falling?  What scientific
18   information do you have that he was falling at the
19   point in time what Officer Molina is shooting him?
20        A.  Well, I'll go back to -- to the way we've
21   learned over the years to characterize the phases of
22   a fall.  If you're running forward, essentially you
23   usually, not always, trip, and you fall forward to
24   the ground, right?  There's the descent phase, where
25   you go from standing height to impact with the

Page 78

1    ground; there's the impact phase; and there is, in
2    fact, sometimes a post-impact phase.
3         If you know -- if you know that, those
4    phases, and you know where he ended up and how he had
5    to be positioned because of the shored bullet and the
6    parallel nature of the last two bullets, the two
7    bullets that killed him, and you work backwards
8    through the phases of a fall, if he ends up down
9    there on his belly and he's shot while that -- one of
10   those two last bullets, he's basically on the ground,
11   then he has to be falling in order to get to that
12   position.
13        So four missed shots were occurring during
14   the descent phase of the -- absent the hand.  The
15   hand we get very little to no information from.
16   Hands are chaotic moving.  Who knows where his hand
17   is when shot and how it was positioned and where it
18   happened in the event?  But knowing that he impacted
19   the way he did, knowing that we have a shored bullet,
20   that the only way it can be shored is by the ground,
21   he has to be falling during the rest of this event
22   while he's shooting at him.
23        Q.  And so I was going to ask you about that.
24   What is your understanding about shored -- the shored
25   exit wound?  Is that a term that Dr. Harruff and

Page 79

1    Dr. Mazram (phonetic) used in the medical-examiner
2    report?
3         A.  I don't think so.  I -- but if you look back
4    at the early literature, the first -- it may have
5    been used before this, but I know of papers that are
6    in '80 and '81 about shored bullets, with some
7    experiments that were done with experimental animals,
8    looking at both entry and exit wounds, not referred
9    to in the report.
10        Q.  Okay.  I was just going to look through.
11        A.  On the side, but part of background.
12        Q.  Okay.
13        A.  And yes, they're -- I mean, you can have
14   shored entry wounds, where you're leaning up against
15   a piece of glass or something, you get shot through
16   the glass.  Those are called shored entry wounds.
17   And then a shored exit wound's when you're leaning up
18   against -- or on hard surfaces that can stop the
19   bullet.  And if you are on that surface when the
20   bullet no longer has sufficient energy to basically
21   get through, despite the fact that you're on the
22   ground, which is the case here, I believe, you end up
23   with a unique situation.
24        Q.  So it's your opinion here that the fact that
25   it is a shored exit wound, that arises because he was

Page 80

1    on the ground and that shored exit wounds -- is that
2    how they always arise, is they have to be, again, on
3    the ground or against the wall or something?  I
4    noticed that notation in your --
5         A.  Well, they can -- they could be against
6    anything hard anywhere.  You could be up -- I think
7    one -- some of the experiments that have been done,
8    they shoot -- they're shooting up in the air or --
9    but as long as your body part is against a hard
10   surface, it can stop the bullet.  And I believe the
11   medical --
12        I didn't look in detail at the Washington
13   State Lab report on the gelatin experiments that were
14   done, but I will expect that the distance that they
15   were shooting in the gelatin is on the range -- you
16   know, not -- I can't tell you exact relationship
17   between those distances and the distance through
18   Tommy Le, but just by leafing through it, roughly the
19   same distances that are involved here, again with the
20   caveat that I haven't checked it.  But that causes
21   the bullet to slow down enough so that it stays in --
22   stays in the wound and is shored.
23        And I should say -- at some point I said
24   that I need to look at those bullets.  That would be
25   confirmatory in terms of the impact surfaces, but in

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

# Exhibit 8

# Deposition of Dajina Coric, MS

# Le, et al. v. Martin Luther King Jr. County

# April 29, 2019



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Le, et al. v. Martin Luther King Jr. County                                      Dajina Coric, MS

Page 21

1    Q.  And those are bullet 25, correct?
2    A.  Yes.
3    Q.  And then page 49 there's another two bullets,
4  photos of bullet 25, correct?
5    A.  Yes.
6    Q.  Those are the before photos?
7    A.  Yes.
8    Q.  Then could you identify for me the after photo
9  when the petals had been peeled back by the --
10   A.  I didn't take any after photos.  I documented in
11 written form, which according to our protocol is
12 allowed.
13   Q.  Was there any other reason why you didn't take
14 any photo of the bullet 25 petals peeled back?
15   A.  No.  That's -- we usually -- I usually don't,
16 nor do we -- because we actually bend back -- we bend
17 back the petals of hollow points on more numerous
18 occasions than one would think, especially when we are
19 doing identification, because we need access to the
20 rifling.  And as long as we note it in our Bullet
21 Worksheet, that is something we did and we were
22 transparent about it.
23   Q.  Is there any other laboratory standard, besides
24 the Washington State Patrol Crime Lab standard, that
25 authorizes the failure to photograph an alteration of

Page 22

1  physical evidence such as a bullet?
2    A.  I don't know.  I follow our procedures.
3    Q.  And there is that accrediting agency that
4  promulgates procedures --
5    A.  Yes, and we were just accredited and passed.
6        (Exhibit No. 5 was marked.)
7    Q.  Exhibit 5 consists of two photos that I put on
8  the same page.  The top photo is bullet 24 from the
9  autopsy photographs, and if you look at the bullet
10 below, that is bullet 24.
11   A.  Yes.
12   Q.  Referring to the bullet below, which is from
13 Bates No. 47 of Exhibit 3, do you agree that is a
14 photograph that you took of bullet 24?
15   A.  Yes.
16   Q.  And then looking at the autopsy photograph of
17 bullet 24, it appears different than the photograph of
18 bullet 24 that you took.
19   A.  Well, the autopsy photo is getting a viewpoint
20 of the base up, while my bottom -- the photo I took
21 is of -- the base is actually flat on its surface, so
22 it's getting an inside view.  So it's two different
23 viewpoints.
24   Q.  Looking at the bottom photograph from page 47 of
25 your report, you see that there are two petals which are

Page 23

1  bent out, correct?
2    A.  Yes, appears like it, yes.
3    Q.  And on the autopsy photograph on top of
4  Exhibit 5, you don't see petals bent out like that, do
5  you?
6    A.  Not from that viewpoint, no.
7    Q.  Is it your opinion that because of the
8  photograph taken from the base of the bullet at time of
9  autopsy explains why we don't see the petals splayed out
10 as we see in the bottom bullet photo that you took?
11   A.  I don't know.  I can't really say.  Possible.
12   Q.  As a forensic scientist, you do see that there's
13 two apparent different copper casings?
14   A.  Yes.  You mean copper jacketing.  Yes.
15   Q.  Copper jacket.
16       And do you have an explanation for that?
17   A.  No.  I mean, I took photos of it as I received
18 it, so I don't.
19   Q.  Isn't it fair to say that between the autopsy
20 photograph of Exhibit 5 on the top and the photograph of
21 the same bullet 24 that you took on the bottom, there
22 was an alteration in the copper --
23   A.  It's possible.
24   Q.  -- jacket?
25   A.  It's possible.

Page 24

1        (Exhibit No. 6 was marked.)
2    Q.  If you look at Exhibit 6, Ms. Coric, and look at
3  Exhibit 3, your lab report, Bates No. 50.
4    A.  Okay.
5    Q.  You see the Exhibit 6 photographs were taken
6  from the lab report photographs on page 50?
7    A.  Yes.
8    Q.  And looking at bullet 24 on Exhibit 6, just the
9  single bullet picture, do you see the indentations?
10 There's apparently six of them that I am pointing to
11 (indicating).
12   A.  Yes.
13   Q.  What are those indentations from?
14   A.  Oh, the six, the Starlight?  That's the
15 manufacturer, like when the lead core, the hollow point,
16 the little dot, that's the copper protruding out, so
17 that's a manufacturer.
18   Q.  What's the purpose for that?
19   A.  It's for -- to help with expansion.
20   Q.  Is that the point where the bullet was designed
21 to stop mushrooming?
22   A.  It's more like it -- just like there's six
23 petals, and those petals -- six cuts or indentations in
24 the copper and the petals move outward into six
25 individual petals.  Same thing is meant for the lead

6 (Pages 21 to 24)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

# Exhibit 9


**CAMPICHE**
**ARNOLD**
**PLLC**
Trial Attorneys

campichearnold.com

1201 Third Avenue
Suite 3810
Seattle, WA 98101

ph 206.281.9000
fax 206.281.9111

**Sierra Landholm**
Paralegal
slandholm@campichearnold.com
parnold@campichearnold.com

May 13, 2019

*Via Email & Legal Messenger to: dan.kinerk@kingcounty.gov;*
*Kathy.vanolst@kingcounty.gov*
*Nadia.rizk@kingcounty.gov;Angela.lindsey@kingcounty.gov;*
*tim@gosselinlawoffice.com*

Mr. Daniel Kinerk
Ms. Kathy Van Olst
Senior Deputy King County Prosecuting Attorneys
500 Fourth Avenue, Suite 900
Seattle, WA 98104

Mr. Timothy Gosselin
Gosselin Law Office PLLC
1901 Jefferson Avenue
Tacoma, WA 98402

      Re:    Le Family v. King County, *et al.,* USDC No. 18-00055
               Judge Thomas S. Zilly, Trial Date: 06-10-19
               **Hayes & Associates Rebuttal Report to Dajina Coric's**
               **03-07-19 WSP Crime Lab Report**

Counsel:

Pursuant to Dkt. 143, attached find Plaintiffs' expert Wilson C. Hayes, PhD and
Jeremy Bauer, PhD's Rebuttal Report to Dajina Coric's WSP Crime Lab Report
dated March 7, 2019.

Cordially,

Sierra Landholm

attachment as noted



HAYES + ASSOCIATES

Injury Biomechanics. Clearly Explained.

May 13, 2019

Mr. Jeffery M. Campiche
Campiche Arnold PLLC
1201 Third Avenue
Suite 3810
Seattle, WA  98101

Re:     *LE v. King County*
        *Supplemental Rebuttal Report*

Dear Mr. Campiche:

        1.      At your request, and in compliance with Federal Rules of Civil Procedures, Rule 26, I am writing this summary of my opinions in rebuttal to the Washington State Patrol Crime Laboratory report dated March 7, 2019.  My opinions are based on a reasonable degree of engineering and biomechanical certainty and founded on my professional education and my academic and consulting experience in the fields of accident reconstruction, occupant dynamics, injury biomechanics, anatomy and orthopaedics.  If called as a witness, I could and would competently testify as to the opinions set forth in this report.  I reserve the right to amend or supplement these opinions should additional information become available.

        2.      My qualifications are described in my December 12, 2018, report and will not be repeated here.

<strong>Case Materials</strong>

        3.      In addition to the case materials listed as reviewed in my previous report, I have also reviewed: King County's Supplemental Disclosure of Expert Names and the Topics on Which They Will Opine (12/12/18); Caroline Crump, PhD, Report (10/19/18); Police Officer Christopher Myers, Use of Force Report (12/6/18); Jeffrey J. Noble Report (2/6/18); William H. Anderson, PhD, Report (11/6/18); James Borden CV, Fee Schedule, and Testimony History; Plaintiff's First Interrogatories to Defendant King County, and Responses Thereto (7/9/18); Plaintiffs' Second Interrogatories Nos. 13, and Sixth Request for Production No. 26 to Defendant King County, and Responses Thereto (1/14/19); Deputy Cesar Molina, deposition (2/7/19), with Exhibits 2, 6-9, 23, 52, 54-55, 59, 66-68, 71, 77-79, 81-85, 90-91, 98, 101, 165,167, and Exhibits I and J; Detective Christopher Johnson, deposition (1/29/19), with Exhibits 1, 6-8, 15, 36, 52, 54-56, 58-62, 71, 74, 77, 79, 81-85, 90-94, 96-97, 99, and Exhibit H; Deputy Tanner Owens, deposition (2/21/19), with Exhibits 53B, 53C, 54A, 55:23, 72, 156, and 168; Jeffrey J. Noble Supplemental Report (2/25/19); James W. Borden Report (2/26/19); Anthony Rice, deposition (2/25/19); Subpoena Duces Tecum Issued to Wilcon C. Hayes, PhD (3/4/19); and Notice of Deposition for Wilson C. Hayes, PhD (3/4/19); King County Supplemental Disclosure: Washington State Crime Lab [Ballistic] Report (3/7/19); and TransUnion Records (Various Dates)   (Bates KC-DISV-0088941 – 0088968); King County Medical Examiner Autopsy Report Addendum by Brian Mazrim, MD, Associate Medical Examiner, and Richard Harruff, MD, PhD, Chief Medical Examiner (3/11/19); Declaration of Defendant Cesar Molina in Support of Motion for Summary Judgment (3/21/19); Wilson Hayes, PhD, deposition (3/15/19), with Exhibits 1-4; Dajina Coric, MS, deposition (4/29/19), with Exhibits 1, 1A, and 2-6.

2390 NW Kings Blvd. ⬥ Corvallis, OR 97330

541.754.9645 ⬥ fax 541.754.9949 ⬥ cell 503.201.9213 ⬥ email mse@hayesassoc.com ⬥ www.hayesassoc.com

### Rebuttal of Defense Expert, Dajina Coric, MS

4.      Mr. Le was shot and killed by Deputy Molina on June 14, 2017. The autopsy examination was performed by King County Medical Examiners, Dr. Mazrim and Dr. Harruff on June 15, 2017. The bullets (including the lead cores and copper jackets) labelled CTJ0024 and CTJ0025 and referred to herein as Bullets C 24 and C 25, were retrieved from Mr. Le's body and photographed during the autopsy. From that point forward, I am aware of no chain of custody documents until the two bullets (C 24 and C 25) were packaged by Detective Johnson on December 4, 2017 (as indicated by the photographs of the sealed, signed and dated envelopes). The bullets were received for review on February 7, 2019 by the Washington State Patrol Crime Laboratory. In their March 7, 2019 report, the Washington State Patrol Crime Laboratory made observations of the bullets extracted from Mr. Le. The bullets have not yet been made available for my examination.

5.      Washington State Patrol Crime Laboratory (WSPCL) forensic scientist Dajina Coric provided a report, dated March 7, 2019, detailing her analyses of the two bullets (C 24 and C 25) that had been removed from Tommy Le at autopsy on June 15, 2017. Surprisingly, the report itself provided no details on the rationale for, objectives of, or hypotheses guiding these examinations, beyond a single sentence in a column of Special Instructions "PLEASE EXAMINE FOR IMPACT DAMAGE." Presumably, these Special Instructions were meant to apply to both Bullet C 24 and Bullet C 25 since there are no explicit instructions indicating otherwise. During her deposition, taken by counsel for the Plaintiffs on April 29, 2019, she testified that Detective Johnson "*wanted to test these two particular bullets which were collected at autopsy, for any type of bullet impact*" (Coric 9:13). When asked if she was given any additional oral information, Ms. Coric testified that her supervisor had learned from Detective Johnson "*…that bullet 2 [C 25], which was pulled from the anterior chest, was collected in the stellate laceration, so that a portion of the bullet was out of the body and the majority of it was in*"(Coric 10:1-2).  For purposes of this rebuttal report, I will refer to bullet 2 as Bullet C 25 and its location as the anterior abdomen, in keeping with correct anatomic terminology and my prior report. Ms. Coric indicated that Detective Johnson wanted to know whether there was evidence of "*any type of bullet impact damage*"(Coric 10:17) after "*it [Bullet C 25] was fully expanded*" (Coric 10:8). At some point in the process, Ms. Coric spoke with Detective Johnson, was provided the autopsy report and was made aware that there was an "expert on the other side" (which I take to refer to my December 12, 2018 report) who "*had indicated that bullet 25 was consistent with hitting a hard – like a roadway, some textured surface like a roadway after expanding*" (Coric 11:13). She further testified that she had not yet released her report at the time Detective Johnson sent her that information (Coric 11:10). She further indicated that she "*looked at the other expert's conclusions, at least specifically to this [impact damage]*" and her "*conclusions did not change*" (Coric 11:16). No mention was made whether she altered any other aspect of her report. However, she did testify that she "*decided to do a little bit more experimentation based on what [the other expert] was indicating*" (Coric 11:18). This timeline, the failure to clearly articulate the objectives and timing of the experimentation reported in the Coric report, the manipulation and destruction of crucial and potentially dispositive physical evidence (detailed below), the failure to document, much less maintain a chain of evidence, and flaws in the documentation and interpretation of her own results, especially when these factors are considered together, collectively raise serious issues as to the scientific reliability and integrity of the Coric report.

6.      Noting these issues, I have been asked to provide a rebuttal report focused on the examination of these two bullets by the WSPCL as outlined in Ms. Coric's report. In the following paragraphs, I will do so, looking first at the failure on the part of the Defendants King County and others responsible for the evidence handling procedures between the time that Bullets C 24 and C 25 left the Medical Examiner's Office, were later packaged by Detective Johnson on December 4, 2017 and were received on February 7, 2019 by the WSPCL for review. Specifically, I will detail the instances in which recommended chain of evidence standards were violated, bullet evidence was irreparably damaged and

detail the harm caused that will make it impossible for the Plaintiff's experts and any other investigators to then make use of this crucial evidence. Second, I will summarize and evaluate the analysis of Bullets C 24 and C 25 that Ms. Coric has reported, pointing out its limitations and summarizing her interpretation of the findings as detailed in both her report and deposition testimony. Finally, I will note the limitations imposed by an investigation that looks in isolation at simply the bullet evidence, without also considering other facts (for example, the scene ballistics, the anatomic pathways of the bullets and the path and kinematics of Tommy Le as he was fired upon, stumbled toward the ground and finally was shot in the back while he was close to and on the ground).

7.      *Evidence Handling.* Standard practices have been developed by ASTM International to ensure consistency in receiving, documenting and storing evidence. Specifically,  "*ASTM E 1492 – 11 (17): Standard practice for receiving, documenting, storing, and retrieving evidence in a forensic science laboratory"* and, "*ASTM E 860 – 07 (13): Standard practice for examining and preparing items that are or may become involved in criminal or civil litigation*" set forth guidelines protecting and documenting the integrity of physical evidence, and for the examination and testing of actual items or systems that may have been involved in a specific incident that are or may be reasonably expected to be the subject of civil or criminal litigation. In addition, "*ASTM E 1492 – 11 (17): Standard practice for receiving, documenting, storing and retrieving evidence in a forensic science laboratory"* and "*ASTM E 1188-11 (17): Standard practice for collection and preservation of information and physical items by a technical investigator"* further set guidelines on the preservation of physical evidence including maintaining a chain of custody, documenting test procedures and documenting alteration of evidence. The protocols Ms. Coric referenced during her deposition also require maintenance of a chain of custody. Specifically, the Washington State Patrol Forensic Services Guide reads, "*Proper documentation is necessary to prove the chain of possession from the time of collection until entered in evidence in court. It may be necessary to prove the integrity of the evidence at some later time."* (5). The ANSI National Accreditation Board (ANAB) requirements indicate, "*A chain of custody record shall be maintained from the receipt of items/samples which details each person who takes possession of an item or alternatively the location of that item."* (1).  To date, no documentation has been provided describing the treatment and whereabouts of Bullets C 24 and C 25 from the time they were photographed at autopsy on June 15, 2017, to the time they were packaged, sealed, and signed by Detective Johnson on December 4, 2017. It is also unclear where the whereabouts of the Bullets from that time until they were received by the WSPCL on February 7, 2019. Based on the records that have been provided to date, the Defendants have apparently failed to keep any of the records recommended on the above referenced standards including ASTM E 860 – 07 (13), ASTM E 1492 – 11 (17), ASTM E 1188 – 11 (17), their own WSP Forensic Services Guide and the ANAB requirements.

8.      Ms. Coric testified that "*…once I received the evidence and start my examination, I document it thoroughly through photos, [and] written documentation."* (Coric Deposition – 15:6) She further indicated that she follows the Washington State Patrol Quality Assurance Manual and the ANAB accrediting body. Ms. Coric testified that she did not know how the bullets were preserved between the time of Mr. Le's death on June 14, 2017, and December 4, 2017, when they were last packaged prior to her review. (Coric Deposition – 18:15).  She also testified it was possible that "*…between the autopsy photograph of Exhibit 5 [photograph of bullet extracted from Mr. Le's right, lateral chest] and the photograph of the same bullet that [she] took [on 02/12/19], there was an alteration in the copper jacket."* (Coric Deposition – 23:25). The envelopes were signed and dated on the tape closure by Detective Chris Johnson(Figure 1; Figure 2). Examining the photographs (Figure 3) between these two times, there are significant changes to the positioning of the petals on the copper jacket of Bullet C 24. This is problematic for at least three reasons: 1) This is a clear violation of *ASTM E 860 – 07 (13): Standard practice for examining and preparing items that are or may become involved in criminal or civil litigation,* which first became an active standard in 1997, 22 years prior to Ms. Coric's inspection.  Section 5.2 of ASTM E 860 states, "*If proposed tests, examinations, or other actions are likely to alter the nature, state, or condition*

*of the evidence so as to preclude or limit additional examination or testing, the person, firm, or agency planning to perform the proposed action should take the following steps: 5.2.1 Notify its client that the proposed action is likely to alter the nature, state, or condition of the evidence so as to preclude or limit additional examination or testing of the evidence. 5.2.2 Recommend that its client notify other interested parties of the proposed action described in 5.2 and, 5.2.3 Recommend to its client that other interested parties be given the opportunity to participate in the procedures described in 5.2 or to witness and record any such actions."*  We were never notified of Ms. Coric's examination and manipulation of the bullet evidence, nor were we given an opportunity to observe Ms. Coric's manipulation of the bullet evidence; 2) There is no clear chain of custody for the bullet evidence between the autopsy, performed on June 14, 2017, and the date on the sealed outer envelopes, December 4, 2017; and 3) According to the "Bullet Worksheet" (KC_DISC_0088945) included in the Washington State Patrol – Crime Laboratory Report, the only documented (in writing) manipulation of evidence performed by Ms. Coric was to Bullet C 25.  Ms. Coric wrote, "*…pliers used to peel back petals for examination purposes*".  There is no such description of manipulation to the copper jacket of Bullet C 24.  However, the copper jacket from Bullet C 24 was, in fact, also clearly deformed during Ms. Coric's examination (Figure 3).  Further, photographs (Figure 4) of Bullet C 25 taken both at autopsy and by Ms. Coric on February 12, 2019, do not show any apparent manipulation of the petals of the bullet from the time it was recovered until it was reviewed by the WSPCL, contrary to Ms. Coric's entry on the "Bullet Worksheet" in the WSPCL report.  Therefore, she neglected to report that she manipulated the petals of Bullet C 24 on the "Bullet Worksheet" and failed to document photographically the deformation of the petals of Bullet C 25.



Figure 1.  Photographs taken by Dajina Coric on February 12, 2019, included in the Washington State Patrol – Crime Laboratory Report, showing: (LEFT) a large, sealed envelope containing Bullet C 24, dated 12/04/17; (CENTER) A smaller envelope that had been inside the envelope on the LEFT, sealed, but with no date other than the date of the autopsy listed on the sticker; and (RIGHT) the lead core and copper jacket recovered from Mr. Le's right, lateral chest  (KC_DISC_0088946).

2390 NW Kings Blvd. ▲ Corvallis, OR 97330

541.754.9645 ▲ *fax* 541.754.9949 ▲ *cell* 503.201.9213 ▲ *email* mse@hayesassoc.com ▲ **www.hayesassoc.com**



Figure 2.  Photographs taken by Dajina Coric on February 12, 2019, included in the Washington State Patrol – Crime Laboratory Report, showing: (LEFT) a large, sealed envelope containing Bullet C 25, dated 12/04/17; (CENTER) A smaller envelope that had been inside the envelope on the LEFT, sealed, but with no date other than the date of the autopsy listed on the sticker; and (RIGHT) the bullet recovered from Mr. Le's anterior chest  (KC_DISC_0088948).



Figure 3.  (LEFT COLUMN) Photographs of Bullet C 24 taken on June 15, 2017, during Mr. Le's autopsy showing side and top views of the lead core and copper jacket retrieved from Mr. Le's right, lateral chest; and (RIGHT COLUMN) Photographs taken by Dajina Coric on February 12, 2019, included in the Washington State Patrol – Crime Laboratory Report, showing side and top views of the lead core and copper jacket retrieved from Mr. Le's right, lateral chest.  A comparison of the condition of the copper jacket on the two dates indicates that at least one of the petals was manipulated by some unknown person at some point between June 15, 2017, when the bullets were recovered during Mr. Le's autopsy, and February 12, 2019, when the photographs were taken by Ms. Coric. Moreover, comparing the upper and lower photographs on the right (taken at different times on February 12, 2019), indicates that at least one of the petals was deformed during examination, presumably by Ms. Coric.  However, Ms. Coric only documented manipulated the petals on the bullet recovered from Mr. Le's anterior chest.  No such deformation was described in the Crime Laboratory Report for Bullet C 24, recovered from Mr. Le's right, lateral chest.

2390 NW Kings Blvd.  ▲ Corvallis, OR 97330

541.754.9645  ▲ fax 541.754.9949  ▲ cell 503.201.9213  ▲ email mse@hayesassoc.com  ▲ www.hayesassoc.com

# Bullet C 25: Anterior Abdomen



Figure 4. (LEFT COLUMN) Photographs of Bullet C 25 taken on June 15, 2017, during Mr. Le's autopsy showing side and top views of the bullet retrieved from Mr. Le's anterior chest; and (RIGHT COLUMN) Photographs taken by Dajina Coric on February 12, 2019, included in the Washington State Patrol – Crime Laboratory Report, showing the bullet with the combined lead core and copper jacket retrieved from Mr. Le's anterior chest. Apparently, based on these two sets of photographs, one set taken at autopsy on June 15, 2017 and the other at the Crime Lab on February 12, 2019, there has been no alteration in Bullet C 25 between the two times the photographs were taken. However, and importantly, Ms Coric's report indicates that the petals were then bent during examination ("Bullet Worksheet", "pliers used to peel back petals for examination purposes". Inexplicably, and in violation of all of the evidence handling proedures noted above, there are no photographs showing the manipulation of evidence that was reported.  As a consequence, there is no indication as to which or how many of the petals were physically altered. In her deposition, Ms. Coric testified that "it was more than one" (Coric deposition – 19:15).

9.      Ms. Coric testified at deposition that *"…for examination purposes…"* the copper jacket petals on bullet 25 were pulled by pliers into a new position (19:15). Specifically, she testified, "*So I peeled*

back with pliers, because I was asked to look if there was any type of damage on the actual bullet." (Coric Deposition – 20:2). She further testified, "…the portion that comes into contact with the rifling, I needed to bend back the petals a little bit so I can get better access under there and see if there was any type of over-marking that might be consistent with hitting a harder surface, other than just liquid in a body." (Coric Deposition – 20:7). She took photographs of the bullets when she received it out of the package, but "…didn't take any after photos." She indicated that she "…documented in written form, which according to our protocol is allowed." (Coric Deposition – 21:12). With respect to alteration of evidence, ASTM E 1492 states "do not alter a piece of evidence any more than is absolutely necessary to obtain a valid analysis."(3). It further indicates researchers should, "Document any conditions that prevent or interfere with the preservation of any sample in its submitted state.". ASTM E 860 states "destructing testing should be kept to a minimum, and thoroughly documented." (2). The standard further defines destructive testing as "testing, examination, re-examination, disassembly, or other actions likely to alter the original, as-found nature, state or condition of items of evidence so as to preclude or adversely affect additional examination and testing." It also defines spoliation of evidence as "the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation. Spoliation of evidence may occur when the movement, change or destruction of evidence, or alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence as did any prior investigator." Although Ms. Coric did photograph the ballistic evidence as she opened the packages, she did not photograph the changes made afterward. Instead, the only documentation she made regarding the alteration of evidence was in writing in her report. She wrote, "…pliers used to peel back petals for examination purposes." (Washington State Crime Laboratory Report, 3/7/19). The alteration of evidence Bullet C 25 was not documented photographically. The actions of Ms. Coric's manipulation of the to peel back on the jacket of Bullet C 24 and on Bullet C 25 petals constitutes to destructive testing and potentially spoliation of evidence.

10.    It is my interpretation and understanding of the above that spoliation of evidence occurs when an investigator physically alters or destroys something of evidentiary value and that that alteration significantly impairs the opportunity of subsequent interested parties to obtain the same evidentiary value that was available to investigators prior to the alteration. Put another way, there must be both a change in the evidence and that change must be harmful in ways that reduce or eliminate the evidentiary value of the evidence for subsequent investigators. In this instance, there can be little dispute that Ms. Coric's handling of these two bullets has not only resulted in a physical alteration to both Bullet C 25 (where there is a known dispute as to whether the bullet was "shored", thereby indicating that Tommy Le had been shot in the back while on the ground), but also, inexplicably, for Bullet C 24 for which, except for her own conclusory, speculative, and erroneous comments, there is no evidence of an impact within the body to anything hard except for an interaction between the separated copper jacket and lead core

11.    In fact, all of the available evidence demonstrates that the bullet passed only through the intercostal space (not the "intercostal spinal cord area", which are, in fact, two anatomically distinct regions). Since there was no evidence that any bony tissue was struck by either the lead core or the copper jacket, and there are no other sources of "hard" surfaces (i.e. surfaces that could leave "coarse" scratches or markings on the lead core), other than the copper jacket itself, AND there were fragments of copper and/or lead that could be identified radiographically at autopsy, the obvious inference is that the coarse markings on the lead core were made interactions between the copper jacket itself and the lead core. Again, and egregiously, Ms. Coric physically altered by pulling with a pair of pliers, the very petals from the copper jacket that would have been the primary candidate to "fit" the coarse scratches with the petal geometries to demonstrate that these markings came from no other surface or source than the separated jacket. For Bullet C 24, that opportunity is now gone. We and any other investigators are no longer in a position to make that determination. Thus, as detailed above, there has been a physical alteration (the

pulling of petals) and, in this instance, irreparable harm since we can no longer make a determination that is of evidentiary and probative value.

12.      The spoliation situation is arguably even worse for Bullet C 25 since in that instance the trajectory analysis from the scene evidence and the anatomic path through Tommy Le's body indicate that C 25 entered Tommy Le's left back, passed through the tissues of the anterior abdomen and stopped in a "shored" position (i.e. because of the presence of the hard asphalt surface) in a stellate laceration when Tommy Le was against a hard surface, thereby indicating that he was not only shot in the back but that he was shot in the back when on the asphalt surface of the roadway. Since this finding is not only in dispute, but of considerable importance to the Plaintiff's case, Ms. Coric's decision to physically alter two of the six petals of the copper jacket, along with its overlying and apparently adherent lead core, can be expected to have altered the adherent lead that was detailed in my December 12, 2018, report as showing evidence of direct impact with the asphalt surface. While it is not known at this time whether the specific petal pointed out in Figure 26 of my December report was one of the two petals that were physically manipulated by Ms. Coric, the manipulation of any of those petals will reduce the evidentiary value of the bullet evidence, even if the manipulated petals were to be used solely for comparative purposes. Whether or not these manipulations were made after Ms. Coric had been provided my December report and therefore knew, or should have known, which petal we believed bore the markings from interaction with the asphalt, is also not known at this time. Either way, there seems little doubt but that spoliation has occurred, in that there has been an admitted physical alteration, and it is quite clear that the evidentiary value of the intact jacket/core combination has been reduced in value if not eliminated entirely (in the case that Ms. Coric manipulated the petal that we believe demonstrated asphalt markings).  Whether this was done willfully and in complete disregard, not only for standard practices, but for fundamental fairness in the pursuit of a litigated matter, remains to be seen.

13.      *Bullet Evidence.* As noted earlier, to the extent that there is a stated objective to the WSPCL report, it is reflected in the phrase "PLEASE EXAMINE FOR IMPACT DAMAGE." However, in this effort she has ignored obvious findings that are counter to the Defense position in the case, in favor of results that are highly speculative, without foundation,  contrary to her own findings, and simply incorrect apparently since they are supportive of the Defense position. As such, these results and their interpretation are not only fundamentally and fatally flawed but actually support the Plaintiff's position (i.e. that Bullet C 24 did not strike any hard, bone surface and was instead marked by interaction with the separated copper jacket and that Bullet C 25 was "shored" in the stellate exit wound, indicating that it had struck the asphalt roadway, thereby providing dispositive evidence that Tommy Le was shot in the back while on the ground.) With respect to Bullet C 24: Right Lateral Chest, Ms. Coric testified that *"…the reason the lead core wouldn't expand outward as much is because it probably did strike something, as a secondary impact, so the harder impact, so it flattened itself a little."* (Coric Deposition – 26:6). She further testified that while she didn't think there was confirmation from the autopsy that any anatomy was struck by Bullet C 24, *"…in my expert opinion, it expanded, so clearly hit some type of tissue simulant. From my experience and training those course markings are not produced from just a spreading and the expansion in water, so it had to have hit some type of harder surface. Can I say it for sure it's bone? No. It's process of elimination because it was found in a body. But those course [sic] markings on the lead core are consistent with hitting a harder surface."* (29:16). She said that *"…the minimal amount of course scratches observed on the lead core, that could come from a graze…"* and that *"…it would just need to graze [the bone] to provide that type of course markings."* Ms. Coric's conclusions are misguided and incorrect. As she admits, there is no evidence in the autopsy report that Bullet C 24 struck any bony tissue. There were no fractures indicated in the report. Specifically, the autopsy report indicated, *"The vertebrae, clavicles, sternum, ribs, and pelvis are without fracture."* (Autopsy Report, 8/2/17). Instead, the parallel scraping visible on Bullet C 24 was likely due to the interaction of the lead core with the copper jacket. The x-rays taken at autopsy depict the ring of the copper jacket behind and separated from the lead core, also indicating that the parallel scraping on

the lead core was likely due to an interaction with the copper jacket after the two components had separated. In addition, Ms. Coric ignores the radiographic evidence of what are likely copper and/or lead fragments distributed within the chest that demonstrate forceful interaction between lead core and copper jacket.

14.     With respect to Bullet C 25 (anterior chest), Ms. Coric testified that the wound was *"…not a shored exit, it's a stellate laceration."* (Coric Deposition – 32:4). She further testified that a shored exit *"…means that the bullet went through the body and then the body was up against a hard surface, it went out and struck and came back. And Dr. Haruff would say there would be indications around the wound to show that it would be consistent with a shored."* (Coric Deposition – 32:12). She explained that the bullet did not completely exit the body because *"…the design of a jacketed hollow point is for it to expand upon hitting tissue."* (Coric Deposition – 33:1). When asked, *"So it's coincidental that the bullet lost energy at the point that it was partly in and partly out of the body?"*, Ms. Coric responded, *"Yeah. I wouldn't say it's unlikely."* (Coric Deposition – 33:24). The autopsy report indicates *…a deformed copper jacketed bullet is recovered from the skin in a 0.7 x 0.4 inch stellate laceration…"* (Autopsy Report, 8/2/17 The autopsy photographs show the irregular abrasions caused by the skin contacting a hard surface, thereby meeting the criteria used to define a shored exit wound. Specifically, Haag and Haag (2011) wrote, *"Shored exit wounds…arise in situations where the skin around the exit site is abraded at the moment the bullet stretches and breeches the skin.  A subject lying on the ground or against a wall when shot, and the bullet's exit site supported by the surface, will sustain a shored exit wound."*  They further explained, *"Substantial shoring combined with a bullet that barely has the remaining energy to perforate the skin may result in the bullet being retained at the exit site."* Moreover, as described in my December 12, 2018, report, the lead bullet showed textured indentations only on one surface of the bullet (Figure 5), indicating it struck the asphalt roadway once it passed through Mr. Le's abdomen. The other surfaces of the bullet did not exhibit this textured damage.   Apparently, Ms. Coric did not consider these skin abrasions in the autopsy photographs when she concluded that Bullet C 25 had not been lodged in a shored exit wound. Nor did she seem to have considered the substantial similarity between the Top Down Views of the test firings in ballistic gel that she herself conducted and the exit wound in Tommy Le's body observed at autopsy (Fig**.** 6, this report). And finally, Ms. Coric seems to want to ignore the quite simple, fundamental physics of impact which indicate that a deformable object such as a lead core (with or without a constraining copper jacket) will spread out more (as with C 25) when it strikes a hard surface, in favor of complex and nearly indecipherable explanations regarding *"Hydraulic pressure…"* (Coric 27:25).



Figure 5. (LEFT) Autopsy photograph of Mr. Le showing the shored exit wound and partially exited bullet in Mr. Le's abdomen; (CENTER) side and top view of the bullet extracted from Mr. Le during the autopsy showing textured indentations (yellow arrow) on the edge of the bullet that exited from Mr. Le. This texture is not found on the other aspects of the bullet, providing further evidence that the bullet struck a textured surface, such as the roadway once it passed through Mr. Le; (RIGHT) Photographs of the bullet extracted from Mr. Le showing the scale and description of the evidence.

15.    *Ballistic Gel Tests.* The Washington State Patrol – Crime Laboratory Report indicates that "Using a 9 mm Luger caliber Glock model 17 semiautomatic pistol and 9 mm Luger caliber Winchester Ranger 147 grain JHP SXT ammunition from the WSPCL Seattle reference collection, bullets were fired into Clear Ballistic gelatin and a layer of neoprene resting on top of concrete." Although use of ballistic gelatin is common in forensic studies, it does not replicate the characteristics and mechanical behavior of heterogeneous biological tissue in the human body (4). With respect to the test fired bullets, Ms. Coric concluded that *"one side of the lead core flattened/damaged, coarse scratches observed. Consistent with secondary impact of the concrete…".* Unfortunately, Ms. Coric made no attempts to relate the length of the bullet paths in the two test firings to the distance traveled in Tommy Le, nor did she attempt to measure or even approximately represent the angle of incidence with the hard surface (concrete, in the test firings and asphalt for the Le shooting). Given these two fundamental flaws, there is no way to know whether the approach velocity and angle for the test fired bullets is in any way representative of the conditions that held when Tommy Le was killed by Deputy Molina. No attempts have even been made to estimate error rates. That said, Ms. Coric's description of the results *"one side of the lead core flattened/damaged, coarse scratches observed. Consistent with secondary impact of the concrete…,"* tracks nearly exactly our analysis of the autopsy photographs showing the shored Bullet C 25 within the stellate laceration, as reported in our December 12, 2018 report and repeated here in Figure 6. Note that, in keeping with Ms. Coric's results, we point out and highlight a local region of flattening and damage, including scratching and indentations, on one of the lead core/copper jacket petals that we have attributed to impact with the asphalt roadway, thereby establishing that Tommy Le was on the ground when the last shot (C 25) was fired. Moreover, as

2390 NW Kings Blvd. ▲ Corvallis, OR 97330

541.754.9645 ▲ fax 541.754.9949 ▲ cell 503.201.9213 ▲ email mse@hayesassoc.com ▲ www.hayesassoc.com

shown in the top down views on pages 10/14 and 11/14 of her report, the "exit" characteristics of the two fired bullets in the ballistic gel are remarkably similar to the exit wound photograph taken at Tommy Le's autopsy (Fig. 6 of this report). Despite this concordance, astoundingly and inexplicably, Ms. Coric concludes that, "*The fired item [Bullet C 25] did not exhibit characteristics consistent with a secondary impact.*" In my view, this can be seen as intentional distortion of the obvious, direct experimental evidence and interpretation of that evidence in a light favorable to the Defense.

16.    *Shooting Reconstruction.* An additional limitation of the WSPCL report is that Ms. Coric has limited her consideration and analysis to the physical examination of the two bullets extracted from Tommy Le's body at autopsy and ignored the contextual background and the broad range of physical and testimonial evidence associated with the scene and the shooting itself. By contrast, my opinions regarding the bullet analysis is based, not only on my knowledge of the bullet evidence itself, but also of the reconstruction of the shooting incident as a whole. As described in my December 12, 2018, report, we reconstructed the shooting incident and determined Officer Molina's position, the bullet paths, and the position of Mr. Le at the time he was shot.  The two bullet paths through Mr. Le progressed from Mr. Le's left to his right, both with an upward trajectory.  Therefore, Mr. Le's back and left side were facing Officer Molina and Mr. Le was falling to the ground, or on the ground at the time he was shot. The trajectory through Mr. Le's body for the two bullets are nearly parallel to one another, indicating that one of the shots (C 25) occurred when Mr. Le was on the ground (the one with the shored exit wound) and the other when he was very near the ground.  This context and these findings were not considered by Ms. Coric when she reached her conclusions that Bullet C 24: Right Lateral Chest had sustained a secondary impact (apparently, in her view, as a grazing contact with bone) when all the evidence available indicates that it had not and that Bullet C 25: Anterior Abdomen had not sustained a secondary impact with the asphalt roadway, when all the evidence (including her own) indicated that it had. Moreover, despite her sworn testimony during deposition that she had reviewed our report of December 12, 2018, she has provided no scientific rebuttal to the findings of that report, simply stating at deposition that "*her conclusions were her conclusions no matter what the other person said"* (Coric 11:6) and that "*her conclusions did not change"* (Coric 11:16).

### Opinions

17.    Based on our review and analysis of this case, and on my background, education and training in scene analysis, shootings and fall reconstructions, injury biomechanics, and anatomy, my conclusions, to a reasonable degree of engineering and biomechanical certainty, are that: 1) Defendants King County, and others, clearly violated applicable, and widely accepted chain of evidence standards, irreparably damaged bullet evidence, and caused spoliation of the bullet evidence in ways that physically altered and destroyed the bullet evidence in ways will make it impossible for us and any subsequent investigators to reach the opinions we could have prior to Defendants' spoliation; 2) Ms. Coric's direct examination of Bullets C 24 and C 25 ignores obvious findings that are counter to the Defense position in the case, in favor of results that are highly speculative, without foundation, contrary to her own results , and simply incorrect; as such they are not only fundamentally and fatally flawed, but in many instances actually support the Plaintiff's positions; and 3) The Washington State Police Crime Laboratory Report, in its examination of the two bullets removed from Tommy Le's body at autopsy, has ignored the contextual background and the broad range of physical and testimonial evidence associated with the scene and the shooting itself, thereby further compromising their analysis. In this regard, and in light of all the above, the Coric report (along with the additional materials received since that report was submitted) has not only not changed the opinions in my December 12, 2018 report, but actually strengthened them.

18.    Please note that I reserve the right to further supplement this and my previous report should additional information become available to me.  In particular, I have not yet been able to see the

Page 13                                              5/13/2019

bullets and examine them myself. Thank you for the opportunity to review this case.  Please let me know if I can provide any further information.

19.      I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of May 2019.

Respectfully Submitted,

Wilson C. "Toby" Hayes, Ph.D.                        Jeremy J. Bauer, Ph.D.
Hayes+Associates, Inc.                               Owner, Bauer Forensics, LLC

Page 14                                                          5/13/2019

References

1.   ANSI-ASQ National Accreditation Board. ANAB ISO/IEC 17025 Accreditation Manual of Laboratory-related Programs. 2016

2.   ASTM E860-07(13) Standard practice for examining and preparing items that are or may become involved in criminal or civil litigation. *ASTM* 1-2, 2013.

3.   ASTM E1492-11(17) Standard practice for receiving, documenting, storing, and receiving evidence in a forensic laboratory. *ASTM* 1-2, 2017.

4.   Evans JJ, Bost A, Muci-Kuchler KH, DeVeaux LC: Factors affecting use of ballistics gelatin in laboratory studies of bacterial contamination in projectile wounds. *Mil Med Res* 5(1); 16, 2018.

5.   Washington State Patrol. Forensic Services Guide. 2018

2390 NW Kings Blvd.  ▲  Corvallis, OR 97330

541.754.9645  ▲  *fax* 541.754.9949  ▲  *cell* 503.201.9213  ▲  *email* mse@hayesassoc.com  ▲  www.hayesassoc.com